No. 17-7306

IN THE

# United States Court of Appeals
# for the Fourth Circuit

UNITED STATES OF AMERICA,
Appellee,

v.

BLAKE CHARBONEAU,
Appellant.

_____

On Appeal from the United States District Court
for the Eastern District of North Carolina (Dever, C.J.)

_____

**OPENING BRIEF FOR APPELLANT**

_____

LOUIS C. ALLEN
ACTING FEDERAL PUBLIC DEFENDER
EASTERN DISTRICT OF NORTH CAROLINA

JACLYN L. DILAURO
ASSISTANT FEDERAL PUBLIC DEFENDER
EASTERN DISTRICT OF NORTH CAROLINA
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
(919) 856-4236

January 22, 2018                 *Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... ii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ..........................................................2

STATEMENT OF ISSUES ...................................................................3

STATEMENT OF THE CASE ...............................................................3

SUMMARY OF ARGUMENT ............................................................25

ARGUMENT ................................................................................26

I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT MR.
CHARBONEAU SUFFERS FROM A "SERIOUS MENTAL ILLNESS,
ABNORMALITY, OR DISORDER" FOR PURPOSES OF THE ADAM
WALSH ACT

    A. Crediting Dr. Zinik's Diagnosis Of A Personality Disorder Went
Against The Clear Weight Of The Evidence—And The Opinions Of
Three Other Experts

    B. In The Absence Of Any Paraphilic Disorder Diagnosis, The District
Court Erred In Concluding Mr. Charboneau Suffers From A Serious
Mental Illness For Purposes Of The Adam Walsh Act

    C. The District Court Erred In Concluding That The Government Proved,
By Clear And Convincing Evidence, That There Is A Causal Link
Between Alcohol Use Disorder And/Or Dr. Zinik's Other Diagnoses
And Serious Difficulty Refraining In Mr. Charboneau's Case

II.    THE DISTRICT COURT ERRED IN CONCLUDING THAT MR.
CHARBONEAU WILL HAVE SERIOUS DIFFICULTY REFRAINING
FROM SEXUALLY VIOLENT CONDUCT OR CHILD
MOLESTATION IF RELEASED

CONCLUSION .............................................................................49

STATEMENT REGARDING ORAL ARGUMENT ...........................................50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## CASES

*Addington v. Texas*,
  441 U.S. 418 (1979) ...................................................................29

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985) ...................................................................27

*Doe v. Menefee*,
  391 F.3d 147 (2d Cir. 2004) ......................................................28

*Kansas v. Crane*,
  534 U.S. 407 (2002) .........................................................31, 32, 48

*Kansas v. Hendricks*,
  521 U.S. 346 (1997) ............................................................31, 32

*Taylor v. Maddox*,
  366 F.3d 992 (9th Cir. 2004) ....................................................30

*United States v. Antone*,
  742 F.3d 151 (4th Cir. 2014) .............................................*passim*

*United States v. Begay*,
  No. 5:11-HC-2197-BO, DE 33 (E.D.N.C. July 25, 2012) ...........33, 37

*United States v. Gloshay*,
  No. 5:08-HC-2051-BR, DE 91 (E.D.N.C. June 4, 2012)..................34

*United States v. Julius*,
  5:08-HC-2076-H, DE 59 (E.D.N.C. March 18, 2013)................*passim*

*United States v. Sneezer*,
  No. 5:08-HC-2107-H, DE 65 (E.D.N.C. Nov. 30, 2012)..............*passim*

*United States v. Starko*,
  735 F.3d 989 (7th Cir. 2013)......................................................35

*United States v. Wooden*,
  693 F.3d 440 (4th Cir. 2012)...............................................................27, 28, 30, 40

## STATUTES

18 U.S.C. § 4247(a)(5)......................................................................................6, 26

18 U.S.C. § 4247(a)(6)..................................................................................6, 26, 31

## OTHER SOURCES

American Psychiatric Association, Diagnostic and Statistical Manual of Mental,
  Disorders (5th ed. 2013) .......................................................................................32

# INTRODUCTION

This Court has never upheld a civil-commitment judgment under the Adam Walsh Act in the absence of a paraphilic disorder diagnosis. Never. But that is precisely the kind of judgment the District Court entered here, predicated only on a consensus diagnosis of alcohol use disorder and one expert's diagnosis of inhalant disorder, inhalant-induced mild neurocognitive disorder, and a personality disorder. That last diagnosis was affirmatively ruled out by every other testifying expert.

The Adam Walsh Act prescribes an extreme result for a very narrowly defined subset of the population. It provides for indefinite, preemptive civil commitment of those who, having already committed or attempted to commit sexually violent conduct or child molestation, will have serious difficulty refraining from doing so in the future *as a result of* a serious mental illness, abnormality, or disorder.

The Government's theory of this case, which the District Court adopted, is that Mr. Charboneau cannot stop himself from drinking and, when he drinks, he becomes sexually dangerous.

That theory suffers three fatal flaws which, standing alone or together, require reversal. *First*, alcohol use disorder, alone or in connection with other non-paraphilic disorders, is not a "serious mental illness" for purposes of the Adam

1

Walsh Act. *Second*, the Government failed to prove, by clear and convincing evidence, that there is an adequate causal connection between any "serious mental illness" and sexually violent conduct or child molestation. *Third and most importantly,* Mr. Charboneau has not had a drink since 2003—now fifteen years ago. He has refrained from sexually offending for the same span. He has had near-perfect conduct while incarcerated, incurring only one minor infraction. He will turn sixty next year, and he will be subject to a two-year term of supervision upon his release. Mr. Charboneau's case is nearly indistinguishable from three others in which this Court or district courts have held that the Government failed to meet its burden to prove that the respondent would have serious difficulty refraining from sexually violent conduct or child molestation. There is no reason for the District Court to have held otherwise in this case. Its decision should be reversed.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over Mr. Charboneau's civil-commitment hearing pursuant to 18 U.S.C. § 4248. That court entered its final judgment on September 28, 2017. Mr. Charboneau filed a timely notice of appeal four days later. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.    Whether the District Court erred in concluding that alcohol use disorder, standing alone or paired with other non-paraphilic disorders, constitutes a "serious mental illness, abnormality or disorder" for purposes of the Adam Walsh Act.

II.   Whether the District Court erred in concluding that Mr. Charboneau will have serious difficulty refraining from sexually violent conduct or child molestation if released.

## STATEMENT OF THE CASE

**Blake Charboneau's Early Life.**  Mr. Charboneau is 58 years old.  He was born in Devils Lake, North Dakota, and is the fifth of thirteen children.  JA372. He is an enrolled member of the Turtle Mountain Band of Chippewa.  *Id.*  He has spent most of his life on the Devils Lake Sioux Reservation in Ft. Totten, North Dakota.  *Id.*  Mr. Charboneau's father abused his mother when he was young and Mr. Charboneau "played the role of her protector."  JA387.  Mr. Charboneau's mother reported that his father may have sexually abused their children, but Mr. Charboneau denies knowledge of this.  JA390.

Mr. Charboneau's family members reported that he was a good student and obedient son until his early adolescence, when he began abusing alcohol and sniffing solvents, including paint and gas.  JA373; JA387.  This sniffing of

3

solvents may have led to organic brain damage. JA388. From that point on, Mr. Charboneau struggled in school, functioning in a borderline intellectual range. JA373. He ultimately withdrew in the ninth grade. *Id.* By age 26, Mr. Charboneau had been admitted to the North Dakota State Hospital eleven times for treatment related to alcohol use. JA374; JA325.

Mr. Charboneau has never been married, but conflicting reports suggest he may have fathered two children. JA374. He has worked in concrete, landscaping, and carpentry, and most recently worked as a dishwasher for three years during his last term of supervised release. *Id.*

Mr. Charboneau has four sexual offenses in his history. In 1982, he pleaded guilty to assault against his cousin. She was house-sitting for a friend and Mr. Charboneau entered the bedroom where she was sleeping and physically and sexually assaulted her. She reported that Mr. Charboneau "was talking in a crazy manner" and Mr. Charboneau told police he "was in an alcoholic blackout and did not remember anything until he awoke at his brother's trailer the next morning." JA374-JA375; JA341; JA328-JA329; JA388-JA389. In 1987, Mr. Charboneau entered a home and attempted to have sex with a woman on the kitchen floor. Her husband returned home and removed Mr. Charboneau from the house. He was charged with liquor violation and public intoxication, but no charges were filed with regard to the sexual assault. JA375; JA342; JA329; JA390. In 1988, Mr.

4

Charboneau was found guilty of Aggravated Sexual Abuse by Force.  After drinking heavily, he pulled his daughter behind foliage during a family picnic and physically and sexually assaulted her.  JA375-JA376; JA342-JA344; JA329-JA330; JA390-JA392.  In 2003, Mr. Charboneau pleaded guilty to Sexual Contact with a Person Incapable of Consenting.  He and his niece were drinking whiskey together in her apartment.  Later in the evening, she awoke to find Mr. Charboneau performing cunnilingus on her.  She asked him to stop and told him to leave her apartment; he returned later in the evening and assaulted her.  JA375-JA376; JA344-JA346; JA330-JA331; JA396-JA397.

Mr. Charboneau has more than twenty convictions for non-sexual offenses in his history, including disorderly conduct, public intoxication, petty larceny, resisting lawful arrest, assault and battery, liquor violation, fleeing on foot, and pedestrian on roadway without regard for safety.  JA374; JA348-JA349; JA327-JA328.

**The Civil-Commitment Hearing.**  Kara Holden, Psy.D., a sex offender program psychologist at Butner, was first to testify.  She explained that Mr. Charboneau is participating in Alcoholics Anonymous, JA51, and volunteered for the Commitment and Treatment Program (CTP) in February 2016, JA43.  At the time of the hearing, he was in the second of four phases in the program.  JA53.  Although he is very reserved, Dr. Holden testified that Mr. Charboneau was slowly

5

opening up to her in therapy. JA47. She opined that, in her view, in Mr.

Charboneau's past, he "felt entitled to sex" because he has not had much

experience in dating or a meaningful romantic relationship so he "misinterprets the

courtship process and he misreads social cues." JA52. And she opined that, in her

view, alcohol acts as a disinhibitor for Mr. Charboneau. *Id.*

Dr. Holden explained that Mr. Charboneau "understands that he needs

treatment because he has hurt people in the past and he does not want to continue

that pattern." JA56. She noted that he's "progressing through the program" and

"doing well." JA55. She described him as "very likeable in the program," "easy

going," and "laid back." JA50. And she opined that leaving the program "would

impede his progress." JA49. She noted that Mr. Charboneau is working as an

orderly at Butner, JA48, and "[a]nything we need, he helps us out." JA50.

Next to testify was Christopher North, Ph.D., a clinical psychologist. JA61.

Dr. North opined that Mr. Charboneau met all three criteria for civil commitment

under the Adam Walsh Act: (1) he has previously "engaged or attempted to engage

in sexually violent conduct or child molestation" (the "prior conduct" element), 18

U.S.C. § 4247(a)(5); (2) he currently "suffers from a serious mental illness,

abnormality, or disorder" (the "serious illness" element), *id.* § 4247(a)(6); and (3)

as a result of such a condition, he "would have serious difficulty in refraining from

sexually violent conduct or child molestation if released" (the "serious difficulty" or "volitional impairment" element), *id.*

Dr. North opined that Mr. Charboneau met the prior conduct element as a result of three convictions for sexually violent offenses in 1982, 1988, and 2003. JA63. And he opined that Mr. Charboneau met the serious illness element, diagnosing him with alcohol use disorder, severe in a controlled environment. JA67. In Dr. North's opinion, that disorder is "serious" because "of the impact it has had both on his life and the lives of the victims." JA68-JA69. That was so, in his view, despite the fact that Mr. Charboneau has consumed no alcohol since 2003. JA80. Dr. North also diagnosed him with inhalant use disorder, severe, in sustained remission, and inhalant-induced mild neurocognitive disorder, but he did not find either of these disorders to be "serious" for purposes of the serious illness element. JA70. Dr. North explained that Mr. Charboneau has a "longstanding problem" of being "unable to collect the words to express himself" and answer questions. This problem is "so severe that it makes it very difficult for him to communicate with anyone in a very meaningful way." JA71. This disability "leads to a lot of social isolation on his part and it affects his self-esteem as well." *Id.*

Dr. North did not diagnose Mr. Charboneau with a paraphilic disorder, noting that his offenses "have only occurred when he is highly intoxicated and

there is no indication he has ever been sexually aggressive while not under the influence of alcohol." JA364. "It is clearly the alcohol that disinhibits him as opposed to any paraphilic interest in forcing sex or harming or humiliating his partners." *Id.*; JA80; JA82. Neither did he diagnose him with a personality disorder. JA80. He recognized that Mr. Charboneau has had excellent prison conduct, JA80-JA81, and noted that Mr. Charboneau is "rather meek and mild-mannered." JA364.

Dr. North concluded that Mr. Charboneau would nonetheless have serious difficulty refraining from sexually violent conduct or child molestation as a result of his alcohol use disorder because, in his view, "whenever [Mr. Charboneau]'s out he eventually reverts to drinking and when that happens, it's only a matter of time that he sexually assaults a woman or a child." JA71-JA72. He opined that Mr. Charboneau "simply doesn't have the capacity to control his behavior when he drinks alcohol." JA72. Dr. North scored Mr. Charboneau as a 5 on the Static-99R, which falls within the "above average" risk category. JA75. And he found that Mr. Charboneau suffers from "poor problem-solving skills" because, in his view, Mr. Charboneau did not have any "awareness of his problem with alcohol." JA76. Dr. North viewed this as a dynamic risk factor. JA76-JA77. He concluded that no protective factors applied in Mr. Charboneau's case, JA76-JA77, despite the fact that Mr. Charboneau will be subject to 24 months of supervised release following

8

his release from Butner, JA81, and the fact that he acknowledged he could benefit from sex offender treatment. Dr. North viewed that admission simply as "additional corroboration, confirmation, supportive evidence for my opinion" that he is sexually dangerous. JA78.

Heather Ross, Ph. D., a sex offender forensic psychologist at Butner, testified next. JA85. She based her opinion on a written records review because Mr. Charboneau declined to be interviewed; she was thus not able to obtain a "firsthand perspective of Mr. Charboneau." JA86; JA321. Dr. Ross agreed with Dr. North that Mr. Charboneau met the prior conduct element. JA87-JA88. With respect to the serious illness element, she diagnosed Mr. Charboneau with alcohol use disorder in a controlled environment, inhalant use disorder in sustained remission, adult sexual abuse by non-spouse or perpetrator, and child sexual abuse perpetrator. JA88. She applied the first two diagnoses because, in her view, "Mr. Charboneau has had severe difficulties with inhalants in the past and alcohol up until his current incarceration." JA89. And she applied the last two to indicate the type of abuse he engaged in historically "because there's no paraphilic diagnosis." JA88. She found that only alcohol use disorder was sufficiently "serious" to qualify under the serious illness element, JA88; JA338, because, in her view, it was "pervasive . . . and it has affected every aspect of his life, whether it's employment, housing, the criminal justice system." JA89.

9

With respect to the volitional impairment element, she scored Mr. Charboneau on the Static-99R as a 5, which is in the "moderate high" range, opining that his risk of re-offense is actually higher than that because of certain dynamic risk factors, namely "lack of emotionally intimate relationships with adults, his lifestyle impulsivity, his poor problem solving, and his resistance to rules and supervision" in the community.  JA93.  Notably, Dr. Ross found that more than half of the listed dynamic risk factors did not apply to Mr. Charboneau, finding no evidence of sexual preoccupation, no evidence of deviant sexual interest, no evidence of emotional congruence with children, no evidence of grievance or hostility, and no evidence of an offense-supportive attitude.  JA116.

In her view, the "dynamic risk factors" that did apply are "exacerbated by his alcohol use" and "cause[] him serious difficulty refraining from further acts of sexual violence."  JA100.  In support of her conclusion, she noted that Mr. Charboneau "seemed to deny or minimize much of the offenses," that he has offended while on supervision, and has not successfully completed sex offender treatment.  JA101.

Dr. Ross noted that Mr. Charboneau is approaching 60 and "age above 60 . . . can reduce someone's risk on the Static-99R.  JA104.  And she noted that he "does very well in the institution" and "follows the rules and regulations of institutions . . . quite well."  JA94.  Although she acknowledged that Mr.

10

Charboneau would be subject to a term of supervision if he were released from
Butner, and "supervised release can be a protective factor," she did not find it to be
protective in Mr. Charboneau's case, describing the two-year term that would
follow his release as "rather short," and noting that Mr. Charboneau was on
supervised release at the time of his 2003 offense. JA105.

 Although, like all other experts in this case, Dr. Ross did not diagnose Mr.
Charboneau with a paraphilia, she concluded that he was nonetheless sexually
dangerous because, in her view, "his alcohol use disorder is so severe . . . that it
qualifies as a serious mental illness . . . and it would lead to that serious difficulty
from refraining." JA108. Although Mr. Charboneau has not had a drink since
2003, Dr. Ross explained her opinion that this was irrelevant because "when it's all
around him in the community and that structure is not there, he just can't control
himself." JA112.

Dr. Ross agreed that intoxication has preceded both sex offenses and general
criminal activity in Mr. Charboneau's history. JA117. And she noted that he
admitted to drinking alcohol on New Year's Eve of 2001, but that there was no
evidence that he engaged in any sexually dangerous behavior on that date. JA120.
The same was true on April 22, 2003; Mr. Charboneau admitted drinking alcohol,
but no evidence suggested that he engaged in sexually dangerous behavior or child
molestation on that day. JA121. Nonetheless, she held fast to her opinion because

11

"at least on four occasions when he's drank [sic] he has engaged in sexually violent conduct or child molestation."  JA123.

Gary Zinik, Ph.D., testified next.  JA124.  He agreed with Drs. North and Ross that the prior conduct element was met as a result of four previous offenses.  JA127.  With respect to the serious illness element, he diagnosed Mr. Charboneau with alcohol use disorder, severe in a controlled environment; inhalant disorder, severe in sustained remission; inhalant-induced mild neurocognitive disorder; and other specified personality disorder with schizotypal and schizoid features.  JA128.  Dr. Zinik described Mr. Charboneau's alcohol use as "disinhibiting": "[H]e's anxious, he's scared . . . when he drinks it calms him, it sooth[e]s him, it relaxes him, it disinhibits him."  JA129.  In his view, alcohol use disorder is "serious" in Mr. Charboneau's case because "if he has been drinking and he becomes sexually aroused and he's in the presence of a vulnerable female of just about any age, child or adult, he would have serious difficulty refraining from sexual assault."  JA130.

Dr. Zinik also addressed Mr. Charboneau's linguistic difficulty, which he described as a neurocognitive impairment related to his historical use of inhalants, explaining: "[W]hen you ask him an open-ended question where he has to sort of think and organize his thoughts and articulate what he's thinking and feeling, he just can't do that and he becomes—he starts talking in almost nonsensical terms and he becomes incoherent sometimes."  JA132.

12

And Dr. Zinik concluded that Mr. Charboneau suffered from other specified personality disorders with schizoid and schizotypal features. JA133. To support this diagnosis, Dr. Zinik relied on his view of Mr. Charboneau's "magical" or "religiosity-type thinking" as well as his having been described as a "loner and as self-isolating and keeping to himself." *Id.*

Dr. Zinik recognized that "when he's sober . . . he does really well, and when he's sober he stays away from women and he stays away from relationships and friendships and so on." JA134. But, in Dr. Zinik's view, "when he's drunk, he gets disinhibited, he relaxes and his sexual feelings rise to the surface, you might say. And if he is in the presence of a vulnerable female, particularly someone that he may be attracted to, he doesn't know how to manage those sexual feelings. He's intoxicated, he has poor judgment, and he tends to get violent and aggressive and commit sexual assault." JA135.

With respect to the volitional impairment element, Dr. Zinik concluded that, as a result of these disorders, Mr. Charboneau would have serious difficulty refraining from sexually violent conduct or child molestation because they are "additive in a way and kind of act together to continue to make him sexually dangerous." JA136. He expressed his view that Mr. Charboneau "does not understand the nature and severity of his alcohol abuse." *Id.* Despite Mr.

13

Charboneau's participation in Alcoholics Anonymous, Dr. Zinik concluded that he "has not participated in structured substance abuse treatment."  *Id.*

He scored Mr. Charboneau in the "above-average" range on the Static-99R, and in the "high-risk" range on the SVR-20.  JA137.  He highlighted certain dynamic risk factors, including: lack of emotionally intimate relationships, lifestyle impulsiveness, poor problem solving, and poor cooperation with supervision. JA138-JA139.  He also analyzed BOP guidelines for determining sexual dangerousness, noting that, in his view, Mr. Charboneau did not appear to be deterred by incarceration, that he considered himself to be sexually dangerous, that he has offended while on supervision, and that he has not completed sex offender treatment. JA142.  Dr. Zinik acknowledged that Mr. Charboneau enrolled himself in the CTP at Butner in February 2016, and that "this is a really good sign."  *Id.* Dr. Zinik testified to his belief that it "would be a setback for him" to be removed from the program.  JA144.

Dr. Zinik also recognized that "men in general who are past middle aged, certainly past age 60, at last statistically, in general have less sex drive . . . [and] sex offenders['] . . . rates of recidivism decline with age and decline dramatically after 60. JA145.  Nonetheless, because he believed Mr. Charboneau to be in "excellent physical health," he did not view Mr. Charboneau's age to be a

protective factor.  JA146.  He opined that Mr. Charboneau is "emotionally and

psychologically . . . the same person that he was back in 2003."  JA147.

Despite the fact that Dr. Zinik did not diagnose Mr. Charboneau with a paraphilia,

he nonetheless concluded that "if certain factors line up for him, he—if he gets

drunk and if he gets sexually aroused, which he's likely to do because he relaxes

and he's disinhibited when he's drunk, and if he's in the presence of a vulnerable

female, he will have serious difficulty refraining from a sexual assault."  JA149.

Therefore, although he agreed that Mr. Charboneau's nonsexual offenses "far

outnumber" his sexual offenses, JA151, that Mr. Charboneau has never engaged in

sexually violent conduct or child molestation when he was sober, JA153, that he

has had no incidents of sexual behavior or alcohol use while incarcerated for the

preceding thirteen years, *id.*, he still concluded that Mr. Charboneau would have

serious difficulty refraining from that behavior if released.

      The Government rested.

      Mr. Charboneau then took the stand on his own behalf.  JA158.  He began

by acknowledging his difficulty expressing himself, noting that he went to school

only through the eighth grade and that he struggled with it.  JA158-JA159.  He

admitted his past acts of sexual violence, admitted he was under the influence of

alcohol when they were committed, and explained that he "feel[s] very disturbed of

what I've done in a very emotional way."  JA160.   He explained: "I feel guilty for the things I've done."  JA158.

Mr. Charboneau acknowledged that he has been arrested for other, non-sexual, offenses, and that he was drinking during most of them.  JA161.  He confirmed that he has never committed a sex offense, nor has he had the desire to commit a sex offense, while he was sober.  *Id.*  And he confirmed that during the last thirteen years he has been in custody, has not consumed any alcohol, and is attending Alcoholics Anonymous weekly because he recognized he was "powerless over alcohol," even though he had previously denied that fact out of fear.  JA162; JA173-JA174.  Mr. Charboneau explained that he joined the CTP at Butner "[b]ecause I felt guilty of things I shouldn't have done."  JA164.  He testified that he has been voluntarily attending a weekly men's Bible study in the Bureau of Prisons "to feel better inside, understand where I've been."  JA159.  And he explained his commitment to never have another drink of alcohol: "Because I don't want to hurt another individual.  I don't want to cause no more harm.  I'm ashamed of what I've done already."  JA163.

Joseph Julian Plaud, Ph.D., testified next.  JA175.  Dr. Plaud agreed that Mr. Charboneau meets the prior conduct element of the Adam Walsh Act.  JA176.  With respect to the serious illness element, he diagnosed Mr. Charboneau with alcohol use disorder, severe, in a controlled environment, as well as inhalant use

16

disorder, severe, in sustained remission.  JA382.  He did not diagnose Mr. Charboneau with a paraphilia.  JA380.  And he concluded that the disorders Mr. Charboneau suffers from, even if they were considered "serious" under the Act, would not cause him to have serious difficulty refraining from sexually violent conduct or child molestation if released.  JA177.

To try to make such a causal link, Dr. Plaud opined, would require a "prognosticator's two-step"; that is, "number one, you have to be certain or fairly certain that he's going to relapse with alcohol" because "there is no evidence in his history ever, no accusation, no admission, no expert here has drawn attention to the fact that when he has been sober in his past that he has committed or attempted to commit any acts of sexual violence or child molestation."  JA177-JA178.  Second, "we have to then jump from that to another and that is, if he does relapse with alcohol, he will then have serious difficulty in refraining.  JA178.  In Dr. Plaud's view, although "alcohol has been a disinhibitor for him sexually in the past . . . that doesn't mean it fuels deviant sexual arousal."  *Id.*  And "it's too tenuous a relationship" to assume that "[i]f he drinks and relapses," he will automatically reoffend sexually.  JA179: "If there's a direct connection such that it really meets the standard that I think the standard is for sexual dangerousness, I would expect it to be a lot more offending given the fact he was drinking all the time."  JA180.  Dr. Plaud referenced a database of 28,000 sex offender studies which noted zero

17

correlation between alcohol abuse and future sexual recidivism and opined that he "cannot predict with any professional certainty that even if he goes to step one and relapses with substances that at this time is going to cause him to lack volitional capacity of sexual impulses." JA185-JA186.

Dr. Plaud agreed with the other experts, opining that Mr. Charboneau does not have any sexual deviance, and agreed with all but Dr. Zinik that he does not suffer from a personality disorder. JA163. Dr. Plaud declined to diagnose a personality disorder, opining instead that Mr. Charboneau's "expressive vocabulary issues" are better accounted for by his history of substance abuse. JA187. Dr. Plaud rejected the view of other experts that his progress in treatment would be impeded if Mr. Charboneau were released, explaining that he can get outpatient treatment and will be subject to supervised release for two years. JA190. And he opined that the "ethical way to analyze this situation" is to determine "how can a person derive the most of treatment from the least restrictive environment." JA200.

He noted that Mr. Charboneau was, at the time of the hearing, 57 years old with thirteen years of sobriety under his belt. JA184. He explained that Mr. Charboneau's remaining term of supervised release would extend to when he is "about 60 years old and that gets into an age range in terms of sexual recidivism where almost nobody re-offends, even when you have lots of offenses in the past."

*Id.* And he noted Mr. Charboneau's excellent institutional conduct over the last thirteen years, observing that he "has the ability to regulate himself sexually and more generally." JA195.

In the community context, Dr. Plaud noted that there are four discrete instances of sexually violent conduct from when Mr. Charboneau was 23 to 57 years old and two of them involved family members, so in Dr. Plaud's view, "he's not out there when he's out there just getting drunk and grabbing people or trying to assault people as a more general function of lack of volitional capacity over sexual impulse." JA196. And Dr. Plaud explained that "[g]enerally speaking, sex offenders with family victims tend to be less likely to re-offend." JA196.

Dr. Plaud addressed the letter written in July 2014 by some members of Mr. Charboneau's family, explaining that although the letter is "heartfelt" and that the letter writers are "pretty upset with him," they are not experts and are not in a "special position" to determine whether Mr. Charboneau is sexually dangerous. JA202.

With respect to Mr. Charboneau's prior denials of his conduct, Dr. Plaud did not attach significant weight to them because "shame is something that in some people causes them to minimize or deny" and "denial doesn't predict recidivism." JA204. Dr. Plaud also was not persuaded that prior noncompliance with supervision or poor problem solving undermine his opinion, explaining that neither

19

is a significant predictor of risk, especially in the absence of a paraphilia or major personality disorder diagnosis. JA205-JA206. Dr. Plaud explained that Mr. Charboneau is "of a different mindset now" and "able to avail himself of the treatment he's required to get as a condition of his supervised release." JA200.

Dr. Plaud concluded: "Given the absence of any paraphilia or other disorder, given his institutional history, given the ongoing evidence, we're coming up on a decade and a half of both general and behavioral regulation and control, given his current age of 57 years of age, I am unable, and I want to underscore that four times, to conclude that he will have serious difficulty in refraining at this time. He is not sexually dangerous." JA211.

**The District Court's Commitment Judgment.** The District Court orally announced its decision on September 28, 2017. JA245. It began by reciting the facts of the case, starting with Mr. Charboneau's early history, JA247-JA249, and then describing the facts of his four prior sexual offenses. JA249-JA257. Next, the court read a letter from some of Mr. Charboneau's family members in its entirety. JA257-JA259. The court then turned to the six witnesses who testified at trial, summarizing the testimony of each. JA260-JA288.

The District Court began its conclusions of law by setting forth the three elements the Government is required to prove by clear and convincing evidence to obtain a civil-commitment judgment. JA288-JA289. The court then began its

analysis.  First, it concluded that the Government had met its burden to prove by
clear and convincing evidence that Mr. Charboneau meets the prior conduct
element based on the conduct underlying his 1982, 1988, and 2003 convictions and
the 1987 attempted rape.  JA289-JA290.

Next, the court concluded the Government also met its burden with respect
to the serious illness element.  It credited Dr. Zinik's analysis and found that Mr.
Charboneau suffers from alcohol use disorder, severe, in a controlled environment;
inhalant use disorder, severe, in a sustained remission; inhalant-induced mild
neurocognitive disorder; and other specified personality disorder with schizotypal
and schizoid features.  JA290.  The court recognized that Mr. Charboneau had
ceased using inhalants in his late 20s, but noted that he continued to consume
alcohol and marijuana after that time, crediting Dr. Zinik's opinion that alcohol is
his "drug of choice and his most persistent addiction," and explaining its view that
the diagnosis is apt "because his life essentially has revolved around drinking,
getting into trouble, and serving time."  JA292.  The court also credited Dr. Zinik's
diagnosis of mild neurocognitive disorder due to years of inhalant abuse, and
possibly compounded by heavy alcohol consumption, based on his "episodes of
disorganized thinking and loose associations and problems with verbal expressions
and language."  *Id.*  And it credited his diagnosis of a mixed personality disorder
with schizotypal and schizoid features on the basis of Dr. Zinik's perception that

21

Mr. Charboneau lacked close friends or confidants, nearly always chose solitary activities, took pleasure in few activities, had little interest in having sexual experience with another person, and suffered from odd beliefs, superstitions, unusual perceptual experiences, odd thinking and speech, suspiciousness or paranoid ideation, inappropriate or constricted affect, excessive social anxiety, emotional coldness, and detachment or flattened affectivity.  JA295.

The District Court credited Dr. Zinik's opinion with respect to this last diagnosis and disregarded the opinions of Dr. Ross and Dr. Plaud ruling it out. *Id.*[1] The court agreed with Dr. Zinik that, in its view, Mr. Charboneau is "afraid of women and embarrassed about sex" but "has no ability to manage and control sexual feelings when they do occur, especially under the influence of alcohol." JA297.

In the alternative, the District Court held that alcohol use disorder in a controlled environment is a serious mental illness, abnormality, or disorder, crediting the opinions of Drs. North, Ross, and Zinik.  JA297.  The court stated that Mr. Charboneau has "repeatedly" been jailed for alcohol-related offenses, including public intoxication, liquor violations, and disorderly conduct.  JA298.  It concluded that Mr. Charboneau's alcohol abuse was "pervasive" and that he

---

[1]      Dr. North also opined that Mr. Charboneau does not suffer from a personality disorder.  JA80.

committed four sexually violent offenses while severely intoxicated. Standing

alone, the court concluded, this disorder caused "interpersonal difficulties that

included estrangement from his family and tribe." JA298. And it concluded that

the disorder is strong enough that "he lost control" during the 1988 and 2003

offenses and "should not have" committed them. *Id.*

With respect to the volitional impairment element, the court credited Dr.

Zinik's opinion that Mr. Charboneau would have serious difficulty refraining from

sexually violent conduct or child molestation if released as a result of his four

diagnosed disorders. JA300. In the alternative, the court credited the opinions of

Drs. Zinik, North, and Ross that he would have such serious difficulty as a result of

alcohol use disorder standing alone. *Id.*

The District Court acknowledged that "[t]he experts all agreed that when

housed in a secured institution Charboneau generally acts as a model prisoner."

JA301. But the court noted that, in its view, each time Mr. Charboneau was

released, he "abused alcohol and reoffended violently and sexually." *Id.* The court

then attempted to distinguish *United States v. Antone*, 742 F.3d 151 (4th Cir.

2014), noting that on the date of Mr. Charboneau's last offense, in 2003, he was on

supervised release, had been attending sex offender treatment in the community,

and was urine tested for alcohol on the morning of the assault. *Id.*

23

The court concluded that "Charboneau's positive institutional conduct does not outweigh the other factors in this unique case." JA302. Chief among those, and a "critical factor" to the court's analysis was "Charboneau's admission in December 2016 that he was sexually dangerous." *Id.* On that score, the court credited Dr. Holden's testimony that he made the admission, despite Mr. Charboneau's denial he made the statement and Dr. Plaud's explanation of the statement, if it happened. *Id.*

The court then began to analyze what it called the "*Wooden* factors," namely failures while on supervision, resistance to treatment, cognitive distortions, actuarial risk assessments, impulsiveness, and sexual and nonsexual historical offenses. JA300-JA-302. The court stated that the record is "replete" with evidence of Mr. Charboneau's failures on supervision, citing Mr. Charboneau's "resistance to both sex offender treatment and substance abuse treatment" when he was on supervision in 2003. JA302. But it credited his voluntary enrollment in CTP and his attendance at AA meetings. *Id.* The court also cited Mr. Charboneau's "cognitive distortions," and his "persistent denial until the trial in this 4248 case that he has an alcohol abuse problem." *Id.* In summary fashion, the court ticked through the remaining "*Wooden* factors," concluding "[t]hey too support this Court's finding on Prong 3." JA303. However, it acknowledged,

24

again in summary fashion, that "[u]nlike the respondent in *Wooden*, there isn't evidence of continued deviant thoughts by Mr. Charboneau." *Id.*

The court concluded by explaining that it did not credit Dr. Plaud's opinion on the volitional impairment element, giving "greater weight" to Dr. Zinik's opinion because, in the court's view, Dr. Zinik "persuasively explained the unique interplay among all of Charboneau's diagnoses." JA304. In the alternative, assuming only alcohol use disorder qualified as a serious mental illness, the court concluded that the opinions of Dr. Ross, Dr. North, and Dr. Zinik "are better reasoned, more thorough, and more consistent with this unique case." JA305. The court committed Mr. Charboneau to the custody of the Attorney General. *Id.*

This timely appeal followed.

## SUMMARY OF ARGUMENT

The District Court's decision suffers from three errors, each of which requires reversal. First, it erred in concluding that alcohol use disorder, alone or in connection with other non-paraphilic disorders, can be a "serious mental illness" for purposes of the Adam Walsh Act. Second, it erred in concluding the Government met its burden to prove, by clear and convincing evidence, that there is an adequate causal connection between any "serious mental illness" in Mr. Charboneau's case and sexually violent conduct or child molestation. Third and finally, it erred in failing to give adequate credit to the last fifteen years of Mr.

25

Charboneau's life, in which he has neither consumed alcohol nor committed a sexual offense. And it failed to adequately account for protective factors, including Mr. Charboneau's impending sixtieth birthday, his remaining two years of supervised release, and his near-perfect institutional conduct while incarcerated.

Mr. Charboneau's case cannot be meaningfully distinguished from this Court's prior decision in *Antone*, 742 F.3d 151, or from district court decisions in *United States v. Julius*, No. 5:08-HC-2076-H, DE 59 (E.D.N.C. March 18, 2013), and *United States v. Sneezer*, No. 5:08-HC-2107-H, DE 65 (E.D.N.C. Nov. 30, 2012). The District Court's decision civilly committing him should be reversed.

## ARGUMENT

To demonstrate that someone should be civilly committed under the Adam Walsh Act, the Government must prove, by clear and convincing evidence, that each of the following criteria is satisfied: (1) he has previously "engaged or attempted to engage in sexually violent conduct or child molestation" (the "prior conduct" element), 18 U.S.C. § 4247(a)(5); (2) he currently "suffers from a serious mental illness, abnormality, or disorder" (the "serious illness" element), *id.* § 4247(a)(6); and (3) as a result of such a condition, he "would have serious difficulty in refraining from sexually violent conduct or child molestation if released" (the "serious difficulty" or "volitional impairment" element), *id.*

This Court reviews the District Court's legal conclusions *de novo* and its factual findings for clear error. *Antone*, 742 F.3d at 158. Even if the evidence in the record is in "equipoise or . . . ris[es] to a level of preponderance in favor of commitment," that is "simply not enough to satisfy the statutory burden of clear and convincing evidence." *Antone*, 742 F.3d at 160. Reversal is warranted if the District Court failed to "properly tak[e] into account substantial evidence to the contrary" or its factual findings are against the clear weight of the evidence considered as a whole. *United States v. Wooden*, 693 F.3d 440, 462 (4th Cir. 2012). And it is warranted if the District Court relied on testimony that was "so internally inconsistent . . . that a reasonable factfinder would not credit it." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). This Court may reverse if it is "left with the definite and firm conviction that a mistake has been committed." *Wooden*, 693 F.3d at 451.

## I.   THE DISTRICT COURT ERRED IN CONCLUDING THAT MR. CHARBONEAU SUFFERS FROM A "SERIOUS MENTAL ILLNESS, ABNORMALITY, OR DISORDER" FOR PURPOSES OF THE ADAM WALSH ACT

All of the testifying experts agreed that Mr. Charboneau suffers from alcohol use disorder. JA67; JA88; JA128; JA177. Dr. Zinik also diagnosed Mr. Charboneau with inhalant disorder, severe in sustained remission; inhalant-induced mild neurocognitive disorder; and other specified personality disorder with

schizotypal and schizoid features.  JA128.  For the reasons below, none of these is

a "serious mental illness" for Mr. Charboneau.

### A. Crediting Dr. Zinik's Diagnosis Of A Personality Disorder Went Against The Clear Weight Of The Evidence—And The Opinions Of Three Other Experts

This Court has previously held that a district court's reliance on one expert's

opinion with respect to the propriety of a diagnosis can be clearly erroneous.

*Wooden*, 693 F.3d at 456.  In *Wooden*, the district court credited one expert's

opinion that the respondent no longer suffered from pedophilia.  *Id.* at 451.  This

Court reversed and remanded, concluding that the record did not support the

district court's determination, especially where the court failed to "consider the

[contrary] evidence, and account for it, when concluding otherwise."  *Id.* at 454

(quoting *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) (Sotomayor, J.) ("We

have found a district court's factual findings to be clearly erroneous where the

court has failed to synthesize the evidence in a manner that accounts for conflicting

evidence or the gaps in a party's evidentiary presentation.").  This Court reversed

despite the fact that "the district court repeatedly explained in its opinion that it

found Dr. Campbell's testimony more credible than that of the government's

experts, and the court explicitly relied on Dr. Campbell's opinion when concluding

that Wooden was not a pedophile."  *Id.* at 454.

The same analysis applies here, and perhaps with greater force because it was expert testimony the District Court failed to contend with: "Whether the individual is mentally ill and dangerous to either himself or others . . . turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington v. Texas*, 441 U.S. 418, 429 (1979).

Of the four experts to testify at Mr. Charboneau's hearing, only one diagnosed him with a personality disorder. JA128. The other three specifically ruled out such a diagnosis. JA80; JA115; JA187. Dr. Plaud explained that he could not apply such a diagnosis because Mr. Charboneau "has been a substance abuser so I think that is a better explainer" for some characteristics that might otherwise suggest the presence of a personality disorder. JA187. And he explained that Mr. Charboneau's significant "expressive vocabulary issues" also could account for these characteristics. JA187.

Dr. North agreed that Mr. Charboneau does not suffer from a personality disorder, JA80, explaining in his report that he considered but rejected a diagnosis of antisocial personality disorder because Mr. Charboneau "does not come across as an angry or antisocial individual but as rather meek and mild-mannered." It is only when he is "under the influence of alcohol" that "his personality changes." JA364.

29

And Dr. Ross considered but rejected personality disorder diagnoses, opining that although they had been offered in the past, "during his most recent mental health evaluation in the BOP in 1989, it was noted that he was no longer displaying such symptoms and that testing did not support such diagnoses." JA334; JA115. She explained that this "is consistent with mental health records from his current incarceration, as well as direct, albeit limited observation by the undersigned evaluator." JA334.

Although the District Court gave a hat tip to these conflicting opinions, it certainly did not engage in " '[t]he process of explaining and reconciling seemingly inconsistent parts of the record' " to " 'lay[] bare the judicial thinking process' " and " 'enabl[e] a reviewing court to judge the rationality of the fact-finder's reasoning.' " *Wooden*, 693 F.3d at 454 (quoting *Taylor v. Maddox*, 366 F.3d 992, 1007-1008 (9th Cir. 2004)). Instead, it simply stated that "Dr. Zinik was the only expert to make this diagnosis," and, in its view, "his explanation of the diagnosis was compelling and consistent with the unique record in this case." JA293; *see also* JA295 ("In crediting Dr. Zinik's opinion, the Court recognized that Dr. Ross ruled out the diagnosis at page 15 of her report and that Dr. Plaud's report and testimony revealed some evidence of schizoid and histrionic personality disorder, but that he ruled out the diagnosis.").

In light of the rejection of this diagnosis by all but one expert, and the District Court's failure to wrestle meaningfully with the reasons given for these contrary opinions, this Court should conclude that this factual finding was clearly erroneous.

### B. In The Absence Of Any Paraphilic Disorder Diagnosis, The District Court Erred In Concluding Mr. Charboneau Suffers From A Serious Mental Illness For Purposes Of The Adam Walsh Act

This Court has never affirmed a civil-commitment judgment under the Adam Walsh Act in the absence of a paraphilic disorder diagnosis. That is for good reason: The statute is not designed to reach generalized "dangerousness." Rather, it provides for civil commitment of "sexually dangerous person[s]" and requires a legal conclusion that those persons will have "serious difficulty refraining from sexually violent conduct or child molestation if released," 18 U.S.C. § 4247(a)(6). For others who are deemed to be "dangerous" in the more general sense of presenting a "substantial risk of bodily injury to another person or serious damage to the property of another," civil commitment may be available under other provisions, including 18 U.S.C. § 4246. And of course, criminal prosecution remains available: As the Supreme Court explained in *Kansas v. Hendricks* and *Kansas v. Crane*, there is "constitutional importance [to] distinguishing a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively

31

through criminal proceedings." *Crane*, 534 U.S. 407, 412 (2002) (quoting

*Hendricks*, 521 U.S. 346, 360 (1997)).  Specifically, the Court explained that the

proof of serious difficulty in controlling behavior must be viewed in light of "the

nature of the psychiatric diagnosis, and the severity of the mental abnormality

itself." *Crane*, 534 U.S. at 413.

     None of the four testifying experts in this case diagnosed Mr. Charboneau

with a paraphilic disorder.  JA364 (North) ("Mr. Charboneau does not appear to

meet criteria for a paraphilic disorder."); JA334 (Ross) ("[N]o paraphilic diagnoses

were appropriate for this inmate."); JA405 (Zinik) ("[H]e does not meet the criteria

for a sexual Paraphilia."); JA183 (Plaud) ("There's no sexual deviance.  Even the

Government's experts don't say sexual deviance."); *see also* JA380.  Even the

District Court agreed: "[T]here isn't evidence of continued deviant thoughts by Mr.

Charboneau."  JA303.

     That is extraordinary, and significant.  A paraphilic disorder diagnosis is

appropriate under the Diagnostic and Statistical Manual of Mental Disorders where

a person has an "intense and persistent sexual interest" that does not involve

"physically mature, consenting human partners" and "is currently causing distress

or impairment to the individual" or "personal harm or risk of harm . . . to others."

American Psychiatric Association, Diagnostic and Statistical Manual of Mental

Disorders 685-686 (5th ed. 2013).  That definition closely mirrors the inquiry

required under the Adam Walsh Act. And it is hard to see how an individual could meet the requirements of the Adam Walsh Act while four experts agree that a paraphilic disorder diagnosis is not warranted.

Several district courts have rejected attempts to commit people solely on the basis of an alcohol use and/or personality disorder diagnosis in cases similar to this one. In *United States v. Begay*, the court credited Dr. Plaud's opinion that the behaviors that formed the basis of two other experts' diagnosis of antisocial personality disorder were better explained by Begay's "maladaptive upbringing and early onset of substance abuse that continued into adulthood." No. 5:11-HC-2197-BO, DE 33 at 6 (July 25, 2012). The court further concluded, consistent with the reports of all testifying experts, that neither alcohol dependence nor cannabis dependence constituted a serious mental disorder for purposes of the Adam Walsh Act. No. 5:11-HC-2197-BO, DE 33 at 7 (July 25, 2012). As the court explained:

> the goal of § 4248 is to isolate *sexually* dangerous offenders. Even if Mr. Begay has appropriately been diagnosed with antisocial personality disorder, the Court is reluctant to find that, in this instance where there is no companion diagnosis of a sexual disorder or paraphilia, a diagnosis of antisocial personality disorder, alone, rises to the level of a serious mental disorder that is a sufficient basis upon which to predicate civil commitment under the Adam Walsh Act.

*Id.* at 6-7.

In two other cases, the district court recognized: "Under the current state of the law, it is unclear whether substance dependence or antisocial personality

33

disorder, alone or in combination, constitute a serious mental disorder sufficient to civilly commit an individual under the Adam Walsh Act." *United States v. Sneezer*, No. 5:08-HC-2107-H, DE 65 at 9; *United States v. Julius*, No. 5:08-HC-2076-H, DE 59 at 11. In each of those cases, the court did not reach the question in light of its conclusion that the Government failed to meet its burden by clear and convincing evidence that the respondent would have serious difficulty refraining from sexually violent conduct or child molestation if released. *See Sneezer*, DE 65 at 10; *Julius*, DE 59 at 12. *But see United States v. Gloshay*, No. 5:08-HC-2051-BR, DE 91 (June 4, 2012) (noting that "alcohol dependence may not be considered serious in every case" but concluding it was for Gloshay because it "has caused him to exhibit poor sexual and general self-regulation.").

This Court, too, has had the opportunity to consider a case in which the district court relied entirely on diagnoses of polysubstance dependence and antisocial personality disorder to conclude that a respondent suffered from a "serious mental illness." *See United States v. Antone*, 742 F.3d at 164. Although Antone did not structure his appeal as challenging the seriousness of those mental illnesses, he did raise constitutional and statutory objections to his commitment on the basis of these two diagnoses, arguing that his "lack of any paraphilia made him highly unlikely to meet the commitment standard." *United States v. Antone*, No. 12-2400, Opening Br. at 34-38. The court did not address these arguments in its

34

opinion, but ultimately concluded that the Government failed to prove, by clear

and convincing evidence, that Antone would have serious difficulty refraining

from sexually violent conduct or child molestation if released.  *Antone*, 742 F.3d at

170 n.15.

### C. The District Court Erred In Concluding That The Government Proved, By Clear And Convincing Evidence, That There Is A Causal Link Between Alcohol Use Disorder And/Or Dr. Zinik's Other Diagnoses And Serious Difficulty Refraining In Mr. Charboneau's Case

The Adam Walsh Act also incorporates a causation requirement, which has

sometimes been addressed under the second element and sometimes under the

third: A person may only be committed under the statute if the serious difficulty he

experiences is a "result" of the identified serious mental illness.  In other words,

the Government must also demonstrate a causal link between its proffered serious

mental illness and a person's serious difficulty in refraining.  *United States v.

Starko*, 735 F.3d 989, 993 (7th Cir. 2013) ("to be civilly committed, there must be

a causal connection between an individual's mental illness and his behavior").  The

Government failed to prove that causal link by clear and convincing evidence in

this case, and the District Court erred in concluding otherwise.

As Dr. Plaud testified, any attempt to connect a diagnosis of alcohol use

disorder to serious difficulty refraining from sexually violent conduct or child

molestation if released would require a "prognosticator's two-step"; that is,

"number one, you have to be certain or fairly certain that he's going to relapse with alcohol" because "there is no evidence in his history ever, no accusation, no admission, no expert here has drawn attention to the fact that when he has been sober in his past that he has committed or attempted to commit any acts of sexual violence or child molestation.  JA177-JA178.  Second, "we have to then jump from that to another and that is, if he does relapse with alcohol, he will then have serious difficulty in refraining.  JA178.  In Dr. Plaud's view, although "alcohol has been a disinhibitor for him sexually in the past . . . that doesn't mean it fuels deviant sexual arousal."  *Id.*  And "it's too tenuous a relationship" to assume that "[i]f he drinks and relapses," he will automatically reoffend sexually.  JA179: "If there's a direct connection such that it really meets the standard that I think the standard is for sexual dangerousness, I would expect it to be a lot more offending given the fact he was drinking all the time."  JA180.  He referenced a database of 28,000 sex offender studies which noted zero correlation between alcohol abuse and future sexual recidivism and opined that he "cannot predict with any professional certainty that even if he goes to step one and relapses with substances that at this time is going to cause him to lack volitional capacity of sexual impulses."  JA185-JA186.  As Dr. Plaud testified, the fact that Mr. Charboneau's criminal record reflected many offenses other than sex offenses related to alcohol was important: "[I]t shows . . . there were . . . more instances where his alcohol use

36

and intoxication resulted in nonsexual criminal behavior than sexual criminal behavior." JA197.

The analysis does not improve with the addition of Dr. Zinik's other diagnoses.  Dr. Zinik opined:  "[I]f certain factors line up for him, he—if he gets drunk and if he gets sexually aroused, which he's likely to do because he relaxes and he's disinhibited when he's drunk, and if he's in the presence of a vulnerable female, he will have serious difficulty refraining from a sexual assault."  JA149. This hypothetical requires no fewer than three conditions to be met.

Dr. Plaud testified that Dr. Zinik's other diagnoses could not be causally linked to sexual offending in Mr. Charboneau's case.  With respect to a neurocognitive disorder, Dr. Plaud opined that these challenges may cause him to have "negative things attributed to him" because "he can't articulate things and he can't remember things and he can't function socially a lot of times."  JA192. However, there "is no evidence" that these issues "impact his sexual functioning, sexual behavior, his sexual arousal in some way."  *Id.*  Dr. Plaud also opined that even if a personality disorder diagnosis were appropriate in Mr. Charboneau's case, "I don't think it's relevant in this case even if you did make it."  JA187.

In *United States v. Begay*, Drs. North and Plaud both testified that "the correlation between substance abuse and sex offense recidivism is virtually non-existent."  No. 5:11-HC -2197-BO, DE 33 at 9.  The district court there quoted Dr.

North's report, opining that Begay has "been intoxicated numerous times without necessarily committing a sexual crime." *Id.* (internal quotation marks and citation omitted). The court explained that "[w]hen, as here, there is little statistical evidence to support a correlation between a diagnosed mental disorder and recidivism of a sexual nature, the Court is reluctant to find that the government has carried its burden to show that a respondent will have serious difficulty refraining from sexually violent conduct if released." *Id.* And it credited Dr. Plaud's conclusion that a finding of serious difficulty refraining would require a "leap of future analysis" that suffers from "great error in affirmative prediction": One would need to find "first that he will relapse using substances, and then as a consequence of this relapse have further difficulties controlling (specifically) his sexual impulses." *Id.*

The District Court here accepted Dr. Zinik's two-step theory wholesale: "Dr. Zinik persuasively explained the unique interplay among all of Charboneau's diagnoses to explain why Charboneau met Prong 3 under the Adam Walsh Act." JA304. Although the court acknowledged Dr. Plaud's opinion to the contrary, it did not explain how it would account for the instances in which Mr. Charboneau used alcohol but committed no offenses or the instances in which Mr. Charboneau used alcohol and committed non-sexual offenses. As this Court has explained: "Even though the district court acknowledged its awareness of the [contrary]

38

testimony, that by itself does not indicate to us that it adequately considered its impact. If, after reading the opinion, we cannot understand how the district court came to its conclusions, then we will be unable to perform a cogent analysis on its merits." *Antone*, 742 F.3d at 169. Exactly right.

## II. THE DISTRICT COURT ERRED IN CONCLUDING THAT MR. CHARBONEAU WILL HAVE SERIOUS DIFFICULTY REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR CHILD MOLESTATION IF RELEASED

Even if Mr. Charboneau suffers from a "serious mental illness," the District Court nonetheless erred in concluding that he will have serious difficulty refraining from sexually violent conduct or child molestation if released. In reaching its conclusion, the District Court did not properly heed this Court's guidance in *Antone* and went against the weight of the evidence by failing to fully credit the thirteen years prior to its civil-commitment hearing in which Mr. Charboneau abstained both from alcohol and sexual offending and had excellent institutional conduct. The District Court instead uncritically accepted Dr. Zinik's hypothetical two-step analysis with respect to dangerousness, gave undue importance to stale information and lay opinion, and misconstrued the import of Mr. Charboneau's recognition of his historic struggles with alcohol abuse and sexual offending and his need for ongoing treatment. The District Court also failed to address two important protective factors in its analysis.

At the time of Mr. Charboneau's hearing, it had been thirteen years since he last consumed alcohol or committed a sexual offense.  It has now been fifteen years.  And, by all accounts, his institutional conduct in that time has been excellent.  He has enrolled in Alcoholics Anonymous, joined a Bible study, taken and maintained a job as an orderly[2], and participated with full effort in sex offender treatment.  The District Court acknowledged that Mr. Charboneau does not suffer from continued deviant thoughts.  JA303.

The court nonetheless concluded that he would have serious difficulty refraining from sexually violent conduct or child molestation, relying on a two-step hypothetical prognostication that presumes that Mr. Charboneau will first have serious difficulty refraining from alcohol consumption and, as a result of that, will then have serious difficulty refraining from sexually violent conduct or child molestation if released.

In support of that analysis, the District Court cited the *Wooden* factors, including failures while on supervision, resistance to treatment, continued deviant thoughts, cognitive distortions, actuarial risk assessments, impulsiveness, and historical offenses.  JA300-JA301.  Despite listing these seven factors, the court addressed only a few of them, acknowledging that Mr. Charboneau does not have

---

[2]     Since his civil-commitment hearing, Mr. Charboneau has taken a second job, working in the kitchen.

continued deviant thoughts, JA303, asserting that he does suffer from cognitive

distortions, and then claiming that "the record is replete with evidence of

Charboneau's failure on supervision." JA302. But it is not. Mr. Charboneau did

violate his supervised release in 2003 when he committed his most recent sexual

offense. JA330. But he also began and completed substance abuse treatment

during that time and continued sex offender and mental health treatment. JA377.

His supervised release violation report in fact reflects that Mr. Charboneau

"progressed well in all areas and was able to maintain nearly full-time

employment." JA395. And it was Mr. Charboneau's own admission to his

treatment providers that informed them he had consumed alcohol at his apartment

on one occasion. *Id.* In any event, that was fifteen years ago now.

    The District Court also explained that a "critical factor" in its analysis was

"Charboneau's admission in December 2016 that he is sexually dangerous."

JA302. But that is a red herring, for three reasons. First, the District Court failed

to place this statement in context. Dr. Holden, the treatment provider who reported

the statement, explained that he's "admitting that he does have a sexual deviance

problem and he understands that he needs treatment because he has hurt people in

the past and he does not want to continue that pattern." JA56. This Court has

recognized that such self-awareness is to be praised, not condemned: "[W]e note

that Antone's admission that he will always struggle with alcohol is a crucial and

41

necessary step in his path toward recovery from substance abuse." *Antone*, 742 F.3d at 166 n.10.

Second, the District Court did not account for the significant communicative and cognitive disorders Mr. Charboneau suffers and the effects those disabilities have on his ability to speak clearly with his treatment providers. Every testifying expert confirmed this. JA57 (Holden) ("He does have some expressive difficulties where he substitutes words and . . . he has been referred to a neuropsychologist"); JA71 (North) (noting Mr. Charboneau's "expressive language problems" and that they "make[] it very difficult for him to communicate with anyone in a very meaningful way"); JA107 (Ross) ("his communication is a bit difficult to weed through"); JA132 (Zinik) ("when you ask him an open-ended question where he has to sort of think and organize his thoughts and articulate what he's thinking and feeling, he just can't do that and he becomes—he starts talking in almost nonsensical terms and he becomes incoherent sometimes"); JA184 (Plaud) ("his verbal skills, ability to communicate . . . it was difficult even for times with me. And I think the guy is an anxious person and I think he wants to please you in a situation."). And third, Mr. Charboneau is not a lawyer, nor is he a psychologist. If he did say that he is "sexually dangerous," that utterance should hold little, if any, weight. It certainly should not be treated as a "critical factor" against him, as it was here.

42

The District Court also failed to credit two important aspects of Mr. Charboneau's case, each of which is protective. First, Mr. Charboneau will be subject to a two-year term of supervised release upon his release from Butner. And second, Mr. Charboneau will turn sixty next year, which is a significant milestone for purposes of predicting someone's risk of recidivism. JA145 (Zinik) ("[W]e certainly know that sex offenders have—that their rates of recidivism decline with age and decline dramatically after 60"); JA104 (Ross) ("age above 60. . . .is certainly considered . . . can reduce someone's risk on the Static-99R");

But perhaps the best way to demonstrate precisely how the District Court erred is to examine three cases, very similar to Mr. Charboneau's, in which the respondents were ultimately released; one by this Court, and two by district courts. The cases are those of Byron Antone, Ronald Sneezer, and William Julius.

Begin with Byron Antone's case. At the time this Court considered it, he was forty-one years old. Like Mr. Charboneau, he was raised on a reservation. 742 F.3d at 155. Like Mr. Charboneau, he dropped out of high school in the ninth grade and struggled to maintain steady employment. *Id.* From 1991 until 1999, Antone was charged with and pleaded guilty to several acts of sexual misconduct, including three forcible rapes. *Id.* at 155-156. Like Mr. Charboneau, these incidents took place when Antone was intoxicated with alcohol and/or high on cocaine and Antone had "little to no recollection" of them. *Id.* at 156. For the

43

fourteen years following his last sexual offense until this Court's decision in 2014, like Mr. Charboneau, Antone was continuously in federal custody. *Id.* This Court explained that, like Mr. Charboneau, he had not been shown to have consumed alcohol or drugs during that time. *Id.* He attended Alcoholics Anonymous (like Mr. Charboneau) and Narcotics Anonymous on his own initiative. *Id.* He also completed a substance abuse and drug education program. *Id.* The Court described his infractions in prison—which are four times as many as those in Mr. Charboneau's case, and involve some fighting and collecting photos of scantily clad women—as "minimal." *Id.* Antone got his GED in prison, he regularly sought out advice and counseling from his treatment providers, and like Mr. Charboneau, he maintained employment as an orderly. *Id.* at 156-157. Like Mr. Charboneau, he had not engaged in any sexual misconduct during his "extended incarceration." *Id.* at 157. Unlike Mr. Charboneau, he had not attended sex offender therapy or treatment. *Id.*

This Court held that the district court's "inadequate consideration of certain 'substantial evidence'—namely Antone's behavior in the past fourteen years or so—constitutes reversible error" and required his release. 742 F.3d at 165. The court noted that none of its prior cases involved someone who "had demonstrated such positive behavior during the extended period of his incarceration." *Id.* at 166. In fact, it noted that even cases where the respondent was released "nevertheless

involved some evidence of negative behavior during incarceration." *Id.* Although recognizing the district court's obligation to consider past conduct, it explained: "[T]he deficiency here lies primarily in the Government's failure to muster, and the district court's failure to hold the Government to its obligation to muster, sufficient evidence of an *ongoing volitional impairment* in this case." *Id.* at 168.

Turn next to Ronald Sneezer. Like Mr. Charboneau, Sneezer is a Native American who was raised on a reservation. *United States v. Sneezer*, No. 5:08-HC-2107-H, at 1 (Nov. 30, 2012). Like Mr. Charboneau, he never married. *Id.* at 2. Like Mr. Charboneau, he has a long history of substance abuse, beginning with alcohol at the age of 11. *Id.* And like Mr. Charboneau, he has a number of convictions for alcohol offenses. *Id.* Sneezer's convictions included liquor-related offenses such as public intoxication, driving while intoxicated, possession of open container, and unlawful possession of liquor. *Id.* at 2-3. They also included offenses committed while intoxicated, including disorderly conduct, resisting or obstructing a law enforcement officer, unlawful use of a firearm, assault, loitering, criminal trespass, and public indecency. *Id.* at 3. And they included five sexual crimes that were committed while intoxicated, including sexual assault, attempted sexual abuse, and aggravated sexual assault, including several rapes. *Id.* at 3-5. Unlike Mr. Charboneau, Sneezer had four disciplinary infractions in prison for possessing intoxicants or refusing to submit to alcohol testing. *Id.* at 6. However,

45

those occurred more than thirteen years prior to his civil-commitment hearing. *Id.* At the time of his hearing, he had not consumed any alcohol in six years and, like Mr. Charboneau, he admitted that he was an alcoholic and recognized the need to participate in substance abuse and sex offender treatment. *Id.*

Like Mr. Charboneau, none of the experts diagnosed Sneezer with a paraphilia. *Id.* at 9. Instead, the diagnoses focused on Sneezer's substance abuse and personality disorder. *Id.* The district court explained that it is "unclear whether alcohol dependence or antisocial personality disorder, alone or in combination, constitute a serious mental disorder sufficient to civilly commit an individual under the Adam Walsh Act." *Id.*

The court did not decide the issue because it concluded that the Government did not meet its burden on the volitional impairment element. *Id.* at 10. The court explained:

> The evidence in this case makes clear that the trigger for Sneezer's sexually violent conduct is his drinking. Sneezer has never committed a sexual offense while sober and, in fact, it appears as though even Sneezer's non-sex-related offenses were committed during bouts of intoxication. Although the evidence is uncontroverted that Sneezer exhibits primitive social development and some impulsivity and cognitive distortion, it is only when he is disinhibited by alcohol consumption that Sneezer is unable to conform his behavior to societal norms. There is no evidence that he has a general sexual preoccupation.

*Id.* at 12. The court cited Sneezer's positive work performance reports and infraction-free conduct in prison over the preceding six years. *Id.* It credited

46

Sneezer's "great strides, albeit while confined, in refraining from alcohol use." *Id.*
at 13. And it credited a testifying expert's opinion that although his "personality
and legal history suggest he may engage in criminal activities . . . , it is the opinion
of this examiner that he will not have serious difficulty [refraining] from sexually
violent conduct in the future." *Id.* at 12. Noting that Sneezer would remain subject
to conditions of supervised release, the court held that the Government had not met
its burden by clear and convincing evidence and ordered Sneezer to be released.
The Government did not appeal. That was more than five years ago.

Similarly, in *United States v. Julius*, the district court declined to commit
someone who had a "substantial criminal history beginning in his childhood" and
who had committed three sexual assaults. No. 5:08-HC-2076-H, at 3-5 (March 18,
2013). Like Mr. Charboneau, he grew up on a reservation and had a substantial
history of substance abuse, beginning with alcohol at age 7. *Id.* at 3. After
rejecting one expert's paraphilic disorder diagnosis, the court was left only with
substance dependence and antisocial personality disorder diagnoses and noted that
it is "unclear" whether such a diagnosis could ever constitute a serious mental
disorder under the Act. *Id.* It concluded that it need not decide the question
because the Government had failed to prove that Julius would have serious
difficulty refraining from sexually violent conduct or child molestation if released.

As in *Sneezer*, the court credited Julius's admission that alcohol had played a major role in his criminal offenses, both sexual and non-sexual: "There is no evidence that Julius has ever committed a sexual offense while sober." *Id.* And the court noted that "Julius exhibits poor judgment and gives little consideration to the rights of others while intoxicated and, as a result has engaged in a litany of criminal activities, including three sexual assaults." *Id.* The court credited Julius's testimony that he had not consumed alcohol in the preceding seven years, his acknowledgment that he is an alcoholic, and his understanding of the problems alcohol could cause him in the future. *Id.* The court noted that Julius had three years of supervised release to include drug and alcohol and sex offender treatment. *Id.* at 15. And it reiterated that "there is simply a lack of clear and convincing evidence that Julius presently has a sexual preoccupation or deviance that he would be unable to control if released." *Id.* The court viewed Julius as "cognizant of the significant harm he has caused his past victims and to have a desire to reform his conduct upon release." *Id.* And it described Julius as a " 'garden variety' opportunistic criminal" who was more akin to *Crane*'s "dangerous but typical recidivist convicted in an ordinary criminal case" than to the "dangerous sexual offender" subject to civil commitment under § 4248. *Id.* at 16 (quoting *Crane*, 534 U.S. at 413). Again, the Government did not appeal. That was nearly five years ago.

48

This case very closely resembles the *Antone*, *Sneezer*, and *Julius* cases. It is nearly identical to Antone's. And the few distinctions—Mr. Charboneau has not obtained his GED or as proactively sought to speak with his treatment providers— are explainable by his neurocognitive challenges with language and more than outweighed by his dedicated participation in sex offender treatment and counseling, beginning even before the District Court's hearing.

The District Court did not mention *Sneezer* or *Julius* and, although it did mention *Antone*, it was only to note that, unlike Antone, "Charboneau is in BOP custody on a supervised release revocation for which he violated his term of supervised release while in sex offender treatment." JA301. Although that is true, it misses the point. That offense occurred in 2003—now fifteen years ago—and *Antone* stands for the proposition that, even when someone has been incarcerated, more than a decade of excellent institutional conduct has to mean something, and may well carry the day. Taken alone or together, these cases provide strong support for reversal of the District Court's judgment.

## CONCLUSION

For the foregoing reasons, the District Court's judgment civilly committing Mr. Charboneau should be reversed. At the very least, it should be remanded to the District Court for reconsideration under the proper legal standard.

## STATEMENT REGARDING ORAL ARGUMENT

This case presents an important issue of first impression in this Circuit, namely whether a civil-commitment judgment may be upheld in the absence of a paraphilic disorder diagnosis.  Assuming that is possible, it also raises significant questions about whether civil commitment may be predicated on a two-step hypothetical analysis that presupposes first that a man who has been sober for thirteen years will have serious difficulty refraining from consuming alcohol and, assuming he does drink, will then have serious difficulty refraining from sexually violent conduct or child molestation.  Oral argument would assist the Court in deciding these important questions.  Mr. Charboneau requests oral argument.

Respectfully submitted,

LOUIS C. ALLEN
ACTING FEDERAL PUBLIC DEFENDER

/s/ Jaclyn L. DiLauro

JACLYN L. DILAURO
ASSISTANT FEDERAL PUBLIC DEFENDER
EASTERN DISTRICT OF NORTH CAROLINA
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
(919) 856-4236

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,512 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

/s/ Jaclyn L. DiLauro
Jaclyn L. DiLauro

## CERTIFICATE OF SERVICE

I certify that on January 22, 2018, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send notice of such filing

to the following counsel of record:

MICHAEL GORDON JAMES
OFFICE OF THE UNITED STATES ATTORNEY
EASTERN DISTRICT OF NORTH CAROLINA
Federal Building
Suite 800
310 New Bern Avenue
Raleigh, North Carolina 27601-1461
mike.james@usdoj.gov


/s/ Jaclyn L. DiLauro
Jaclyn L. DiLauro