No. 17-7306

IN THE

# United States Court of Appeals for the Fourth Circuit

UNITED STATES OF AMERICA,
Appellee,

v.

BLAKE CHARBONEAU,
Appellant.
_____

On Appeal from the United States District Court for
the Eastern District of North Carolina (Dever, C.J.)
_____

**JOINT APPENDIX**
_____
**VOL. I**


LOUIS C. ALLEN
ACTING FEDERAL PUBLIC DEFENDER
EASTERN DISTRICT OF NORTH CAROLINA

JACLYN L. DILAURO
ASSISTANT FEDERAL PUBLIC DEFENDER
EASTERN DISTRICT OF NORTH CAROLINA
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
(919) 856-4236

*Counsel for Appellant*

ROBERT J. HIGDON, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NORTH CAROLINA

MICHAEL GORDON JAMES
ASSISTANT UNITED STATES ATTORNEY
EASTERN DISTRICT OF NORTH CAROLINA
310 New Bern Avenue, 8th Floor
Raleigh, North Carolina 27601
(919) 856-4530

*Counsel for Appellee*

# CONTENTS OF APPENDIX

## VOLUME I                                    PAGE NO.

Docket Sheets ..................................................................................... JA1

Certificate of a Sexually Dangerous Person
And Petition (DE1) ............................................................................ JA12

Joint Pretrial Order (DE43) .............................................................. JA19

18 U.S.C. § 4248 Hearing Transcript (Jan. 27, 2017) ..................... JA28

Transcript of Hearing to Announce Decision (Sept. 28, 2017) (DE53) ........... JA245

Order (Sept. 28, 2017) (DE52) ........................................................ JA306

Judgment (Sept. 28, 2017) (DE53) .................................................. JA308

Notice of Appeal (Oct 2, 2017) (DE54) ........................................... JA309

Certificate of Service

## VOLUME II

Initial Treatment Plan Psychological Testing Report, Commitment and Treatment
Program, Kara Holden, Psy.D. (Oct 26, 2016) (Government's Exhibit 26) .... JA311

Forensic Precertification Evaluation, Heather H. Ross, Ph.D. (July 24, 2015)
(DE10-1) .......................................................................................... JA320

Evaluation for Civil Commitment as a Sexually Dangerous Person as Defined in
18 U.S.C. § 4247(a)(5), Christopher North, Ph.D. (Jan. 20, 2016) (DE14-1) .. JA339

Psychosexual Evaluation Report, Joseph J. Plaud Ph.D. (Feb. 12, 2016)
(DE17) .............................................................................................. JA369

Evaluation for Civil Commitment as a Sexually Dangerous Person as Defined in
18 U.S.C. § 4247/4248, Gary Zinik, Ph.D. (Feb. 26, 2016) (DE20-1) ............. JA386

Certificate of Service

APPEAL,CLOSED,Exhibits,USMJ Gates

# U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
### CIVIL DOCKET FOR CASE #: 5:15-hc-02287-D

United States of America v. Charboneau
Assigned to: Chief Judge James C. Dever, III
Case in other court: 17-07306
Cause: 18:4248 Civil Commitment of a Sexually
Dangerous Person

Date Filed: 12/03/2015
Date Terminated: 09/28/2017
Jury Demand: None
Nature of Suit: 540 Mandamus &
Other
Jurisdiction: U.S. Government
Defendant

**Petitioner**

**United States of America**     represented by     **Christopher M. Anderson**
United States Attorney's Office
310 New Bern Avenue, Suite 800
Raleigh, NC 27601
919-856-4530
Fax: 919-856-4821
Email:
Michael.Anderson7@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael James**
310 New Bern Ave.
Suite 800
Raleigh, NC 27601
919-856-4530
Email: Mike.James@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**G. Norman Acker , III**
United States Attorney's Office
310 New Bern Avenue, Suite 800
Raleigh, NC 27601
919-856-4315

Fax: 919-856-4821
Email: norman.acker@usdoj.gov
*ATTORNEY TO BE NOTICED*

## V.

**Respondent**

**Blake Charboneau**                    represented by     **Halerie F. Mahan**
Federal Public Defender's Office
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
919-856-4236
Fax: 919-856-4477
Email: halerie_mahan@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine E. Shea**
Federal Public Defender
150 Fayetteville St. Mall
Suite 450
Raleigh, NC 27601-2919
919-856-4236
Fax: 919-856-4477
Email: kat_shea@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert E Waters**
Federal Public Defender
150 Fayetteville St., Suite 450
Raleigh, NC 27611-5967
919-857-3984
Email: robert_waters@fd.org
*TERMINATED: 09/08/2016*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 12/03/2015 | 1 | Certificate of a Sexually Dangerous Person against Blake Charboneau, filed by United States of America. (Attachments: # 1 Certification of a Sexually Dangerous Person by Dr. Ivonne E. |

| | | Bazerman, dated August 20, 2015, # 2 Text of Proposed Order) (Acker, G.) (Entered: 12/03/2015) |
|---|---|---|
| 12/03/2015 | 2 | Notice of Appearance filed by G. Norman Acker, III on behalf of United States of America. (Acker, G.) (Entered: 12/03/2015) |
| 12/03/2015 | 3 | Notice of Appearance filed by Christopher M. Anderson on behalf of United States of America. (Anderson, Christopher) (Entered: 12/03/2015) |
| 12/04/2015 | 4 | Notice of Appearance filed by Michael James on behalf of United States of America. (James, Michael) (Entered: 12/04/2015) |
| 12/04/2015 | | Case Submitted to Magistrate Judge James E. Gates: for initial review. (McLemore, J) (Entered: 12/04/2015) |
| 12/04/2015 | 5 | ORDER - This case is a proceeding by the government under 18 U.S.C. § 4248 for the civil commitment of respondent as a sexually dangerous person. The courts Standing Order on such cases, No. 13-SO-2 (E.D.N.C. 21 Oct. 2013) ("Standing Order"), shall govern proceedings in this case. Signed by Magistrate Judge James E. Gates on 12/4/2015. Counsel is reminded to read the entire order for critical dated and deadlines. (Indig, A.) (Entered: 12/04/2015) |
| 12/08/2015 | 6 | ORDER - The court hereby APPOINTS Christopher North, Ph.D., a licensed psychologist, as a mental health examiner pursuant to 18 U.S.C. §§ 4247(b) and 4248(b) and 5(b) of Standing Order 13-SO-2. Signed by Magistrate Judge James E. Gates on 12/8/2015. Copy sent to Dr. North via US Mail. (Indig, A.) (Entered: 12/08/2015) |
| 12/08/2015 | 7 | Notice of Appearance filed by Robert E Waters on behalf of Blake Charboneau. (Waters, Robert) (Entered: 12/08/2015) |
| 12/29/2015 | 8 | MOTION to Appoint Expert *Dr. Joseph Julian Plaud* filed by Blake Charboneau. (Attachments: # 1 Curriculum Vitae of Dr. Plaud, # 2 Text of Proposed Order) (Waters, Robert) (Entered: 12/29/2015) |
| 01/04/2016 | | Motion Referred to US Magistrate Judge James E. Gates regarding: 8 MOTION to Appoint Expert *Dr. Joseph Julian Plaud*. (Indig, A.) (Entered: 01/04/2016) |
| 01/04/2016 | 9 | ORDER - GRANTING 8 Motion to Appoint Expert. The court hereby GRANTS respondent's motion and APPOINTS Dr. Plaud, a licensed psychologist, as an additional mental health examiner selected by respondent. Signed by Magistrate Judge James E. Gates on 1/4/2016. Counsel is reminded to read the entire order for critical |

| | | dates and deadlines. Copy of order sent to Dr. Plaud via US Mail. (Indig, A.) (Entered: 01/04/2016) |
| --- | --- | --- |
| 01/11/2016 | 10 | SEALED *(Selected Participants Only)*Forensic Report received as to Blake Charboneau (available to: Respondent Blake Charboneau, Petitioner United States of America). (Attachments: # 1 Forensic Evaluation by Dr. Heather H. Ross, dated July 24, 2015) (Acker, G.) Modified on 1/11/2016 to remove the word Proposed. (McLemore, J). (Entered: 01/11/2016) |
| 01/14/2016 | 11 | MOTION for Extension of Time to File *Petitioner's Expert Report*, MOTION for an Examination Under Standing Order 13-SO-2 (Oct. 21, 2013) filed by United States of America. (Attachments: # 1 Text of Proposed Order) (James, Michael) (Entered: 01/14/2016) |
| 01/14/2016 | 12 | Memorandum in Support regarding 11 MOTION for Extension of Time to File *Petitioner's Expert Report* MOTION for an Examination Under Standing Order 13-SO-2 (Oct. 21, 2013) filed by United States of America. (Attachments: # 1 Exhibit 1-Curriculum Vitae of Dr. Gary Zinik) (James, Michael) (Entered: 01/14/2016) |
| 01/14/2016 | 13 | Memorandum in Support regarding 11 MOTION for Extension of Time to File *Petitioner's Expert Report* MOTION for an Examination Under Standing Order 13-SO-2 (Oct. 21, 2013) *(CORRECTED Case Caption)* filed by United States of America. (Attachments: # 1 Exhibit 1-Curriculum Vitae of Dr. Gary Zinik) (James, Michael) (Entered: 01/14/2016) |
| 01/14/2016 | | Motion Referred to US Magistrate Judge James E. Gates regarding: 11 MOTION for Extension of Time to File *Petitioner's Expert Report*, MOTION for an Examination Under Standing Order 13-SO-2 (Oct. 21, 2013) . (McLemore, J) (Entered: 01/14/2016) |
| 01/15/2016 | | Motions No Longer Referred: 11 MOTION for Extension of Time to File *Petitioner's Expert Report* MOTION for an Examination Under Standing Order 13-SO-2 (Oct. 21, 2013) (McLemore, J) (Entered: 01/15/2016) |
| 02/01/2016 | 14 | SEALED *(Selected Participants Only)*Forensic Report received as to Blake Charboneau (available to: Respondent Blake Charboneau, Petitioner United States of America). (Attachments: # 1 Forensic Report of Court Appointed Examiner Dr. Christopher North, # 2 Confidentiality Agreement of Court Appointed Examiner Dr. Christopher North, # 3 Curriculum Vitae of Court Appointed Examiner Dr. Christopher North, # 4 Case list of Court Appointed |

| | | Examiner Dr. Christopher North) (Acker, G.) Modified on 2/1/2016 to remove the word PROPOSED. (Blankenship, T.) (Entered: 02/01/2016) |
|---|---|---|
| 02/10/2016 | | Motion Referred to US Magistrate Judge James E. Gates regarding: 11 MOTION for Extension of Time to File *Petitioner's Expert Report* MOTION for an Examination Under Standing Order 13-SO-2 (Oct. 21, 2013). (Indig, A.) (Entered: 02/10/2016) |
| 02/10/2016 | 15 | Notice filed by United States of America *(Joint Notice of Proposed Hearing Dates)*. (James, Michael) (Entered: 02/10/2016) |
| 02/10/2016 | | Case Submitted to Chief Judge James C. Dever III regarding 15 Notice filed by United States of America - Joint Notice of Proposed Hearing Dates. (Indig, A.) (Entered: 02/10/2016) |
| 02/11/2016 | 16 | ORDER - GRANTING 11 Motion. Dr. Zinik may conduct an examination of respondent by 18 February 2016; Respondent shall fully cooperate in the examination and the government shall file Dr. Zinik's report on his evaluation of respondent as soon as practicable after the examination is conducted, but in no event later than 4 March 2016. Signed by Magistrate Judge James E. Gates on 2/10/2016. (Indig, A.) (Entered: 02/11/2016) |
| 02/16/2016 | 17 | SEALED *(Selected Participants Only)*Forensic Report received as to Blake Charboneau by Dr. Joseph Plaud (available to: Respondent Blake Charboneau, Petitioner United States of America). (Waters, Robert) Modified on 2/16/2016 to remove the word PROPOSED. (Blankenship, T.) (Entered: 02/16/2016) |
| 02/16/2016 | 18 | Notice filed by Blake Charboneau *Curriculum Vitae of Dr. Joseph Plaud*. (Waters, Robert) (Entered: 02/16/2016) |
| 02/17/2016 | 19 | Notice filed by Blake Charboneau *Confidentiality Agreement of Dr. Joseph Plaud*. (Waters, Robert) (Entered: 02/17/2016) |
| 03/03/2016 | 20 | SEALED *(Selected Participants Only)*Forensic Report received as to Blake Charboneau (available to: Respondent Blake Charboneau, Petitioner United States of America). (Attachments: # 1 Forensic Report by Dr. Gary Zinik, # 2 Confidentiality Agreement by Dr. Gary Zinik, # 3 Curriculum Vitae of Dr. Gary Zinik, # 4 Expert Witness Testimony List of Dr. Gary Zinik) (James, Michael) Modified on 3/3/2016 to remove the word "proposed". (Indig, A.) (Entered: 03/03/2016) |
| 03/16/2016 | 21 | |

| | | MOTION for Extension of Time to Complete Discovery filed by Blake Charboneau. (Attachments: # 1 Text of Proposed Order) (Waters, Robert) (Entered: 03/16/2016) |
|---|---|---|
| 03/18/2016 | | Motion Referred to US Magistrate Judge James E. Gates regarding: 21 MOTION for Extension of Time to Complete Discovery . (McLemore, J) (Entered: 03/18/2016) |
| 03/18/2016 | 22 | ORDER granting 21 Motion for Extension of Time to Complete Discovery. The deadline for completion of discovery is extended to 20 May 2016. The parties shall submit final prehearing disclosures by 27 May 2016, objections to such disclosures by 3 June 2016, and a joint proposed prehearing order by 13 June 2016. All dispositive motions shall be filed by 13 June 2016. Signed by Magistrate Judge Robert B. Jones, Jr. on 3/18/2016. Counsel is reminded to read the entire order for critical dates and deadlines. (McLemore, J) (Entered: 03/18/2016) |
| 03/23/2016 | 23 | Notice filed by United States of America *(Joint Notice of Proposed Hearing Dates)*. (James, Michael) (Entered: 03/23/2016) |
| 04/06/2016 | 24 | Order Setting Hearing -Trial set for 8/23/2016 at 9:00 AM in Raleigh - 7th Floor - Courtroom 1 before Chief Judge James C. Dever III. Signed by Chief Judge James C. Dever III on 4/6/2016. (Agiovlassitis, J.) (Entered: 04/06/2016) |
| 05/17/2016 | 25 | Notice of Writ to Produce Blake Charboneau on 8/23/2016 in Raleigh. (James, Michael) (Entered: 05/17/2016) |
| 06/13/2016 | 26 | Proposed Pretrial Order *(Joint)* by United States of America. (James, Michael) (Entered: 06/13/2016) |
| 08/09/2016 | 27 | Proposed Pretrial Order *(Joint and Amended)* by United States of America. (James, Michael) (Entered: 08/09/2016) |
| 08/16/2016 | 28 | Joint MOTION to Stay *the Civil Commitment Proceedings* filed by United States of America. (Attachments: # 1 Text of Proposed Order) (James, Michael) (Entered: 08/16/2016) |
| 08/16/2016 | 29 | Memorandum in Support regarding 28 Joint MOTION to Stay *the Civil Commitment Proceedings* filed by United States of America. (James, Michael) (Entered: 08/16/2016) |
| 08/16/2016 | 30 | ORDER - GRANTING 28 Motion to Stay. It is hereby ORDERED that the civil commitment proceedings in this case is stayed until further order by the Court. Signed by Chief Judge James C. Dever III on 8/16/2016. (Indig, A.) (Entered: 08/16/2016) |

| 09/07/2016 | 31 | Notice of Substitution of Counsel filed by Katherine E. Shea on behalf of Blake Charboneau substituting for Robert E. Waters. (Shea, Katherine) (Entered: 09/07/2016) |
| 09/07/2016 | 32 | MOTION TO LIFT STAY OF HEARING , MOTION to Continue *TO RESET HEARING FOR JANUARY 2017* filed by Blake Charboneau. (Shea, Katherine) (Entered: 09/07/2016) |
| 09/08/2016 | | Motion Submitted to United States Chief Judge James C. Dever, III regarding 32 MOTION TO LIFT STAY OF HEARING and MOTION to Continue *TO RESET HEARING FOR JANUARY 2017*. (Blankenship, T.) (Entered: 09/08/2016) |
| 09/14/2016 | 33 | Order Setting Hearing - 4248 Bench Trial set for 1/18/2017 at 9:00 AM in Raleigh - 7th Floor - Courtroom 1 before Chief Judge James C. Dever III. Signed by Chief Judge James C. Dever III on 9/13/2016. (Indig, A.) (Entered: 09/14/2016) |
| 10/25/2016 | 34 | Order Re-Setting Hearing - 4248 Bench Trial set for 1/27/2017 at 9:00 AM in Raleigh - 7th Floor - Courtroom 1 before Chief Judge James C. Dever III. Signed by Chief Judge James C. Dever III on 10/25/2016. (Indig, A.) (Entered: 10/25/2016) |
| 11/22/2016 | 35 | Notice of Writ to Produce Blake Charboneau on 1/27/2017 in Raleigh. (James, Michael) (Entered: 11/22/2016) |
| 01/13/2017 | 36 | Proposed Pretrial Order by United States of America. (James, Michael) (Entered: 01/13/2017) |
| 01/15/2017 | 37 | Notice of Appearance filed by Halerie F. Mahan on behalf of Blake Charboneau. (Mahan, Halerie) (Entered: 01/15/2017) |
| 01/16/2017 | 38 | MOTION for Extension of Time to File *Proposed Findings of Fact and Conclusions of Law* filed by Blake Charboneau. (Attachments: # 1 Text of Proposed Order) (Shea, Katherine) (Entered: 01/16/2017) |
| 01/16/2017 | 39 | Proposed Order regarding 38 MOTION for Extension of Time to File *Proposed Findings of Fact and Conclusions of Law CORRECTED PROPOSED ORDER* filed by Blake Charboneau. (Shea, Katherine) (Entered: 01/16/2017) |
| 01/16/2017 | 40 | MOTION to Communicate Ex Parte with Respondent-Selected Examiner, Dr. Joseph Julian Plaud filed by Blake Charboneau. (Attachments: # 1 Text of Proposed Order) (Shea, Katherine) (Entered: 01/16/2017) |
| 01/17/2017 | | |

| | | |
|---|---|---|
| | | Motion Submitted to United States Chief Judge James C. Dever, III regarding 38 MOTION for Extension of Time to File *Proposed Findings of Fact and Conclusions of Law*. (Blankenship, T.) (Entered: 01/17/2017) |
| 01/17/2017 | 41 | ORDER - GRANTING 38 Motion for Extension of Time to File. Each party shall file their proposed findings of fact and conclusions of law no later than 2/3/2017. Signed by Chief Judge James C. Dever III on 1/17/2017. (Indig, A.) (Entered: 01/17/2017) |
| 01/17/2017 | 42 | ORDER - DENYING 40 Motion to communicate ex parte with Dr. Plaud. Signed by Chief Judge James C. Dever III on 1/17/2017. (Indig, A.) (Entered: 01/17/2017) |
| 01/23/2017 | 43 | JOINT PRETRIAL ORDER. Signed by Chief Judge James C. Dever III on 1/23/2017. (Indig, A.) (Entered: 01/23/2017) |
| 01/27/2017 | 44 | Minute Entry for proceedings held before Chief Judge James C. Dever III in Raleigh: Bench Trial completed on 1/27/2017. Counsel for government and respondent present. Opening statements by both parties. All exhibits in the pre-trial order are admitted. All doctors presented are tendered as experts. Government called four witnesses. Respondent called two witnesses. Closing arguments by both parties. Court takes the matter under advisement and will announce its decision on a later date. (Court Reporter Amy Condon) (Briggeman, N.) (Entered: 01/27/2017) |
| 01/27/2017 | 45 | Exhibit List for bench trial held on January 27, 2017. (Briggeman, N.) (Entered: 01/27/2017) |
| 02/03/2017 | 46 | Proposed Findings of Fact by Blake Charboneau. (Shea, Katherine) (Entered: 02/03/2017) |
| 02/03/2017 | 47 | Proposed Findings of Fact by United States of America. (James, Michael) (Entered: 02/03/2017) |
| 02/06/2017 | 48 | Proposed Findings of Fact by United States of America. (James, Michael) (Entered: 02/06/2017) |
| 09/21/2017 | 49 | Order Setting Hearing - Hearing Announcing Decision set for 9/28/2017 at 4:00 PM in Raleigh - 7th Floor - Courtroom 1 before Chief Judge James C. Dever III. Signed by Chief Judge James C. Dever, III on 9/21/2017. (Indig, A.) (Entered: 09/21/2017) |
| 09/21/2017 | 50 | Notice of Writ to Produce Blake Charboneau on 9/28/2017 in Raleigh. (Anderson, Christopher) (Entered: 09/21/2017) |
| 09/28/2017 | 51 | |

| | | Minute Entry for proceedings held before Chief Judge James C. Dever, III in Raleigh: Hearing to Announce Decision held on 9/28/2017. Respondent present with counsel. Attorney for government present. Court announces findings of fact and conclusions of law in open court. Written order to follow. (Court Reporter Lori Russell) (Indig, A.) (Entered: 09/28/2017) |
|---|---|---|
| 09/28/2017 | 52 | ORDER - The United States has proven that Charboneau is a sexually dangerous person as defined in the Adam Walsh Act. Accordingly, judgment shall be entered in favor of petitioner, the United States, and against respondent, Blake Charboneau. Charboneau is hereby committed to the custody and care of the Attorney General pursuant to 18 U.S.C. § 4248. Signed by Chief Judge James C. Dever III on 9/28/2017. (Indig, A.) (Entered: 09/28/2017) |
| 09/28/2017 | 53 | CLERK'S JUDGMENT - that the respondent is committed to the custody and care of the Attorney General pursuant to 18 U.S.C. § 4248. Signed by Peter A. Moore, Jr., Clerk of Court on 9/28/2017. (Indig, A.) (Entered: 09/28/2017) |
| 10/02/2017 | 54 | Notice of Appeal filed by Blake Charboneau as to 53 Clerk's Judgment. Filing fee. (Shea, Katherine) (Entered: 10/02/2017) |
| 10/02/2017 | 55 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 54 Notice of Appeal filed by Blake Charboneau. (Indig, A.) (Entered: 10/02/2017) |
| 10/03/2017 | 56 | US Court of Appeals Case Number 17-7306 (Amy L. Carlheim, Case Manager) as to 54 Notice of Appeal filed by Blake Charboneau. (Indig, A.) (Entered: 10/03/2017) |
| 10/03/2017 | 57 | ORDER of US Court of Appeals as to 54 Notice of Appeal filed by Blake Charboneau. The court appoints the Federal Public Defender for the Eastern District of North Carolina to represent Blake Charboneau in this case. (Indig, A.) (Entered: 10/03/2017) |
| 10/23/2017 | 58 | OFFICIAL TRANSCRIPT for dates of 9/28/2017, before Chief Judge James C. Dever, III, regarding 54 Notice of Appeal. Court Reporter: Lori Russell (Middle District of NC Official Reporter). Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? Yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's |

| | | |
|---|---|---|
| | | website. Redaction Request due 11/16/2017. Redacted Transcript Deadline set for 11/26/2017. Release of Transcript Restriction set for 1/24/2018. (Foell, S.) (Entered: 10/23/2017) |
| 10/23/2017 | | NOTICE of Filing of Official Transcript 58 Appeal Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Foell, S.) (Entered: 10/23/2017) |
| 12/12/2017 | 59 | OFFICIAL TRANSCRIPT of BENCH TRIAL for the date of January 27, 2017, before Chief District Judge James C. Dever III, regarding 54 Notice of Appeal. Court Reporter/Amy Condon. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - Yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 1/5/2018. Redacted Transcript Deadline set for 1/15/2018. Release of Transcript Restriction set for 3/15/2018. (Condon, A.) (Entered: 12/12/2017) |
| 12/12/2017 | | NOTICE of Filing of Official Transcript 59 Appeal Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Condon, A.) (Entered: 12/12/2017) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 01/04/2018 13:46:58 | | |
| | pd000733 | Client Code: |

| PACER Login: | | | |
|---|---|---|---|
| **Description:** | Docket Report | **Search Criteria:** | 5:15-hc-02287-D |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-HC-

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
|     Petitioner,   ) | |
|        ) | |
|       v.   ) | CERTIFICATION OF A SEXUALLY |
|        ) | DANGEROUS PERSON AND PETITION |
| BLAKE CHARBONEAU,   ) | |
| Register Number 05318-059,   ) | |
|     Respondent.   ) | |

The United States of America, by and through the United States
Attorney for the Eastern District of North Carolina, hereby submits
the attached Certification of a Sexually Dangerous Person pursuant
to Title 18 U.S.C. § 4248(a).

Based on the above, the United States hereby petitions the Court
to commit Respondent to the custody of the Attorney General, pursuant
to 18 U.S.C. § 4248(d).

Respectfully submitted, this 3rd day of December, 2015.

THOMAS G. WALKER
United States Attorney

BY:  /s/ G. Norman Acker, III
      G. NORMAN ACKER, III
Assistant United States Attorney
Deputy Chief, Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 27601-1461
Telephone: (919) 856-4530
Facsimile:(919) 856-4821
Email: norman.acker@usdoj.gov
NC Bar No. 12839
Attorney for Petitioner

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 3rd day of December, 2015,

served a copy of the foregoing upon Respondent in this action by

placing the documents in an envelope marked as stated below, and

placing the envelope in the U.S. mail for delivery to:

    BLAKE CHARBONEAU
    Reg. No. 05318-059
    FCI Butner
    PO Box 1000
    Butner, NC 27509

and on the same day served a copy of the foregoing by placing a copy
in the U.S. Mail, addressed as follows:

    Office of the Federal Public Defender
    150 Fayetteville Street Mall
    Suite 450
    Raleigh, North Carolina 27601


                          /s/ G. Norman Acker, III
                          G. NORMAN ACKER, III
                          Assistant United States Attorney
                          Deputy Chief, Civil Division
                          310 New Bern Avenue
                          Suite 800 Federal Building
                          Raleigh, NC 27601-1461
                          Telephone: (919) 856-4530
                          Facsimile:(919) 856-4821
                          Email: norman.acker@usdoj.gov
                          NC Bar No. 12839
                          Attorney for Petitioner

## CERTIFICATION OF A SEXUALLY DANGEROUS PERSON

(1) I, Ivonne E. Bazerman, am Chairperson of the Federal Bureau of Prisons (Bureau) Certification Review Panel, Washington, D.C.  Pursuant to 28 C.F.R. § 0.97, the Director of the Bureau has delegated to me the authority to certify persons in Bureau custody as sexually dangerous, as authorized by 18 U.S.C. § 4248.

(2) Bureau records reflect the following: Inmate Blake Charboneau, Register Number 05318-059, is in Bureau custody at the Federal Correctional Institution, Butner, North Carolina, in service of a 36-month term of imprisonment and a 24-month term of supervised release following his conviction for a Supervised Release Violation for Sexual Contact with Person Incapable of Consenting, (D.S.D.) (Case No. 5:02CR50076-01), for performing cunnilingus on the victim who was not capable of consent.  His projected release date is February 21, 2016.

(3) Based on a review of his Bureau records, I certify he is a sexually dangerous person as defined by 18 U.S.C. § 4247(a)(5), and sexually dangerous to others as defined by 18 U.S.C. § 4247(a)(6).  My certification is based on information found in Bureau records which includes, but is not limited to, the following:

(a) He previously engaged or attempted to engage in sexually violent conduct or child molestation as evidenced

by his current offense conduct and prior convictions for:
Assault, U.S. District Court, North Dakota (Docket No. C2-
82-15-01), for slapping and hitting the victim while
attempting to sexually assault her by force; Aggravated
Sexual Abuse by Force, U.S. District Court, North Dakota
(Docket No. C2-88-54-01), for forcibly having sexual
intercourse with his 10-year old daughter;

(b) A psychological review and assessment indicated
the following diagnoses: Alcohol Use Disorder, In a
Controlled Environment; Inhalant Use Disorder, In sustained
Remission; Adult Sexual Abuse by Nonspouse or Nonpartner
(perpetrator); Child Sexual Abuse (Perpetrator);

(c) A review and assessment of him using an actuarial
risk assessment instrument (Static-99R) was conducted.
This result, in addition to his prior offense conduct, lack
of emotionally intimate relationships with adults,
lifestyle impulsivity and resistance to rules and
supervision, indicate he will have serious difficulty
refraining from sexually violent conduct or child
molestation if released.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


_____        _____
Ivonne E. Bazerman                       Date
Chairperson
Certification Review Panel
Federal Bureau of Prisons

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-HC-

UNITED STATES OF AMERICA,      )
        Petitioner,            )
                               )
        v.                     )        O R D E R
                               )
BLAKE CHARBONEAU,              )
Register Number 05318-059,     )
        Respondent.            )

At the request of the Director of the Bureau of Prisons, the government has filed a Certification of a Sexually Dangerous Person pursuant to 18 U.S.C. § 4248, in order for this Court to hold a hearing to determine whether Respondent is a sexually dangerous person as defined by 18 U.S.C. § 4247(a)(5).

Respondent, having demonstrated eligibility for appointment of counsel at government expense, the Federal Public Defender is directed to provide representation in this action.

The Court further determines that the Respondent is unable to pay the fees of any witness, and pursuant to Federal Rule of Criminal Procedure 17(b) the Clerk shall issue a subpoena for any witness necessary to present an adequate defense to the pending charge or charges.

The Court further ORDERS that the United States Marshal shall serve any subpoenas presented to him in this case by the office of the Federal Public Defender, and shall pay the appropriate fees and

expenses to witnesses so subpoenaed.

Pursuant to 18 U.S.C. section 4247(b), the Court ORDERS the appointment of a mental health examiner of the Respondent's choosing. Pursuant to this section, if the Respondent wishes to request an additional examiner, he shall request such by separate motion to this court.

Any and all future forensic reports, and other such psychological and psychiatric reports or documents relevant to this case, whether such reports are produced by the Federal Bureau of Prisons, independent examiners appointed by order of this Court, or other mental health professionals, shall be filed with this Court under seal, without need of further motion to seal, by either party. Further the Clerk is DIRECTED to permanently seal these reports in accordance with Local Civil Rule 79.2(b), E.D.N.C.

The Court hereby notifies the parties that in light of the provisions of the Amended Standing Order of the Court filed October 21, 2013, the parties will not be required to conduct an initial scheduling conference pursuant to Fed. R. Civ. P. 26(f).

This _____ day of December, 2015.

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-HC-2287-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Petitioner, | ) | JOINT |
| | ) | PRE-TRIAL ORDER |
| v. | ) | PURSUANT TO L.R. 16.1(c) |
| | ) | E.D.N.C |
| BLAKE CHARBONEAU, | ) | (Second Amended) |
| | ) | |
| Respondent. | ) | |

I.   STIPULATIONS:

1.   All parties are properly before the Court.

2.   The Court has jurisdiction of the parties and the
subject matter.

3.   All parties have been correctly designated.

4.   There is no question as to misjoinder or non-joinder
of the parties.

5.   This action arises under the Adam Walsh Act, Title 18,
United States Code, Section 4248 and this Court has
original exclusive jurisdiction.

6.   Venue of this matter is proper.

7.   Copies of all official documents, documents kept in
the ordinary course of business, and all production exchanged
during discovery in this matter are genuine and authentic.

1

8.   At trial, the parties will submit a Joint Trial Notebook, which will contain the exhibits to which the parties have stipulated to the authenticity and admissibility.

II.  CONTENTIONS:

    A.  PETITIONER

       1.  Facts:

         (a)  On December 3, 2015, Respondent Blake Charboneau ("Charboneau") was certified as a sexually dangerous person pursuant to 18 U.S.C. § 4248.

         (b)  At the time of his certification, Charboneau was in custody of the Federal Bureau of Prisons at the Federal Correctional Institution in Butner, North Carolina, serving a 36-month term of imprisonment to be followed by a 24-month term supervised release, as a result of Charboneau's imprisonment for violating his supervised release related to Charboneau's supervised release violation for sexual contact with person incapable of consenting. Charboneau's initial conviction arose out of his conviction after a jury trial for engaging in a sexual act by using force, in violation of 18 U.S.C. § 2241(a)(1).

         (c)  Charboneau's release date on the above-referenced offense was February 21, 2016.

       2.  Issues:

         (a)  Has Charboneau engaged in or attempted to engage in sexually violent conduct or child molestation?

         (b)  Is Charboneau sexually dangerous in that he

2

suffers from a serious mental illness,
abnormality or disorder, and as a result of
his serious mental illness, abnormality or
disorder, would have serious difficulty in
refraining from sexually violent conduct or
child molestation if released?

B.  RESPONDENT

1.  Facts:

    (a)  On December 9, 2003, Mr. Charboneau pleaded
        guilty but mentally ill in South Dakota
        state court to Sexual Contact with a Person
        Incapable of Consenting.  He was sentenced
        to 10 years of incarceration.  As he was on
        federal supervised release at the time of
        this offense, he also received a 36-month
        sentence of incarceration in the BOP for
        supervised release violation, consecutive to
        the state sentence.  His projected release
        date from the federal sentence was February
        21, 2016, with 24-months of federal
        supervised release to follow.  This sexual
        offense involved Mr. Charboneau's 25-year-
        old niece.

    (b)  Mr. Charboneau's federal supervised release
        stemmed from a 1988 conviction after trial
        by jury of aggravated sexual abuse by force.
        This sexual offense involved a minor victim.

2.  Issues:

    (a)  Has Mr. Charboneau engaged in or attempted
        to engage in sexually violent conduct or
        child molestation?

    (b)  Does Mr. Charboneau presently suffer from a
        serious mental illness, abnormality or
        disorder?

    (c)  If so, as a result of the serious mental

illness, abnormality or disorder, would Mr. Charboneau have serious difficulty in refraining from sexually violent conduct or child molestation if released from BOP custody?

II.  EXHIBITS

A.  PETITIONER:

| No. | Description | Bates Stamp #s | OBJECTION |
|-----|-------------|----------------|-----------|
| 1 | Certification of a Sexually Dangerous Person. | 2091-93 | |
| 2 | CV of Dr. Christopher North. | N/A | |
| 3 | Evaluation for Civil Commitment as Sexually Dangerous Person by Dr. Christopher North. | 1613-42 | |
| 4 | CV of Dr. Heather Ross. | N/A | |
| 5 | Forensic Pre-Certification Evaluation Report by Dr. Heather Ross. | 527-45 | |
| 6 | CV of Dr. Zinik. | N/A | |
| 7 | Evaluation for Civil Commitment as Sexually Dangerous Person by Dr. Zinik. | 1643-74 | |
| 8 | July 8, 2014, Letter from the Charboneau  Family regarding Respondent's release. | 155-56 | |
| 9 | Judgment in a Criminal Case, US v. Charboneau, 5:02CR50076-01 (for revocation of supervised release), Dated November 23, 2004. | 726-30 | |

4

| 10 | Supplemental presentence/adjustment report supervised release violation. | 8-11 | |
| 11 | Amended Judgment, State of South Dakota v. Charboneau, File No. 51C03002441AO, Dated January 9, 2004 | 1489-91 | |
| 12 | Complaint, State of South Dakota v. Charboneau, Dated July 14, 2003. | 1492 | |
| 13 | Transcript, State of South Dakota v. Charboneau, Court file No. 03-2441, Dated July 28, 2003. | 175-201 | |
| 14 | Judgment in a Criminal Case, US v. Charboneau, C2-88-54-01, Dated January 4, 1990. | 747-50 | |
| 15 | Judgment and Commitment Pursuant to 18 U.S.C. 4244(d), US v. Charboneau, C2-88-54-01, Dated November 30, 1988. | 767-68 | |
| 16 | Presentence report, US v. Charboneau, C2-88-54-01, Dictated November 19, 1988. | 140-54 | |
| 17 | Verdict Sheet, US v. Charboneau, C2-88-54, Dated October 27, 1988. | 1516 | |
| 18 | Certificate of Recovery and Request to Discharge from Psychiatric Hospitalization. | 804 | |
| 19 | Judgment and Commitment Order, United States v. Charboneau, C2-82-15-01, Dated August 13, 1982. | 2001 | |
| 20 | Docket Sheet, United States v. Charboneau, C2-82-15-01. | 2002-03 | |
| 21 | Deposition of Respondent Blake Charboneau, US v. Charboneau, No. 5:15-HC-2075-FL. | N/A | |
| 22 | Request for Admission No. 4, US v. Charboneau, No. 5:15-HC-2075-FL. | N/A | |
| 23 | Informed Consent to Participate in Sex Offender Treatment form executed by Respondent on February 22, 2016 | 1712-14 | |
| 24 | BOP Psychological Services CTP - Clinical Contact | 1715 | |

5

| 25 | CV of Dr. Kara Holden | N/A | |
| 26 | Initial Treatment Plan Psychological Testing Report Commitment and Treatment Program | 1794-1802 | |
| 27 | Bureau of Prisons Psychology Services CTP – Clinical Contact | 1805 | |
| 28 | Bureau of Prisons Commitment and Treatment Program Initial Assessment | 1806-12 | |

Petitioner reserves the right to designate and use any exhibits identified by Respondent in this action.

    B.   RESPONDENT

| No. | Description | Bates Stamp #s | |
| --- | --- | --- | --- |
| 1 | CV of Dr. Joseph Plaud | RESP_CHAR 18-56 | |
| 2 | Evaluation and Expert Report of Dr. Joseph Plaud | RESP_CHAR 1-17 | |
| 3 | Deposition of Dr. Gary Zinik, US v. Charboneau, No. 5:15-HC-2287-D | N/A | |

Respondent reserves the right to designate and use any exhibits identified by Petitioner in this action.

IV.   DESIGNATION OF PLEADINGS AND DISCOVERY MATERIALS

    A.   PETITIONER

Petitioner designates the entire pleadings and responses and the transcript of the following deposition for purposes of cross-examination: Respondent Blake Charboneau.  Petitioner

6

reserves the right to use, as necessary, all portions of these documents, as appropriate, pursuant to the Federal Rules of Evidence and the Local Rules.

      B.   RESPONDENT

Petitioner designates the entire pleadings and responses and the transcript of the following deposition for purposes of cross-examination: Dr. Gary Zinik.  Respondent reserves the right to use, as necessary, all portions of these documents, as appropriate, pursuant to the Federal Rules of Evidence and the Local Rules.

V.   WITNESSES

      A.   PETITIONER

| Name | Address | Proposed Testimony |
|------|---------|--------------------|
| Dr. Christopher North | PMB #224, 1717 East Vista Chino, Suite A7<br>Palm Springs, CA 92262<br>(760) 325-7299 | Expert Testimony re: Issues (a) and (b) identified by Petitioner |
| Dr. Gary Zinik | 1280 So. Victoria Ave., Suite 230<br>Ventura, CA 93003<br>Phone (805) 650-3327 | Expert Testimony re: Issues (a) and (b) identified by Petitioner; |
| Dr. Heather Ross | Federal Correctional Complex<br>P.O. Box 1000<br>Butner, NC 27509<br>(919) 575-3900 | Expert Testimony re: Issues (a) and (b) identified by Petitioner; |
| Dr. Kara Holden | Federal Correctional Complex<br>P.O. Box 1000 | Expert Testimony re: Respondent's treatment progress |

| | Butner, NC 27509<br>(919) 575-3900 | |
|---|---|---|
| Respondent<br>Blake<br>Charboneau | Federal Correctional<br>Complex<br>P.O. Box 1000<br>Butner, NC 27509 | Testimony re: prior<br>offenses and<br>convictions, facts<br>relating to same,<br>and institutional<br>conduct |

Petitioner reserves the right to call any witness listed by Respondent in this Pretrial Order. Petitioner reserves the right to call rebuttal witnesses, as appropriate.

B.    Respondent

| Name | Address | Proposed Testimony |
|---|---|---|
| Dr. Joseph Plaud | 12 Gloucester Street,<br>Number Two<br>Boston, MA  02115-1700 | Expert Testimony<br>re:Issues (a), (b)<br>and (c) as<br>identified by<br>Respondent. |
| Respondent Blake<br>Charboneau | Federal Correctional<br>Complex<br>P.O. Box 1000<br>Butner, NC 27509 | Testimony as to<br>prior offenses,<br>sexual history, and<br>release plan. |

Respondent reserves the right to call any witness listed by Petitioner in this Pretrial Order. Respondent reserves the right to call rebuttal witnesses, as appropriate.

The parties reserve the right to amend the pre-trial order to correct any defect in the form of the pre-trial order.

8

TRIAL TIME ESTIMATE:   1 day.

Respectfully submitted this 13th day of January 2017.


FOR PETITIONER:                   FOR RESPONDENT:

JOHNS STUART BRUCE                THOMAS P. MCNAMARA
United States Attorney            Federal Public Defender

By: /s/ Michael G. James          By: /s/ Katherine Shea
MICHAEL G. JAMES                  KATHERINE SHEA
Attorney for Petitioner           Attorney for Respondent
Assistant United States           Assistant Federal Public
Attorney                          Defender
Civil Division                    150 Fayetteville Street
310 New Bern Avenue               Suite 450
Suite 800, Federal Building       Raleigh, NC 27601-1461
Raleigh, NC 27601-1461            Telephone:  (919) 856-4236
Telephone:  (919) 856-4530        Facsimile:  (919) 856-4477
Facsimile:  (919) 856-4821        E-mail: kat_shea@fd.org
E-mail: mike.james@usdoj.gov      N.Y. Bar
N.Y. Bar                          LR 57.1 Counsel, Appointed


APPROVED BY:


_____
JAMES C. DEVER, III.
Chief United States District Judge

January 23 , 2017.


9

```
 1                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NORTH CAROLINA
 2                         WESTERN DIVISION

 3   _____)
     UNITED STATES OF AMERICA,      )
 4              Petitioner          )
                vs.                 )  5:15-HC-2287-D
 5                                  )
     BLAKE CHARBONEAU,              )
 6              Respondent.         )
     _____)
 7

 8                      JANUARY 27, 2017
                          BENCH TRIAL
 9        BEFORE THE HONORABLE JAMES C. DEVER III
               CHIEF UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES:

12   On Behalf of the Government:

13   MICHAEL JAMES, ASSISTANT U.S. ATTORNEY
     CHRISTOPHER M. ANDERSON, ASSISTANT U.S. ATTORNEY
14   U.S. Attorney's Office
     New Bern Avenue, Suite 800
15   Raleigh, North Carolina  27601

16

17   On Behalf of the Respondent:

18

19   HALERIE F. MAHAN, FEDERAL PUBLIC DEFENDER
     KATHERINE E. SHEA, FEDERAL PUBLIC DEFENDER
     Federal Public Defender's Office
20   150 Fayetteville Street, Suite 450
     Raleigh, North Carolina  27601

21

22

23                   AMY M. CONDON, CSR, RPR
                       Official Court Reporter
24                 United States District Court
                       Raleigh, North Carolina
25          Stenotype with computer-aided transcription
```

```
1                          I N D E X

2

3     KARA HOLDEN

4          DIRECT EXAMINATION by Mr. James              10
           Cross-Examination by Ms. Shea                30
5          Redirect Examination by Mr. James            33

6     CHRISTOPHER NORTH

7          Direct Examination by Mr. James              34
           Direct Examination by Mr. James              34
8          Cross-Examination by Ms. Shea                53
           Redirect Examination by Mr. James            57
9
      HEATHER ROSS
10
           Direct Examination by Mr. Anderson           59
11         Cross-Examination by Ms. Mahan               88
           Redirect Examination by Mr. Anderson         95
12
      GARY ZINIK
13
           Direct Examination by Mr. Anderson           97
14         Cross-Examination by Ms. Mahan              123
           Redirect Examination by Mr. Anderson        127
15
      BLAKE CHARBONEAU
16
           Direct Examination by Ms. Shea             131
17         Cross-Examination by Mr. James             138
           Redirect Examination by Ms. Shea           147
18
      JOSEPH JULIAN PLAUD
19
           Direct Examination by Ms. Shea             149
20         Cross-Examination by Mr. James             185

21

22

23

24

25
```

**JA29**

```
 1              (Friday, January 27, 2017 commencing 9:00 a.m.)

 2                          P R O C E E D I N G S

 3              THE COURT:  Good morning, and welcome to the United

 4    States District Court for the Eastern District of North

 5    Carolina.

 6              We're here today in the Adam Walsh matter, United

 7    States versus Charboneau.  Am I pronouncing that right, Ms.

 8    Shea?

 9              MS. SHEA:  Yes, Your Honor.

10              THE COURT:  Good morning, Mr. James.  Good morning,

11    Mr. Anderson.

12              MR. JAMES:  Good morning, Your Honor.

13              THE COURT:  Is the United States ready to proceed?

14              MR. JAMES:  We are, Your Honor.

15              THE COURT:  Is the Respondent ready to proceed?

16              MS. SHEA:  Yes, Your Honor.

17              THE COURT:  I have reviewed the materials.  I didn't

18    see any objections in the pretrial order; is that correct?

19              MR. JAMES:  That's correct.  And at this time, as we

20    have done in numerous 4248 cases, with consent of counsel, we

21    will at this time move to admit in evidence the pretrial

22    notebook.

23              THE COURT:  And all the exhibits in the pretrial

24    notebook?

25              MR. JAMES:  That's correct.
```

4

| 09:02 | 1 | THE COURT: For both Petitioner and Respondent are |
| | 2 | received and accepted into evidence. And as in past cases, |
| | 3 | unless either of you all wanted to be heard, all of the doctors |
| | 4 | are experts in their respective fields and I accept them as |
| 09:02 | 5 | such and I've heard them testify before. |
| | 6 | (Pretrial notebook admitted into evidence.) |
| | 7 | MR. JAMES: You beat me to the punch, that's correct. |
| | 8 | There is one doctor, Dr. Holden, she's the treating |
| | 9 | psychologist. She hadn't testified before this Court before so |
| 09:02 | 10 | I may ask some background information. |
| | 11 | THE COURT: That's fine. All right. |
| | 12 | Any other preliminary matters from the Government? |
| | 13 | MR. JAMES: No, Your Honor. |
| | 14 | THE COURT: Any other preliminary matters from the |
| 09:03 | 15 | Respondent? |
| | 16 | MS. SHEA: No, Your Honor. Thank you. |
| | 17 | THE COURT: Does the Government want to make an |
| | 18 | opening statement? |
| | 19 | MR. JAMES: Yes, my very able counsel, Mr. Anderson, |
| 09:03 | 20 | will do that for us. |
| | 21 | THE COURT: Good morning again, Mr. Anderson. |
| | 22 | MR. ANDERSON: Good morning. |
| | 23 | As the evidence will show today, Your Honor, |
| | 24 | Mr. Charboneau has previously committed or attempted to commit |
| 09:03 | 25 | acts of sexually violent conduct or child molestation. His |

09:03  1   offenses in 1982, 1987, 1988, and 2003 all qualify.

       2           In addition, Your Honor, the evidence will show that

       3   Mr. Charboneau suffers from serious mental illnesses,

       4   abnormalities or disorders.  Specifically, all four examiners

09:03  5   agree that Mr. Charboneau suffers from alcohol use disorder,

       6   severe in a controlled environment and inhaling use disorder,

       7   severe and sustained remission.

       8           Dr. Gary Zinik, who is the Government's examiner in

       9   this case, and Dr. Christopher North, who is the

09:04 10   Court-appointed examiner, also agrees that Mr. Charboneau

      11   suffers from inhalant-induced mild neurocognitive disorder.

      12   And Dr. Zinik also diagnosed his other specified personality

      13   disorder as schizoid and schizotypal features.  The serious

      14   mental disorders, Your Honor, those in turn drive

09:04 15   Mr. Charboneau's sexually offending.

      16           As the evidence will show today, the grip of

      17   Mr. Charboneau's alcohol use disorder is profound despite

      18   repeated substance abuse treatment and despite repeated arrests

      19   and incarceration for alcohol-induced crimes, Mr. Charboneau

09:04 20   continues to seek and consume alcohol when he's in the

      21   community.

      22           Mr. Charboneau denies he has any sort of alcohol

      23   problem, but as Dr. Zinik will explain, alcohol is, in fact,

      24   Mr. Charboneau's drug of choice.  It is, in fact, his most

09:04 25   persistent addiction; and it is, in fact, his sole

09:04  1  preoccupation when he's in the community.  And when

2  Mr. Charboneau drinks, he becomes sexually aroused, but he also

3  becomes disinhibited and he cannot understand or control his

4  sexual urges.  The sexual urges instead overwhelm him and he

09:05  5  acts out sexually just as he did in 1982, 1987, 1988 and in

6  2003.  Mr. Charboneau was drunk all four times that he either

7  raped or tried to rape his intended victim.

8       But his most recent offense in 2003, that one is

9  perhaps the most telling.  Despite community-based substance

09:05  10  abuse treatment, despite community-based sex offender

11  treatment, despite a supportive living arrangement that was

12  designed to prevent alcohol relapse, and despite federal

13  supervision, Mr. Charboneau still bought whiskey, got drunk and

14  tried to rape his niece.  And that history, Your Honor, shows

09:05  15  that Mr. Charboneau cannot control his sexual urges when he's

16  intoxicated.

17       And, in fact, Mr. Charboneau seems to agree.  As the

18  Court will hear today, Mr. Charboneau admitted that when he

19  raped his daughter in 1988, he felt a loss of control.

09:06  20  Mr. Charboneau admitted that when he tried to rape his niece in

21  2003, he was out of control.

22       And in December, 2016, Your Honor, barely one month

23  ago, Mr. Charboneau admitted that he is sexually dangerous.

24       Dr. Kara Holden is Mr. Charboneau's sex offender

09:06  25  treatment provider in BOP and will testify about that today.

09:06  1          Based on all of that, Your Honor, Dr. Zinik,

       2    Dr. North and BOP's forensic examiner, Dr. Heather Ross, all

       3    three are unanimous in this case.  All three agree that if

       4    released, Mr. Charboneau will undoubtedly return to alcohol and

09:06  5    sexual offending.

       6          Now, Mr. Charboneau, as I said, is in sex offender

       7    treatment in BOP, but he has not completed the program.  In

       8    fact, he's only just begun the program.  He also is not

       9    currently enrolled in substance abuse treatment.

09:06 10          As the evidence will show, Mr. Charboneau needs both

      11    sex offender treatment and substance abuse treatment in order

      12    to be safe for release to the community.  Otherwise, Your

      13    Honor, Mr. Charboneau will be, as he has always been, unable to

      14    control his urge to drink alcohol and, in turn, unable to

09:07 15    refrain from sexually violent conduct or child molestation.

      16          And for all those reasons, Your Honor, the United

      17    States respectfully requests that the Court find Mr. Charboneau

      18    as a sexually dangerous person who satisfies the criteria for

      19    civil commitment under the Adam Walsh Act.

09:07 20          Thank you.

      21          THE COURT:  Thank you, Mr. Anderson.

      22          Ms. Shea or Ms. Mahan?

      23          MS. SHEA:  Thank you, Your Honor.

      24          The Government in this case wants to change the

09:07 25    question in the statute.  The question before this Court is

**JA34**

09:07  1    whether Mr. Charboneau will have serious difficulty refraining

       2    from sexual -- sexually violent conduct or child molestation if

       3    released.

       4              The Government wants the question to be instead

09:07  5    whether Mr. Charboneau will have serious difficulty refraining

       6    from having a drink if released.

       7              You see, Your Honor, this is a case that involves no

       8    paraphilia, no evidence whatsoever that Blake Charboneau has a

       9    sexually deviant interest, no evidence whatsoever that Blake

09:08 10    Charboneau is motivated to commit sex offenses by an underlying

      11    sexual disorder.

      12              The diagnosis that the Court will hear about today is

      13    not a paraphilia, nor is it even a personality disorder.

      14    Rather it is this alcohol dependence disorder, alcoholism.

09:08 15              And the questions that today's hearing will center

      16    around is whether Mr. Charboneau's alcoholism is sufficient to

      17    meet Prong 2 of the statute and whether the Government can show

      18    by clear and convincing evidence that his alcoholism will cause

      19    him serious difficulty refraining from re-offending if

09:08 20    released.

      21              Judge, the causal link in this case will simply be

      22    too attenuated.  They cannot show by clear and convincing

      23    evidence that his alcoholism will cause him serious difficulty

      24    refraining from sexually re-offending.  And indeed this causal

09:09 25    link between alcoholism and sexual offending is a tricky one.

09:09  1    And indeed it's something that our courts have struggled with

       2    since the inception of the Adam Walsh Act.

       3              Indeed, the Fourth Circuit has never upheld that

       4    alcoholism alone is enough to satisfy the second prong of the

09:09  5    Adam Walsh Act.

       6              All the experts will agree that Mr. Charboneau has

       7    never committed an act of sexual violence when sober.  They

       8    will agree that his criminal history includes many nonsexual

       9    offenses committed under the influence of alcohol.  They will

09:09 10    all agree that he has been incarcerated for 13 years and there

      11    is not a shred of evidence that he's ever had any alcohol in

      12    the prison; that he has been sober now for 13 years.  They will

      13    also have to agree that he has had near perfect prison conduct,

      14    incurring only one very minor infraction, and he must serve two

09:10 15    years of supervised release upon his release from Butner.

      16              In light of all these factors, the Court will be left

      17    with a firm belief that his alcoholism does not meet Prong 2

      18    and that the Government has not shown by clear and convincing

      19    evidence that his alcoholism will cause him serious difficulty

09:10 20    refraining from re-offending if released and we will ask this

      21    Court to find in favor of the Respondent.

      22              THE COURT:  Thank you, Ms. Shea.

      23              The United States may call its first witness.

      24              MR. JAMES:  Thank you, Your Honor.

09:10 25              At this time the United States calls Dr. Kara Holden.

**JA36**

K. Holden - Direct Examination

| | | |
|---|---|---|
| 09:10 | 1 | KARA HOLDEN, PSY.D |
| | 2 | having been duly sworn, testified as follows: |
| | 3 | DIRECT EXAMINATION |
| | 4 | BY MR. JAMES: |
| 09:11 | 5 | Q.   Good morning, Dr. Holden. |
| | 6 | A.   Good morning. |
| | 7 | Q.   Okay.  Dr. Holden, to your left there's a trial notebook, |
| | 8 | and I believe exhibits that are pertinent to you begin around |
| | 9 | Exhibit No. 24.  I made points to refer you to some of those |
| 09:11 | 10 | exhibits. |
| | 11 | Now, Exhibit No. 25, that contains your CV, for the |
| | 12 | record.  And I want to ask you just a few questions about that |
| | 13 | before moving on to some other matters regarding |
| | 14 | Mr. Charboneau's treatment and his progress; okay? |
| 09:12 | 15 | A.   Okay. |
| | 16 | Q.   Basically, the CV, I see that you have a BA in psychology |
| | 17 | and criminal justice, a double major. |
| | 18 | A.   That's correct. |
| | 19 | Q.   And why did you choose a double major? |
| 09:12 | 20 | A.   Initially, I was interested in criminal profiling.  I |
| | 21 | think the career was on the rise in the media, but however, |
| | 22 | after externship in a prison environment I was more inspired by |
| | 23 | helping individuals with mental health illnesses and working to |
| | 24 | rehabilitate and to prevent the revolving door of mental health |
| 09:12 | 25 | inmates in the criminal justice system. |

K. Holden - Direct Examination

09:13  1    Q.    I see that you got your Master's degree in clinical

2    psychology at Virginia State University.  Why did you choose

3    clinical psychology over research psychology?

4    A.    My goal was to pursue my Psy.D versus pursuing my Ph.D.

09:13  5    Psy.D are more focused on retro programs, are heavy-owned

6    clinical experience and therapeutic experience compared to

7    research experience.  And I knew my goal was to work directly

8    with patients and help patients rather than research them.

9    Q.    You then received a Ph.D from the American School of

09:13  10   Psychology at Argosy University.

11   A.    Yes.  Psy.D.  Doctor of psychology.

12   Q.    What did you say?

13   A.    You said Ph.D., Psy.D.

14   Q.    Oh, excuse me.

09:13  15        I see that during that time you also did an internship,

16   doctoral internship at Butner; is that correct?

17   A.    Yes.

18   Q.    That was between 2009 and 2010?

19   A.    That's correct.

09:14  20   Q.    What did you do there?

21   A.    I worked with the Step-Down program with chronically

22   mental ill patients and also with the general population and

23   also a rotation with forensics, forensic psychology.

24   Q.    Now, after you graduated from Argosy, you worked at the

09:14  25   Harnett County Correctional Institution as a staff

K. Holden - Direct Examination

| | | |
|---|---|---|
| 09:14 | 1 | psychologist; is that correct? |
| | 2 | A.   Yes, that's correct. |
| | 3 | Q.   Why did you choose that facility? |
| | 4 | A.   I was able to work with sex offenders directly.  Just |
| 09:14 | 5 | through my graduate program I learned about the traumatic |
| | 6 | impact that sexual abuse has on victims and I knew I wanted to |
| | 7 | work with inmates, specifically sex offenders, to reduce the |
| | 8 | rate of recidivism and hopefully not create any more victims by |
| | 9 | not sexually offending. |
| 09:15 | 10 | Q.   And while you were there, you conducted group and |
| | 11 | individual sex offender treatment services? |
| | 12 | A.   Yes. |
| | 13 | Q.   Did you also conduct education and therapeutic groups in |
| | 14 | the area such as anger management, assertiveness and |
| 09:15 | 15 | problem-solving skills and relapse prevention? |
| | 16 | A.   Yes. |
| | 17 | Q.   And from there you worked at Tabor Correctional |
| | 18 | Institution as a staff psychologist? |
| | 19 | A.   That's correct. |
| 09:15 | 20 | Q.   Why did you choose Tabor? |
| | 21 | A.   Well, they -- it was a staff psychology position.  I was |
| | 22 | able to receive student loan repayment.  It's a hard-to-fill |
| | 23 | area and I was able to just hone my skills as a therapist with |
| | 24 | the general population. |
| 09:15 | 25 | Q.   When you say hard-to-fill area, what do you mean by that? |

K. Holden - Direct Examination

09:15  1   A.    It's a rural area so it's difficult to fill medical and

2   mental health physicians, so they recruit therapists and

3   medical professionals.

4   Q.    While you were there in Tabor you also conducted group

09:16  5   therapy and crisis intervention as well as consulting with the

6   medical correctional staff; is that correct?

7   A.    Yes.

8   Q.    All right.  Then you worked at FCI Williamsburg as a staff

9   psychologist?

09:16  10  A.    That's correct.

11  Q.    And now you currently work at FCI Butner; is that correct?

12  A.    Yes.

13  Q.    You are in the commitment and treatment program?

14  A.    Yes.

09:16  15  Q.    And you work with Dr. Hernandez?

16  A.    Yes.

17  Q.    And what are your duties as a clinical psychologist in the

18  commitment and treatment program?

19  A.    Individual treatment, group therapy and as-needed

09:16  20  assessments, treatment planning.

21        MR. JAMES:  Your Honor, based on the witness'

22  experience, at this time we tender the witness as an expert in

23  the field of sex offender treatment.

24        THE COURT:  All right.  She will be received.

09:17  25  BY MR. JAMES:

**JA40**

K. Holden - Direct Examination

09:17  1    Q.    All right.  Dr. Holden, you are, in fact, the treating

       2    provider for Mr. Charboneau; is that correct?

       3    A.    Yes.

       4    Q.    And I know the Court has experience with --

09:17  5          MR. JAMES:  Your Honor, I know the Court has

       6    experience with what the treatment program is from the *Burkhart*

       7    case, but for the record here I'm going to ask the witness a

       8    few questions about it.

       9          THE COURT:  That's fine.

09:17 10          MR. JAMES:  Thank you.

      11    BY MR. JAMES:

      12    Q.    Dr. Holden, can you just briefly describe the four phases

      13    of the program for the record?

      14    A.    Okay.  If it's okay, I would like to give a little

09:17 15    background of our approach.

      16    Q.    Sure.

      17    A.    Okay.  Well, CTP is based on the Good Lives Model.  The

      18    Good Lives Model is a strength-based program which differs from

      19    a traditional relapse program.  Relapse prevention typically

09:17 20    focuses on triggers such as people, places and things that the

      21    inmate has to avoid, but the Good Lives model, what it does is

      22    focus on strength base and it allows inmates to become a

      23    healthy, well-rounded individual by focusing on certain aspects

      24    of life, such as spirituality, wellness, healthy sexual

09:18 25    management and career occupational, and just every area of

K. Holden - Direct Examination

09:18   1   life.

        2       And then the CTP is a therapeutic community; that is where

        3   the guys live together 24/7, they program together and it

        4   promotes a pro-social community environment 24/7 and the

09:18   5   inmates are able to make change through model and behavior from

        6   inmates that are in higher phases.  And it also allows us the

        7   opportunity -- because our offices are right there in the

        8   community, it allows us an opportunity to view the inmates and

        9   we're able to observe their behaviors and engage with them on a

09:18  10   daily basis and we're able to witness their behaviors rather

       11   than just relying on self-report.

       12       And then the four phases of the program.  Each inmate has

       13   to progress through the four phases, and the initial phase is

       14   Phase 1, and that's the orientation phase where they're

09:19  15   oriented to the community and the program, and we use that time

       16   for observation and for our treatment planning.

       17       And then Phase 2 emphasizes pro-social living,

       18   citizenship, decreasing criminal behavior as well as fostering

       19   interpersonal interactions because a lot of these guys have

09:19  20   social skill deficits.

       21       Phase 3 focuses on sexual self-regulation as well as

       22   honing in their relapse prevention skills.

       23       And Phase 4 is we work directly with U.S. Probation and we

       24   prepare the inmates for successful re-entry into the community.

09:20  25   Q.   All right.  In fact, Mr. Charboneau volunteered for the

**JA42**

K. Holden - Direct Examination

09:20  1  program --

2  A.    Yes.

3  Q.    -- in February of 2016; is that correct?

4  A.    Yes.

09:20  5  Q.    In fact, he entered the program on February 22nd, 2016?

6  A.    That sounds correct, yes.

7  Q.    Now, I believe Exhibit No. 26, that is the initial

8  treatment plan, psychological testing report that you prepared

9  with regard to Mr. Charboneau; is that correct?

09:20  10  A.    Yes.

11  Q.    And if you turn to page 3 of that document, which is Bates

12  1796, there's a section that notes treatment progress.

13  A.    Yes.

14  Q.    Do you see that?

09:21  15  A.    Uhm-uhm.

16  Q.    So this was -- this report, by the way, was prepared on or

17  about October 26th, 2016.

18  A.    Yes.

19  Q.    Okay.  And so this report indicates what his progress was

09:21  20  at that time; is that correct?

21  A.    That's correct.

22  Q.    All right.  Can you just briefly summarize what was his

23  treatment progress at that time?

24  A.    At that time when Mr. Charboneau entered the program, he

09:21  25  was extremely reserved, very isolative, he didn't form a bond

K. Holden - Direct Examination

09:21  1    with treatment staff nor had many relationships with peers in

       2    the community.  But as treatment progressed and he became more

       3    comfortable, very slowly, but he became more comfortable with

       4    the program and the interactions of the program and more

09:21  5    comfortable with myself and other therapists, he began to

       6    engage more in the community; superficially, but he did become

       7    more of a participant on the periphery, but he did engage more.

       8    Q.    Okay.  And when you prepared this report, you reviewed his

       9    PSR; is that correct?

09:22 10    A.    Yes.

      11    Q.    You reviewed the precertification report prepared by

      12    Dr. Ross?

      13    A.    Yes.

      14    Q.    You also reviewed what they called BEMR, which is Bureau

09:22 15    Electronic Medical Records?

      16    A.    Yes.

      17    Q.    And you also performed or had supervised the

      18    administration of a series of tests.

      19          MR. JAMES:  And those, for the record, Judge, I won't

09:22 20    go into them all, but they are beginning on page 3 to page 6, I

      21    believe of the -- page 5 of the report.

      22    BY MR. JAMES:

      23    Q.    Is that correct, Doctor?

      24    A.    Yes.

09:23 25          THE COURT:  Exhibit 26?

K. Holden - Direct Examination

09:23  1          MR. JAMES:  Yes, Exhibit 26, Your Honor.

2    BY MR. JAMES:

3    Q.   One of the tests that you performed was the Multiphasic

4    Sexual Inventory, MSI-II?

09:23  5    A.   Yes.

6    Q.   And when that was administered and the results came back,

7    if you look at, I guess beginning the second paragraph.

8    A.   Yes.

9    Q.   Can you summarize that for the Court?  You don't have to

09:23  10   read the whole thing verbatim, but just summarize that for the

11   Court.

12   A.   Is it okay if I use my highlighted copy?

13   Q.   Sure.

14   A.   Well, overall, it shows that he's very defensive regarding

09:23  15   his sexual interests and behaviors and he has a lot of denial

16   in regard to his sexual offenses.  And he's very, I guess I

17   could use the word prudish when it comes to sex in general.

18   And he holds an overly moralistic view of sex.

19        He admits to committing sexual offenses but seriously

09:24  20   minimizes having thoughts prior to committing rape, but he did

21   admit he derives excitement from the anticipation of the sexual

22   assault, but he does show signs of denial when it comes to

23   acknowledging and planning his sexual assaults.

24        He's defensive, again, about his interest in sex and he

09:24  25   also attempts to portray that he doesn't have sexual interest

K. Holden - Direct Examination

09:24 1   or problems.  And part of the denial and cognitive distortion

2   that he uses is he tends to blame victims or himself as been a

3   victim of injustice to justify his sex offenses.

4       And the test results also reveal that he has anxiety about

09:25 5   his ability to function effectively in social and sexual

6   interactions, especially around age-appropriate females.

7   Q.   If you go to the last paragraph before you get to the PAI

8   assessment, it indicates that he admitted receiving treatment

9   for alcohol abuse.

09:25 10  A.   Yes.

11  Q.   But he denied he has an alcohol problem?

12  A.   That's correct.  That's what the test results revealed.

13  Q.   Now, if you turn to Exhibit No. 28, that is the initial

14  assessment that you prepared on or about December -- it's noted

09:26 15  on the Bureau report December 8, 2016.  I'm wrong, excuse me.

16  November 30th, 2016.

17       MR. JAMES:  That's beginning at Bates 1807, Judge.

18       THE COURT:  Thank you.

19  BY MR. JAMES:

09:26 20  Q.   Do you have that, Dr. Holden?

21  A.   Yes.

22  Q.   You have -- this document, it begins with a PGI title.

23  What does PGI stand for?

24  A.   Problem Go Interventions, and they are listed out as the

09:26 25  treatment plan progresses for each factor that we activated.

**JA46**

K. Holden - Direct Examination

09:26  1   Q.   And therapeutic alliance, what does that mean to the lay
       2   person?
       3   A.   He's able to build a trusting relationship with
       4   therapists, especially myself, but also with other treatment
09:26  5   staff and be able to see us in a trusting role and be able to
       6   work with us through treatment.
       7   Q.   Tell the Court, why is that important?
       8   A.   That's very important because the treatment process is a
       9   very delicate process and he has to be able to feel comfortable
09:27 10   around us to be able to work through some of his issues, and
      11   it's also important because he has a lot of denial and a lot of
      12   shame that's attached to his sexual offending, and he has to
      13   have that bond and that trusting relationship with us to slowly
      14   shed those layers of shame and denial because it serves as a
09:27 15   protective mechanism to overweigh those painful emotions that
      16   are related to the harm that he's done.  So if he trusts us,
      17   then he's willing to trust us with his emotions and sharing
      18   those things he's done that has caused a lot of difficulty in
      19   his life over the past years.
09:28 20   Q.   Is he slowly opening up to you?
      21   A.   He is, slowly.  As I said before, it's a very delicate
      22   process and Mr. Charboneau is a very reserved individual and
      23   very passive.  So he slowly -- opening up to a therapist is a
      24   normal progression of the treatment process, but with
09:28 25   Mr. Charboneau it's more slow than what we see with the typical

K. Holden - Direct Examination

09:28 1  patient.

2  Q.    Now, the rate in which he's opening up to you, is it the

3  same with the other therapists or different?

4  A.    No, it's different.  He's assigned to my caseload so I

09:28 5  have more contact with him, so he's opening up to me more.

6        He does open up to Dr. Smithson, she's had some contact

7  with him, but with the other therapists such as Dr. Hernandez,

8  our clinical coordinator, and some of the other treatment

9  providers, he's more reserved with them.  But we are working on

09:29 10 that.  We do role plays for -- smalltalk role plays just so he

11 can engage on a superficial level.  I've assigned him an

12 orderly job, that way he works directly with staff members in

13 picking up the trash and any type of minute task they have him

14 perform; that way he is more comfortable with us because if we

09:29 15 are able to build that relationship, then it will help him

16 through the rest of the therapeutic process.

17 Q.    For the record, I used the name Dr. Hernandez, and you

18 just mentioned Dr. Smithson.  Dr. Hernandez, her first name is

19 Andres Hernandez?

09:29 20 A.    Yes.

21 Q.    And Dr. Smithson is Dr. Trisha Smithson?

22 A.    That's correct.

23 Q.    Based on the therapeutic alliance that you developed with

24 Mr. Charboneau, do you believe it would be detrimental to

09:30 25 Mr. Charboneau's treatment if the Court were to release

K. Holden - Direct Examination

| | | |
|---|---|---|
| 09:30 | 1 | Mr. Charboneau and no longer in the CTP? |
| | 2 | A.   It would impede his progress.  As I said before, he slowly |
| | 3 | builds trusting relationships and severing that relationship |
| | 4 | with impede the progress that he's made and will probably -- he |
| 09:30 | 5 | may become more steep in those denials and cognitive |
| | 6 | distortions regarding his offenses. |
| | 7 | Q.   Now, the PGI titles, you just talked about one that was |
| | 8 | therapeutic alliance and I'm going to go through the others |
| | 9 | very -- I'll summarize the other ones and I may ask you on |
| 09:30 | 10 | certain points to elaborate. |
| | 11 | A.   Okay. |
| | 12 | Q.   You have down participation in the TC, I take that to |
| | 13 | mean -- |
| | 14 | A.   Treatment community, therapeutic community. |
| 09:30 | 15 | Q.   That's another goal that you would want him to work on; is |
| | 16 | that correct? |
| | 17 | A.   Yes. |
| | 18 | Q.   You have negative self-evaluation as one of the goals -- |
| | 19 | A.   Yes. |
| 09:31 | 20 | Q.   -- is that correct? |
| | 21 | A.   Yes. |
| | 22 | Q.   And why is that important, his negative self-evaluation? |
| | 23 | A.   Mr. Charboneau tends to have a low sense of self-worth, |
| | 24 | which is flawed because his IQ test shows that he's just as |
| 09:31 | 25 | intelligent as the majority of our guys, but he tends to |

K. Holden - Direct Examination

09:31  1   appraise himself based on others and because of that he feels
       2   socially inadequate, and interpersonal interactions are
       3   relevant to risks of sexual behaviors, sexually offending, so
       4   we want to make sure that we increase his social skills.
09:31  5   Q.    Problem solving is another one.  Can you just elaborate a
       6   little bit about problem solving?
       7   A.    Yes.  Mr. Charboneau, he's very likeable in the program.
       8   He's very -- he's -- the guys describe him as easy going, laid
       9   back.  He's very helpful with staff and inmates.  Anything we
09:32 10   need, he helps us out; but, however, in the community he takes
      11   a passive role, he avoids conflict.  So whenever a problem
      12   arises, he let's the situation just die out or work itself out
      13   or he'll ask others to handle the problem for him and he -- and
      14   he's currently sort of in training and he recognizes this is an
09:32 15   issue for him, but he's yet to make any changes on being more
      16   assertive.
      17   Q.    All right.  The next two I want you to elaborate for the
      18   Court.  The PGI title, there's substance abuse and under that
      19   there's one for sexual entitlement.  Tell the Court why these
09:33 20   are areas that you believe Mr. Charboneau needs to work on.
      21   A.    Well, substance use, he is diagnosed with alcohol use
      22   disorder in a controlled environment and he has a history of
      23   inhalant use.  During the commission of all his offenses,
      24   sexual offenses, he was under the -- he was intoxicated with
09:33 25   alcohol.  And normally Mr. Charboneau is not an impulsive man,

K. Holden - Direct Examination

| | | |
|---|---|---|
| 09:33 | 1 | but per his records, with the use of alcohol he becomes |
| | 2 | under-regulated and more prone to impulsiveness. And right now |
| | 3 | he does not protest and does not admit to having a substance |
| | 4 | abuse problem currently, but he is engaged in Alcohol Anonymous |
| 09:33 | 5 | and when we offer another substance abuse class this year he |
| | 6 | will be enrolled. |
| | 7 | Q.   And how does that impact the next PGI, which is sexual |
| | 8 | entitlement. |
| | 9 | A.   Mr. Charboneau, he -- per his self-report and historic |
| 09:34 | 10 | information, he felt he was owed sex from women if he perceived |
| | 11 | they were teasing him.  I mean, it doesn't matter if it was a |
| | 12 | friendly relationship or if it may have been what he deemed as |
| | 13 | flirting.  Because of that, he determined that sex was owed to |
| | 14 | him and he felt entitled to sex. |
| 09:34 | 15 | Q.   And if the substance abuse problem isn't adequately |
| | 16 | addressed and Mr. Charboneau has a problem with sexual |
| | 17 | entitlement as you described, what's the impact? |
| | 18 | A.   Per history, it's possible that he would offend. |
| | 19 | Q.   Now, going to the next page there is human sexuality and |
| 09:35 | 20 | adult intimacy and relational instability.  In particular, with |
| | 21 | regard to the adult intimacy and relational instability, why is |
| | 22 | that important? |
| | 23 | A.   Well, from his -- from his historical records and his |
| | 24 | self-report it doesn't seem that he's formed a reciprocal |
| 09:35 | 25 | romantic relationship with a partner or a significant other. |

K. Holden - Direct Examination

09:35  1   He's had women that have been friends, but not much experience

2   in dating or never been married or had a meaningful friendship,

3   romantic relationship with a woman.  And with that he

4   misinterprets the courtship process and he misreads social cues

09:35  5   in those types of situations with women.

6   Q.    Now, if someone is misreading social cues, but also using

7   alcohol at the same time, what is the impact on that?

8   A.    He typically views that as rejection rather than that

9   someone is uninterested in, they are not interested in sex, he

09:36 10   takes it personally and personalizes it as rejection.

11   Q.    The alcohol use, does that act as a dis-inhibitor?

12   A.    It does.

13   Q.    You also have significant social influences, emotional

14   loneliness and education and/or occupational functioning.  Are

09:36 15   those --

16   A.    That's correct.

17   Q.    These assessments are assessments that are done

18   periodically?

19   A.    This is the initial treatment plan.  So whenever an inmate

09:37 20   enters the program, we develop a treatment plan.  But we review

21   these every six months, so we do amend and alter the treatment

22   plan based on the more information and the behaviors and

23   interactions in the community.

24   Q.    Now, if I didn't ask this before, what phase is

09:37 25   Mr. Charboneau in the CTP?

K. Holden - Direct Examination

09:37  1    A.    He's in Phase 2.  And the phases are oppressive.  So we're

       2    mainly working on interpersonal interactions and prosocial

       3    living and, specifically with him, assertive communication.

       4    Q.    So if you were to -- if the Court were to commit

09:37  5    Mr. Charboneau, he would have to go through the rest of those

       6    phases, the rest of Phase 2, progress on to Phase 3 and into

       7    Phase 4?

       8    A.    Yes.

       9    Q.    And there's no specific time period; in other words, you

09:37  10   don't say -- it's not like social promotion, you get to go from

       11   fifth to sixth grade.  You actually have to work towards it; is

       12   that correct?

       13   A.    Yes.  They have to show us that they have mastered the

       14   competencies and the task within each phase.

09:38  15   Q.    Now, let me direct your attention to Exhibit No. 27 -- I'm

       16   sorry.  Exhibit No. 24, which is dated June 13, 2016.

       17   A.    Yes.

       18   Q.    Can you summarize for the Court what occurred, this

       19   clinical contact, between you and Mr. Charboneau?

09:38  20   A.    Okay.  This was early on in treatment and it was during an

       21   introductory group.  And during our introduction treatments, we

       22   introduce the guys to the program and what type of treatment

       23   that they'll be receiving and what type of admissions they will

       24   have to make.

09:39  25         At that time what I noticed is that Mr. Charboneau was

K. Holden - Direct Examination

09:39   1   really steep in denial and minimization regarding his offenses,

        2   and he used several cognitive distortions and even minimized

        3   his behavior.  Rather than admitting to a sexual assault, he

        4   referred to it as tearing the victim's shirt off and slapping

09:39   5   her.

        6   Q.    Now, you have an example here, second sentence:  When

        7   referring to the victim, he stated that if she did not violate

        8   the rules of the halfway house by being there after hours and

        9   doing drugs with her boyfriend who was a resident, then he

09:40  10   would not have sexually assaulted her.

       11   A.    Yes.  That's one of the distortions that he uses.

       12         He tends to, like I said earlier, he has a lot of shame

       13   that's attached to these offenses.  And so what he does is he

       14   justifies the offenses; that way he doesn't have to face the

09:40  15   harmful impact of his crimes and he is -- it's easier for him

       16   to blame others in situations than accept full responsibility

       17   for the offenses.

       18         So in this specific situation, one of his victims, he was

       19   living in a halfway house at that time, and his victim

09:40  20   frequented the halfway house, which was a violation of the

       21   halfway house rules.  And how he justifies the offense is that

       22   if she were not at the halfway house begging for money, asking

       23   for drugs and alcohol or cigarettes, then he would never have

       24   assaulted her.

09:41  25   Q.    If you look at the next to last sentence, it says:  He

K. Holden - Direct Examination

09:41  1  justifies sexual assault because the victim is not a family

2  member.

3  A.    Yes, it's an irrational distortion.  It's illogical, but

4  from what I understand, in his mind, he believes that if the

09:41  5  victim is not a relative, then the sexual assault is justified.

6       So even though some of his victims were relatives, he

7  disowned them or denounced the kinship.  It's illogical, but

8  that's one of his distortions that he uses.

9  Q.    When you say "denounce the kinship," are you referring to

09:41 10  the self-report of his to you that he claims that his children

11  weren't his children?

12  A.    Yes, his children were not his children or his niece

13  wasn't related to him.  Just -- just he'll deny the relations.

14  Q.    Now, if you turn to Exhibit No. 27.  This is your clinical

09:42 15  contact that occurred on December 9th, 2016.

16  A.    That's correct.

17  Q.    And I want you to summarize to the Court about this

18  clinical contact.

19  A.    Like I said, Mr. Charboneau is -- he's progressing through

09:42 20  the program.  He's doing well.  It's very slowly.  He tends to

21  hold on to distortions longer than the typical patient, but he

22  is starting to recognize that he does, indeed, have a sexual

23  deviance issue, and he admitted to me that -- well, he held

24  himself accountable in our community meeting, that's the

09:43 25  platform for our participants to hold themselves accountable,

K. Holden - Cross-Examination

09:43  1    and he admitted that he did indeed think about having sex with
       2    women prior to the assault.  And previously, he said he never
       3    thought about it and even as so much denied the assaults in
       4    general.
09:43  5          So he's finally admitting that he does have a sexual
       6    deviance problem and he understands that he needs treatment
       7    because he has hurt people in the past and he does not want to
       8    continue that pattern.  So he recognizes that he needs
       9    treatment to address the sexual deviance issues.
09:43 10    Q.    In your last sentence you indicate that, he told me that
      11    he's sexual dangerous.
      12    A.    Yes, I believe he's saying that he needs treatment to
      13    address his sexual deviance problem.
      14    Q.    And when you write down these clinical notes, you only
09:44 15    write down what you believe he had stated accurately to you; is
      16    that correct?
      17    A.    Yes.  I never -- I always have him clarify what he's
      18    saying, and I always -- if I put it in a note, then I'm sure
      19    that's what he said.
09:44 20                MR. JAMES:  Just one moment, Your Honor.
      21                THE COURT:  Okay.
      22                MR. JAMES:  No further questions.
      23                THE COURT:  Cross-examination?
      24                MS. SHEA:  Thank you, Your Honor.
09:44 25                      CROSS-EXAMINATION

**JA56**

K. Holden - Cross-Examination

09:44  1    BY MS. SHEA:

       2    Q.    Dr. Holden, you work in the BOP, correct?

       3    A.    Yes.

       4    Q.    And specifically in the Maryland unit, correct?

09:44  5    A.    Yes.

       6    Q.    And you're aware that some inmates do actually have their

       7    own alcohol in the Maryland unit, correct?

       8    A.    There have been some inmates that make what we call hooch,

       9    yes.  We do what we call shakedowns where we search cells on a

09:44 10    regular basis and if we find that, we confiscate it.

      11    Q.    And there have been people in the Maryland unit that have

      12    been caught with it before?

      13    A.    Since I've been in the program, we did find one guy that

      14    was making the alcohol, yes.

09:45 15    Q.    And when did you begin?

      16    A.    December, 2015.

      17    Q.    Before that there were also instances as well, correct?

      18    A.    I'm sure there were.

      19    Q.    You've read reports and you've observed Mr. Charboneau

09:45 20    himself that he does sometimes speak in a convoluted manner,

      21    would you agree with that?

      22    A.    He does have some expressive difficulties where he

      23    substitutes words and right now he has been referred to a

      24    neuropsychologist for further testing to determine if this is a

09:45 25    neurocognitive disorder or borne out of some type of social

K. Holden - Cross-Examination

09:45  1    anxiety.

2    Q.    You've also read reports and you would agree that he often

3    is a poor historian, correct; that he doesn't remember

4    everything that has happened in his early past?  Have you read

09:46  5    reports to that effect?

6    A.    I would have to look back.  I don't want to say yes or no.

7    I would have to look back at some of the reports.

8    Q.    Have you read any of the other forensic psychologist

9    reports other than Dr. Ross?

09:46 10    A.    Just Dr. Ross' report.

11    Q.    You believe that he does have sexually deviant interests,

12    correct?

13    A.    Yes.

14    Q.    And you've told him that you believe that, correct?

09:46 15    A.    Yes.  We discussed that, yes.

16    Q.    You testified multiple times that he is very ashamed.

17    A.    Yes.  He does have shame attached to his offenses, he

18    does.

19    Q.    In some of your other treatment notes, not the ones in the

09:46 20    binder, some of your other notes, you did actually -- did

21    actually report that he seems sincere about wanting to change

22    his life.

23    A.    Yes.

24    Q.    And you agree with that today still, correct?

09:47 25    A.    Yes.

K. Holden - Redirect Examination

```
09:47  1   Q.   You mentioned several times that your testing showed that
       2   he does not acknowledge a problem with alcohol, correct?
       3   A.   Yes.
       4   Q.   But you also testified that he goes to AA in the Maryland
09:47  5   unit, correct?
       6   A.   He does.  Mr. Charboneau is very compliant with anything
       7   that we recommend.  If we recommend that he participate in any
       8   group or any treatment, he does participate.  But it seems that
       9   he does still deny that he has a current alcohol problem, but
09:47 10   he will participate and he will -- any recommendations that we
      11   have, he will comply.
      12           MS. SHEA:  Just a moment, Your Honor.
      13           THE COURT:  Okay.
      14           MS. SHEA:  Thank you, Your Honor.  No other
09:47 15   questions.
      16           THE COURT:  Anything else, Mr. James?
      17           MR. JAMES:  One moment.  I just have a few, Judge.
      18   Maybe just one or two.
      19                   REDIRECT EXAMINATION
09:48 20   BY MR. JAMES:
      21   Q.   On cross-examination you were asked about Mr. Charboneau's
      22   communicative problems.  Is it true that that's why you
      23   testified that when you write down anything he stated it's
      24   because you are sure of it and you cleared it up with him?
09:48 25   A.   That's correct.  May I elaborate?
```

K. Holden - Redirect Examination

09:48  1    Q.    Yes.

       2    A.    Sessions with Mr. Charboneau typically last longer than

       3    the typical session with other participants because of his

       4    expressive difficulties, and I do that just to make sure that

09:48  5    I'm receiving his intended message.  And I often have him

       6    define words or ask him -- and this is me and other therapists

       7    in the community -- and I'll ask him a series of questions to

       8    ensure that I understand what he's saying.  And if I don't

       9    understand, I don't include it in the note and I don't assume

09:49 10    that's what he's saying.  He'll tell me if I'm not

      11    understanding him or if I do understand him.

      12         I'm also able -- I work with Mr. Charboneau, he's been in

      13    several of my groups, I see him on a daily basis, informal and

      14    formal interactions, so I'm able to gauge his emotions and I'm

09:49 15    learning his language patterns.

      16              MR. JAMES:  All right.  Thank you.  No further

      17    questions.

      18              THE COURT:  Ms. Shea?

      19              MS. SHEA:  Nothing further.  Thank you.

09:49 20              THE COURT:  Thank you, Doctor.  Please watch your

      21    step stepping down, ma'am.

      22              The United States may call its next witness.

      23              MR. JAMES:  At this time the United States calls the

      24    Court-appointed examiner, Dr. North.

09:49 25

C. North - Direct Examination

| | | |
|---|---|---|
| 09:49 | 1 | CHRISTOPHER NORTH, Ph.D |
| | 2 | having been duly sworn, testified as follows: |
| | 3 | THE COURT:  Good morning, Dr. North.  Once you get |
| | 4 | some water, Mr. James will have some questions for you and then |
| 09:50 | 5 | Ms. Shea will have some questions for you.  Please try to keep |
| | 6 | your voice up so we can hear what you have to say. |
| | 7 | You may examine the witness. |
| | 8 | MR. JAMES:  Thank you, Judge. |
| | 9 | DIRECT EXAMINATION |
| 09:50 | 10 | BY MR. JAMES: |
| | 11 | Q.   Good morning, Dr. North. |
| | 12 | A.   Good morning. |
| | 13 | Q.   Dr. North, as you've heard, the Court has already admitted |
| | 14 | you as an expert in this case so I'm going to proceed right to |
| 09:51 | 15 | the questions. |
| | 16 | A.   I'm trying to get this to work properly. |
| | 17 | Q.   Okay.  Well, you let me know if there is something that I |
| | 18 | say that is unclear or my tongue is so thick it's muddled, then |
| | 19 | I'll be more than happy to repeat.  Okay? |
| 09:51 | 20 | A.   Okay. |
| | 21 | Q.   Okay.  Now, you were appointed as the Court examiner in |
| | 22 | this case, that's correct? |
| | 23 | A.   Correct. |
| | 24 | Q.   And you are a clinical psychologist? |
| 09:51 | 25 | A.   Yes. |

C. North - Direct Examination

09:51  1   Q.   And you have testified as an expert in a number of these

       2   Adam Walsh Act cases; is that correct?

       3   A.   Yes.

       4   Q.   You were appointed back on December 8th, 2015; does that

09:52  5   sound correct?

       6   A.   Yes.

       7   Q.   And you interviewed Mr. Charboneau on January 19th, 2016?

       8   A.   Yes.

       9   Q.   Since then, you have reviewed additional material

09:52  10  including the reports by Dr. Holden?

       11  A.   I reviewed BOP records that included reports by her, yes.

       12  Q.   And the issues that you were asked to examine as an expert

       13  in the Adam Walsh case was whether Mr. Charboneau had engaged

       14  or attempted to engage in sexually violent conduct or child

09:52  15  molestation; is that correct?

       16  A.   Yes.

       17  Q.   The second issue was whether Mr. Charboneau currently

       18  suffers from a serious mental illness, abnormality or disorder.

       19  A.   Yes.

09:52  20  Q.   And the third was whether as a result of that serious

       21  mental illness, abnormality or disorder, whether Mr. Charboneau

       22  has serious difficulty refraining from sexually violent conduct

       23  or child molestation.

       24  A.   Yes.

09:53  25  Q.   Now, with regard to issue one, did you so find?

C. North - Direct Examination

09:53  1   A.    I found that he has been convicted of three sexually

2   violent offenses; one of which also involved child molestation.

3   Q.    The 1982 offense, which is --

4         MR. JAMES:  For the record, at Exhibit -- the

09:53  5   judgment, commitment order is Exhibit No. 19, Your Honor.

6         THE COURT:  Thank you.

7   BY MR. JAMES:

8   Q.    That's the 1982 offense.  The 1988 offense is Exhibit No.

9   14, that's the assault, sex abuse and the 2003 offense is

09:53  10  Exhibit No. 9 and No. 11.  No. 9 being the revocation judgment,

11  No. 11 being the amended judgment on Mr. Charboneau's

12  conviction of sexual contact with a person incapable of

13  consenting.

14       So with regard to the 1982 offense, tell the Court why you

09:54  15  found that qualified.

16  A.    That was an offense in which he was originally charged

17  with rape and assault and he pled guilty to the assault and was

18  sentenced to 18 months in federal prison.  He had been

19  drinking, out partying earlier that evening, as had been the

09:54  20  victim.  The victim then returned to a home, she was house

21  sitting for a friend, and went to bed -- she left the party

22  around 1:00 in the morning and Mr. Charboneau followed her home

23  and let himself into her apartment and sexually assaulted her

24  while she was sleeping and they struggled.  She indicated that

09:54  25  he did, in fact, rape her.  However, he, as I said, he pled to

C. North - Direct Examination

09:55  1   assault and was -- served his first federal prison term for
       2   that crime.
       3   Q.   All right.  And when he was serving his first federal
       4   conviction for that crime, he was considered a model prisoner,
09:55  5   don't all the records indicate that?
       6   A.   Yes.
       7   Q.   And he went to some sort of a detox at one point?
       8   A.   Correct.
       9   Q.   And then he was eventually released; is that correct?
09:55 10   A.   Yes.
      11   Q.   Then he was re-admitted because of alcohol abuse; is that
      12   also correct?
      13   A.   Yes.
      14   Q.   And the 1988 offense, you found that also as a qualifying
09:55 15   offense; isn't that correct?
      16   A.   Yes.
      17   Q.   Why did you find that was a qualifying offense?
      18   A.   In this offense he sexually assaulted his 10-year-old
      19   daughter.  He had been drinking heavily all day long prior to
09:56 20   the sexual assault at a family gathering.  And as the day wore
      21   on, most other family members left the site of the gathering
      22   and he was alone with his daughter and a five-year-old nephew.
      23   And at some point his sister left to take the last few people
      24   home and he then grabbed his daughter and sexually assaulted
09:56 25   her.  And a physical examination of the girl afterwards found

C. North - Direct Examination

09:56  1    that she had multiple bruises, contusions, abrasions and semen

       2    was also found -- I don't recall whether it was found inside

       3    her vagina or outside the vagina; but nonetheless, the semen

       4    was found on or in her body.

09:56  5         Mr. Charboneau's sister then returned to the area in which

       6    this party had been occurring about 12 or 13 minutes later and

       7    the 10-year-old girl ran to her aunt and told her that her

       8    father had just raped her and the girl was distraught,

       9    disheveled, dirty, crying.  Mr. Charboneau's sister observed

09:57 10    her brother, Mr. Charboneau, buttoning up his pants and walking

      11    towards the car and she then took the victim to a police

      12    station and reported the crime.

      13    Q.   Now, in your report beginning at page 5, which is Bates

      14    1617, which is your report in Exhibit No. 3, Your Honor.  The

09:57 15    last paragraph says that on August 1, 1988, Bureau of Indian

      16    Affairs officers interviewed Mr. Charboneau, but he declined to

      17    speak with them.  He did speak about that offense at a later

      18    time with the Federal Probation Officer.  Do you see that?

      19    A.   I'm sorry.  What page are you on again?

09:58 20    Q.   It's page 5 of your report.  On the bottom right-hand

      21    corner, it says Bates 1617.

      22    A.   Okay.

      23    Q.   And if you go on to the next page, Mr. Charboneau told

      24    that Federal Probation Officer that he had been drinking during

09:58 25    the day; is that correct?

C. North - Direct Examination

09:58   1   A.   Yes.

        2   Q.   But he denied he was extremely drunk?

        3   A.   Correct.

        4   Q.   Now, don't the records indicate that the family members

09:58   5   had tried to hide alcohol from him?

        6   A.   Yes, that's true.

        7   Q.   Because of his complicated state?

        8   A.   Yes.

        9   Q.   All right.  Now, did he state that, if you look at -- the

09:58  10   third sentence begins, He admitted pulling her clothes down,

       11   but said while doing this he had a numb feeling and a feeling

       12   of vibration going through his body.

       13   A.   Yes.

       14   Q.   All right.  Does he further state that doing this, during

09:59  15   his rape of his daughter that he was frightened and nervous

       16   that he had lost control.  That's the third to last sentence I

       17   believe in that.

       18   A.   Yes.

       19   Q.   So he indicated that there was a loss of control at the

09:59  20   time when he committed that offense; is that correct?

       21   A.   Correct.

       22   Q.   Now, with regard to the 2003 offense, look at page 8 of

       23   your report, which would be Bates 1620.  Did he, again, admit

       24   that he had lost control?

10:00  25   A.   Yes.

C. North - Direct Examination

10:00  1    Q.    So you have the offense from 1988 and you have decades

2    later a second alcohol-based offense; is that correct?

3    A.    Yes.

4    Q.    In that second alcohol-based offense he indicates he lost

10:00  5    control?

6    A.    Correct.

7    Q.    Now, the records also indicate there was a 1987 offense.

8    And if you go to page 20 of your report, which is Bates number

9    1632, last paragraph, he doesn't deny that he committed that

10:01 10    offense to you, he just states he can't remember it; is that

11    correct?

12    A.    Correct.

13    Q.    And in that offense, that was also -- he was also

14    intoxicated at the time?

10:01 15    A.    Yes.

16    Q.    And in that offense, he had apparently broken into the

17    home of the victim?

18    A.    Correct.

19    Q.    And he was only stopped when the victim's husband came

10:01 20    home and I guess kind of found him and threw him out?

21    A.    Correct.

22    Q.    Now, with regard to the second prong of the Adam Walsh Act

23    where he suffers from a serious mental illness, abnormality or

24    disorder, you diagnosed Mr. Charboneau with alcohol use

10:01 25    disorder, severe in a controlled environment?

C. North - Direct Examination

10:01  1   A.   Yes.

2   Q.   Tell the Court why you believe that that diagnosis is

3   appropriate in Mr. Charboneau's case and why in Mr.

4   Charboneau's case that, in your opinion, qualifies as a serious

10:02  5   mental illness, abnormality or disorder under the Adam Walsh

6   Act.

7   A.   I think it qualifies as a severe mental disorder because

8   of the impact it has had both on his life and the lives of the

9   victims.

10:02  10      His life is essentially in a shambles as a result of his

11  chronic drinking problem.  He started getting arrested as a

12  teenager for problems related to his drinking.  He was

13  hospitalized in North Dakota over 10 times in a state hospital

14  by the age of 25 for problems related to his drinking.

10:02  15      He has approximately 20 arrests and convictions for other

16  more minor kinds of offenses related to his drinking.  This is

17  all in addition to the four sex crimes that he committed as a

18  result of his drinking.

19      So even after serving two different prison terms and

10:03  20  getting out and trying to remain sober between 2000 and 2003,

21  he had great difficulty doing that.  And on the day of the last

22  offense in 2003, he had gone to see his probation officer and

23  gave a urine sample earlier that day to comply with the

24  condition that he refrain from drinking alcohol.  And within

10:03  25  hours of providing the urine sample, he was drinking with his

C. North - Direct Examination

10:03   1   last victim whiskey, and of course, became intoxicated and then

2   later that night sexually assaulted her.

3      So he has spent most of his life or much of his life in

4   custody and he's been unable to function in any kind of

10:03   5   independent fashion in the community and he's created

6   significant problems for his victims as a result of his

7   drinking.

8      And as such, I think his alcohol use disorder is a serious

9   or severe mental disorder as described in the Adam Walsh Act.

10:04   10   Q.   In fact, in 2014, did Mr. Charboneau's family send a

11   letter to Probation stating that he shouldn't be released

12   because he's dangerous to the community?

13   A.   They did.

14   Q.   And so that broken ties with the family, would you say

10:04   15   that that is a result of his alcohol abuse disorder?

16   A.   Certainly that's a large part of it, but because of what

17   his drinking has led to behaviorally, they don't want to have

18   anything more to do with him.

19   Q.   You mentioned in 2003 Mr. Charboneau saw his probation

10:05   20   officer, was tested and later on that day assaulted the victim,

21   I guess would be in the instant offense; is that correct?

22   A.   Uhm-uhm.

23   Q.   Isn't it true that noncompliant supervision is one of the

24   more robust inherently supported risk factors for re-offense?

10:05   25   A.   It is.

C. North - Direct Examination

10:05   1    Q.   You've also diagnosed him with inhalant use disorder,

2    severe, in sustained remission.  Tell the Court why you made

3    that diagnosis.

4    A.   Apparently, he started abusing inhalants when he was about

10:05   5    12 years old and his mother described in her letter to the

6    Court how he essentially stopped performing in school, he

7    started having significant behavioral problems, he would be

8    watching television and start laughing at the television when

9    there was nothing funny on the TV at all, he was lost in his

10:06  10    own world and sort of became increasingly disengaged from the

11    family, from society, from school and she sought to have him

12    hospitalized at North Dakota State Hospital numerous times; and

13    he was, in fact, hospitalized on a number of occasions for his

14    inhalant abuse.  And nonetheless, I think it certainly exacted

10:06  15    a toll on his neurocognitive functioning and that he still has

16    significant problems with expressive language that are residual

17    to his years of inhalant abuse.

18       So it looks like he stopped abusing inhalants probably in

19    his early twenties, although it's not entirely clear; but

10:06  20    nonetheless, the damage was done by that point in time.

21       So he certainly historically has a history of severe

22    inhalant use disorder.

23    Q.   Now, you also diagnose him with inhalant-induced mild

24    neurocognitive disorder.

10:07  25    A.   Correct.

C. North - Direct Examination

10:07  1   Q.   Tell the Court, what's the basis for that?

2   A.   The basis for that is really his expressive language

3   problems.  He can't seem to find the words to express his

4   thoughts, feelings and experience.

10:07  5       And I had a sense when I was interviewing him that he

6   understood my questions and that he knew what I was trying to

7   inquire about, but he was simply unable to collect the words to

8   express himself and answer my questions adequately.  And this

9   has been a longstanding problem with him, and the problem is so

10:07  10  severe that it makes it very difficult for him to communicate

11  with anyone in a very meaningful way.  And I think it leads to

12  a lot of social isolation on his part and it affects his

13  self-esteem as well.

14      But I would say that the neurocognitive disorder really is

10:08  15  primarily related to -- primarily due to these severe problems

16  with expressive language.

17  Q.   And with regard to Prong 3, as a result of the disorder

18  that you have testified, do you believe that Mr. Charboneau

19  would have serious difficulty refraining from sexually violent

10:08  20  conduct or child molestation?

21  A.   Yes, I do.

22  Q.   And tell the Court why you view that.

23  A.   Well, it seems that every time he's out, whenever he's out

24  he eventually reverts to drinking and when that happens, it's

10:08  25  only a matter of time that he sexually assaults a woman or a

C. North - Direct Examination

10:09  1  child.

2       I think we heard earlier about some of his problems

3  dealing with his own sexuality.  And in my opinion, his

4  development stopped when he was about 12 or 13 years old and he

10:09  5  started abusing inhalants and I don't think he's grown up since

6  then.  He's basically a 12 or 13-year-old functioning in an

7  adult's body and he's never developed a mature adult sexuality.

8  He doesn't know how to approach women.  We do know he's

9  sexually attracted to women, but he really doesn't know what to

10:09  10  do with them.  He does have sexual drive and sexual urges which

11  he has difficulty dealing with and accepting.

12       When he drinks alcohol, he develops this liquid courage to

13  act out his sexual urges, his sexual desire and unfortunately

14  it takes the form of sexual assault or rape, whether it's with

10:09  15  a female child or adult.

16       He's having problems that are longstanding.  They are

17  likely to act out again if he gets out and starts drinking

18  again.  He simply doesn't have the capacity to control his

19  behavior when he drinks alcohol and we know, unfortunately,

10:10  20  historically that this is likely to happen again.

21       He's not very committed to a life of sobriety.  As we

22  heard his treatment provider say, he goes to AA meetings

23  because he's asked to go to AA meetings, not because he feels

24  he needs to go there.  So he doesn't really have any awareness

10:10  25  of the fact that he needs to stay away from alcohol.

C. North - Direct Examination

```
10:10   1        He's very susceptible to peer influence.  I think all it
        2   would take is someone sitting down with him and offering him a
        3   drink and he would start drinking.  He is unable to say no.  He
        4   doesn't have the ability to think clearly about the situation
10:10   5   and what the right thing to do is.  He's very impulsive.
        6        And we know from experience that when he starts drinking,
        7   eventually he's going to sexual assault a woman or a child if
        8   the opportunity presents itself to him.
        9   Q.   All right.  Now, within your clinical interview with him,
10:11  10   did you ask him if he believed he had a drinking problem?
       11   A.   I did.
       12   Q.   And what was his response?
       13   A.   "No."
       14   Q.   No --
10:11  15   A.   No, he does not have a drinking problem.
       16   Q.   Did he say how he would stay away from alcohol if he was
       17   released?
       18   A.   I don't remember that he said how he would stay away from
       19   alcohol.  He said he would be willing to attend AA meetings if
10:11  20   that were required of him.
       21   Q.   Based on what you heard about his current treatment
       22   progress, he goes because he's told to go?
       23        THE COURT:  What was your question?
       24   BY MR. JAMES:
10:11  25   Q.   Based on -- based upon what you've heard about
```

C. North - Direct Examination

| | | |
|---|---|---|
| 10:11 | 1 | Mr. Charboneau's treatment progress with regard to alcohol |
| | 2 | problems, he goes to the NA meeting or AA meetings because he's |
| | 3 | been told to go or recommended to go by the treatment staff, |
| | 4 | not because he's committed? |
| 10:12 | 5 | MS. SHEA:  Judge, I'm going to object.  I think |
| | 6 | that's a mischaracterization of Dr. Holden's testimony.  I |
| | 7 | think all she said was that he was very compliant, but I don't |
| | 8 | think that she ever said that he was told he had to go to AA. |
| | 9 | MR. JAMES:  I'll rephrase the question. |
| 10:12 | 10 | BY MR. JAMES: |
| | 11 | Q.   Is it your opinion that when Mr. Charboneau goes to the AA |
| | 12 | meeting, based on what you've heard, the testimony that you've |
| | 13 | heard today and based upon your interview with him regarding |
| | 14 | his alcohol problem or whether he considers he has a problem, |
| 10:12 | 15 | that Mr. Charboneau would attend that meeting because that's |
| | 16 | what was recommended, not because he's internally committed to |
| | 17 | addressing an alcohol problem? |
| | 18 | A.   Yes, that's true. |
| | 19 | Q.   And in your interview with Mr. Charboneau, he's told you |
| 10:13 | 20 | that he would go to an AA meeting if he was required? |
| | 21 | A.   Yes. |
| | 22 | Q.   Now, in your report, when you get to the third prong, I |
| | 23 | believe in your report you've indicated that Mr. Charboneau |
| | 24 | believed that he could stay away from alcohol without a program |
| 10:13 | 25 | or without support in the community. |

C. North - Direct Examination

10:13  1    A.    Yes.

       2    Q.    Now, you've been in the field of clinical psychology for

       3    over 30 years; isn't that correct?

       4    A.    Yes.

10:14  5    Q.    And I believe you write in your report that in your over

       6    30 years as a licensed psychologist, you can't recall someone

       7    with this level of denial; is that correct?

       8    A.    That is true.

       9    Q.    Now, you also -- although you did not perform an actuarial

10:14 10    scoring in this case, I believe you stated that in your report

      11    you concur with Dr. Ross' Static-99 with the exception of item

      12    number two, whether he's had a significant partner or lover,

      13    lived with someone for over two years?

      14    A.    Correct.

10:14 15    Q.    And what caused you to disagree with Dr. Ross on that

      16    score?

      17    A.    Well, actually, I did score him on the Static-99R, he has

      18    a 5 on the Static-99R.

      19    Q.    And what does the 5 reflect for individuals, like

10:15 20    individuals?

      21    A.    It falls within the above average risk category.

      22    Q.    You also used an instrument to address -- to guide your

      23    opinion with regard to some dynamic factors; is that correct?

      24    A.    Yes.

10:15 25    Q.    What was that?

C. North - Direct Examination

| | | |
|---|---|---|
| 10:15 | 1 | A.    The Structured Risk Assessment, Forensic Version. |
| | 2 | Q.    All right.  And what dynamic factors or variables did you |
| | 3 | find in this case? |
| | 4 | A.    Well, the most significant one is that I felt he really |
| 10:15 | 5 | eclipses everything else in the risk assessment is poor |
| | 6 | problem-solving skills. |
| | 7 | Again, to have no awareness of his problem with alcohol |
| | 8 | given his history is incredible.  Given all the problems that |
| | 9 | it's created for him and other people in his life, for him to |
| 10:16 | 10 | think that he doesn't have a problem is just astounding. |
| | 11 | And -- and he'll go to AA or treatment if it's recommended to |
| | 12 | him, but the fact that he is unaware that this is a problem |
| | 13 | that he needs to do something about, to me just sort of |
| | 14 | eclipses everything else in the Risk Assessment. |
| 10:16 | 15 | Q.    Did you also look at protective factors? |
| | 16 | A.    Pardon? |
| | 17 | Q.    Did you also look at protective factors? |
| | 18 | A.    Yes, I did. |
| | 19 | Q.    And those protective factors being whether he's been in |
| 10:16 | 20 | the community for 10 years without committing a sexual offense, |
| | 21 | less than 15 years left to live due to illness or physical |
| | 22 | impairment, and very advanced stage. |
| | 23 | Did you find any of those factors as being relevant with |
| | 24 | regard to Mr. Charboneau? |
| 10:17 | 25 | A.    No. |

**JA76**

C. North - Direct Examination

| | | |
|---|---|---|
| 10:17 | 1 | Q.   Now, you were present today for Dr. Holden's testimony |
| | 2 | with regard to Mr. Charboneau's treatment.  Can you tell the |
| | 3 | Court about -- if you have any impressions regarding |
| | 4 | Charboneau's treatment progression so far? |
| 10:17 | 5 | A.   Well, as she indicated, he's in a fairly early stage of |
| | 6 | treatment.  I think it's good that he's going and that he's |
| | 7 | gotten involved in treatment with her.  I think he still has a |
| | 8 | long ways to go.  I didn't hear anything that would convince me |
| | 9 | that he is no longer sexually dangerous. |
| 10:17 | 10 | Q.   And when someone -- when a person in treatment like |
| | 11 | Mr. Charboneau indicates to a treatment provider that they |
| | 12 | believe they are sexually dangerous, that's something that you |
| | 13 | have to take into account; isn't that correct? |
| | 14 | A.   Yes. |
| 10:18 | 15 | Q.   And why is that important when someone makes that kind of |
| | 16 | admission, that they are, in fact, sexually dangerous? |
| | 17 | MS. SHEA:  Object, again.  I'm going to object to the |
| | 18 | question.  I think that he mischaracterized her testimony.  I |
| | 19 | understand that that's what she wrote in the treatment note, |
| 10:18 | 20 | but her testimony was that she said Mr. Charboneau told her he |
| | 21 | should go to treatment before he's released.  That was her |
| | 22 | testimony. |
| | 23 | THE COURT:  Rephrase the question. |
| | 24 | MR. JAMES:  Sure.  Your Honor, I'll be happy to |
| 10:19 | 25 | rephrase the question and the record, of course, stands and |

C. North - Direct Examination

| | | |
|---|---|---|
| 10:19 | 1 | this Court will review it.  But I don't believe I |
| | 2 | mischaracterized -- |
| | 3 | THE COURT:  I don't think you did either, but you're |
| | 4 | asking him about -- he heard the treatment provider's testimony |
| 10:19 | 5 | and whether that changed his opinion and he said no, and he can |
| | 6 | explain why. |
| | 7 | BY MR. JAMES: |
| | 8 | Q.   Can you please explain to the Court why that did not |
| | 9 | change your opinion with regard to Mr. Charboneau's sexual |
| 10:19 | 10 | dangerousness? |
| | 11 | A.   Why it did not change my opinion? |
| | 12 | Q.   Right.  In other words, you believe he's still sexually |
| | 13 | dangerous. |
| | 14 | A.   Well, I just feel it's additional corroboration, |
| 10:19 | 15 | confirmation, supportive evidence for my opinion.  I'm glad |
| | 16 | that he has sort of reached that level of insight where he is |
| | 17 | also aware that he has a sexual problem and that he needs help. |
| | 18 | Q.   Do you agree that it would be -- it would negatively |
| | 19 | impact Mr. Charboneau's treatment if he were to be removed from |
| 10:20 | 20 | or quit the CTP that he's currently in right now? |
| | 21 | MS. SHEA:  Judge, I don't think that this witness is |
| | 22 | qualified as an expert in sex offender treatment.  I don't know |
| | 23 | what his background is in treatment, so I don't know if he's |
| | 24 | qualified to comment on that. |
| 10:20 | 25 | THE COURT:  Just lay a foundation. |

C. North - Direct Examination

10:20  1  BY MR. JAMES:

2  Q.   Dr. North, have you been involved in sex offender

3  treatment as well?

4  A.   Yes.

10:20  5  Q.   All right.  And in your practice in, I believe California

6  and Washington State?

7  A.   Yes.

8  Q.   All right.  And have you been involved in the treatment of

9  sex offenders for a number of years?

10:20  10  A.   Yes.  I worked at Atascadero State Hospital, which is a

11  forensic mental health hospital in California, from 1985 to

12  1993, and I worked with a number of sex offenders, mentally

13  disordered sex offenders as well as sex offenders who were

14  transferred from the Department of Corrections for treatment in

10:21  15  the hospital.

16  Q.   All right.  Have you opined as an expert in regards to sex

17  offender treatment as well?

18  A.   Yes.

19       MR. JAMES:  Your Honor, at this time I ask that you

10:21  20  allow me to ask the witness --

21       THE COURT:  You can ask the question.

22       MR. JAMES:  Thank you.

23  BY MR. JAMES:

24  Q.   Do you believe that if Mr. Charboneau was removed from

10:21  25  treatment at this current time that it would negatively impact

C. North - Cross-Examination

| | | |
|---|---|---|
| 10:21 | 1 | his ability to progress? |
| | 2 | A.    I do. |
| | 3 | MR. JAMES:  One moment, Your Honor. |
| | 4 | THE COURT:  Okay. |
| 10:21 | 5 | MR. JAMES:  No further questions, Your Honor. |
| | 6 | THE COURT:  Cross-examination? |
| | 7 | MS. SHEA:  Thank you. |
| | 8 | CROSS-EXAMINATION |
| | 9 | BY MS. SHEA: |
| 10:21 | 10 | Q.    Good morning, Dr. North. |
| | 11 | A.    Good morning. |
| | 12 | Q.    You'd agree that Mr. Charboneau does not suffer from a |
| | 13 | paraphilia, correct? |
| | 14 | A.    Yes. |
| 10:22 | 15 | Q.    You'd agree that he does not suffer from a personality |
| | 16 | disorder, correct? |
| | 17 | A.    Yes. |
| | 18 | Q.    You'd agree that he's been incarcerated since 2003 |
| | 19 | continuously, correct? |
| 10:22 | 20 | A.    Correct. |
| | 21 | Q.    And in all of the records that you reviewed, there was not |
| | 22 | a shred of evidence that he has had a sip of alcohol in 13 |
| | 23 | years, correct? |
| | 24 | A.    Correct. |
| 10:22 | 25 | Q.    You'd agree that he has had excellent prison conduct, |

C. North - Cross-Examination

10:22  1  correct?

2  A.   Correct.

3  Q.   That he's only gotten one infraction, which was a minor

4  one, correct?

10:22  5  A.   Yes.

6  Q.   Not showing up where he was supposed to show up, something

7  like that?

8  A.   Right.

9  Q.   You're aware that he has 24 months of supervised release

10:22  10  following his release from Butner, correct?

11  A.   Yes.

12  Q.   You'd agree that his criminal history involves many other

13  types of criminal violations that he did under the influence of

14  alcohol other than sex offenses, correct?

10:23  15  A.   Well, the other violations were pretty minor.  They were

16  things like disorderly conduct, minor assaults, driving -- I

17  don't think he's ever had a license.  But basically, disorderly

18  conduct-type offenses related to drinking.

19  Q.   Public intoxication type things, correct?

10:23  20  A.   Yes.

21  Q.   On your report, on page 14 of your report, you noted that

22  his thinking and functioning generally improve when he's been

23  clean and sober for extended periods of time; do you remember

24  that you wrote that?

10:23  25  A.   Yes.

C. North - Cross-Examination

10:23  1    Q.   And you testified today that he has trouble expressing

2    himself, correct?

3    A.   Yes.

4    Q.   But then in your opinion, he was actually trying to

10:23  5    respond relevantly to your questions and having trouble finding

6    the words, correct?

7    A.   Yes.

8    Q.   On page 17 of your report -- and this is the last

9    paragraph of that page -- that he came across as a gentle

10:24  10   individual who is perhaps somewhat shy and uncomfortable around

11   other people and that he did not present as angry, resentful or

12   antisocial, and then following on to page 18 you wrote that his

13   immediate and short-term memory were surprisingly good and his

14   cognitive problems appeared to be limited to self-expression.

10:24  15   Correct?

16   A.   Yes.

17   Q.   On page 26 of your report -- and this is the last couple

18   of sentences on the first full paragraph -- you wrote that

19   there is no indication that he has ever been sexually

10:25  20   aggressive while not under the influence of alcohol.  It is

21   clearly the alcohol that disinhibits him as opposed to any

22   paraphiliac interest in forcing sex or humiliating his

23   partners, correct?

24   A.   Correct.

10:25  25   Q.   And in all of the records that you reviewed, it did not

C. North - Redirect Examination

10:25  1   come across that Mr. Charboneau planned any of his sex

2   offenses, rather that they were acts of opportunity when he was

3   already drunk, correct?

4   A.    For the most part, that's true.  However, the 1982

10:26  5   offense, remember, he went to the woman's apartment where she

6   was house sitting, entered and then went to her room and

7   sexually assaulted her.  So I would say that there probably was

8   some premeditation for that offense.

9   Q.    But there was no evidence that he planned it, for example,

10:26 10   days in advance or anything like that, correct?

11   A.    Pardon?

12   Q.    There was no evidence that he planned it days in advance

13   or anything like that, correct?

14   A.    Well, we don't know.  No, just that he went there and

10:26 15   assaulted her, yes.

16   Q.    Right.

17         MS. SHEA:  Thank you, Your Honor.  No other

18   questions.

19         MR. JAMES:  I have a few, Judge.

10:26 20                    REDIRECT EXAMINATION

21   BY MR. JAMES:

22   Q.    Dr. North, Ms. Shea had, during cross-examination, pointed

23   out that Mr. Charboneau has had I believe excellent conduct --

24   I believe that was the term that was used -- while in prison

10:27 25   except for one infraction.  Is that correct?

C. North - Redirect Examination

| | | |
|---|---|---|
| 10:27 | 1 | A.   Yes. |
| | 2 | Q.   Is it also true that the review of his institutional |
| | 3 | history, that Mr. Charboneau generally does not act out at all |
| | 4 | while in a structured environment? |
| 10:27 | 5 | A.   Correct. |
| | 6 | Q.   In fact, in -- he was in a structured environment in |
| | 7 | '82 when they considered him a model prisoner; is that correct? |
| | 8 | A.   That's correct. |
| | 9 | Q.   And he's committed offenses obviously after 1982 once he |
| 10:27 | 10 | got out in the community; is that correct? |
| | 11 | A.   Yes. |
| | 12 | Q.   He was incarcerated in 1988 to 2000 where there is no |
| | 13 | evidence he was anything other than a model prisoner; isn't |
| | 14 | that correct? |
| 10:27 | 15 | A.   Yes. |
| | 16 | Q.   And once he was out unstructured he committed sexual |
| | 17 | offenses while intoxicated? |
| | 18 | A.   Correct. |
| | 19 | Q.   And with regard to the 2003 conviction, he was on |
| 10:28 | 20 | supervision -- |
| | 21 | A.   That's right. |
| | 22 | Q.   -- is that correct? |
| | 23 | A.   That's right. |
| | 24 | MR. JAMES:  No further questions, Your Honor. |
| 10:28 | 25 | THE COURT:  Okay. |

H. Ross - Direct Examination

```
10:28   1              MS. SHEA:  Nothing further.

        2              THE COURT:  Thank you, Doctor.  Watch your step

        3    stepping down, sir.

        4              MR. JAMES:  Your Honor, is it possible that we could

10:28   5    take a comfort break?

        6              THE COURT:  Sure, we can.  Ten-minute recess.

        7         (The proceedings were recessed at 10:28 a.m. and reconvened

        8    at 10:40 a.m.)

        9              THE COURT:  The United States may call its next

10:40  10    witness.

       11              MR. ANDERSON:  Your Honor, the United States calls

       12    Dr. Heather Ross to the stand.

       13

       14                        HEATHER ROSS, Ph.D

10:40  15         having been duly sworn, testified as follows:

       16              THE COURT:  Good morning, Dr. Ross.

       17              THE WITNESS:  Good morning.

       18              THE COURT:  You may examine the witness.

       19              MR. ANDERSON:  Thank you.

10:40  20                        DIRECT EXAMINATION

       21    BY MR. ANDERSON:

       22    Q.   Good morning, Dr. Ross.

       23    A.   Good morning.

       24    Q.   Can you give your full name and position for the record.

10:40  25    A.   Heather Ross, and I'm a sex offender forensic psychologist
```

H. Ross - Direct Examination

10:41  1   at the Bureau of Prisons.

       2   Q.   Again, just for the record, your CV is located at

       3   Government's Exhibit No. 4?

       4   A.   Yes.

10:41  5   Q.   Did you evaluate Mr. Charboneau pursuant to the Adam Walsh

       6   Act?

       7   A.   I did.

       8   Q.   Can you explain to me how you evaluated him in this case?

       9   A.   Just as in most cases, I conducted a records review, which

10:41 10   involved reviewing police reports, court documents, Bureau of

      11   Prisons records, both psychological as well as medical, also

      12   looked at his behavior in the Bureau of Prisons and offered him

      13   the opportunity to interview with me.

      14   Q.   Did he interview with you?

10:41 15   A.   He did not.

      16   Q.   Did you write a report of your findings?

      17   A.   I did.

      18   Q.   And is that report in Government's Exhibit No. 5?

      19   A.   Yes.

10:41 20   Q.   Did you also review the reports of Dr. North, Dr. Zinik

      21   and Dr. Plaud in this case?

      22   A.   I did.

      23   Q.   Have you reviewed any other records since you wrote your

      24   report?

10:42 25   A.   I reviewed Mr. Charboneau's deposition as well as any

H. Ross - Direct Examination

10:42  1    other records sent to me by the AUSA's office.

       2    Q.   Did you review some records that had been prepared by Dr.

       3    Holden?

       4    A.   Yes, I reviewed those as well.

10:42  5    Q.   In this case, have you formed an opinion to a reasonable

       6    degree of professional certainty as to whether Mr. Charboneau

       7    is a sexually dangerous person under the Adam Walsh Act?

       8    A.   I have.

       9    Q.   What's that opinion?

10:42 10    A.   My opinion is that he's a sexually dangerous person.

      11    Q.   Let's break that down into the three prongs of sexual

      12    dangerousness.

      13         On Prong 1, did you find that Mr. Charboneau previously

      14    committed or attempted to commit acts of sexually violent

10:42 15    conduct and child molestation?

      16    A.   Yes.

      17    Q.   Just for the record, the basis for your assessment on

      18    Prong 1, is that located in Government's Exhibit No. 5, the

      19    pages that are Bates labeled 535539?

10:43 20    A.   Yes, that's the sexual criminal history section of my

      21    report.

      22    Q.   Did you hear Dr. North testify about his analysis on Prong

      23    1 and the details of all four of those cases?

      24    A.   Yes.

10:43 25    Q.   Do you have anything to add here?

H. Ross - Direct Examination

| | | |
|---|---|---|
| 10:43 | 1 | A.    No, I think he covered it well. |
| | 2 | Q.    Let's move on to Prong 2, then.  Have you concluded that |
| | 3 | in Prong 2 that Mr. Charboneau suffers from serious mental |
| | 4 | illness, abnormality and disorders? |
| 10:43 | 5 | A.    I did. |
| | 6 | Q.    Again, just for the record, the basis for your analysis is |
| | 7 | at pages 540 to 541 in Government's Exhibit No. 5? |
| | 8 | A.    That's correct.  Under diagnostic impressions. |
| | 9 | Q.    What specific diagnoses did you give? |
| 10:43 | 10 | A.    I gave several.  I gave alcohol use disorder in a |
| | 11 | controlled environment, inhalant use disorder in sustained |
| | 12 | remission, adult sexual abuse by non-spouse or perpetrator and |
| | 13 | child sexual abuse perpetrator. |
| | 14 | Q.    I'm going to go in reverse order with those.  Let's start |
| 10:44 | 15 | with the last two just to knock them out. |
| | 16 | Why did you put those in your report here? |
| | 17 | A.    Because there's no paraphilic diagnosis, that just is |
| | 18 | provided to indicate to the reader, specifically any treatment |
| | 19 | providers that might follow up afterwards, of the victims of |
| 10:44 | 20 | his abuse, what type of abuse he engaged in, whether it was |
| | 21 | against adults or against children. |
| | 22 | Q.    Did those diagnoses factor in your analysis on Prong 3? |
| | 23 | A.    No. |
| | 24 | Q.    Let's talk about the first two diagnoses then; alcohol use |
| 10:44 | 25 | disorder and inhalant use disorder.  Again, you heard Dr. North |

H. Ross - Direct Examination

10:44   1   testify about his analyses for those diagnoses?

        2   A.   I did.

        3   Q.   Can you -- first of all, do you have anything to add as to

        4   why he diagnosed those two disorders?

10:44   5   A.   No, I don't think so.  I think it's readily apparent to I

        6   believe all the evaluators in this case that Mr. Charboneau has

        7   had severe difficulties with inhalants in the past and alcohol

        8   up until his current incarceration.

        9   Q.   Why, in your opinion, is Mr. Charboneau's alcohol use

10:45  10   disorder a serious mental illness abnormality or disorder in

       11   this case?

       12   A.   I think Dr. North explained that very well, just the

       13   impact it has had on his life as well as the lives of the

       14   victims that have been involved, and his family members as

10:45  15   well.

       16       So his alcohol use disorder has been pervasive, it's been

       17   since he was an adolescent and it has affected every aspect of

       18   his life, whether it's employment, housing, the criminal

       19   justice system.  It's been a severe disorder for him.

10:45  20   Q.   You heard Dr. North testify that Mr. Charboneau's family

       21   has disowned him at least in part because of the consequences

       22   of his drinking, right?

       23   A.   Correct.

       24   Q.   Take a look, if you would please, at Government's Exhibit

10:46  25   No. 8.

H. Ross - Direct Examination

10:46  1   A.   I'm there.

       2   Q.   Have you seen this document before?

       3   A.   I have.

       4   Q.   Can you explain to us what this document is?

10:46  5   A.   This was a letter written by the Charboneau family, or

       6   several members of the family, to U.S. Probation and Parole in

       7   July of 2014.

       8   Q.   And what does this document say?  Just summarize it,

       9   please.

10:46 10   A.   As the first sentence says, "This letter is an attempt to

      11   prohibit Blake Charboneau from being released into society."

      12   And then they went into their concerns about him because of his

      13   alcohol use and then the resulting sexual assaults he's engaged

      14   in, specifically on family members as well as other members in

10:46 15   the community.

      16   Q.   In addition to his family disowning him, has his tribe

      17   also disowned him?

      18   A.   Yes, I believe he's been banned or excommunicated or

      19   something from the reservation.  And I think at that same time

10:47 20   his family had also expressed grave concerns of him coming back

      21   at that time as well.

      22   Q.   Let's move then to Prong 3, please.  Did you find that as

      23   a result of Mr. Charboneau's serious mental abnormalities that

      24   he would have serious difficulty refraining from serious

10:47 25   violent conduct and child molestation if released?

10:47   1   A.    I did.

2   Q.    Again, just for the record, your analysis on Prong 3 is at

3   pages 541, 545 of Government Exhibit No. 5?

4   A.    That's correct.

10:47   5   Q.    Can you please summarize the basis?  We'll get into the

6   details in a minute.

7   A.    The basis for my finding on Prong 3 is based on his

8   moderate, high risk on the Static-99R as well as several

9   dynamic risk factors, all of which encourage the -- I won't say

10:48   10   encourage, but they facilitate the use of the alcohol and they

11   are exacerbated by his use of alcohol.  So all of those, I

12   think, give him serious difficulty from refraining from further

13   acts of sexual violence and child molestation.

14   Q.    Let's start with the actuarial score that you mentioned.

10:48   15   Which actuarial instrument did you use?

16   A.    The Static-99R.

17   Q.    And what score did you give him?

18   A.    I gave him a 4.

19   Q.    You heard Dr. North explain that he gave Mr. Charboneau a

10:48   20   5.

21   A.    Yes.

22   Q.    Why did you give Mr. Charboneau a 4?

23   A.    Unlike the other evaluators in this case, I did not have

24   the benefit of interviewing Mr. Charboneau, so I couldn't ask

10:48   25   more detailed information about his history and specific to the

H. Ross - Direct Examination

10:48  1    item two that Dr. North mentioned was his relationship history.

       2        So because he had some type of, it appeared long-term

       3    relationship that resulted in two children, I gave him the

       4    benefit of the doubt and gave a more conservative score of a

10:49  5    zero on number two instead of a one, but now that Dr. North

       6    gave that information, I think that was consistent through the

       7    other evaluators as well, I would change my score to a 5 as

       8    well to reflect that new information.

       9    Q.   What risk category of Static score of 4 or 5 for that

10:49  10    matter into?

       11    A.   The Static-99 scores categories have changed a bit, but

       12    when I scored it, it was moderate high.  I believe Dr. North

       13    used a different term that's the new term now, but at the time

       14    of the score it was moderate high, still above average.

10:49  15    Q.   Do you think that adequately represents Mr. Charboneau's

       16    risk of re-offense?

       17    A.   No, not in this case.

       18    Q.   Why not?

       19    A.   In this case -- so every case you have to consider

10:49  20    individually and the specific risk factors in that case and

       21    because Mr. Charboneau's severe, severe alcohol use and the

       22    violent sexual assaults that have resulted from his using the

       23    alcohol, I just don't think it's captured very well on the

       24    Static-99R.

10:50  25    Q.   So in your opinion, his risk of re-offending is higher

H. Ross - Direct Examination

| | | |
|---|---|---|
| 10:50 | 1 | than what the Static-99R would state? |
| | 2 | A.   I believe it is, yes. |
| | 3 | Q.   Let's talk about the dynamic risk factors, since you |
| | 4 | mentioned those. |
| 10:50 | 5 | First, briefly list which ones you think are the most |
| | 6 | important in Mr. Charboneau's case. |
| | 7 | A.   Sure.  I believe his lack of emotionally intimate |
| | 8 | relationships with adults, his lifestyle impulsivity, his poor |
| | 9 | problem solving, and his resistance to rules and supervision at |
| 10:50 | 10 | least in the community are all concerning. |
| | 11 | Q.   Let's take those one by one.  We'll start with lack of |
| | 12 | emotionally intimate relationships with adults.  Can you |
| | 13 | explain what evidence supports that dynamic factor? |
| | 14 | A.   Sure.  As we discussed, he's never had a long-term |
| 10:50 | 15 | relationship with an adult that was emotionally intimate.  He |
| | 16 | had a relationship that resulted in two children; but as we |
| | 17 | found out more recently, that was on again and off again.  I |
| | 18 | think he testified to that in his deposition.  So it wasn't a |
| | 19 | particularly strong bond.  And as Dr. North discussed, he's got |
| 10:51 | 20 | social difficulties where it's hard for him to form bonds and |
| | 21 | understand the process of finding a partner.  So that's a risk |
| | 22 | factor. |
| | 23 | Q.   What about lifestyle impulsivity, what supports that in |
| | 24 | this case? |
| 10:51 | 25 | A.   I think most of his history supports that.  His life has |

H. Ross - Direct Examination

10:51  1    been unstable both with employment, with housing, again, the
       2    criminal justice system, and, of course, overarching all of
       3    that is the alcohol misuse.  So all of that is very suggestive
       4    of impulsivity throughout his lifestyle.
10:51  5    Q.   Can you talk about now of poor problem solving, what
       6    evidence supports that?
       7    A.   Sure.  So in my report I said there wasn't much
       8    information in the record about his problem-solving abilities
       9    other than, again, when he's misusing alcohol and obviously
10:52  10   that -- he demonstrates significant problem-solving
       11   difficulties at that time.  But then as Dr. Holden testified
       12   to, and as I had reviewed in the treatment records, they also
       13   identified problem solving as a concern and she discussed how
       14   his problem-solving style is one of passivity where he waits
10:52  15   for the problem to resolve itself rather than taking an active
       16   role in solving those problems himself.
       17   Q.   And then finally, resistance to rules and supervision.
       18   Can you briefly summarize your analysis of that dynamic risk
       19   factor?
10:52  20   A.   Sure.  As I said, and has been testified to previously
       21   today, Mr. Charboneau does very well in the institution.  He
       22   follows the rules and regulations of institutions or in any
       23   kind of secure or structured environment quite well.
       24        But in the community, that's where he has significant
10:53  25   difficulty following those rules, whether it be drinking

H. Ross - Direct Examination

10:53  1    alcohol or engaging in other offenses.  And as was noted in his

2    most recent period of supervision, he did quite well when he

3    was in that structured residential placement, such that they

4    moved him down to him being in his own apartment, but then once

10:53  5    he had that freedom again, that was when he went and did the

6    urine test and then later that same day bought alcohol and then

7    engaged in another rape.

8    Q.    Let's talk in a little bit more detail about that last

9    time period that he was in the community and put some dates on

10:53  10   it.

11   A.    Okay.

12   Q.    You mentioned that he was put into a residential program.

13   Do you recall exactly when he was placed in that residential

14   program?

10:53  15   A.    According to my report, I have that he was placed at

16   Behavioral Management Systems or BMS, which was a residential

17   program, on November 15th, 2001.

18   Q.    And that, like you said, was a residential program?

19   A.    Yes.

10:54  20   Q.    Did he have a job during that time period?

21   A.    I believe he did.  I believe he was a dishwasher.

22            THE COURT:  Doctor, is that a federal halfway house,

23   is that what that is?

24            THE WITNESS:  It may be.  I'm unfamiliar.

10:54  25   BY MR. ANDERSON:

H. Ross - Direct Examination

| | | |
|---|---|---|
| 10:54 | 1 | Q.   After Mr. Charboneau was placed in the residential program |
| | 2 | in November, 2001, when was the next time that he had a drink? |
| | 3 | A.   Let me see if I can identify it.  He was placed in a detox |
| | 4 | program at some point after that, so I'm guessing he -- let's |
| 10:54 | 5 | see.  What I have in my report is that he tested positive while |
| | 6 | on supervision for marijuana on January 25th, 2002, and |
| | 7 | admitted drinking alcohol on New Year's Eve, I guess of 2001, |
| | 8 | December, 2001. |
| | 9 | Q.   And that would have been about a month, month and a half |
| 10:55 | 10 | after he was placed in that residential program? |
| | 11 | A.   Yes. |
| | 12 | Q.   When did Mr. Charboneau get out of that residential |
| | 13 | program?  By "get out," I mean move from the residential |
| | 14 | program to the more independent apartment adjacent to it. |
| 10:55 | 15 | A.   He did a detox program after the alcohol use for about 12 |
| | 16 | days and then returned back to BMS, so that was probably |
| | 17 | sometime in about February of 2002.  And then because of his |
| | 18 | good progress, he was eventually moved to an apartment right |
| | 19 | next door to BMS on March 21st, 2003. |
| 10:55 | 20 | Q.   When was the next time Mr. Charboneau had a drink after he |
| | 21 | was moved to that independent apartment? |
| | 22 | A.   I can't say for sure, but we definitely know that he had a |
| | 23 | drink and continued to drink on the date of the offense, which |
| | 24 | was I believe in July of that same year.  Let me check the |
| 10:55 | 25 | exact date.  I can't find the date.  I know 2003. |

H. Ross - Direct Examination

| | | |
|---|---|---|
| 10:56 | 1 | Q.   We'll get to that in just a second. |
| | 2 | So he was released to -- he was released, you said, in |
| | 3 | March of 2003 from the residential program to the independent |
| | 4 | apartment. |
| 10:56 | 5 | Let me direct your attention to the page of your report |
| | 6 | marked 532, and your report, again, is Government's Exhibit No. |
| | 7 | 5. |
| | 8 | THE COURT:  542? |
| | 9 | MR. ANDERSON:  532, Your Honor. |
| 10:56 | 10 | THE COURT:  532. |
| | 11 | THE WITNESS:  Yes, I'm there. |
| | 12 | BY MR. ANDERSON: |
| | 13 | Q.   Top paragraph, second to last line beginning, "On |
| | 14 | April 22nd, 2003," can you just take a look at that to yourself |
| 10:56 | 15 | and let me know when you're done. |
| | 16 | A.   I'm done. |
| | 17 | Q.   Does that refresh your recollection as to approximately |
| | 18 | the next time after he was released in March, 2003 that he had |
| | 19 | a drink? |
| 10:57 | 20 | A.   Yes.  So I was incorrect.  So in between the March and |
| | 21 | July there was also the April 22nd, 2003, when he reported that |
| | 22 | he had consumed alcohol. |
| | 23 | Q.   And then from April, 2003 -- well, first let's nail down |
| | 24 | the date on this last offense. |
| 10:57 | 25 | MR. ANDERSON:  Your Honor, may I have just one |

H. Ross - Direct Examination

10:57  1    moment, please?

2              THE COURT:  You may.

3          (Pause in the proceeding.)

4    BY MR. ANDERSON:

10:58  5    Q.   Dr. Ross, can you flip, please, to Government's Exhibit

6    No. 10.

7    A.   Yes, I'm there.

8    Q.   Turn to the page marked -- Bates labeled 10.

9    A.   Yes.

10:58 10    Q.   Paragraph number eight, first line.

11    A.   Yes.

12    Q.   Just read that to yourself, please.

13    A.   Uhm-uhm.

14    Q.   Does that fresh your recollection as to when

10:58 15    Mr. Charboneau committed his next offense?

16    A.   Yes.  He was arrested on July 12th, 2003.

17    Q.   So just for the record, Government's Exhibit No. 12, is

18    that the complaint, the criminal complaint for that offense?

19    A.   Yes, it is.

10:59 20    Q.   So Mr. Charboneau is released from that residential

21    program in March of 2003, he reported that he had a drink in

22    April 2003, and then he committed his offense, as we saw, in

23    July 2003.

24    A.   Correct.

10:59 25    Q.   Can you describe his living arrangement after he reported

H. Ross - Direct Examination

10:59   1   his drinking in April of 2003?

2   A.    Sure.  So I believe he was originally placed in an

3   apartment by himself and then as -- after he reported that

4   incident with alcohol in 2000 -- in April 2003, they eventually

10:59   5   moved another individual -- I don't know if it was into his

6   apartment or him into the other individual's apartment, but

7   they gave him a roommate on July 1st, 2003.

8   Q.    Why was he given a roommate?

9   A.    They felt the roommate would be a positive influence on

10:59  10   him.

11   Q.    Was Mr. Charboneau on federal supervision at the time of

12   that offense?

13   A.    Yes, he was.

14   Q.    The same federal supervision that he will be released to

11:00  15   when he is released?

16   A.    That's correct.

17   Q.    Let's go back to the dynamic factors that we were talking

18   about.

19        Now that we've gone through each of the four that you

11:00  20   identified as the most important, which were poor problem

21   solving, lifestyle impulsivity, resistant to rules and

22   supervision, and lack of emotional relationships with adults,

23   can you, please, explain the interplay of those four dynamic

24   factors and how they impact your analysis to Prong 3?

11:00  25   A.    Sure.  Dynamic risk factors, it's not necessarily

H. Ross - Direct Examination

11:00   1   additive, it's not one point for each dynamic risk factor.

        2   Each one has to be considered individually and on a

        3   case-specific basis on how that risk factor is involved in that

        4   individual's case.  And I think for Mr. Charboneau, he doesn't

11:00   5   hit all the dynamic risk factors that I look at in my reports,

        6   but those that he does hit on, those work together and they're

        7   exacerbated by his alcohol use to the point that I think it

        8   causes him serious difficulty refraining from further acts of

        9   sexual violence.

11:01  10   Q.    Did you also analyze the factors in BOP's guidelines for

       11   determining sexual dangerousness?

       12   A.    I did.

       13   Q.    Just for the record, your analysis is detailed in

       14   Government's Exhibit No. 5 at pages marked 544, 545.

11:01  15   A.    Yes.

       16   Q.    All right.  At the time that you wrote your report -- and

       17   I'm looking now at the very last paragraph, second line about

       18   midway on that line -- it says, "His appreciation of his

       19   criminal conduct is unknown, as this was not addressed in

11:01  20   records and the inmate did not interview during the current

       21   evaluation."  Do you see that?

       22   A.    Yes.

       23   Q.    Since you wrote your report, have you seen evidence that

       24   Mr. Charboneau does not, in fact, appreciate the wrongfulness

11:01  25   of his actions?

H. Ross - Direct Examination

11:01    1    A.    Yes.   In the other evaluators' reports where they
         2    interviewed him and he seemed to deny or minimize much of the
         3    offenses.  And then as Dr. Holden testified today, in treatment
         4    he's also justified or minimized his offenses.
11:02    5    Q.    Of the BOP factors that you considered, which are the most
         6    important in Mr. Charboneau's case?
         7    A.    I believe that the inability to control conduct and the
         8    lack of successful completion of sex offender treatment are
         9    probably the most important in this case.
11:02   10    Q.    Let's start with the first one; the inability to control
        11    conduct.
        12        Can you explain why Mr. Charboneau meets that factor here?
        13    A.    Sure.  So that factor, according to the federal register,
        14    references offending while under supervision, when likely to
11:02   15    get caught, statements of intent to re-offend or admission of
        16    an inability to avoid re-offending or inability to control
        17    behavior.
        18        And in Mr. Charboneau's case, he's offended while on
        19    supervision, as his most recent case demonstrates; he's
11:03   20    offended when likely to get caught, as demonstrated I believe
        21    in all of his cases.  So with his daughter there was a
        22    five-year-old witness and his sister was coming back soon to
        23    pick them up and obviously his own daughter identified who had
        24    raped her.  So that's certainly suggestive of a good chance to
11:03   25    be caught.  With the -- I'm sorry.  That wasn't the most

H. Ross - Direct Examination

11:03  1    recent.

2    The most recent one with the niece, I believe her

3    girlfriend was in the bed with her when he first was sexually

4    abusing her with having oral sex on her and then they kicked

11:03  5    him out and then he came back again. So he was obviously known

6    for what he had already done; he had been identified as that.

7    So there is obviously lots of evidence of offending when likely

8    to get caught.

9    I don't know any statements of intent to re-offend. I

11:04  10   don't know that he's made any statements like that, but he

11   certainly said that he has difficulty controlling his behavior,

12   it's been brought up already where he said he felt out of

13   control on at least of two of those offenses.

14   Q.   I want to look at one of those offenses in particular,

11:04  15   this is mostly for the record, but turn to Government's Exhibit

16   No. 16.

17   A.   Yes, I'm there.

18   Q.   At the page marked 144.

19   A.   Yes.

11:04  20   Q.   Paragraph 21 at the top, lines two through five. Can you

21   explain to us what this is saying as far as his admission of

22   inability to control his conduct?

23   A.   Sure. In that paragraph it's describing that

24   Mr. Charboneau discussed that he had a loss of control when --

11:05  25   during the rape of his daughter.

H. Ross - Direct Examination

11:05    1    Q.    Let's move then to the second factor that you mentioned,

2    which is failure to successfully complete sex offender

3    treatment.

4    A.    Yes.

11:05    5    Q.    Has Mr. Charboneau ever successfully completed sex

6    offender treatment?

7    A.    Not as far as I know.

8    Q.    At the time of his most recent offense, was he

9    participating in sex offender treatment?

11:05   10    A.    Yes, he was.

11    Q.    You heard Dr. Holden's testimony that Mr. Charboneau is

12    currently in sex offender treatment at Butner, right?

13    A.    Yes.

14    Q.    In your opinion, has Mr. Charboneau made enough progress

11:05   15    in that treatment to make him not sexually dangerous?

16    A.    No.  I think he's still early on in treatment.

17    Q.    Do you think Mr. Charboneau needs some other kind of

18    treatment in addition to sex offender treatment?

19    A.    Yes.  He absolutely needs substance abuse treatment as

11:05   20    well.

21    Q.    Is Mr. Charboneau currently in substance abuse treatment?

22    A.    No, he's not, other than Alcoholics Anonymous.

23    Q.    Is going to Alcoholics Anonymous the same as substance

24    abuse treatment?

11:06   25    A.    No, it's not.

H. Ross - Direct Examination

11:06  1    Q.    Is going to Alcoholics Anonymous enough to make him not

       2    sexually dangerous?

       3    A.    No, I don't believe it is.

       4    Q.    And you also heard from Dr. Holden that Mr. Charboneau

11:06  5    continues to deny that he has an alcohol problem?

       6    A.    Yes.

       7    Q.    Are there protective factors that would reduce

       8    Mr. Charboneau's risk of re-offending?

       9    A.    I assessed protective factors, however, I don't believe

11:06  10   any are present in this case.

       11   Q.    Again, just for the record, Government's Exhibit 5, the

       12   page marked 544, that's your basis for your conclusion there on

       13   the protective factors?

       14   A.    Yes.

11:06  15   Q.    Why isn't Mr. Charboneau's age a protective factor?

       16   A.    He is approaching 60, and 60 is considered -- age above 60

       17   is certainly considered -- especially on the Static-99R, that

       18   can reduce someone's risk on the Static-99R, but his age of --

       19   I believe he was 55 when I scored this and 57 now, is already

11:07  20   addressed in the Static-99R, the points have been adjusted for

       21   his current age.

       22   Q.    Why aren't medical issues a protective factor?

       23             THE COURT:  Medical what?

       24             MR. ANDERSON:  Issues.

11:07  25             THE WITNESS:  For Mr. Charboneau, he's a very healthy

H. Ross - Direct Examination

11:07  1  individual.  I don't believe he has any medical diagnoses at
       2  all.
       3  BY MR. ANDERSON:
       4  Q.    What about Mr. Charboneau's time in the community, is that
11:07  5  a protective factor in any way here?
       6  A.    Time in the community is considered protective if there's
       7  a significant period of time since the last sexual offense that
       8  someone has been in the community, and Mr. Charboneau is
       9  still -- he's been in prison since his last sexual offense so
11:07 10  he has not had any time in the community since then.
      11  Q.    What about his two-year term of supervised release, is
      12  that a protective factor in any way for him?
      13  A.    Certainly supervised release can be a protective factor,
      14  but in this case, I don't believe it is.
11:08 15  Q.    Why not?
      16  A.    It's a rather short term of supervised release.  I don't
      17  know that he could successfully complete a term of sex offender
      18  treatment within two years, especially as Dr. Holden testified
      19  it's rather slow-going with him because of his communication
11:08 20  and significant shame, so it's difficult for him to trust
      21  people.
      22        And then history bears the evidence that he was not
      23  successful in supervision the very last time he was out and he
      24  sexually offended while he was on supervision, after completing
11:08 25  substance abuse treatment and while he was in sex offender

H. Ross - Direct Examination

| | | |
|---|---|---|
| 11:08 | 1 | treatment. |
| | 2 | Q.   What about a well-developed relapse prevention plan and |
| | 3 | release plan, can that be beneficial to an offender who is |
| | 4 | released? |
| 11:08 | 5 | A.   Yes. |
| | 6 | Q.   Did you read the transcript of Mr. Charboneau's |
| | 7 | deposition? |
| | 8 | A.   I did. |
| | 9 | Q.   Specifically the section where he discussed his plans? |
| 11:09 | 10 | A.   Yes. |
| | 11 | Q.   Can you briefly summarize what those release plans were? |
| | 12 | A.   I'd have to refresh my memory on that one. |
| | 13 | Q.   Take a look at Government's Exhibit No. 21. |
| | 14 | A.   Yes. |
| 11:09 | 15 | Q.   Flip specifically to page 86, that's the start.  And his |
| | 16 | discussion for the record -- for the record, his discussion |
| | 17 | goes from page 86 to page 91 and then there's another reference |
| | 18 | to his release plans on page 96. |
| | 19 | Just take a minute to look through that, please. |
| 11:10 | 20 | A.   What was that other page that you mentioned it referenced? |
| | 21 | Q.   96. |
| | 22 | A.   Yes. |
| | 23 | Q.   Having looked through that, does that refresh your |
| | 24 | recollection as to Mr. Charboneau's release plans? |
| 11:10 | 25 | A.   Yes, it does. |

H. Ross - Direct Examination

11:10  1    Q.    Can you please describe what those release plans are?

2    A.    He plans to avoid alcohol and find a place to live and try

3    to get a job.

4    Q.    Did he provide any details beyond that?

11:11  5    A.    No, not that I could tell.  Again, his communication is a

6    bit difficult to weed through, but it didn't appear anything

7    and he seemed unaware of the fact that his family had suggested

8    they were not going to give him any support.

9    Q.    Did he identify exactly how he was going to avoid alcohol?

11:11 10    A.    I think he said he was going to leave it alone.

11    Q.    In your opinion, is that an effective relapse prevention

12    plan?

13    A.    No, it is not.

14    Q.    And are those effective release plans --

11:11 15    A.    No.

16    Q.    -- that would be beneficial for an offender of release?

17    A.    No.

18    Q.    Can strong community support be beneficial to an offender

19    who is released?

11:11 20    A.    Yes, it can.

21    Q.    Is it beneficial to Mr. Charboneau if he were to be

22    released?

23    A.    No, he doesn't have any support in the community.

24    Q.    I have just a couple additional items.

11:12 25          You didn't diagnose Mr. Charboneau with paraphilia, right?

H. Ross - Direct Examination

11:12  1  A.    That's correct.

2  Q.    In your opinion, does that make him any less sexually

3  dangerous on the Adam Walsh Act?

4  A.    No.   I believe his alcohol use disorder is so severe in

11:12  5  this case that it qualifies as a serious mental illness,

6  abnormality or disorder and it would lead to that serious

7  difficulty from refraining.

8  Q.    In Government's Exhibit No. 5, that's your report at the

9  page Bates labeled 544?

11:12  10  A.    Yes.

11  Q.    The third paragraph down, that paragraph begins, "Negative

12  social influences."

13  A.    Yes.

14  Q.    And I'm looking specifically at lines two and three, the

11:13  15  line, "Given repeated descriptions"; do you see that?

16  A.    Yes.

17  Q.    You note there had been repeated descriptions of

18  Mr. Charboneau as a loner?

19  A.    Yes, in the records.

11:13  20  Q.    Does that in any way, in your opinion, make him less

21  sexually dangerous, the fact that he's been described as a

22  loner?

23  A.    No.

24  Q.    Why not?

11:13  25  A.    So he's been described as a loner kind of throughout his

**JA108**

H. Ross - Direct Examination

11:13   1    life and he has been still been able to find individuals while

      2    he was drinking that he can victimize.  So I don't believe

      3    that's a protective factor in any way.  In fact, that kind of

      4    feeds into the lack of emotionally intimate relationships with

11:13   5    people, that would be -- kind of raise his risk.

      6            THE COURT:  What paragraph are you on?

      7            MR. ANDERSON:  Your Honor, it's the page Bates

      8    labeled 544 on Government's Exhibit No. 5, it's the third

      9    paragraph on the top beginning, "Negative social influences,"

11:13 10    and the second line, "Given repeated description of

     11    Mr. Charboneau" is the beginning of the line.

     12            THE COURT:  Thank you.

     13    BY MR. ANDERSON:

     14    Q.   Dr. Ross, you mentioned that Mr. Charboneau has been

11:14 15    described as a loner all his life.  Flip to page 532 of your

     16    report.

     17    A.   (The witness complied.)

     18    Q.   Do you remember a particular assessment that was conducted

     19    in 1982 by Dr. Jeffrey McKee?

11:14 20    A.   Yes.

     21    Q.   And if you look at the first paragraph of mental health

     22    history, that's where he talks about the assessment by

     23    Dr. McKee?

     24    A.   That's correct.

11:14 25    Q.   Move down to the blocked quote beginning, "In summary."

H. Ross - Direct Examination

11:14  1    A.    Uhm-uhm.

       2    Q.    What does Dr. McKee say about Mr. Charboneau's status as a

       3    loner?

       4    A.    He said he appears to be a rather immature, inept loner

11:14  5    who appears to have difficulty developing close, reciprocal,

       6    nurturing relationships with others.

       7    Q.    That assessment was in August of 1982?

       8    A.    Yes.

       9    Q.    How many of Mr. Charboneau's sexual offenses has he

11:15 10    committed since then?

      11    A.    I believe three.

      12    Q.    Most of Mr. Charboneau's offenses have been against family

      13    members, as we heard from Dr. North's testimony, right?

      14    A.    Correct.

11:15 15    Q.    And as you mentioned, and as Dr. North mentioned, and as

      16    we saw in Government Exhibit No. 8, Mr. Charboneau's family

      17    doesn't want him back?

      18    A.    Correct.

      19    Q.    In your estimation, does that make him any less likely to

11:15 20    commit a sexual offense if released?

      21    A.    No.

      22    Q.    Why not?

      23    A.    I believe his offenses were against family members solely

      24    because they were convenient victims of opportunity while he

11:15 25    was intoxicated, not because they were targeted in some way

H. Ross - Direct Examination

11:15  1   because they were members of his family.

2   Q.   And we've heard a lot about Mr. Charboneau's institutional

3   behavior and how good he is in an institution, right?

4   A.   Yes.

11:15  5   Q.   And how he can go long stretches of over a decade, in at

6   least two cases, of good institutional behavior?

7   A.   Yes.

8   Q.   Without drinking alcohol, at least there is no evidence of

9   it, right?

11:16  10   A.   That's correct.

11   Q.   Does that, in your opinion, make him less sexually

12   dangerous under the Adam Walsh Act if he were released?

13   A.   No.

14   Q.   Why not?

11:16  15   A.   I believe that he does so well in institutions solely

16   because of the restrictions on his behavior.  When -- kind of

17   as Dr. Holden said, when he's told what to do or suggested what

18   to do, he does well in a restricted environment.  But when he's

19   out in the community and he can make -- he has some

11:16  20   independence in his choices and he has the peer pressure, he's

21   just not successful.  He doesn't have the skills and abilities

22   currently to be successful in that environment.

23   Q.   And we talked about the fact that Mr. Charboneau on New

24   Year's Eve in 2001, a month or so after he had joined the

11:16  25   residential program, had a drink.

H. Ross - Direct Examination

| | | |
|---|---|---|
| 11:16 | 1 | A.    Yes. |
| | 2 | Q.    How does that impact your understanding on this particular |
| | 3 | topic that we're just discussing, which is that he behaves well |
| | 4 | in an institution but appears in the community to devolve? |
| 11:17 | 5 | A.    That's evidence of it.  So when he's in a restricted |
| | 6 | environment, he doesn't drink.  As much as we'd like to say in |
| | 7 | the Bureau of Prisons that inmates don't have access to alcohol |
| | 8 | or drugs, they do, they can get it if they work hard enough at |
| | 9 | it.  And Mr. Charboneau hasn't done that; he hasn't sought it |
| 11:17 | 10 | out.  But when it's all around him in the community and that |
| | 11 | structure is not there, he just can't control himself. |
| | 12 | Q.    Even when he's in the residential program? |
| | 13 | A.    Even when he's in the residential program.  That is a |
| | 14 | little bit more free than prison. |
| 11:17 | 15 | Q.    And you talked about prisoners having access to alcohol |
| | 16 | while in the Bureau of Prisons.  So I want to just touch on |
| | 17 | this very briefly. |
| | 18 | Turn to Government's Exhibit No. 21, please, which is |
| | 19 | Mr. Charboneau's deposition. |
| 11:18 | 20 | A.    Yes. |
| | 21 | Q.    When you read through Mr. Charboneau's deposition, do you |
| | 22 | recall him talking about whether he has ever seen hooch while |
| | 23 | he's been at Butner in the Maryland unit? |
| | 24 | A.    I recall the discussion -- I don't remember if he said, |
| 11:18 | 25 | though, if he had seen it or not. |

H. Ross - Direct Examination

11:18   1   Q.   Turn to page 51, please.

        2   A.   Yes.

        3   Q.   And down at line 17 to line 19.

        4   A.   Yes.

11:18   5   Q.   Does that refresh your recollection as to whether he had

        6   seen hooch in the Maryland unit?

        7   A.   In the Maryland unit he said he hadn't seen it, that's

        8   correct.  I believe he said previously he saw some officers

        9   carrying some hooch that had been seized on another unit

11:19  10   previously.

       11   Q.   And one final question:  We heard about this a little bit

       12   in Dr. North's testimony; that Mr. Charboneau has committed

       13   numerous offenses while intoxicated.

       14   A.   Yes.

11:19  15   Q.   Four of those were sexual offenses, right?

       16   A.   Correct.

       17   Q.   But the rest of them were nonsexual?

       18   A.   That's correct.

       19   Q.   Does that somehow demonstrate that he has volitional

11:19  20   control or not sexually dangerous if released?

       21   A.   No, I don't believe it does.

       22   Q.   Why not?

       23   A.   The rest of his offenses, as Dr. North suggested, were

       24   relatively minor, most were alcohol-related.  Disorderly

11:19  25   conduct, public intoxication, possession of alcohol, I believe,

H. Ross - Direct Examination

11:19  1    I think a couple of assaults and maybe one petit larceny.

       2        So I think that demonstrates that, yes, absolutely, he

       3    makes lots of kinds of poor decisions when he's intoxicated;

       4    but specifically, he makes poor sexual decisions.  Probably not

11:20  5    even decisions.  He impulsively acts with this sexual behavior

       6    when he's intoxicated and it doesn't stop and it tends to

       7    happen, at least more recently, relatively recently to him

       8    leaving a secured or more restricted environment, so it seems

       9    to some degree to be intensified.

11:20 10        I don't believe in his last period of supervision he had

      11    any other kind of offenses other than alcohol and raping an

      12    individual.  So that's very concerning to me, and I don't think

      13    that's in any way evidence that sexual -- inappropriate sexual

      14    behavior is not a serious concern in this case.

11:20 15    Q.   Just to recap:  Based on all the considerations that we

      16    just discussed and the ones in your report in Government's

      17    Exhibit No. 5, have you formed an opinion to a reasonable

      18    degree of professional certainty as to whether Mr. Charboneau

      19    is sexually dangerous under the Adam Walsh Act?

11:21 20    A.   I have.

      21    Q.   And what is that opinion?

      22    A.   I believe he does meet criteria as a sexually dangerous

      23    person.

      24            MR. ANDERSON:  Nothing further.

11:21 25            THE COURT:  Cross-Examination?

H. Ross - Cross-Examination

11:21  1                 CROSS-EXAMINATION

2   BY MS. MAHAN:

3   Q.   Good morning, Dr. Ross.

4   A.   Good morning.

11:21  5   Q.   You determined that Mr. Charboneau met criteria, as you

6   just testified, correct?

7   A.   Correct.

8   Q.   But you did not diagnose any paraphilia, correct?

9   A.   That's correct.

11:21  10   Q.   And you did not diagnose a personality disorder, correct?

11   A.   That's correct.

12   Q.   The only diagnosis that you relied on in your report as a

13   severe mental disease or defect for purposes of the Adam Walsh

14   Act is the alcohol use disorder, correct?

11:21  15   A.   That's correct.

16   Q.   Now, for purposes of Prong 3, you considered a number of

17   exacerbating or dynamic risk factors, correct?

18   A.   Yes.

19   Q.   And, in fact, you determined that Mr. Charboneau had few

11:22  20   exacerbating dynamic risk factors, correct?

21   A.   Yes, I think he had less than half.

22   Q.   There was no evidence of sexual preoccupation, correct?

23   A.   Correct.

24   Q.   No evidence of deviant sexual interest, correct?

11:22  25   A.   Yes.

H. Ross - Cross-Examination

11:22  1   Q.   No evidence of emotional congruence with children,

       2   correct?

       3   A.   Correct.

       4   Q.   No evidence of grievance or hostility, correct?

11:22  5   A.   Correct.

       6   Q.   No evidence of an offense-supportive attitude, correct?

       7   A.   Correct.

       8   Q.   You also determined that he does not have a high risk as

       9   categorized in the actuarial assessment score; isn't that

11:22 10   correct?

      11   A.   Yes.

      12   Q.   Now, you were just asked some questions about

      13   Mr. Charboneau's criminal record.  You would agree that --

      14        THE COURT:  Excuse me.  What page in your report were

11:22 15   you just going -- was Ms. Mahan asking you about the dynamic

      16   risk factors?

      17        THE WITNESS:  The dynamic risk factors start on

      18   page 17 of my report.  I can't give you the Bates numbers.

      19        MS. MAHAN:  It's Bates 543, Your Honor.

11:23 20   BY MS. MAHAN:

      21   Q.   Dr. Ross, you would agree that Mr. Charboneau was

      22   intoxicated during all of his sex offenses, correct?

      23   A.   Yes.

      24   Q.   But you also listed what is a very lengthy history of

11:23 25   non-criminal sexual charges on page 8 and 9 of your report;

H. Ross - Cross-Examination

| | | |
|---|---|---|
| 11:23 | 1 | isn't that correct? |
| | 2 | A.   That's correct. |
| | 3 | Q.   And just for the record, that is Bates 534 and 535; is |
| | 4 | that correct? |
| 11:23 | 5 | A.   I believe so, yes. |
| | 6 | Q.   A number of those non-sexual charges, as you previously |
| | 7 | testified, involved intoxication, correct? |
| | 8 | A.   Yes. |
| | 9 | Q.   So it's fair to say that intoxication has been a problem |
| 11:23 | 10 | for Mr. Charboneau in terms of both sex offenses and in terms |
| | 11 | of general criminal activity, correct? |
| | 12 | A.   Yes. |
| | 13 | Q.   Now, you testified that you did not interview |
| | 14 | Mr. Charboneau, correct? |
| 11:24 | 15 | A.   Correct.  We had a brief meeting where I explained the |
| | 16 | process to him, but he chose eventually not to participate in |
| | 17 | the interview. |
| | 18 | Q.   But you did -- after listening to the testimony of |
| | 19 | Dr. North and Dr. Holden today, you would agree that it's your |
| 11:24 | 20 | opinion that he's been denying that he has a problem with |
| | 21 | alcohol, correct? |
| | 22 | A.   Yes. |
| | 23 | Q.   And you -- Mr. Anderson had you look at Mr. Charboneau's |
| | 24 | deposition testimony regarding his release plan; do you recall |
| 11:24 | 25 | that just a few minutes ago? |

H. Ross - Cross-Examination

11:24  1    A.    Yes.

2    Q.    If you would, would you please turn to Government's

3    Exhibit 21, page 86.

4    A.    Yes, I'm there.

11:24  5    Q.    Starting on page 18 -- I'm sorry, line 18 and continuing

6    to page 87, line 10, would you read that please, to yourself.

7    A.    Sure.  Yes, I've read it.

8    Q.    You would agree that in that section Mr. Charboneau, in

9    fact, says that he needs to leave alcoholism alone, doesn't he?

11:25 10    A.    I'm sorry.  Your question was that he said that he needs

11    to leave it alone -- what was your exact statement?

12    Q.    I said he wants to prove that he can -- I think I didn't

13    say this, but I'm saying it now.  He wants to prove that he can

14    leave the alcoholism alone.

11:25 15    A.    Yes, he says that, just the way he did with drugs.

16    Q.    You were discussing Mr. Charboneau's relapse prevention

17    plan, which he was discussing in this section of the deposition

18    earlier, correct?

19    A.    I would call it more like a release plan, not a relapse

11:26 20    prevention plan, but yes.

21    Q.    In your current job at the Bureau of Prisons, you're not

22    involved in treating offenders, correct?

23    A.    That's correct.

24    Q.    And you're not involved in creating relapse prevention

11:26 25    plans, are you?

H. Ross - Cross-Examination

11:26  1    A.    Not creating them.  I'm involved in assessing them for

2    individuals who have gone through at least part of the

3    treatment program and are up for release.

4    Q.    But you're not involved in creating them?

11:26  5    A.    That's correct.

6    Q.    Now, there was some discussion about the time that

7    Mr. Charboneau was released from prison in 2000 and was in the

8    community until 2003.  Would you agree that that is true; that

9    he was in the community from roughly 2000 to 2003?

11:26 10    A.    Yes.

11    Q.    And he discussed that his family had disowned him prior to

12    that point, correct?

13    A.    If I said "disowned," I'm not sure that's accurate.  There

14    was a document that referenced that his family, at least the

11:27 15    members that had come forward, didn't want anything to do with

16    him.

17    Q.    And that family is from North Dakota, correct?

18    A.    That's correct.

19    Q.    During the time that Mr. Charboneau was in the community

11:27 20    from 2000 to 2003, he was, in fact, on release in South Dakota,

21    wasn't he?

22    A.    I think maybe very early on it was North Dakota and then

23    it was moved to South Dakota, yes, so he can get more access to

24    treatment.

11:27 25    Q.    There was no evidence that he had any family support

H. Ross - Cross-Examination

11:27  1    during that time period, is there?

       2    A.    His victim was his niece, so he was having contact with a

       3    family member and drinking with her and spending time together

       4    I think for six months prior.

11:27  5    Q.    But the immediate family that referenced not providing

       6    Mr. Charboneau with any support, there's no evidence during

       7    that time period he had any support from them, correct?

       8    A.    Right.  I don't believe he did, no.

       9    Q.    Now, you discussed some timing with Mr. Anderson during

11:28 10    your direct testimony during that time period.  You said that

      11    he entered the Behavior Management System in November of 2001;

      12    is that correct?

      13    A.    Yes, that's what I said.

      14    Q.    And just for reference, I'm on Government's Exhibit 10,

11:28 15    Bates 09.

      16    A.    Yes, I'm there.

      17    Q.    I believe you testified that he entered into residential

      18    placement BMS on November 15th, 2001, correct?

      19    A.    Yes.

11:28 20    Q.    And he admitted to drinking alcohol on New Year's Eve,

      21    which would have been December 31st, 2001, correct?

      22    A.    Yes.

      23    Q.    There is no evidence that he engaged in any sexually

      24    dangerous behavior on that date, is there?

11:29 25    A.    No, there's not.

H. Ross - Cross-Examination

11:29    1    Q.    And you also testified that he drank alcohol on

2    April 22nd, 2003, correct?

3    A.    Yes, I believe that's right.

4    Q.    And there's no evidence that he engaged in any sort of

11:29    5    sexually dangerous behavior or child molestation on that date,

6    correct?

7    A.    That's correct.

8    Q.    And in fact, you also testified that he was back in the

9    BMS on I believe March 28th, 2002; is that correct?  I believe

11:29    10   it was February, 2002.

11   A.    Yeah.  I don't think I knew an accurate date, but I know

12   early on, sometime after January, he was in detox for 12 days

13   and then was returned back to BMS, so I estimated it was

14   probably in February.

11:29    15   Q.    And there's no evidence of any sort of problems until he

16   drank alcohol on April 22nd, 2003, correct?

17   A.    I just want to make sure I'm understanding your question

18   correctly.  There was no suggestion of alcohol use between then

19   and April, nor any sexual -- you know, no complaints about

11:30    20   sexual behavior either.  I'm not sure which way you're asking

21   about.  As I can recall, there where are no concerns at all

22   during that period.

23   Q.    And that would be a period of over one year, correct?

24   A.    Yes.  I think it was noted that he was progressing so

11:30    25   well, that's why they moved him to an apartment on his own.

H. Ross - Redirect Examination

11:30    1              THE COURT:  Anything else, Mr. Anderson?

         2              MR. ANDERSON:  Briefly, Your Honor.

         3                   REDIRECT EXAMINATION

         4    BY MR. ANDERSON:

11:30    5    Q.    Dr. Ross, you talked with Ms. Mahan about some of the

         6    dynamic factors that Mr. Charboneau did not show.

         7    A.    Yes.

         8    Q.    Does Mr. Charboneau need to show all or most of the

         9    dynamic factors in order to be sexually dangerous, in your

11:31   10    opinion?

        11    A.    No.

        12    Q.    One of the dynamic risk factors that we talked about on

        13    your direct was his conduct on supervision, his failure to

        14    comply with rules and regulations, right?

11:31   15    A.    Yes.

        16    Q.    Is that one of the more robust risk factors for sexual

        17    re-offending?

        18    A.    It is.

        19    Q.    You talked again on your cross-examination with Ms. Mahan

11:31   20    about the fact that when Mr. Charboneau was released from BOP

        21    in 2000 he initially went to North Dakota?

        22    A.    I believe so, yes.

        23    Q.    But his supervision was transferred to South Dakota?

        24    A.    Yes.

11:31   25    Q.    And he didn't have any family support in South Dakota?

H. Ross - Redirect Examination

11:31    1    A.    Right.

2    Q.    What happened in July of 2003 in South Dakota?

3    A.    That was when he raped his niece.

4    Q.    You also talked about -- with Ms. Mahan about the two

11:31    5    instances in which Mr. Charboneau had alcohol when he was in

6    residential treatment or in the residential program, BMS.

7    A.    Yes.

8    Q.    And as you explained, there was no evidence that

9    Mr. Charboneau sexually assaulted a woman on New Year's Eve in

11:32   10    2001 when he drank?

11    A.    That's correct.

12    Q.    Was there any evidence that a woman was present when he

13    was drinking?

14    A.    I have no evidence of anything.  All I know is that he

11:32   15    reported to a treatment provider or to his probation officer

16    that he had drank on that evening.

17    Q.    What about the 2002 incident when he reported drinking,

18    did he report there was a woman there when he was drinking?

19    A.    I don't believe any description of the event was

11:32   20    mentioned.

21    Q.    What does the evidence show about what happens when

22    Mr. Charboneau does drink and there is a woman present?

23    A.    We certainly know that at least on four occasions when

24    he's drank he has engaged in sexually violent conduct or child

11:32   25    molestation.

G. Zinik - Direct Examination

| | | |
|---|---|---|
| 11:32 | 1 | MR. ANDERSON:  Nothing further, Your Honor. |
| | 2 | THE COURT:  Ms. Mahan? |
| | 3 | MS. SHEA:  Nothing further, Your Honor. |
| | 4 | THE COURT:  Thank you.  Please watch your step |
| 11:32 | 5 | stepping down. |
| | 6 | The United States may call your next witness. |
| | 7 | MR. ANDERSON:  The United States called Dr. Gary |
| | 8 | Zinik. |
| | 9 | GARY ZINIK, Ph.D |
| 11:33 | 10 | having been duly sworn, testified as follows: |
| | 11 | THE COURT:  Good morning, Dr. Zinik. |
| | 12 | THE WITNESS:  Good morning, Your Honor. |
| | 13 | THE COURT:  As soon as you're situated, one of the |
| | 14 | lawyers at this table over here are going to have some |
| 11:33 | 15 | questions for you.  Feel free to adjust the microphone. |
| | 16 | You may examine the witness. |
| | 17 | DIRECT EXAMINATION |
| | 18 | BY MR. ANDERSON: |
| | 19 | Q.   Good morning, Dr. Zinik. |
| 11:33 | 20 | A.   Good morning. |
| | 21 | Q.   Could you give your full name for the record and where you |
| | 22 | currently practice? |
| | 23 | A.   My name is Gary Zinik and I'm a forensic psychologist, and |
| | 24 | I have a private practice in Ventura, California. |
| 11:34 | 25 | Q.   And for the benefit of the court reporter, can you please |

G. Zinik - Direct Examination

11:34    1    spell your last name.

2    A.    Z-I-N-I-K.

3    Q.    Thank you.

4         Dr. Zinik, you have experience in forensic psychology,

11:34    5    right?

6    A.    Yes.

7    Q.    Do you also have experience in sex offender treatment?

8    A.    Yes.

9    Q.    Can you please describe that experience, please?

11:34   10    A.    Okay.  For about the last 20 years I've done sex offender

11    treatment in my private treatment.  I do both individual and

12    group treatment with sex offenders who are on probation in

13    Ventura County and refer to me for treatment, and so I've been

14    trained in sex offender treatment and been to many conferences,

11:34   15    and I still currently do it in my private practice.

16    Q.    Have you ever testified as a expert in sex offender

17    treatment?

18    A.    Yes.

19    Q.    Did you evaluate Mr. Charboneau pursuant to the Adam Walsh

11:34   20    Act?

21    A.    Yes.

22    Q.    What did you do to evaluate him?

23    A.    First, I reviewed all of the discovery records that were

24    sent to me by the U.S. Attorney's Office, and then I did have

11:35   25    an interview with Mr. Charboneau on, let's see, it was --

G. Zinik - Direct Examination

11:35   1    Q.   I'll direct your attention, Dr. Zinik, to Government

2    Exhibit No. 7, the page labeled 1643, the first paragraph under

3    "Sources of Information."

4    A.   Yes.

11:35   5    Q.   First line.

6    A.   Thank you.  February 18th, 2016, is when I interviewed

7    Mr. Charboneau.

8    Q.   Did you write a report of your findings?

9    A.   I did.

11:35  10    Q.   And we're looking at Government's Exhibit No. 7?

11    A.   Yes.

12    Q.   And your CV is Government's Exhibit No. 6, just one tab

13    before that?

14    A.   Correct.

11:36  15    Q.   Did you also review the reports of Dr. North, Dr. Ross and

16    Dr. Plaud in this case?

17    A.   Yes.

18    Q.   And aside from those reports, did you review any other

19    documents after you had written your report?

11:36  20    A.   Yes.  I reviewed the deposition from Mr. Charboneau and

21    the report and some treatment records from Dr. Holden.

22    Q.   And in this case, have you formed an opinion to a

23    reasonable degree of professional certainty as to whether

24    Mr. Charboneau is a sexually dangerous person under the Adam

11:36  25    Walsh Act?

G. Zinik - Direct Examination

11:36  1   A.    Yes.

2   Q.    What is that opinion?

3   A.    I do believe that he's sexually dangerous.

4   Q.    Let's start with Prong 1, and we'll make this pretty

11:36  5   quick.  In your opinion, has Mr. Charboneau previously

6   committed or attempted to commit acts of sexually violent

7   conduct or child molestation?

8   A.    Yes, on four occasions.

9   Q.    And the basis for that opinion, for the record, is

11:36  10   Government's Exhibit No. 7, the pages Bates labeled 1644 to

11   1655; is that right?

12   A.    Yes.

13   Q.    Were you in the courtroom when Dr. North and Dr. Ross

14   testified about their basis on Prong 1?

11:37  15   A.    I was.

16   Q.    Do you have anything to add?

17   A.    No.

18   Q.    On Prong 2, did you conclude that Mr. Charboneau suffers

19   from serious mental illnesses, abnormalities or disorders?

11:37  20   A.    Yes, I did.

21   Q.    And for the record, your analysis on Prong 2 is in

22   Government's Exhibit 7, pages labeled 1662 to 1665?

23   A.    Yes.

24   Q.    What specific diagnoses did you give?

11:37  25   A.    I gave Mr. Charboneau four diagnoses:  Alcohol use

**JA127**

G. Zinik - Direct Examination

11:37  1   disorder, severe in a controlled environment; inhalant

2   disorder, severe in sustained remission; inhalant-induced mild

3   neurocognitive disorder; and other specified personality

4   disorder with schizotypal and schizoid features.

11:37  5   Q.    On alcohol use disorder, how would you describe

6   Mr. Charboneau on dependence on alcohol?

7   A.    I think this has been a chronic life-long dependence on

8   alcohol, and we know from the records he began drinking alcohol

9   as a young teenager, even though he was also using inhalants at

11:38  10   that time he -- apparently he stopped using those in his early

11   twenties, but he continues to use alcohol and has never stopped

12   since then and repeatedly uses it when he's in the community,

13   and I would say alcohol is really his drug of choice and his

14   most persistent addiction.

11:38  15   Q.    In your opinion, why is he so dependent on alcohol?

16   A.    Well, I think -- we've already heard how Mr. Charboneau,

17   ever since he was a youngster he was a loner, he was isolated,

18   he was exhibiting odd behavior, and I think he has a -- I think

19   Mr. Charboneau is confused.  He has this neurocognitive

11:39  20   disorder that manifests itself in difficulty with verbal

21   expression and language in expressing himself.  He's not able

22   to communicate well with other people.  He isolates himself.

23   He's a loner, and he's very anxious.  And he kind of -- the

24   world is kind of a foreign, confusing place to him.  He really

11:39  25   doesn't understand how things work.  He doesn't understand how

G. Zinik - Direct Examination

11:39  1  television works, for example.  He doesn't know where the

2  images come from and why there is this constant screen with

3  images over the TV.

4  So he's in this chronic state of confusion and anxiety and

11:39  5  he drinks alcohol in order to sooth himself and calm himself

6  and relax himself and help him cope with his fears and

7  anxieties, and give him I think what Dr. North called the

8  liquid courage to approach women and tend to be sexual with

9  women, but that typically turns out badly.

11:40 10  Q.   Did you hear Dr. Ross and Dr. North explain why they

11  believe alcohol use disorder in Mr. Charboneau's case is a

12  serious mental illness, abnormality or disorder?

13  A.   I did.

14  Q.   Do you agree with their assessment?

11:40 15  A.   I do.

16  Q.   Do you have anything to add to what they've already talked

17  about on that particular point?

18  A.   Well, just to re-summarize it, I mean, I think

19  Mr. Charboneau is, like I said, he's anxious, he's scared,

11:40 20  he's -- you know, when he drinks it calms him, it sooths him,

21  it relaxes him, it disinhibits him and it allows him -- he

22  becomes sexually aroused, at least some of the time.  And I

23  think if he has been drinking and he becomes sexually aroused

24  and he's in the presence of a vulnerable female of just about

11:41 25  any age, child or adult, he would have serious difficulty

G. Zinik - Direct Examination

11:41   1   refraining from sexual assault.

        2        I think these circumstances, you know, the alcohol, the

        3   disinhibition, the emergence of his sexual feelings, the

        4   confusion, he doesn't understand how to manage his sexual

11:41   5   feelings.  Sexual arousal makes him anxious.  Women make him

        6   anxious.  He's afraid of women.  He doesn't know how to

        7   approach women.  He's never really had healthy intimate or

        8   sexual relationships with women.  So when these circumstances

        9   occur, intoxication, sexual arousal, and being in the company

11:41  10   of a vulnerable female, it's like a perfect storm that can --

       11   and he can erupt very quickly into a violent rapist.

       12   Q.   You mentioned that Mr. Charboneau, he is sexually aroused

       13   at least some of the time when he drinks.  Did Mr. Charboneau

       14   in your interview with him tell you how often he is sexually

11:42  15   aroused when he drinks?

       16   A.   He didn't give me like a number or a measure or frequency,

       17   but he did say that he -- when we were talking about the 1988

       18   rape of his daughter, he did admit that he was sexually aroused

       19   and he did reference that being intoxicated does make him feel

11:42  20   sexually aroused.  He thought that was normal, so it sounds

       21   like it's a fairly common occurrence for him.

       22   Q.   Let's take a look, in particular, at your report, again

       23   that's Government Exhibit No. 7, page Bates 1661.

       24   A.   What page of my report is it?

11:42  25   Q.   Page 19.

G. Zinik - Direct Examination

11:42   1    A.    Thank you.

        2    Q.    The bottom paragraph there, just to give some context for

        3    the record, the bracketed questions, are those your questions

        4    that you posed to him?

11:43   5    A.    Yes.

        6    Q.    And the unenforceable bracketed comments, those are the

        7    responses that Mr. Charboneau gives?

        8    A.    Yes.

        9    Q.    Let's jump down to the sixth line down, and you see the

11:43  10    question there in brackets, "What kind of drugs"?

       11    A.    Yes.

       12    Q.    Can you read those two lines please?

       13    A.    So I asked, "What kind of drugs?"

       14          He answered, "Alcohol, and being aroused by being drunk."

11:43  15          And I asked, "Do you get aroused when you get drunk?"

       16          And he answered, "Well, everybody does.  I always feel it.

       17    It's normal to be aroused.  There's nothing wrong with it."

       18          I asked, "Are you talking about getting sexually aroused

       19    when you get drunk?"

11:43  20          He said, "I get aroused, but I don't want to have sex.

       21    I'd rather be embarrassed, but I don't want to have sex.  I'd

       22    rather get aroused and be embarrassed."

       23    Q.    We'll talk about that when we get to the schizoid-type

       24    features.  Quickly, before we get there, I want to talk about

11:44  25    inhalant use disorder.  Do you have anything to add from what

G. Zinik - Direct Examination

11:44  1    you already heard today from Dr. North about his inhalant use

2    disorder?

3    A.    No, I don't think so.

4    Q.    You also diagnosed, like Dr. North did, inhalant-induced

11:44  5    mild neurocognitive disorder.

6    A.    Yes.

7    Q.    Can you explain briefly why you diagnosed that?

8    A.    Okay.  There is some early records from the North Dakota

9    State Hospital system, where Mr. Charboneau spent a lot of

11:44 10    time, he had quite a few admissions as a teenager and young

11    adult where they described how his chronic inhalant abuse and

12    described neurocognitive impairment that he probably sustained

13    as a result of that.  So that's where we begin to see those

14    records.

11:44 15        And I think that based on his current behavior, the way I

16    see this manifesting, he has been described as kind of shy and

17    meek and mild-mannered and cooperative, that's true, he's

18    generally that way.  If you ask him sort of simple yes or no

19    questions or he has to perform simple concrete tasks on testing

11:45 20    and things like that, for example, he can do that.  But when

21    you ask him an open-ended question where he has to sort of

22    think and organize his thoughts and articulate what he's

23    thinking and feeling, he just can't do that and he becomes --

24    he starts talking in almost nonsensical terms and he becomes

11:45 25    incoherent sometimes.  So I think that's the way his

G. Zinik - Direct Examination

11:45 1   neurocognitive impairment is currently manifested by the

2   impairment in expressive language.

3   Q.   That brings us to the other specified personality

4   disorders, schizoid and schizotypal features.

11:46 5   A.   Yes.

6   Q.   Can you explain to us why you diagnosed Mr. Charboneau

7   with that?

8   A.   All right.  Again, I'm not the first one that has

9   diagnosed him that way.  We see these diagnoses popping up in

11:46 10   his early records.  He was diagnosed with schizoid personality

11   disorder back in the 1980s in the North Dakota State Hospital

12   system, and he was diagnosed with schizotypal personality

13   disorder more recently in the Board of Prisons terms when he

14   was incarcerated after the rape of his daughter in 1988.  And

11:46 15   he's been described as a loner and as self-isolating and

16   keeping to himself.

17       And I also saw -- and there have been episodes when he

18   exhibited kind of bizarre thinking and what we call magical

19   thinking, some religiosity-type thinking where he seemed

11:47 20   preoccupied with religious themes trying to decipher the

21   mysteries of the Bible and things like this.  As we said, he

22   doesn't like watching TV, doesn't like reading, he doesn't like

23   talking on the phone.  So I think, you know, to the present day

24   he still manifests many of the symptoms of the, you know, what

11:47 25   I see as a combination of the schizoid and schizotypal

G. Zinik - Direct Examination

11:47   1   personality disorder.

2   Q.    And two of the schizoid features that you mentioned in

3   particular were his solitary nature, the descriptions of him as

4   a loner, and the fact that he has little interest in sexual

11:47   5   experience with others, which is alluded to in that quote that

6   you read a few minutes ago in your report.

7   A.    Uhm-uhm.

8   Q.    In your opinion, do those two somehow make him not

9   sexually dangerous in this case?

11:47  10   A.    No, I don't believe they do.  I know this looks a bit

11   somewhat paradoxical because you think someone who is a loner,

12   isolates and is afraid of women and doesn't want to get

13   married, doesn't want to have relationships with women, wants

14   to avoid sexual interactions with women, you would think that

11:48  15   that would make him safer.  But the problem is that

16   Mr. Charboneau still has a significant libido, he still has a

17   sexual drive, he still masturbates a few times a month.  Even

18   with masturbation, he talks about that makes him uncomfortable,

19   and he doesn't like to do it and he feels guilty about it and

11:48  20   he tries not to do it.  He still has a significantly strong sex

21   drive so he still does it a few times a month.

22       So I think the problem here is that even though -- when

23   he's sober, like we already said, he does really well, and when

24   he's sober he stays away from women and he stays away from

11:48  25   relationships and friendships and so on.  But when he's drunk,

**JA134**

G. Zinik - Direct Examination

11:48 1    he gets disinhibited, he relaxes and his sexual feelings rise

2    to the surface, you might say.  And if he is in the presence of

3    a vulnerable female, particularly someone that he may be

4    attracted to, he doesn't know how to manage those sexual

11:49 5    feelings.  He's intoxicated, he has poor judgment, and he tends

6    to get violent and aggressive and commit sexual assault.

7    Q.    Moving now to Prong 3, did you determine as a result of

8    the serious mental illness, abnormalities, or disorders that we

9    discussed that Mr. Charboneau would have serious difficulty

11:49 10    refraining from sexually violent conduct or child molestation?

11    A.    Yes, I believe he would.

12    Q.    For the record, your analysis is Government's Exhibit 7,

13    pages Bates labeled 1666 to pages 1670, and Dr. Zinik, for your

14    reference that is pages 24 to 28 of your report.

11:49 15    A.    Thank you.

16    Q.    Is that correct?

17    A.    Yes.

18    Q.    That's your analysis?

19    A.    Yes.

11:50 20    Q.    Can you please summarize your basis; and in particular,

21    explain to the Court how the interplay among his diagnoses that

22    you gave him factors into your analysis in Prong 3?

23    A.    All right.  Well, I think the diagnoses that I gave him,

24    you know, the alcohol use disorder, the neurocognitive

11:50 25    impairment disorder and the mixed personality disorder with

G. Zinik - Direct Examination

11:50  1  schizoid and schizophrenic features, I think those all sort of

2  interact and are additive in a way and kind of act together to

3  continue to make him sexually dangerous.

4      I'm particularly concerned about the fact that he does not

11:50  5  understand the nature and severity of his alcohol abuse.  He

6  does not seem to believe -- he makes a few statements about,

7  yeah, maybe it caused a problem in the past, but he doesn't

8  seem to understand that this is still his primary problem and

9  that he needs to stay clean and sober for the rest of his life

11:51  10  and never touch alcohol or any intoxicants again.  I don't

11  think he understands the gravity of it.

12      He has not participated in structured substance abuse

13  treatment aside from the AA groups that he goes to, which it's

14  not clear if he's really invested and participating in those or

11:51  15  if he's just doing it to comply with the recommendations of his

16  treatment team.

17      So, you know, when people really accept that they --

18  they're alcoholics and begin a program of recovery, they talk

19  differently, they identify themselves this way and they

11:51  20  understand that sobriety is a primary value that they have to

21  follow and they structure their life around that.  And I don't

22  believe Mr. Charboneau has -- he's anywhere close to

23  understanding that.

24      So I think, you know, he's still -- he needs a lot of

11:52  25  treatment.  So I think there is still quite a few risk factors

G. Zinik - Direct Examination

11:52   1    that are present in his profile as a result of his mental

  2    disorders.  These are serious disorders because, you know, it's

  3    interesting that when he gets drunk he does not commit violent

  4    acts towards men.  A lot of alcoholics -- a lot of men with

11:52   5    drinking problems, you know, they get drunk and they act

  6    aggressively toward other men, they get involved in bar fights

  7    or fist fights.  We don't see this in Mr. Charboneau's history.

  8         There is only one nonsexual violent crime in his history

  9    where he was arrested for assault and battery in 1985 and we

11:52 10    don't honestly know if that was a male or female victim.

11    Otherwise, all of his violent offenses were sexually violent

12    offenses toward other women.

13         So I think these mental disorders sort of act

14    synergistically to continue to make him sexually dangerous and

11:53 15    I think the fact that he has some significant dynamic risk

16    factors that are still present, he scores in the above-average

17    range on the Static-99.

18         On the SVR-20, which is another risk assessment scale that

19    I scored him on, he scores I think higher, he's in the high

11:53 20    risk range.  I think that scale captures some of the risks that

21    is not captured by the Static-99.  So I just think that there

22    is compelling evidence that he still remains sexually

23    dangerous.

24    Q.    Dr. Zinik, let's assume that we have the exact same

11:53 25    Mr. Charboneau that we have today, the man who, as you said,

G. Zinik - Direct Examination

11:53   1   has anxiety, who has the neurocognitive dysfunction as you

2   explained, but the only diagnosis that you gave was alcohol use

3   disorder and inhalant use disorder.  You would still find

4   him -- in your opinion, he would still be sexually dangerous,

11:54   5   right?

6   A.   Yes.

7   Q.   All right.  Let's discuss some of the details of your

8   analysis.  And you already hit on the actuarials, the

9   Static-99R and Sexual Violent Risk 20, so I'll skip over those.

11:54 10   Let's analyze the dynamic factors as you did in your

11   report.  What are the most important dynamic risk factors that

12   you believe are most important for Mr. Charboneau?

13   A.   I think lack of emotionally intimate relationships with

14   adults, we've already said he's quite a loner, he's never

11:54 15   really had extended intimate relationships with women and

16   doesn't really seem to have friends or men that he's friendly

17   with or intimate with either.  His family, as we've already

18   said, has been -- has disowned him and wants nothing to do with

19   him.  Frankly, in that letter from 2014 that was signed by a

11:55 20   number of family members they're still terrorized -- terrified

21   of him and were pleading with Board of Prison terms not to

22   release him.  So I think that is a current significant dynamic

23   risk factor that puts him at risk.

24   The second one is lifestyle impulsiveness.  I think we've

11:55 25   seen throughout his life that he has acted very impulsively,

G. Zinik - Direct Examination

11:55   1    particularly when he's been drinking, and he's really never

2    made good choices about -- he's never been able to hold a job,

3    he's never been able to -- the reports from his family describe

4    how he -- he really could not -- he was totally dependent on

11:55   5    family members, he couldn't live independently, he never could

6    cook for himself or do his own laundry.  He was just so

7    impulsive and kind of infantile that he was never really able

8    to manage himself in the community.

9        And then we've got poor problem solving, which we've

11:56  10    already heard about.  You know, I agree with Dr. North that

11    this is a primary risk factor, that in many ways overshadows

12    his functioning.  When he's presented with a situation or a

13    problem that requires -- requires him to come up with a

14    solution, he either takes this passive posture and doesn't do

11:56  15    anything and waits and hopes that it passes or he will drink

16    and make poor decisions while intoxicated.

17        And then the last dynamic factor is poor cooperation with

18    supervision.  I think we've already heard that the

19    meta-analysis research tells us that's one of the strongest,

11:56  20    most robust predictors of dynamic factors predicting sexual

21    recidivism, and this is well-demonstrated by Mr. Charboneau by

22    the fact that he continues to drink while he's on supervision

23    in the community, he's used marijuana a few times, and he puts

24    himself in higher risk situations by being intoxicated and

11:57  25    alone with a vulnerable female.

G. Zinik - Direct Examination

11:57  1    So I think these are all significant problems that still

2    put him at risk.

3    Q.    Did you also analyze the factors in BOP's guidelines for

4    assessing for sexual dangerousness?

11:57  5    A.    Yes.

6    Q.    Let's talk about a couple of those.  First, in your

7    opinion, is -- that first factor, repeated contact or

8    attempting contact with one or more victims, is that an

9    important factor here?

11:57 10    A.    It certainly is.  We've already heard that he's sexually

11    assaulted four victims.  So -- and at least after three of them

12    he was incarcerated.  So he was incarcerated for 18 months

13    after the '82 sexual assault, but he was released and then

14    re-offended in 1987.  So obviously being incarcerated didn't

11:58 15    work, so to speak, as a deterrent to change his behavior and

16    prevent him from acting that way again.

17    He committed another sexual assault in 1987.  And then

18    that case was referred to the Devils Lake Trial Court so it was

19    pending, and less than a year later he committed another sexual

11:58 20    assault, this is the 1988 case, where he raped his 10-year-old

21    daughter.

22    So these are examples where even after incarceration and

23    even while a court case is currently pending he will commit new

24    sexual assaults.  And then, of course, he did it again in 2003

11:58 25    when he was under lots of supervision, he was getting lots of

G. Zinik - Direct Examination

11:58  1  support, he was in sex offender treatment and he drank and

2  committed another sexual assault.  So he certainly meets that

3  BOP guideline.

4  Q.    And what about a person's admission of inability to

11:59  5  control behavior, is that an important consideration of

6  Mr. Charboneau in this case?

7  A.    I think it is, yes.

8  Q.    Explain why, please.

9  A.    He has made statements in the past when he lost control,

11:59 10  particularly during the rape of his daughter in 1988.  He

11  described how he looked up and saw a black mask coming down at

12  him and he felt this vibration going through his body, which I

13  think was sexual arousal, and he lost control of himself and

14  started to hit his daughter and pull her clothes off.  He said

11:59 15  the same thing to me, that he lost control.

16       So -- and he has made statements in his treatment program

17  where he felt that he still considered himself sexually

18  dangerous.  So I think these are current statements that he's

19  making that reflect a serious difficulty refraining from sexual

12:00 20  violence.

21  Q.    Another factor in those BOP's guidelines is offending

22  under supervision or likely to get caught.  In your estimation,

23  is that important here, too?

24  A.    Yes, it is.

12:00 25  Q.    Just very briefly, why?

G. Zinik - Direct Examination

12:00  1    A.    I already said that he re-offended on probation in 2003,

       2    while he was on probation for a prior sex offense, even though

       3    he was getting lots of supervision and treatment and support.

       4    And he, you know, his -- he's had four cycles of sexual

12:00  5    offending where he committed an offense, he got caught; and at

       6    least after three of them, he was sanctioned and after a fourth

       7    one in 1987 he was pending court proceeding, and the '87 and

       8    '88 cases, they happened less than a year apart, sometimes we

       9    call that rapid re-offending, when an offender commits two

12:01 10    sexual crimes within a year.  So I think these are examples

      11    where he meets that BOP guideline.

      12    Q.    And then finally, I believe this is Factor E in the BOP

      13    guidelines, failure to successfully complete sex offender

      14    treatment.

12:01 15          Has Mr. Charboneau ever completed sex offender treatment?

      16    A.    No.  He started sex offender treatment -- I know he agreed

      17    to the in-treatment I think it was February of 2016, last year,

      18    and I think he started the groups and the program in April of

      19    last year.  And this is a good sign.  You know, I think he's --

12:01 20    he understands that he's got a problem and he needs help for it

      21    and he is participating in treatment, although it sounds like

      22    he may take more of a passive posture in treatment.  And what

      23    we heard from Dr. Holden earlier is that he is participating,

      24    but he's making very slow progress, but at least he's trying.

12:02 25    And I think this is a really good sign and he gets credit for

G. Zinik - Direct Examination

| | | |
|---|---|---|
| 12:02 | 1 | the fact that he started treatment, but this is just the |
| | 2 | beginning of a long road of intensive treatment that he really |
| | 3 | needs to become safe again.  And so he's getting started, but |
| | 4 | he's got a long way to go. |
| 12:02 | 5 | Q.   So in your opinion, has he made enough progress in sex |
| | 6 | offender treatment to date that he would be safe for the |
| | 7 | release to the community? |
| | 8 | A.   No. |
| | 9 | Q.   We heard when Dr. Holden was testifying, we saw a |
| 12:02 | 10 | document, particularly Government's Exhibit 24, about how |
| | 11 | Mr. Charboneau continues to minimize or justify his offenses or |
| | 12 | blame his victims.  Do you recall hearing that? |
| | 13 | A.   Yes. |
| | 14 | Q.   How does that factor into your -- as to his progress and |
| 12:02 | 15 | treatment? |
| | 16 | A.   Well, I think it's going to be slow.  I think, again, he's |
| | 17 | just beginning to think about this for the first time in, you |
| | 18 | know, many years, certainly since 2003.  He's just starting to |
| | 19 | think about it, he's just starting to talk about it, and he's |
| 12:03 | 20 | at the very beginning of the treatment program.  And he's still |
| | 21 | minimizing his offenses, he's still kind of claiming that the |
| | 22 | victims were not his family members and denying kinship with |
| | 23 | the victims to kind of somehow justify the sexual assaults |
| | 24 | against them.  He's still claiming that, you know, the -- his |
| 12:03 | 25 | daughter was not his daughter, and so I think he's still doing |

G. Zinik - Direct Examination

12:03  1    a lot of minimizing and denial.  And this is typically what

2    you'd find at the beginning of sex offender treatment.

3    Q.    You mentioned that he's starting to open up about his

4    offense conduct and his behavior.  Did you hear Dr. Holden when

12:03  5    she was talking about how in her estimation he's opening up

6    because of the therapeutic alliance that he's starting to form

7    with her?

8    A.    Yes.

9    Q.    In your opinion, would it be detrimental to remove him

12:04 10    from that treatment at this point?

11    A.    I think so.  I think it would be a setback for him.  I

12    think he's just beginning to form a healthy relationship with a

13    female adult, Dr. Holden.  This may be the first time he's ever

14    done that.

12:04 15        So he's getting some practice at how to be honest and let

16    down his defenses and talk to her in his therapy sessions, and

17    this is a good thing that will help him develop those skills to

18    carry with him when he gets out in the community.  And I think

19    if that were interrupted now, it would be a big setback and he

12:04 20    would have to start all over again and who knows if he would do

21    as well with another therapist.

22    Q.    Do you think there is another form of treatment that

23    Mr. Charboneau needs in addition to sex offender treatment?

24    A.    Substance abuse treatment, yes.

12:05 25    Q.    Are Alcoholics Anonymous and substance abuse treatment,

G. Zinik - Direct Examination

12:05  1    are those the same?

2    A.    No.

3    Q.    Is going to Alcoholics Anonymous for Mr. Charboneau, is

4    that enough?

12:05  5    A.    No.

6    Q.    Moving on to protective factors.  Just for the record,

7    your analysis is detailed in Government's Exhibit 7, pages

8    marked 1667 to 1668.  Dr. Zinik, that's pages 25 and 26 of your

9    report; is that right?

12:05  10   A.    Yes.

11   Q.    I just want to talk about one of those in particular, and

12   that's Mr. Charboneau's age.  What does the literature say

13   about age as a protective factor?  Okay.

14   A.    Well, certainly age, particularly advanced age becomes a

12:05  15   protective factor.  We know that men in general who are past

16   middle aged, certainly past age 60, at least statistically, in

17   general have less sex drive, they're less interested in sex and

18   we certainly know that sex offenders have -- that their rates

19   of recidivism decline with age and decline dramatically after

12:06  20   60.

21        How does that pertain to Mr. Charboneau's case?  I think

22   Mr. Charboneau -- he's 57.  In their fifties, sex offenders in

23   their fifties, men in general in their fifties, there's quite a

24   wide range of sexual functioning and sexual interests.  There's

12:06  25   a lot of men in their fifties that are still quite sexually

G. Zinik - Direct Examination

12:06  1   active and virile and interested in sex, and we know that

       2   Mr. Charboneau is in excellent physical health.  He doesn't

       3   have any medical problems or medical conditions that would

       4   impair his physical functioning or shorten his lifespan, he's

12:06  5   not taking any medications of any kind.  He also exercises a

       6   lot.  He's very fit.  He told me that he walks about four miles

       7   a day, four or five times a week and that he also skips rope

       8   for an hour at a time about three times a week.

       9        And I must say that I was quite impressed with the

12:07 10   skipping rope because I skip rope too for exercise and I'm

      11   pretty fit and after 15 minutes I'm quite exhausted.  So if

      12   he's really telling the truth about skipping rope for an hour

      13   at a time, he must be in really great shape.

      14        So physically I think he's in good health.  And being 57

12:07 15   at this point and considering everything else about him that we

      16   know, I don't think his age operates as a protective factor to

      17   make him any safer at this point.

      18   Q.   Did you hear Dr. North testify that Mr. Charboneau is

      19   basically a 12- or 13-year-old in a 57-year-old's body?

12:07 20   A.   Yes, I did.

      21   Q.   What is your take on that?

      22   A.   I think that's an interesting observation.  I know in my

      23   report what I said was -- and I'll say it again -- I think he's

      24   the same person he was in 2003 when he committed the last

12:08 25   sexual offense.  What I mean by that he is chronologically

G. Zinik - Direct Examination

12:08  1  older, he's 13 or 14 years older, but emotionally and

2  psychologically I think he's the same person that he was back

3  in 2003.

4      Now, when I wrote my report I did not have the treatment

12:08  5  records from Dr. Holden and, you know, I think he is making --

6  I think this is an important step that he get some credit for,

7  the fact that he's begun the commitment treatment program and

8  he's making some small steps of progress.  But again, I think

9  he basically has a long way to go.  And I do think that due to

12:08 10  the chronic alcohol abuse and the inhalant abuse and the

11  resulting cognitive neurological impairment that that created

12  in his early years, his development was arrested at that time,

13  and I think he, in many ways, is, you know, emotionally and

14  psychologically very immature.

12:09 15  Q.   Dr. Zinik, I only have three more items and I'll hit them

16  quickly.  We heard a lot about Mr. Charboneau's behavior in an

17  institution and how well he behaves.  In your estimation, does

18  that make him less sexually dangerous if released?

19  A.   No.

12:09 20  Q.   We've also heard about his general offense history and as

21  you heard, and as I'm sure you noted in the records, he has

22  committed a number of offenses while he's intoxicated, right?

23  A.   Yes.

24  Q.   And four of those were sex offenses?

12:09 25  A.   Yes.

G. Zinik - Direct Examination

12:09   1    Q.    But the rest of them were not sexual offenses?

      2    A.    Yes.

      3    Q.    Does that somehow, in your opinion, suggest that he has

      4    volitional control or that he's not sexually dangerous?

12:10   5    A.    No.

      6    Q.    Why not? Can you explain that a little bit?

      7    A.    Well, because -- well, like I said, Mr. Charboneau has

      8    committed two types of crimes, two types of -- two categories

      9    of crimes. They have all been alcohol-related.

12:10 10         The first and most frequent category is the -- really

    11    they're minor alcohol-related crimes like disturbing the peace

    12    or disorderly conduct or crimes like that; and the other

    13    category is sexual violence assaults against women, he has

    14    committed four of those. He has not committed property crimes

12:10 15    like theft or burglary or things like that. He has not

    16    committed nonsexual violent crimes like robbery or assault,

    17    except one time in '85 and we don't know if that was a female

    18    victim or not. So this is how he's prone to behave.

    19         Given his history, he has these four cycles of sexual

12:11 20    offending that he has not learned from his treatment, from

    21    prior incarceration and that he still minimizes his alcohol

    22    problem, I think he's still sexually dangerous and this is the

    23    kind of crime that he's likely to commit in the future.

    24    Q.    The third and final item that I have is that you haven't

12:11 25    diagnosed Mr. Charboneau with a paraphilia, right?

G. Zinik - Cross-Examination

12:11  1    A.    Correct.

       2    Q.    In your opinion, does that make him not sexually

       3    dangerous?

       4    A.    No.

12:11  5    Q.    Why not?

       6    A.    Because I just think that, like I said, the -- if certain

       7    factors line up for him, he -- if he gets drunk and if he gets

       8    sexually aroused, which he's likely to do because he relaxes

       9    and he's disinhibited when he's drunk, and if he's in the

12:12 10    presence of a vulnerable female, he will have serious

      11    difficulty refraining from committing a sexual assault, and you

      12    don't need the presence of a paraphilia in order to make that

      13    happen.  I think those are the conditions that create this

      14    perfect storm in which that behavior is likely to happen.

12:12 15    Q.    Excuse me.  Just to wrap up all of your testimony here.

      16    Have you formed opinion to a reasonable degree of medical

      17    certainty as to whether Mr. Charboneau is a sexually dangerous

      18    person under the Adam Walsh Act?

      19    A.    Yes.

12:12 20    Q.    What is that opinion?

      21    A.    I believe he is sexually dangerous.

      22          MR. ANDERSON:  Nothing further, Your Honor.

      23          THE COURT:  Cross-examination?

      24                    CROSS-EXAMINATION

12:12 25    BY MS. MAHAN:

**JA149**

G. Zinik – Cross-Examination

12:12  1   Q.   Good afternoon.

2   A.   Good afternoon.

3   Q.   My name is Halerie Mahan.  I'm going to ask you a couple

4   quick questions.

12:12  5        You just testified that Mr. Charboneau does not suffer

6   from a paraphilic disorder, correct?

7   A.   Yes.

8   Q.   And you have not diagnosed him with any sexual disorder in

9   this case, correct?

12:13 10   A.   Correct.

11   Q.   You talked about Mr. Charboneau having four victims,

12   right?

13   A.   Yes.

14   Q.   And one of those was an offense that you referenced in

12:13 15   1987, correct?

16   A.   Yes.

17   Q.   And I believe that that is in your report, on page 5 of

18   your report, Bates 1647.  You're aware that there is no

19   evidence that Mr. Charboneau was convicted of the crime charged

12:13 20   in that case, correct?

21   A.   Correct.

22   Q.   You diagnosed him with alcohol use disorder, right?

23   A.   Yes.

24   Q.   And you were just discussing that he has many different

12:13 25   convictions for crimes involving alcohol, right?

G. Zinik – Cross-Examination

| | | |
|---|---|---|
| 12:13 | 1 | A.   Yes. |
| | 2 | Q.   You said, in fact, many of those crimes are not sexual in |
| | 3 | nature, correct? |
| | 4 | A.   Correct. |
| 12:14 | 5 | Q.   And I believe, in fact, you testified during your |
| | 6 | deposition that the nonsexual offenses far outnumber the sexual |
| | 7 | offenses, correct? |
| | 8 | A.   Correct. |
| | 9 | Q.   And some of those offenses are things like public |
| 12:14 | 10 | intoxication, correct? |
| | 11 | A.   Yes. |
| | 12 | Q.   And disorderly conduct, correct? |
| | 13 | A.   Correct. |
| | 14 | Q.   And assault, correct? |
| 12:14 | 15 | A.   Pardon? |
| | 16 | Q.   And assault, correct? |
| | 17 | A.   There was one assault offense, to my knowledge. |
| | 18 | Q.   Did you get a chance to look at Dr. North's report in this |
| | 19 | case? |
| 12:14 | 20 | A.   Yes. |
| | 21 | Q.   If you could, please, turn to Government's Exhibit 3, |
| | 22 | pages 1622 and 1623. |
| | 23 | A.   Okay.  What page? |
| | 24 | Q.   It's pages 10 and 11. |
| 12:14 | 25 | A.   All right.  Thank you.  Got it. |

G. Zinik - Cross-Examination

12:14   1   Q.   The sixth offense up from the bottom, that's an assault,

2   correct?

3   A.   Yes.

4   Q.   In 1982?

12:15   5   A.   Yes.

6   Q.   And three down from that is an assault and battery in

7   1985, correct?

8   A.   Yes.

9   Q.   In fact, just above the assault he has a conviction for

12:15   10   petit larceny in 1982 also, correct?

11   A.   Yes.

12   Q.   Now, you said that you were surprised that he didn't have

13   any violent behavior towards men, correct, in his record?

14   A.   I said that men with alcohol problems and alcohol use

12:15   15   disorders, when they get aggressive, they often get assaultive

16   and get in fights with other men, and I must have somehow

17   missed this other assault in 1982.  I was only aware of the one

18   in '85.  And again, we don't know who the victims of those

19   crimes are, if they are men or women.

12:15   20   Q.   And we, in fact, don't know if they were violent, correct?

21   A.   Well, if they're labeled assault and assault and battery,

22   I would assume that involves some physical violence.

23   Q.   Now, you interviewed Mr. Charboneau, right?

24   A.   Yes.

12:16   25   Q.   And you testified I believe that he has difficulty with

G. Zinik - Cross-Examination

12:16  1    language expression, right?

2    A.    Yes.

3    Q.    And open-ended questions cause him difficulty?

4    A.    Yes.

12:16  5    Q.    And that he can be difficult to understand when he

6    responds to questions like that?

7    A.    Correct.

8    Q.    I believe you might have, in fact, used the word

9    "nonsensical" to describe his answers, right?

12:16  10   A.    I think sometimes his language becomes so confusing and

11   incoherent, yes, it's kind of -- you can't make sense out of

12   it.

13   Q.    And you experienced that during your interview, right?

14   A.    Yes.

12:16  15   Q.    You would agree, wouldn't you, that there is no evidence

16   that Mr. Charboneau has engaged in sexually violent behavior

17   and child molestation when he's sober, right?

18   A.    Correct.

19   Q.    He's been in custody continuously for the last 13 years?

12:17  20   A.    Yes.

21   Q.    With no evidence that he has any incident reports relating

22   to sexual behavior?

23   A.    Correct.

24   Q.    And no evidence that he has any incident reports relating

12:17  25   to alcohol use, correct?

G. Zinik - Redirect Examination

12:17  1    A.    Correct.

2    Q.    In fact, there's no evidence that he has had difficulty

3    remaining sober while in custody, correct?

4    A.    Correct.

12:17  5              MS. MAHAN:  No further questions.

6              THE COURT:  Thank you, Ms. Mahan.

7              Anything else, Mr. Anderson?

8              MR. ANDERSON:  Briefly.

9                      REDIRECT EXAMINATION

12:17  10   BY MR. ANDERSON:

11   Q.    Dr. Zinik, you were talking with Ms. Mahan about the 1987

12   events.  As you noted, Mr. Charboneau was never adjudicated for

13   that offense, right?

14   A.    Yes.

12:17  15   Q.    Turn to his deposition please, that's Government's Exhibit

16   No. 21.

17   A.    Okay.

18   Q.    And specifically to page 60.

19   A.    Okay.

12:17  20   Q.    On page 60, specifically starting on line 10.

21   A.    All right.

22   Q.    Do you see where the question was talking about the 1987

23   offense.  That he -- "You forced your way inside a home without

24   permission and there was a woman there."

12:18  25              Do you see that?

G. Zinik - Redirect Examination

12:18  1    A.    Yes.

       2    Q.    And his answer was?

       3    A.    "Yes."  His answer was "yes."

       4    Q.    Do you see right below that he doesn't exactly remember

12:18  5    what happened?

       6    A.    Correct.

       7    Q.    But at the very -- at the bottom, starting on line 23,

       8    "Were you drinking at the time?" -- is the question -- "Is that

       9    why you don't remember?" -- is the question.  What's the

12:18 10    answer?

      11    A.    "Yes."

      12    Q.    You also talked about with Ms. Mahan that there's no

      13    evidence that Mr. Charboneau, since he was incarcerated in

      14    2003, that he has offended sexually in prison, right?

12:18 15    A.    Correct.

      16    Q.    Or that he has had alcohol in prison?

      17    A.    Correct.

      18    Q.    And that's about a 13-year time period roughly?

      19    A.    Yes.

12:18 20    Q.    Mr. Charboneau was also incarcerated from 1988 to 2000,

      21    right?

      22    A.    Yes.

      23    Q.    A 12-year period?

      24    A.    Right.

12:19 25    Q.    Was there any evidence that he acted out sexually in

**JA155**

12:19   1    prison?

        2    A.    None.

        3    Q.    Was there any evidence that he drank in prison?

        4    A.    None.

12:19   5    Q.    What happened when he was released?

        6    A.    He re-offended and committed another sexual assault in

        7    2003.

        8    Q.    Was he intoxicated when he committed that assault?

        9    A.    Yes, he was.

12:19  10    Q.    Was he on supervision when he committed that assault?

       11    A.    Yes.

       12              MR. ANDERSON:  Nothing further, Your Honor.

       13              THE COURT:  Anything else, Ms. Mahan?

       14              MS. SHEA:  No, Your Honor.

12:19  15              THE COURT:  Thank you, Doctor.  Watch your step

       16    stepping down.

       17              Does the Government have any other witnesses?

       18              MR. JAMES:  No, Your Honor.  That is the Government's

       19    case.

12:19  20              THE COURT:  Is the Respondent, is it just going to be

       21    Dr. Plaud?

       22              MS. SHEA:  Your Honor, we'd like to talk with our

       23    client about whether he would like to testify on his own

       24    behalf.  Other than that, it is Dr. Plaud.

12:19  25              THE COURT:  I'm just trying to get a sense of time.

| | | |
|---|---|---|
| 12:20 | 1 | Do you think the totality of Dr. Plaud's testimony will be |
| | 2 | about an hour? |
| | 3 | MS. SHEA:  I hope so, Your Honor. |
| | 4 | THE COURT:  I know you don't have much control over |
| 12:20 | 5 | that. |
| | 6 | MR. JAMES:  No one does. |
| | 7 | THE COURT:  Nor does Mr. James. |
| | 8 | Okay.  To keep things moving, we'll take a 20-minute |
| | 9 | break and then I think when we come back we'll do our best to |
| 12:20 | 10 | get through the witnesses.  I have another matter from 3:00 to |
| | 11 | 4:00.  And so if we finish by 3:00, that's fine.  If we finish |
| | 12 | with the evidence and then I need to do this other thing from |
| | 13 | 3:00 to 4:00 and then I hear closings, that's fine; but that's |
| | 14 | kind of the schedule I'm working on. |
| 12:20 | 15 | So let's take a 20-minute recess. |
| | 16 | (The proceedings were recessed at 12:20 p.m. and reconvened |
| | 17 | at 12:40 p.m.) |
| | 18 | THE COURT:  The Respondent may call its first |
| | 19 | witness. |
| 12:42 | 20 | MS. SHEA:  Thank you, Your Honor.  At this time we |
| | 21 | would call Blake Charboneau. |
| | 22 | |
| | 23 | |
| | 24 | |
| 12:42 | 25 | BLAKE CHARBONEAU, |

B. Charboneau - Direct Examination

| | | |
|---|---|---|
| 12:42 | 1 | having been duly sworn, testified as follows: |
| | 2 | THE COURT:  Good afternoon, Mr. Charboneau.  Ms. Shea |
| | 3 | is going to have some questions for you and then Mr. James is |
| | 4 | going to have some questions for you. |
| 12:43 | 5 | You can adjust that microphone.  If you pull it |
| | 6 | closer, we'll be able to hear you. |
| | 7 | You may examine the witness. |
| | 8 | MS. SHEA:  Thank you, Your Honor. |
| | 9 | DIRECT EXAMINATION |
| 12:43 | 10 | BY MS. SHEA: |
| | 11 | Q.   Good afternoon, Mr. Charboneau.  Can you hear me okay? |
| | 12 | A.   Yes. |
| | 13 | Q.   Are you feeling a little nervous today? |
| | 14 | A.   Yes. |
| 12:43 | 15 | Q.   Why do you feel nervous? |
| | 16 | A.   I just feel -- I'm scared, you know, I'm scared. |
| | 17 | Q.   Do you ever have trouble expressing how you feel and |
| | 18 | saying what you feel? |
| | 19 | A.   Yes. |
| 12:43 | 20 | Q.   What do you mean by that? |
| | 21 | A.   I get emotional and sad.  I feel guilty for the things |
| | 22 | I've done. |
| | 23 | Q.   Do you ever have trouble with people understanding what |
| | 24 | you mean when you say things? |
| 12:43 | 25 | A.   Yes, I do. |

B. Charboneau - Direct Examination

| | | | |
|---|---|---|---|
| 12:43 | 1 | Q. | How old are you, Mr. Charboneau? |
| | 2 | A. | Fifty-seven. |
| | 3 | Q. | Where are you from? |
| | 4 | A. | North Dakota. |
| 12:43 | 5 | Q. | How many brothers and sisters do you have? |
| | 6 | A. | Five sisters, seven brothers. |
| | 7 | Q. | Did you grow up on a reservation? |
| | 8 | A. | Yes. |
| | 9 | Q. | How far did you go in school? |
| 12:44 | 10 | A. | Eighth grade. |
| | 11 | Q. | Did you have trouble in school? |
| | 12 | A. | Yes. |
| | 13 | Q. | What is your faith, your religion? |
| | 14 | A. | Catholic. |
| 12:44 | 15 | Q. | Was there a Catholic church on your reservation? |
| | 16 | A. | Yes. |
| | 17 | Q. | Are you still Catholic? |
| | 18 | A. | Yes. |
| | 19 | Q. | And do you attend a weekly men's Bible study in the BOP? |
| 12:44 | 20 | A. | Yes, I do. |
| | 21 | Q. | Why do you go there? |
| | 22 | A. | I just want to feel better inside, understand where I've |
| | 23 | | been. |
| | 24 | Q. | Does anyone make you go to that? |
| 12:44 | 25 | A. | No. |

B. Charboneau - Direct Examination

12:44  1    Q.   Do you go on your own?

2    A.   Yes.

3    Q.   We're going to talk a little bit about your sex offense

4    history, now.  When you look back at your sex offenses, how

12:44  5    does that make you feel?

6    A.   Very disturbed and very angry for what I've done.

7    Q.   Are you denying that you have committed acts of sexual

8    violence in the past?

9    A.   No, I don't.  No, I don't.

12:44 10    Q.   Do you admit that you've committed sexually violent acts

11    in the past?

12    A.   Yes.

13    Q.   Were you under the influence of alcohol during all of your

14    past offenses?

12:45 15    A.   Yes, I was.

16    Q.   Why do you feel badly about your sex offenses?

17    A.   Because I know I shouldn't have been drinking or allowed

18    myself been drinking.

19    Q.   Are you also sad because of anything that might have

12:45 20    happened to the victims?

21                MR. JAMES:  Objection.

22                THE WITNESS:  Yes, I do.

23                THE COURT:  Overruled.

24                THE WITNESS:  Yes, I do.  I feel very disturbed of

12:45 25    what I've done in a very emotional way.

B. Charboneau - Direct Examination

12:45   1              MR. JAMES:  Your Honor, could I ask the witness --
        2    would you instruct the witness to put the mic a little bit
        3    closer to him.
        4              THE COURT:  Just speak into that a little more.
12:45   5    That's better.  Just lean in.
        6    BY MS. SHEA:
        7    Q.   Have you been arrested for other crimes that are not sex
        8    crimes?
        9    A.   Yes.
12:45  10    Q.   Were you drinking during most of those other offenses as
       11    well?
       12    A.   Yes.
       13    Q.   Have you ever committed a sex offense while you were not
       14    drinking?
12:46  15    A.   No.
       16    Q.   While you were sober, have you ever even had the desire to
       17    commit a sex offense?
       18    A.   No.
       19    Q.   While you were sober, have you ever fantasized or dreamed
12:46  20    about committing a sex offense?
       21    A.   No.
       22    Q.   Have you been locked up for 13 years?
       23    A.   Yes.
       24    Q.   During the last 13 years, have you ever consumed alcohol
12:46  25    in prison?

B. Charboneau - Direct Examination

12:46  1  A.  No.

2  Q.  Is this the longest time that you've been sober in your

3  adult life?

4  A.  Yes.

12:46  5  Q.  Are you aware that alcohol does exist in prison?

6  A.  Yes.

7  Q.  Have you ever tried to make it?

8  A.  No.

9  Q.  Have you ever tried to buy it?

12:46 10  A.  No.

11  Q.  Have you ever asked another inmate for access to it?

12  A.  No.

13  Q.  Do you go to AA?

14  A.  Yes.

12:47 15  Q.  And how often does that meet?

16  A.  Once a week.

17  Q.  And when did you start going?

18  A.  Probably about a month or so after I got there.

19  Q.  Was that a month or so after you got to the Maryland unit?

12:47 20  A.  Yes.

21  Q.  Why did you start going there?

22  A.  Because I know I was powerless over alcohol.

23  Q.  Can you say that again?

24  A.  Powerless over alcohol.

12:47 25  Q.  Does anyone make you go?

B. Charboneau - Direct Examination

12:47  1    A.    No.

2    Q.    Did Dr. Holden recommend you to go?

3    A.    No.

4    Q.    Mr. Charboneau, do you believe that you have a problem
12:47  5    with alcohol?

6    A.    Yes, I do.

7    Q.    If you were released, will you have another drink of

8    alcohol?

9    A.    No, I will not.

12:47  10   Q.    Why won't you?

11   A.    Because I promise I won't.  I promise that I won't.

12   Q.    How can you be sure that you're going to follow through

13   with that?

14   A.    Because I don't want to hurt another individual.  I don't
12:48  15   want to cause no more harm.  I'm ashamed of what I've done

16   already.

17   Q.    Now, since you've been locked up you've had one infraction

18   for violating the rules.  What happened there?  Why did you get

19   that infraction?

12:48  20   A.    Excuse me?  Can you repeat?

21   Q.    Sure.  Since you've been in the BOP, you had one

22   infraction for violating the rules for being late.  What

23   happened there?

24   A.    I was -- I was at the rec yard and I went out there too
12:48  25   early and I was in the wrong area.

B. Charboneau - Direct Examination

12:48  1  Q.   In that situation did you mean to break the rule?

       2  A.   No.  They called out for rec and they didn't say nothing

       3  else, but called out for rec, that was it.

       4  Q.   Have you had a job in the BOP?

12:49  5  A.   Yes.

       6  Q.   What is your job?

       7  A.   My job here is an orderly, helping officers, being

       8  acquainted with people.

       9  Q.   Do you enjoy having your job?

12:49 10  A.   Yes, I do.

      11  Q.   When you are out in the community this last time, did you

      12  work as a dishwasher?

      13  A.   Yes, I did.

      14  Q.   And do you remember how long you had that job?

12:49 15  A.   About almost two-and-a-half years.

      16  Q.   Did you enjoy that job as well?

      17  A.   Yes, I did.

      18  Q.   Now, you've joined the Commitment and Treatment Program at

      19  Butner, CTP.  Why did you join that program?

12:49 20  A.   Because I felt guilty of things I shouldn't have done.

      21  Q.   Dr. Holden mentioned in one of her treatment notes that

      22  you told her that you were a sexually dangerous person.  Do you

      23  think that you're a sexually dangerous person?

      24  A.   No, I don't.

12:50 25  Q.   Do you know what that means?

B. Charboneau - Cross-Examination

12:50  1    A.    Yes, attempt to rape and violent to other persons.

       2    Q.    Mr. Charboneau, if you are released, will you have another

       3    drink for the rest of your life?

       4    A.    No, I will not.

12:50  5    Q.    Will you rape anyone else for the rest of your life?

       6    A.    No.

       7          MS. SHEA:  Judge, I don't have any other questions.

       8          THE COURT:  Thank you.

       9          Cross-examination.

12:50  10                    CROSS-EXAMINATION

       11   BY MR. JAMES:

       12   Q.    Good afternoon, sir.

       13   A.    Good afternoon.

       14   Q.    All right.  If anything I say is unclear, I'll be happy to

12:50  15   repeat it.  Okay?

       16   A.    Yes.

       17   Q.    All right.  Mr. Charboneau, you testified that you have

       18   committed these sexual offenses?

       19   A.    Yes.

12:50  20   Q.    And that would include the 1987 sexual offense, August,

       21   1987?

       22   A.    Yes.

       23   Q.    And so you forced your way into that woman's home; is that

       24   correct?

12:51  25   A.    Yes.

**JA165**

B. Charboneau - Cross-Examination

12:51  1    Q.    And you removed the woman's clothing?

       2    A.    Yes.

       3    Q.    And you unbuttoned your pants?

       4    A.    Yes.

12:51  5    Q.    And you tried to have sex with this woman on the kitchen

       6    floor?

       7    A.    Yes.

       8    Q.    And you were drinking at the time, right?

       9    A.    Yes.

12:51 10    Q.    Now, as you sit there before this Judge you're under oath,

      11    you realize that, right?

      12    A.    Yes, I know.

      13    Q.    And you swore to tell the truth?

      14    A.    Yes, I did.

12:51 15    Q.    Now, you were deposed in this case.  In other words, you

      16    recall myself and Mr. Anderson, we traveled to Butner to talk

      17    to you and there was a person who was a reporter there?

      18    A.    Yes, I remember.

      19    Q.    And that was on Monday, February 29th, 2016, around that

12:52 20    time, do you recall that?

      21    A.    Yes, I do.

      22    Q.    And that is Government's Exhibit No. 21.  Let me direct

      23    your attention to that book in front of you.  If you go to

      24    page 60 in that book.

12:52 25    A.    I need glasses to see.

B. Charboneau - Cross-Examination

12:52   1               MR. JAMES:  Do you have his glasses?

          2               MS. SHEA:  No.

          3   BY MR. JAMES:

          4   Q.   I will read to you what the question was and what your

12:52   5   responses were.  All right?

          6   A.   Again, please?  I couldn't hear.

          7   Q.   I'll repeat it.  I know you were needing assistance.  I

          8   will read to you the questions that I asked you and what your

          9   responses were, okay?

12:52 10   A.   Yes.

      11   Q.   Now, you were under oath at that deposition.  In other

      12   words, you remember the lady that was there who was taking

      13   everything down, she swore you in to tell the truth?

      14   A.   Yes, I do.

12:52 15   Q.   Just like you were sworn in to tell the truth here today.

      16   A.   Yes.

      17   Q.   All right.  Now, in February of 2016, and this is for the

      18   record, page 60, line 10:  "Now, in 1987, in August of '87, you

      19   forced your way inside a home without permission and there was

12:53 20   a woman there?"

      21       And your answer was:  "Yes."

      22       Do you recall that?

      23   A.   Yes, I do.

      24   Q.   The next question at line 14:  "And you forced that woman

12:53 25   to remove her clothing?"

B. Charboneau - Cross-Examination

12:53  1      Your answer:  "I, I don't remember."

       2      Then line 17:  "Okay.  You remember unbuttoning your

       3  pants, though, right?"

       4  A.   Yes.

12:53  5  Q.   At line 19, your answer in February of 2016 while you were

       6  under oath was:  "No, I don't."

       7      Line 20, question:  "You tried to have sex with this woman

       8  on the kitchen floor?"

       9      Line 22, answer:  "I don't remember."

12:53 10      And then at line 23, question:  "Were you drinking at the

      11  time?  Is that why you don't remember?"

      12      And your answer then at line 25 was "yes."

      13      Now, you're testifying here today that you committed all

      14  these offenses.  So tell me, how did you remember -- did your

12:54 15  remembrance come about between February 2016 and today as

      16  you're sitting in court before the Judge?

      17  A.   Because I had a lot of time to think about what I was

      18  thinking doing wrong.

      19  Q.   So what you're saying is you weren't truthful then, but

12:54 20  you're truthful now?

      21  A.   I was truthful.  Some of it I couldn't remember.  I was

      22  truthful.

      23  Q.   You are in the CTP program and you're only in Stage 2 of

      24  the program; isn't that correct?

12:54 25  A.   Yes.

B. Charboneau - Cross-Examination

12:54  1    Q.    All right.  So you have the orientation stage and now

       2    you're at the very beginning stages of -- under Stage 2?

       3    A.    Yes.

       4    Q.    So you have a long way to go in that program; is that

12:54  5    correct?

       6    A.    That is correct.

       7    Q.    And do you believe that program is helping you?

       8    A.    Yes, it is.

       9    Q.    On direct examination you said you got as far as eighth

12:55 10    grade in school, and I'm paraphrasing here, but I believe you

      11    stated you didn't do well in school?

      12    A.    Yes.

      13    Q.    There was a point in which you were actually doing well

      14    until you began using inhalants; isn't that correct?

12:55 15    A.    Yes.

      16    Q.    In your offense history, your offense history is all

      17    alcohol-based; is that correct?

      18    A.    Yes.

      19    Q.    Whether it's general crimes or sexual crimes, it's

12:55 20    alcohol-based?

      21    A.    Yes.

      22    Q.    In fact, when you drink alcohol you lose control; isn't

      23    that correct?

      24    A.    Yes.

12:56 25    Q.    And as the record shows, you lost control, you thought you

B. Charboneau - Cross-Examination

12:56  1    lost control when you raped your daughter, right?

2    A.    Yes.

3    Q.    You lost control when you committed all these other sexual

4    crimes; isn't that correct?

12:56  5    A.    Yes.

6    Q.    And the bulk of your other nonsexual alcohol-related

7    crimes are kind of like public intoxication-type crimes; isn't

8    that correct?

9    A.    Yes.

12:56  10   Q.    In other words, you were in public, whether daylight or

11   nighttime, and you were observed by someone drinking?

12   A.    Yes.

13   Q.    And actually in a manner that was unlawful, right?

14   A.    Yes.

12:56  15   Q.    Then the police were called and then you were arrested,

16   right?

17   A.    Yes.

18   Q.    Now, with regard to your sexual crimes, these are crimes

19   that you committed, with the exception of your daughter, inside

12:56  20   someone's home, right?

21   A.    Yes.

22   Q.    A place they were staying; is that correct?

23   A.    That is correct.

24   Q.    All right.  Now, on direct examination you said you've

12:57  25   been sober the last 13 years because -- while you were in

B. Charboneau - Cross-Examination

12:57 1  prison?

2  A.    Yes.

3  Q.    It's true, is it not, in your offense history you usually

4  don't act out in prison at all; isn't that correct?

12:57 5  A.    Yes.

6  Q.    In fact, in '82 you were known -- and that was after your

7  first offense -- you were known as a model prisoner, right?

8  A.    Yes.

9  Q.    And once you were released back in the community, you

12:57 10  began drinking again, right?

11  A.    Yes.

12  Q.    And in fact, you were brought back to the -- you were

13  brought back to the facility because of your alcohol abuse,

14  right?

12:58 15  A.    Yes.

16  Q.    And it's clear in your record that once you've been

17  released into the community and not supervised, you have

18  offended, generally and specifically sexually; isn't that

19  correct?

12:58 20  A.    Yes.

21  Q.    In fact, when you were -- the last offense in 2003, you

22  had progressed well enough that they placed you in your own

23  apartment, right?

24  A.    Yes.

12:58 25  Q.    And you drank?

B. Charboneau - Cross-Examination

| | | |
|---|---|---|
| 12:58 | 1 | A.    Yes. |
| | 2 | Q.    And then you were going to get a roommate? |
| | 3 | A.    Yes. |
| | 4 | Q.    They wanted to give you a roommate or move you in with |
| 12:58 | 5 | someone, they wanted someone to be with you, right? |
| | 6 | A.    That's correct. |
| | 7 | Q.    And you never got that roommate because I believe about 10 |
| | 8 | days later that's when you committed the sexual offense that |
| | 9 | has brought you here today, right? |
| 12:58 | 10 | A.    Yes. |
| | 11 | Q.    You were also on supervision; isn't that correct? |
| | 12 | A.    Yes, I was. |
| | 13 | Q.    And in fact, the day you committed the sexual offense you |
| | 14 | went to your probation officer that tested you to make sure you |
| 12:59 | 15 | weren't using alcohol; isn't that right? |
| | 16 | A.    Yes. |
| | 17 | Q.    And you passed that test, right? |
| | 18 | A.    Yes, I did. |
| | 19 | Q.    And that very same day you then committed a sexual |
| 12:59 | 20 | offense, right? |
| | 21 | A.    Yes. |
| | 22 | Q.    And in that sexual offense, it was due to your consumption |
| | 23 | of alcohol? |
| | 24 | A.    Yes, it was. |
| 12:59 | 25 | Q.    Which caused you to lose control? |

B. Charboneau - Cross-Examination

12:59  1   A.   Yes.

       2   Q.   And in fact, while you're out in the community, at the

       3   time you were also in sex offender treatment, weren't you, in

       4   2003?

12:59  5   A.   I was -- I didn't hear the word.

       6   Q.   I'll repeat it.

       7        In 2003, prior to your being arrested because of the

       8   sexual offense, during that period of time you were in sex

       9   offender treatment; isn't that correct?

13:00 10   A.   Yes.

      11   Q.   With Dr., I think it's Fiferman?

      12   A.   Yes, it was.

      13   Q.   But you were not satisfied with Dr. Fiferman, in fact, you

      14   had intended to stop going to sex offender treatment; isn't

13:00 15   that correct?

      16   A.   I would say yes.  Up to my three-year period, yes, I

      17   wasn't into it.

      18   Q.   All right.  And until, I guess you testified about this

      19   today, you had denied that you had an alcohol problem; isn't

13:00 20   that correct?

      21   A.   Yes.

      22   Q.   You denied it to Dr. North, right?

      23   A.   Yes, I did.

      24   Q.   You denied it to Dr. Zinik?

13:00 25   A.   Yes, I did.

B. Charboneau - Redirect Examination

| | | |
|---|---|---|
| 13:00 | 1 | Q.   And you denied it while you've been in treatment -- |
| | 2 | A.   Yes, I have. |
| | 3 | Q.   -- at CTP? |
| | 4 | A.   Yes. |
| 13:01 | 5 | MR. JAMES:  Can I have a moment, Judge? |
| | 6 | THE COURT:  You may. |
| | 7 | (Counsel conferring.) |
| | 8 | MR. JAMES:  No further questions, Your Honor. |
| | 9 | THE COURT:  Thank you, Mr. James. |
| 13:01 | 10 | Ms. Shea, anything else? |
| | 11 | MS. SHEA:  Thank you, Judge. |
| | 12 | REDIRECT EXAMINATION |
| | 13 | BY MS. SHEA: |
| | 14 | Q.   Mr. Charboneau, why have you denied in the past that |
| 13:01 | 15 | you've had a problem with alcohol? |
| | 16 | A.   Because I just scared of being abused by it, you know, the |
| | 17 | way I -- I couldn't handle it, I was scared of it and didn't |
| | 18 | want to be associated with it.  I was scared.  I was scared of |
| | 19 | being around.  I was just really scared of alcohol.  I really |
| 13:01 | 20 | didn't care for it.  I felt like being left alone, I wanted to |
| | 21 | be left alone.  I didn't want to use it.  I didn't -- I really |
| | 22 | don't have the right quick answer.  I'm scared of alcohol. |
| | 23 | Q.   And if you're released, are you going to be able to stay |
| | 24 | away from alcohol? |
| 13:02 | 25 | A.   Yes, I can.  I can promise you that, yes. |

| | | |
|---|---|---|
| 13:02 | 1 | MS. SHEA:  Thank you, Your Honor.  No other |
| | 2 | questions. |
| | 3 | THE COURT:  Anything else? |
| | 4 | MR. JAMES:  No, Judge. |
| 13:02 | 5 | THE COURT:  Thank you, Mr. Charboneau.  Please watch |
| | 6 | your step stepping down, sir. |
| | 7 | Ms. Shea, you may call your next witness. |
| | 8 | MS. SHEA:  Thank you, Your Honor.  At this time we |
| | 9 | will call Dr. Joseph Plaud. |
| 13:02 | 10 | |
| | 11 | JOSEPH JULIAN PLAUD, Ph.D |
| | 12 | having been duly sworn, testified as follows: |
| | 13 | THE WITNESS:  Good afternoon, Judge. |
| | 14 | THE COURT:  Good afternoon, Dr. Plaud. |
| 13:03 | 15 | I want the record to be clear that my comments about |
| | 16 | the lawyers not being able to control you reflects on your |
| | 17 | independence, which I admire. |
| | 18 | MS. SHEA:  And pursuant to the order entered at the |
| | 19 | start of the trial, we would ask that he be allowed to testify |
| 13:03 | 20 | as an expert. |
| | 21 | THE COURT:  He absolutely is testifying as an expert. |
| | 22 | MS. SHEA:  Thank you, Your Honor. |
| | 23 | THE COURT:  As soon as you indicate to Ms. Shea you |
| | 24 | are ready, she may ask you questions. |
| 13:04 | 25 | THE WITNESS:  Thank you, Your Honor. |

J. Plaud - Direct Examination

13:04   1          DIRECT EXAMINATION

2    BY MS. SHEA:

3    Q.   Good afternoon, Dr. Plaud.

4    A.   Good afternoon.

13:04   5    Q.   You were asked to conduct an evaluation in this case.  Did

6    you form an opinion as to whether or not Mr. Charboneau meets

7    the criteria to be a sexually dangerous person?

8    A.   I did.

9    Q.   What is your opinion?

13:04  10    A.   It's my opinion that he is not a sexually dangerous

11   person.

12   Q.   Why do you believe that he is not a sexually dangerous

13   person?

14   A.   Well, first of all, if we look at it through the three

13:04  15   tiers of analysis, as we do in these cases, it's clear that he

16   meets Tier 1, I'm in the affirmative on that.

17          Regarding Tier 2, concerning whether Mr. Charboneau has a

18   serious mental illness, abnormality or disorder, there's a

19   bunch of experts here, usually four against one as usual, but

13:04  20   I'll do my best, we basically agree diagnostically.  I mean,

21   there is some extraneous diagnoses, but not really important

22   ones.  On the main issue in terms of substance use disorder

23   pertaining most centrally to alcohol as well as more historical

24   inhalants, but it's really the alcohol that we're here to

13:05  25   analyze, debate, discuss, figure out.  So we're all pretty much

J. Plaud - Direct Examination

13:05  1    diagnostically in sync in this case.

2          The question is whether that diagnosis, absent a

3    significant personality disorder such, for example, as an

4    antisocial personality disorder, absent a primary paraphilia,

13:05  5    such as sexual sadism or pedophilia or pedophilia disorder, or

6    something in that nature, in and of itself is that sufficient

7    to make a professional conclusion as to whether or not in the

8    present tense some -- the individual with that diagnosis,

9    absent those other co-morbid diagnoses, would have serious

13:06  10   difficulty in the present tense in refraining from further acts

11   of child molestation or sexually violent conduct, and that's

12   where the analysis in this case breaks; it drops.

13          In my professional judgment, Judge, Mr. Charboneau's

14   substance abuse disorder does not, cannot, in this case,

13:06  15   suffice as a major mental illness, abnormality or disorder that

16   we can reliable conclude at this time cause him to have serious

17   difficulty in refraining.

18          And really, if you think about it, it's what I would call

19   a prognosticator's two-step, because not only, number one, you

13:06  20   have to be certain or fairly certain that he's going to relapse

21   with alcohol, and I certainly see there's an argument to be

22   made that he will given his history.  And in my report I

23   certainly also say it's not beyond the bounds of possibility

24   that he might relapse.  So I'm not really even taking the

13:07  25   analysis there, but it is important, step one, you have to make

J. Plaud - Direct Examination

| | | |
|---|---|---|
| 13:07 | 1 | that assumption first because there is no evidence in his |
| | 2 | history ever, no accusation, no admission, no expert here has |
| | 3 | drawn attention to the fact that when he has been sober in his |
| | 4 | past that he has committed or attempted to commit any acts of |
| 13:07 | 5 | sexual violence or child molestation.  So we have to make that |
| | 6 | first leap. |
| | 7 | Then we have to then jump from that to another, and that |
| | 8 | is, if he does relapse with alcohol, he will then have serious |
| | 9 | difficulty in refraining. |
| 13:07 | 10 | So now -- it's kind of like, to put it in more legal |
| | 11 | jargon, it's double hearsay in that sense.  It's another step |
| | 12 | of analysis, when the first isn't certain and the second |
| | 13 | clearly isn't certain, because even though Mr. Charboneau in |
| | 14 | his history, by his own admission, and I would agree by my |
| 13:08 | 15 | reading of the records, my discussion with him during the |
| | 16 | clinical interview that I had with him, alcohol has been a |
| | 17 | disinhibitor for him sexually in the past.  But that doesn't |
| | 18 | mean it fuels deviant sexual arousal. |
| | 19 | I mean, I heard earlier testimony today, kind of getting |
| 13:08 | 20 | at that I think Dr. Zinik was testifying to the effect that, |
| | 21 | you know, he reported to him during the interview that when he |
| | 22 | drank alcohol it affected his sexual arousal as well.  Well, |
| | 23 | that's not abnormal.  I would remind you, let's go back to |
| | 24 | Shakespeare and MacBeth, Act II, Scene III, where Shakespeare |
| 13:09 | 25 | writes about alcohol and sexual arousal.  He said it provokes |

J. Plaud - Direct Examination

13:09 1    the desire, but it takes away from the performance.  So it's

2    clear throughout our history alcohol has an impact on our

3    sexual arousal.  That's not abnormal or deviant.

4        The question is:  If he drinks and relapses, will it

13:09 5    automatically be assumed that he can't control himself, his

6    volitional capacity over sex.  And it's too tenuous a

7    relationship given the absence of any other deviant arousal

8    driving him or personality disorder that would be associated

9    with sexual recidivism.  So that is the main issue I think in

13:09 10    this case.  We're way, way out on a branch that I don't think

11    has -- you can say with clear and convincing analysis that he

12    would have serious difficulty in refraining.

13        I would also add to that, you know, I've heard a lot of

14    testimony -- I pretty much get to go last so I get to hear

13:10 15    everything before I get up here -- but it is clear that

16    Mr. Charboneau starting as a relatively young man started

17    abusing substances.  It looks like inhalants was his way in and

18    then alcohol took over from there.  It looked like he was

19    basically a good student before then.  He was not a behavioral

13:10 20    problem in the records before then.  But then alcohol enters

21    his life and it had -- it's had many negative effects on others

22    and himself throughout much of his adulthood when he was in the

23    community.  We all agree with that.

24        We all also agree, too, that he does have a significant

13:10 25    history in the community of drinking.  If -- and he has

J. Plaud - Direct Examination

13:10   1   committed sex offenses and other offenses while drinking.

  2      But here's the thing:  If there's a direct connection such

  3   that it really meets the standard that I think the standard is

  4   for sexual dangerousness, I would expect it to be a lot more

13:11   5   offending given the fact he was drinking all the time.

  6      So let's look at his offenses.  We have four documented

  7   issues here:  The first is when he's 22 years old.  He's a kid.

  8   That is against an extrafamilial person who he met earlier and

  9   went to the -- she was house sitting and he went there.

13:11 10   Clearly, an act of rape.  He doesn't remember it.  I tend to

11   credit him.  He probably doesn't remember a lot.  I think it's

12   been fabulated a lot because he doesn't remember, but that's a

13   sexual violent act, okay, 22 years old.

14      Go up in time, some years go by and we are up to now

13:11 15   '87 and the incident that he was just asked about where there's

16   a level of confusion a bit, at least legally, because he wasn't

17   convicted of any sexual offense, it was like a public

18   intoxication offense, nonsexual.  He told me during the

19   interview he didn't remember it.  He didn't deny it, but he

13:12 20   didn't remember it.  That's with another adult, several years

21   later and it's outside the family.

22      Then we come to 1988, which is with daughter and it's a

23   heinous act.  Could he have lost control completely during that

24   time?  Yeah, he probably did.  There's another instance.

13:12 25      Then he goes to prison for about 12 years.  He comes out,

J. Plaud - Direct Examination

13:12  1   he's out in community and then we have the index, the federal
       2   offense for which he has now served the last 13 years.

       3       In my analysis -- and I haven't heard this come out in the
       4   testimony, but again, I try to pay attention in real-time
13:12  5   what's going on, I like to see how it's being dealt with
       6   legally, what's going on, what's the situation.  This involves
       7   his niece.  This is a niece, from my reading of the record and
       8   discussion with Mr. Charboneau, was his niece, but didn't
       9   really know she was his niece until maybe six months or a year.
13:13 10   He was introduced to her, she's was an adult, she's in her
      11   twenties.  And according to Mr. Charboneau, he seems to have
      12   the greatest recollection about things about this and we talked
      13   about it for a while and it hasn't really come out here.  But I
      14   don't know, I wasn't there.

13:13 15       But here's what I can tell you.  It seems to me that
      16   offense, which is the most recent one, which is 13, 14 years
      17   ago and involved alcohol, was not of the nature of the one like
      18   when he was 22 years old.  It seems to be, involved some type
      19   of relationship that went around even being a family and
13:13 20   involved into some type of sexual relationship, okay?

      21       And Mr. Charboneau told me that there was a lot going on,
      22   we discussed a lot of things, that it was essentially, and
      23   using his words, it was consensual, they had a relationship.

      24       Now, I will remind everyone that his conviction in that
13:14 25   case was not for rape of any kind, it was for basically a

J. Plaud - Direct Examination

13:14  1   statutory issue.  It was sexual contact with a person incapable
       2   of consent.  To my reading, I'm not a lawyer, but I would think
       3   that's more of a statutory issue of able consent.  So I'm just
       4   pointing that out.  To my analysis, it's very different.  Now
13:14  5   he's older, he's violating probation, he's abiding substances
       6   and there's this indication that the offense that happens, that
       7   is the most recent one takes place not as he's drinking out of
       8   control and grabbing everyone like he has no volitional
       9   capacity even while he's drinking, which is clear evidence by
13:14  10  his own admission and in the records that he was, but he
       11  developed some type of relationship with someone that he comes
       12  to understand is his niece and something goes wrong, okay?
       13  That's 2003.
       14      Now we're in 2017.  There is no indication during this
13:15  15  period of time that Mr. Charboneau has gotten hooch, whatever
       16  you call it in the federal parlance, even though it's -- I
       17  mean, I read records all the time, it's not beyond the bounds
       18  of human experience while you're incarcerated to do that.  If
       19  you are so dependent on it and if you can't control it, you can
13:15  20  get access to it.  He has not.  No indication.
       21      And I think that there are other issues right now with
       22  him, with his advanced age, with his struggle over the past 13
       23  years to try to understand certain things that just when you
       24  put it all together, are there risk factors involving alcohol?
13:16  25  Yes.  Am I here to tell you it's impossible for him to

J. Plaud - Direct Examination

13:16  1  re-offend if he gets drunk and gets out and goes to a bar and

2  gets out?  No, I'm not saying that.

3       But I'm telling you that if you're asking me as a

4  professional, I can't do that two-step, I can't do that

13:16  5  prognosticator's two-step, it's a house built on a foundation

6  of sand, in this case.  There's no sexual deviance.  Even the

7  Government's experts don't say sexual deviance.  There's no

8  real personality disorder.

9       I mean, we've heard some V codes being announced here by

13:16  10  Dr. Ross, which are not mental abnormalities and she said don't

11  really add to anything.  You have the fact that he has a

12  history of alcohol abuse, and he has had episodes when he has

13  committed sex offenses while under the influence during his

14  lifetime beginning when he was in his early twenties.

13:16  15       I would expect -- I would be more comfortable if there

16  were many more victims as I see when alcohol plays more of a

17  role over the course of his life.  And I do want to note the

18  little difference in the 2003 offense in my analysis of the

19  situation.  I also want to note that he's 57 years old and you

13:17  20  can -- you say he skips rope for six days.  I can't skip it for

21  two minutes, I imagine that must be a good thing, but age does

22  matter.  I think it's taken him a little longer.  I think it's

23  reasonable to assume he does have some type of neurocognitive

24  issues going on.  I mention it a little bit in my report.  I

13:17  25  don't give a full diagnosis because I don't really have the

J. Plaud - Direct Examination

13:17   1   neuropsychological data to back it up.  But clearly in my
        2   discussion with him, the things we were talking about in terms
        3   of his verbal skills, ability to communicate, yeah, it was
        4   difficult even for times with me.  And I think the guy is an
13:17   5   anxious person and I think he wants to please you in a
        6   situation.  At times sitting up here just a few minutes ago
        7   just saying yes, yes, yes, whatever.  Were you involved in the
        8   Kennedy assassination, he probably would have said yes.  He's
        9   just -- that's the way he is.
13:18  10        But I do not have any confidence as a professional to say
       11   that I can guarantee you or be very certain, very likely
       12   certain, that he is a 57-year-old man, with everything that has
       13   been going on, with the fact he has 13 years, which is a long
       14   time of sobriety, with no evidence that he has tried to get
13:18  15   that, that he has sought out at least some type of substance
       16   abuse.  You know, AA is AA.  It's got its detractors; it's got
       17   its advocates, but it's something.  He's been involved in that.
       18   He does have a term of supervised release that will extend to
       19   when he's about 60 years old and that gets into an age range in
13:18  20   terms of sexual recidivism where almost nobody re-offends, even
       21   when you have lots of offenses in the past.  And that should
       22   be -- so I -- you know, if this was just -- if we were here
       23   having a court case about is Mr. Charboneau going to relapse
       24   with alcohol?  If this was an alcohol court or something, well,
13:19  25   I would say, you know what, I'd say, I would give him more

J. Plaud - Direct Examination

13:19   1   credit than I would maybe 13, 14 years ago, but you know,

2   substance abuse is the devil and it's so hard to predict

3   because of the base rates, it's so hard to predict that someone

4   is not going to relapse.  So I'll even concede that he may

13:19   5   relapse.  But then to take that relapse and then go the next

6   level and pair that with volitional problems with a sexual

7   behavior, I can't do it based on the specifics of this case,

8   his current age, I think he's caught up a bit maturationally, I

9   think he does really feel badly about himself.  And if you look

13:20  10   at the research, none of this has been discussed, we have to

11   discuss this, look at the research on using alcohol

12   specifically as a predictor of future offending.  I'll go to

13   the largest and venerable database of Hanson and Bussiere, over

14   28,000 sex offender studies, one of the factors in their study

13:20  15   was alcohol abuse.  Do you want to know what the correlation

16   with future sexual recidivism was in that meta-analysis?  Zero.

17   In other words, a big egg.  It had no ability in and of itself

18   to predict future re-offending.  It's for the reasons that

19   cause me to step backward in this case.

13:20  20   So that's my analysis.

21       My analysis is:  He does not really have a serious mental

22   illness, abnormality or disorder.  He has a substance abuse

23   problem, and I cannot predict with any professional certainty

24   that even if he goes to step one and relapses with substances

13:21  25   that at this time is going to cause him to lack volitional

J. Plaud - Direct Examination

13:21   1   capacity of sexual impulses.  It's certainly possible, but it's

2   not a likely probability in my judgment given all the factors

3   that I've seen in this case.

4   Q.   Thank you, Dr. Plaud.

13:21   5       You mentioned the 2003 offense being different in kind in

6   your mind.

7   A.   Yes.

8   Q.   Does it matter that the victim in that offense denied a

9   consensual sexual relationship?

13:21  10   A.   I'm aware of that.  And like I said, I'm not here to make

11   judgments in the sense of this happened and that happened.  I

12   mean, I read -- read the reports, right?  I read -- I read what

13   other reports the person said they did, you know, or during the

14   interview what they say.  But then I also pay attention to the

13:22  15   legal disposition of the case.  It's in real-time.  Here we are

16   sitting 13, 14 years later.  We don't have anybody here who is

17   involved directly in that case, except Mr. Charboneau's here.

18       So I have to -- the bottom line is he was convicted of

19   what I said he was convicted of.  So I have to pay attention to

13:22  20   that.  And if you look at the whole thing, I do believe it's a

21   little bit of a difference, especially when in 1982, it's

22   clearly a different issue, he was 22 years old then.  So that's

23   what -- the best I can tell you.

24       I'm not -- you know, I wasn't there, but I have to pay

13:22  25   attention to everything, including, you know, the legal

J. Plaud - Direct Examination

13:22  1    disposition helps to guide me because that's how it's being

2    dealt with in real-time in a criminal context.

3    Q.    I want to ask you a few more questions about Prong 2 of

4    the Adam Wash Act.  You heard Dr. Zinik diagnosed

13:23  5    Mr. Charboneau with a personality disorder.

6    A.    Right.

7    Q.    Why did you decline to offer that diagnosis?

8    A.    Well, here's the situation.  I did some testing of him as

9    well, it's at the end of my report, and actually, I picked up

13:23 10    on some of the things that I think the others specified

11    personality disorder, talking about schizotypal features,

12    schizoid, I forgot which was said, but I picked up some of that

13    on my testing too.  The problem is the guy has been a substance

14    abuser so I think that is a better explainer.  You know, we

13:23 15    talk about neurocognitive functioning and maybe some problems

16    with that.  I think he confabulates; in other words, I don't

17    think he doesn't remember a lot because of the substance abuse

18    history, so he tries to fill in the gaps like a lot of

19    substance abusers do.

13:23 20        I think some of the -- his expressive vocabulary issues, I

21    think if you look at all those things, it really washes out

22    other specified personality disorder.  You can make it, but I

23    don't think it's relevant in this case even if you did make it.

24    Q.    You touched on this previously in your earlier answer;

13:24 25    that the other doctors diagnosed him with mild neurocognitive

J. Plaud - Direct Examination

13:24   1   disorder.

        2   A.    Yeah.

        3   Q.    What do you make of that in terms of being relevant for

        4   purposes of looking at Prong 2?

13:24   5   A.    Okay.  Well, what I think -- like I said earlier, I tend

        6   to agree that he probably does.  I just, like I said, didn't

        7   have enough data.  I think I heard Dr. Holden say he's being

        8   referred for a neuro-psych evaluation.  That would probably be

        9   a good idea.  But I do talk in my report that he probably has

13:24  10   something along those lines without making a diagnosis.

       11       I think it affects his interpersonal functioning along a

       12   number of different domains.  There is two things that happened

       13   that I read in the reports and heard him testify today that

       14   kind of set me off a little bit, and I think it's related to

13:24  15   his interpersonal style, his verbal deficits, and maybe a

       16   neurocognitive impairment of some sort.  And that is this:  You

       17   know when you say, well, he admitted he was sexually

       18   dangerous -- I remember this after I interviewed him and I

       19   remember traveling here for a trial several months ago, I got

13:25  20   here and there was no trial because he was going to commit

       21   himself.  Well, I think that is an expression of the fact that

       22   he is being told in his treatment right now, you heard

       23   testimony this morning to that effect, that he has a sexual

       24   deviance, and even that was used by -- Dr. Holden used that

13:25  25   term, he has a sexual deviance and kind of been told he's

J. Plaud - Direct Examination

13:25  1   sexually dangerous and says, okay, I'm sexually dangerous.

2   Just like he said yes to everything that both sides asked him

3   here today.

4        So I think you have to be careful a little bit about that

13:25  5   and understanding because he said that, that I think that's how

6   he responds to social pressures, especially institutionally.

7   You know, he's not one who just is a defier, he's going to say

8   no, because you say this. He'll say, okay, am I? Okay, I am

9   then.

13:26 10        And I think -- I'm a little concerned with that, using

11   that to conclude, well, you know, he even admitted he was

12   sexually dangerous. Well, I don't think he really admitted he

13   was sexually dangerous. I know he denied it again here today,

14   but I think he was just kind of going with the treatment mode,

13:26 15   he got into treatment and was going along that mode. After

16   all, this is the Commitment and Treatment Program, these are

17   people who already committed are in the program eventually.

18   It's very rare for a guy in his stage to be in treatment. They

19   don't do it mostly because the lawyers say don't do it because,

13:26 20   you know what, they're going to come and testify against you

21   like you saw happening here this morning, that's why.

22        But he took it. He's taking it. And I think he is making

23   progress. That's great. But to say well, would it deprive him

24   of his -- you know, would it interfere with him, would it be a

13:27 25   stumbling block for him, this progress that he's making if he's

J. Plaud - Direct Examination

13:27  1    not -- declared not sexually dangerous and leaves Butner.

2    Well, other experts would say, yeah, it would be a real

3    impediment to him, he's making such progress.  It's easy for us

4    to say.  Guess where I'm going tonight?  It's restaurant week

13:27  5    in Raleigh.  I'm going to have a good time tonight when I get

6    out of here.  I'm free.  It's easy for me to judge.

7         No.  I think you have to make these determinations based

8    upon not convenience, oh, yeah, he's in a program, he seems to

9    be making process, it's a commitment program.  He can get

13:27 10    outpatient treatment.  He will have to get outpatient

11    treatment.  He has a term of supervised release until he's

12    about 60.

13         So you know, these kinds of things, they just --

14         THE COURT:  How do you think -- you know, talking

13:27 15    about the agreeability component of whether the term is

16    personality or whatever, how does that play in, do you think,

17    if he's released and he's with somebody who has a bottle of

18    whiskey, right?  In terms of somebody that just says yes, just

19    like a person who is just agreeable and some companion that by

13:28 20    pure happenstance, not by design, but by pure happenstance,

21    hey, I got this, I'm drinking, do you want some, how do you

22    think that plays in on the concept of what you talked about,

23    the two-step on that first step?

24         THE WITNESS:  I'm more willing to concede the first

13:28 25    step of the two step.

J. Plaud - Direct Examination

13:28  1          THE COURT:  I understand that.  How do you think that

2    plays in?  Do you think that's -- it's a risk issue, right?

3          THE WITNESS:  It's a risk issue, Judge.  It's a risk

4    issue.

13:28  5          The question is -- again, he's on -- he's going to be

6    on supervised release and you can't just say he stopped

7    maturing at age 12, I mean, come on.  I could agree that he

8    certainly had issues going forward.  I think he was -- you

9    know, there was certainly a developmental delay there going on,

13:29 10  but he's 57 now.  He has 13 years, you know, and he seems to at

11   least have a commitment not to drink.

12          Now, is that sufficient?  There's no magic bullet.

13   He may relapse.  I would never, ever, ever say someone has very

14   little chance, someone with a history of alcohol like he had

13:29 15  that, no, he's not going to relapse.  I'm sure he believes he

16   won't right now.  I believe him when he says that.  Do I think

17   that's reality?  I don't know.  I certainly hope he continues

18   with substance abuse treatment, and I would imagine his

19   probation officer is going to be very attuned into that for the

13:29 20  next couple of years, and I think if he can stay sober, and I

21   think there's an increasing chance that he can this time around

22   given his age and the fact he's been incarcerated for so long

23   without any indication that he has to have a drink, that I'm at

24   least more prepared to say I think there's a probability of

13:30 25  that.

**JA191**

J. Plaud - Direct Examination

13:30  1          But like I said, even if he does take a drink, then

2    to go to the next level and say then he's going to lose his

3    ability to control himself sexually now.  I don't know.  That's

4    just not good.

13:30  5    BY MS. SHEA:

6    Q.    Do you think that his neurocognitive issues make him more

7    likely to be sexually dangerous?

8    A.    No.

9    Q.    Why not?

13:30  10   A.    I think that -- because what do they fuel?  To say they

11   would make it more sexually dangerous, it would impact his

12   sexual functioning, sexual behavior, his sexual arousal in some

13   way, and there is no evidence of that.

14         Now, I think it manifests itself in ways that,

13:30  15   unfortunately, that he gets negative things attributed to him

16   because he can't articulate things and he can't remember things

17   and he can't function socially a lot of times that people would

18   have expectations for him to do.  That's more of the issue.

19   Q.    Do you think that alcohol use disorder can ever satisfy

13:31  20   Prong 2?

21   A.    Well, I think it certainly can be a part of Prong 2, yes.

22   In and of itself -- like I said, if we had this case and we had

23   a history of sex offenses that truly were clustered, I mean, in

24   a way that there was a very, very direct relationship, very

13:31  25   direct, I mean, he drank, within a week he was committing an

J. Plaud - Direct Examination

13:31  1    offense; he drank within a week he committed an offense, he

       2    drank -- this guy, yeah, he's committed offenses, two with

       3    family members, one when he was 22 in the house and some

       4    question about the third, I think there was an attempt there,

13:31  5    at the very least, even though he wasn't convicted of it.

       6    That's not the pattern I would expect if there was that direct

       7    relation with alcohol.

       8        But I would see substance abuse being --

       9            THE COURT:  If you had that fact, I realize those

13:32 10    aren't the facts, but if you had those, do you think you could

      11    to a professional certainty opine on that or would that not

      12    even be --

      13            THE WITNESS:  I think I could, Judge.  Yes, I could.

      14            But I'll tell you where substance abuse disorder

13:32 15    would play a more major role as a contributing factor of a

      16    major mental illness.  In other words, you pair that with a

      17    paraphilia, all right, or a major personality disorder or both,

      18    yes.

      19            In and of itself, as we have here, given the

13:32 20    behavioral evidence we have going back to when he was 22 years

      21    old, no.

      22    BY MS. SHEA:

      23    Q.   If you were to consider alcohol abuse disorder sufficient

      24    for Prong 2, would you also expect to see more struggle with

13:32 25    maintaining sobriety?

J. Plaud - Direct Examination

| | | |
|---|---|---|
| 13:33 | 1 | A.    I would.  You mean institutionally or just -- |
| | 2 | Q.    Both. |
| | 3 | A.    Yeah, I definitely would, yeah. |
| | 4 | Q.    Do you believe that nonsexually based disorders in general |
| 13:33 | 5 | can qualify for Prong 2? |
| | 6 | THE COURT:  What was your question, ma'am? |
| | 7 | BY MS. SHEA: |
| | 8 | Q.    Do you believe that nonsexually based disorders alone can |
| | 9 | qualify for Prong 2 even more on a macro level, just |
| 13:33 | 10 | non-paraphilias. |
| | 11 | A.    Well, the short answer is it depends.  It's the same |
| | 12 | argument I just gave for, you know, for alcohol abuse. |
| | 13 | If somebody has some condition and it's linked directly, |
| | 14 | repeatedly and sequentially to sexually inappropriate behavior, |
| 13:33 | 15 | illegal behavior, then, yeah, you can.  But the farther afield |
| | 16 | you get from that, the more difficult it is.  Here we have to |
| | 17 | make two leaps, so that's the best way I think to characterize |
| | 18 | it. |
| | 19 | Q.    You noted in your report, which is our Exhibit 2.  I'm on |
| 13:34 | 20 | page 2 of your report of our Exhibit 2.  You noted that he has |
| | 21 | excellent behavioral regulation and control. |
| | 22 | A.    Yes. |
| | 23 | Q.    What did you mean by this? |
| | 24 | A.    That means that -- I mean, we have 13 years now to look |
| 13:34 | 25 | back most recently -- and again, in these cases -- and I know |

J. Plaud - Direct Examination

13:34  1  he set up with supervised in past current level, you know, he's

2  12 years, he also had good -- I didn't see any real issues when

3  he was in prison before -- but the more important data, when

4  you do these kinds of cases and analysis time matters and the

13:35  5  farther you go back in time, the less predictive things are,

6  because this is about him today, it's not to re-punish him for

7  something he already did.  It's to say he has a current

8  condition that causes him to do certain things.

9      So the farther you go back in time from where we are right

13:35  10  now, the more suspect generally the data gets.  So when I look

11  back the last 13, 14, years, I saw one disciplinary report, I

12  pointed it out in my report, it was for a technicality, not

13  showing up for employment or something, absent from assignment.

14  That's it.  He's not a sexual problem, he's not a general

13:35  15  behavioral problem, he's not getting into fights, he's not, you

16  know, trying to get alcohol, he's not trying to do anything

17  that's against institutional rules.  So clearly, the guy has

18  controls.  Clearly, the guy has the ability to regulate himself

19  sexually and more generally.

13:36  20      So then you get back into this kind of issue about, okay,

21  then he takes a drink and does it all go to pieces?  Well, it

22  has gone to pieces at times, yeah, it has, but is this an

23  ongoing problem?  In other words, is it a continuous problem?

24      I have taken a drink or two in my day, Judge, and there

13:36  25  were times that I have said or done things that I have not been

J. Plaud - Direct Examination

13:36  1    too proud of.  You know, you wake up the next day and I said, I

2    said what?  I did what?  I mean, it's not the way I generally

3    live my life.  I have control.  You can't let the exception

4    prove the rule.

13:36  5        I'm not trying to put light on anything here, but even

6    taken from its worse from age 23 to age 57, we have discrete

7    instances, two of whom were in the family.  So he's not out

8    there when he's out there just getting drunk and grabbing

9    people or trying to assault people as a more general function

13:37 10    of lack of volitional capacity over sexual impulse.  It's not

11    there.

12    Q.    Now, Dr. Ross was asked some questions about the fact that

13    his victims were mostly family and she said that it didn't -- I

14    won't characterize what she said.  She made some comments about

13:37 15    familial victims.  Does that matter to you in this case?

16    A.    Well, yeah, in a way, too, it speaks to issues of control.

17    Generally speaking, sex offenders with family victims tend to

18    be less likely to re-offend.  Incest offenders throughout the

19    lifespan tend to be the lowest group of recidivists, but I

13:37 20    don't really consider him in the class with incest offenders,

21    I'm not even putting it that way, other than to note that he

22    has within the family victim.

23        Clearly, there is something going on there within the

24    context of his family environment that didn't but on one really

13:38 25    known occasion when he is 22 and something else five years

J. Plaud - Direct Examination

13:38  1    later that we have some question about because we really don't

2    know what happened other than what I read and what the

3    disposition was and what he says and doesn't and does remember,

4    beyond that there is no instances of sexual assaulting during

13:38  5    that period, and the guy, from hearing the testimony today, I

6    think he was intoxicated a good percentage of that time.

7    Q.    Did you consider that his criminal record contained many

8    offenses other than sex offenses related to alcohol?

9    A.    Yes.

13:38  10    Q.    Do you think that's significant at all?

11    A.    I do.  And I pointed that out I think on page 2 of my

12    report because it shows, you know, there were instances and

13    more instances where his alcohol use and intoxication resulted

14    in nonsexual criminal behavior than sexual criminal behavior.

13:39  15    Q.    You mentioned a little bit about Dr. Holden's testimony.

16    Having heard her testimony today, has your opinion changed?

17    A.    No.  I mean, like all the other experts, you get to be an

18    expert echo chamber in here sometimes, not with me because I'm

19    usually all by myself.  Here's the situation and this is kind

13:39  20    of a problem too.  We talked I think early in the testimony

21    about the therapeutic alliance.  That's important.  I've been a

22    treatment provider for 30 years with sex offenders and good

23    luck with the therapeutic alliance now, when your therapist is

24    up there testifying against you.  But you know, no, it didn't

13:39  25    change.  I think he's at a point in his life where he

J. Plaud - Direct Examination

13:39  1    recognizes.  I don't think he can fill in all the gaps.  I
        2    don't think he's capable of filling in all the gaps.  I think
        3    he doesn't remember a lot of things.  I think when you're
        4    intoxicated as much as he is or was, I don't think he remembers
13:40  5    a lot of it.  It's not atypical, and I think he at times will
        6    say this is what I remember and it may differ from what it says
        7    or I don't remember what it is.

        8        But I think putting all of that on the table, I think he's
        9    reached a point in his life, and I do think this is important,
13:40 10    yeah, I do want to continue to do the right thing.  I think his
       11    heart is in the right place here, and I think his
       12    participation -- I don't remember the last client I had before
       13    commitment who was in the CTP, none of them are.  They don't
       14    go -- they don't want to for the reasons here, number one.  And
13:40 15    number two, to use treatment in a way in this case, it's kind
       16    of like putting the cart before the horse here.  He's not been
       17    found dangerous yet.  To say he's going to graduate from CTP
       18    before -- let's take one step at a time here.  I know the
       19    statute itself talks about participation and treatment, it
13:41 20    doesn't talk particularly about the CTP and that's a treatment
       21    program geared to people who are sexually dangerous.  That's
       22    the whole purpose for its existence.

       23        THE COURT:  What's your opinion about the treatment
       24    that he had in that time period of 2000 to 2003?

13:41 25        THE WITNESS:  From what I read, and I mentioned the

J. Plaud - Direct Examination

13:41 | 1    therapists in my report as well, I don't think he was of the

2    mindset at that point that he would be benefiting from

3    treatment.

4            Again, going back in time, 13, 14, 17 years, but I

13:41 | 5    think his mindset is a bit different today than it was back

6    then from what I, you know, take from my interactions with him

7    and the records.

8    BY MS. SHEA:

9    Q.   So the fact that he was out in the community on conditions

13:41 | 10   for three years and then re-offended, that doesn't change your

11   opinion?

12   A.   No, it doesn't change my opinion.  I'm aware of the

13   condition; but again, it was a period of time, number one, so

14   it wasn't like it was three weeks that he re-offended which

13:42 | 15   people with volitional incapacity you probably would think to

16   be the case.  So it was a period of time.

17           And again, I want to go back to what I said earlier.  I

18   think the offense itself was a bit different in its scope than

19   the earlier offending in the '80s.

13:42 | 20   Q.   Do you think that it's significant that he was able to be

21   in the community for three years on conditions?

22   A.   Yeah.  I didn't make a big deal of it because he did

23   re-offend.  Three years is a significant period of time.  You

24   know, I would note that, yeah, but I didn't make a great big

13:42 | 25   deal of it in my analysis.

J. Plaud - Direct Examination

13:42 1    Q.    Does the fact that he has two years of supervised release

2    play into your opinion at all?

3    A.    It does.

4    Q.    Why?

13:42 5    A.    Because I think he's on a course now, and I credit the CTP

6    program, I think, for helping him to understand certain things,

7    getting him to try to dedicate his life to living a good life.

8    And I think those goals, while you can say they could be

9    achieved at CTP, okay, well, maybe they can, but you know what,

13:43 10    he's also got to stay there.

11         So the question is, as a trained psychologist we learn

12    from step one, least restrictive alternatives; in other words,

13    the thing that guides me in my treatment planning and what I

14    recommend is how can a person derive the most of treatment from

13:43 15    the least restrictive environment.  That's the ethical way to

16    analyze this situation.

17         If they can't and they need strict -- you know, I

18    testified people -- I think some people are dangerous and then

19    I'd say, no, CTP is the place to get the treatment.  I don't

13:43 20    think so in this case.  I think he's of a different mindset

21    now.  I think he's going to be able to avail himself of

22    treatment he's required to get as a condition of his supervised

23    release, and I think that's a good thing.

24    Q.    Is his voluntary attendance to AA significant to you at

13:44 25    all?

J. Plaud - Direct Examination

13:44   1   A.    It is.  Again, as I said, there are different treatment

        2   modalities for substance abuse.  There is

        3   institutionally-based, in my experience, there are very

        4   intensive substance abuse treatment like sex offender

13:44   5   treatment, but it's geared -- they share certain things.  We

        6   talk about relapse prevention.  The Good Lives Model, the way

        7   it's practiced now in sex offender treatment it takes a turn

        8   from a relapse prevention.  Before the cognitive behavioral

        9   approach that the CTP started, when it started and before the

13:44  10   SOP programs and all of these things, they are based on a

       11   cognitive behavioral relapse prevention model, which means you

       12   identify your risk factors, you integrate your risky situations

       13   and you develop strategies in order to A, recognize what your

       14   triggers are; and B, take action in real-time to lower your

13:45  15   risk by developing what we call interventions.  That's what a

       16   relapse prevention model is.

       17        Good Lives integrate some of that, but it is, I think, as

       18   testified earlier by Dr. Holden, she said it very well, you

       19   know, emphasis has changed toward living the good life; in

13:45  20   other words, having the skills and identifying the positives

       21   and trying to move toward that.  But it doesn't abandon the

       22   principles of relapse prevention, but relapse prevention was

       23   stolen from substance abuse.  That's really where it came from.

       24   So they share certain commonalities there, but that doesn't

13:45  25   mean AA is not effective.  It's the number one in the world.

**JA201**

J. Plaud - Direct Examination

13:45  1   You know, for a lot of people I think it's done a lot of good.

2   It doesn't mean I agree with all the 12 steps and what they

3   mean and the philosophical and theoretical aspects of it; but

4   yeah, I think it certainly can be a very positive development

13:45  5   and I think it has been for Mr. Charboneau.

6   Q.    Other experts were directed to discuss the 2014 letter

7   from some of Mr. Charboneau's family.

8   A.    Yes.

9   Q.    Did you also have a chance to read that letter?

13:46 10   A.    I did.

11   Q.    And does that affect your opinion?

12   A.    No.

13   Q.    Why not?

14   A.    Well, look, that's a heartfelt letter written from his

13:46 15   family.  They're obviously on a number of domains, emotionally

16   and personally.

17       You know, they're very upset with Mr. Charboneau and for

18   pretty good reason, I would say.  But they're not experts.  I

19   mean, that's not their -- they can whatever, they can have

13:46 20   nothing to do with him, that's their right, but that doesn't

21   mean that puts them in a special position to say, okay, well

22   then you have to make him sexually dangerous because we are

23   pretty upset with him given what he's done currently and in

24   life around our family environment.

13:46 25       So I think we need to separate the two out.  You bring it

J. Plaud - Direct Examination

13:46 1  in a trial, his family says he's dangerous, then he must be

2  dangerous.  I think that's not very good to do that.

3  Q.   I want to ask you a few questions about things that the

4  other experts testified about and wrote about in their reports.

13:47 5  Have you had an opportunity to read all of the other experts'

6  reports?

7  A.   I have.

8  Q.   And you were here for all of their testimony?

9       THE WITNESS:  Judge, I was so on time this morning.

13:47 10  Yes.

11  BY MS. SHEA:

12  Q.   Dr. North in his report wrote that in 30 years as a

13  licensed psychologist, I cannot remember ever encountering

14  someone with such a level of denial.  Do you remember reading

13:47 15  that?

16  A.   I did.

17  Q.   And do you have a response to that?

18  A.   Well, he must not get out much because I've seen a lot

19  more of that in my 30 years, but here's the thing with that.  I

13:47 20  don't think that's true.  This man was intoxicated

21  significantly.  Nobody is disputing that.  A lot of times in

22  these cases where alcohol is involved, oh, you're just using

23  alcohol as an excuse.  This one everybody is crediting it, this

24  is the driving thing in this whole case.

13:48 25       So when you have everybody agreeing that alcohol played

J. Plaud - Direct Examination

13:48  1    such a role earlier in his life, you know what, he's going to

2    not remember things, he is a nervous person.  You know, a lot

3    of time shame, we talked about shame, shame is something that

4    in some people causes them to minimize or deny that which they

13:48  5    do remember because of that factor.  And that's not necessarily

6    a negative thing.  At least it shows that if they're shameful,

7    you want them to be ashamed and denial doesn't predict

8    recidivism.  Like alcohol abuse, look at the research.  It

9    doesn't predict increased risk to re-offend.  If it did this

13:48 10    would be easier, but it doesn't.

11        May I say this, too, because I listened to the testimony?

12    He said that in his report and it was discussed about the level

13    of denial and all of this and lack of insight and all that, but

14    then he said in his testimony he's got insight.  He was

13:49 15    referencing his participation in treatment now at CTP.  You

16    can't have it both ways; you either have it or you don't have

17    it.  You can't say, you know, he lacks insight but then testify

18    during the same testimony later on in the testimony, yes, he

19    has it.  He used the word "insight."  He has insight now, he

13:49 20    said, which is being demonstrated by his participation in CTP

21    right now.  So which is it?  Yes or no.  You can't be both.

22    Q.    Do you believe that Mr. Charboneau is in denial that he

23    has an alcohol problem --

24    A.    No.

13:49 25    Q.    -- currently?

J. Plaud - Direct Examination

13:49  1    A.    No.   He wasn't in denial with me during the interview.

2    You know, I -- he was a little apprehensive at the beginning,

3    as my memory serves.   He was a little apprehensive when I

4    started the interview so it took a while to develop a rapport

13:50  5    with him.   I think I remember doing the testing first to let

6    him chill a little bit and then go back at him.

7        No, he never denied to me that he had a substance abuse

8    problem, and I think hopefully I put him at ease at some point

9    during that where he felt comfortable telling me things.

13:50 10   Q.    Dr. North, in particular, testified that noncompliance

11   with supervision was, I believe he said, a robustly supported

12   risk factor.   Do you agree with that assessment; and if so, why

13   doesn't that sway your opinion?

14   A.    Well, I mean, that's kind of lot like -- it's not a yes or

13:50 15   no.   Certainly, research has shown in the meta-analytic

16   research that noncompliance with supervision is a risk factor,

17   it is.   Now, okay, how big a risk factor?   Not much.

18        And here's the issue.   If you look at the updated meta --

19   I mentioned the '98 Hanson and Bussiere meta-analysis.   Fast

13:51 20   forward to the mid 2000s and there were updated Hanson

21   meta-analysis.   And what appeared at one point was a category

22   essentially antisocial lifestyle orientation or words to that

23   effect and grouped under it is a whole bunch of stuff and

24   that's where this kind of noncompliance of supervision becomes

13:51 25   one sub element of that; but in and of itself, it's not

J. Plaud - Direct Examination

13:51  1    predictive.  If you bunch it with a whole other predictor

2    variables, most importantly, antisocial personality disorder

3    being the main thing, yeah, it has some predictability; but in

4    and of itself, no.

13:51  5    Q.    Dr. Ross testified that she believes that 5 on the

6    Static-99 underestimated his risk of re-offense.  Do you agree

7    with her conclusion?

8    A.    I do not agree with her conclusion.

9    Q.    And why not?

13:52 10    A.    Well, I mean, that's just subjective.  I say it

11    underestimates his risk, okay?  So one says over and one says

12    under.  What's the basis for it?

13          I'll give you the numbers.  I present the re-offense

14    comparative numbers in my report and that's all I say.  I don't

13:52 15    say underestimates or overestimates because it's never about

16    predicting an individual's risk to re-offend.  That's a misuse

17    of the tool.  You just say people who score a 5 and if you want

18    to use a certain sub group to compare, which I don't, I use the

19    routine sample, all the data, that people who score a 5 over

13:52 20    five years in the routine samples re-offended at X percent, in

21    this case, it's 15 percent, 15.2 percent.  If I say I think

22    that's an underestimate.  Okay?  Put your money where your

23    mouth is.  Why?  I don't know.  I didn't hear any articulation

24    of reasons.

13:53 25    Q.    Dr. North testified that Mr. Charboneau's poor

J. Plaud - Direct Examination

13:53   1   problem-solving skills; that that risk factor essentially

2   eclipsed all other risk factors.  What is your response to

3   that, do you agree?

4       (Interruption due to fire alarm.)

13:55   5   BY MS. SHEA:

6   Q.   I had asked you about Dr. North's testimony that his --

7   that Mr. Charboneau has poor problem-solving skills, that risk

8   factor essentially eclipsed all other risk factors.  I was

9   hoping that you can respond with your take on that.

13:55  10   A.   Yeah, poor problem solving.  You know, there is a certain

11   jargon that is developed in the development of certain

12   instruments usually like the SR-AFV and things like that are

13   kind of experimental in nature.

14       Yeah, I would say -- I might even go so far as to say I

13:55  15   would agree that that has been historically an issue for him;

16   that he has had poor problem solving.

17       But, okay, does that mean -- how much more of a risk does

18   that make him?  And again, if you go back to the research, if

19   you go back to the Mann, et al research 2010, none of that in

13:56  20   and of itself is a significant predictor of risk, it's not.  So

21   I would acknowledge, yeah, I would agree, but that doesn't mean

22   sexually dangerous.  Especially, yeah, in the absence of a

23   paraphilia, a major personality disorder and the like.

24   Q.   Dr. Zinik commented on his direct examination that all of

13:56  25   Mr. Charboneau's violence appeared to be directed to women.

J. Plaud - Direct Examination

13:56    1    Did you hear his testimony about that?

2    A.    Yes.

3    Q.    First, do you agree; and second, does that factor into

4    your opinion?

13:56    5    A.    Well, I don't know that to be the case is probably the

6    easiest way to answer that question.  There is no way given the

7    data that I reviewed to even say that that's the case, so...

8    Q.    Dr. Zinik wrote in his report, and this is on page 23 of

9    his report, he wrote that Mr. Charboneau's sexual anxiety and

13:57   10    the fact that he has no ability to manage and control sexual

11    feelings when they do occur, especially under the influence of

12    alcohol, make him more sexually dangerous.

13        Do you agree with that?

14    A.    No, I don't remember agree with it.  And I certainly don't

13:57   15    think there's any way he can conclude that.

16        You know, I -- it bothers me a little bit, you know, no

17    ability.  How do you have no ability?  The man is a father to

18    children.  Has been in a relationship.  He has some ability.

19    And I'm certain in that relationship he certainly engaged in

13:57   20    appropriate sexual behavior.  So even going back in time, there

21    is some ability.  So I don't like those categoric ways to

22    describe things in, "no," so I would dismiss that.

23    Q.    But do you believe that his sexual anxiety makes him more

24    sexually dangerous?

13:58   25    A.    No.

J. Plaud - Direct Examination

13:58  1    Q.    Why not?

2    A.    Well, because I think the sexual anxiety -- I think he has

3    an element of overall anxiety in interpersonal relationships as

4    well as in general social functioning.  And has it caused him

13:58  5    to have difficulties in the past?  Yes, of course it's caused

6    him difficulties in the past.  May some of his drinking at

7    least be associated with a reduction in anxiety?  You know,

8    it's not out of the realm of possibility, too.

9         But again, how many layers do you want to -- the more you

13:58 10    go inside and try to make this stuff make sense, sounds good

11    psychologically, but I don't think we know.  It's not been

12    demonstrated in the evidence that that's necessarily the case.

13    You can make that conjecture, but you sure need to have more

14    data to support that.

13:59 15    Q.    Dr. Zinik writes in his report on page 25 that

16    Mr. Charboneau has 15 of 20 factors present on the SVR-20.  In

17    conclusion, he is a high risk in re-offending.

18         How much stock do you put into the SVR-20?

19    A.    I've used the SVR-20, but it's not an actuarial tool.

13:59 20    Although, it can be scored, but it generally isn't.  I don't

21    think it was in his case.

22         The SVR-20 is the 20 areas, 20 factors grouped in three

23    different areas relating to basically psychosocial adjustment,

24    sexual offense history and future planning.  You know, I've

13:59 25    used it myself to structure clinically my approach to cases,

J. Plaud - Direct Examination

13:59  1    but to use it as a risk assessment tool, I generally don't

2    think that's really what -- I'm not aware of any good research

3    to support that use.

4    Q.    So do you believe that having 15 of 20 factors present

14:00  5    would make him a sexually dangerous person?

6    A.    No.

7    Q.    Why not?

8    A.    It wasn't designed for that, to answer that question.  I

9    mean, I didn't score it so I don't even know if I agree with 15

14:00  10   of 20, so I would have to score it myself.

11   Q.    In conclusion, Dr. Plaud, what factors did you find most

12   significant in concluding that Mr. Charboneau does not meet

13   criteria as a sexually dangerous person?

14   A.    Well, my opinion is based on the following, kind of follow

14:00  15   the bouncing ball here.  Mr. Charboneau has engaged in

16   sexually-offensive behavior.  First when he was 22, 23 years

17   old.  Clearly, he has a substance abuse problem and a diagnosis

18   to go along with it.  He has engaged in sexual illegal behavior

19   on three or four occasions.  Over that period of time, two of

14:01  20   whom were family members.  Clearly, his alcohol abuse, as I

21   think earlier in life his inhalant abuse, has affected many

22   areas of his functioning, interpersonally, socially, legally,

23   sexually.  He has been criminally sanctioned and now here he is

24   at 57 years old, he's been sober for 13 years, he does not

14:01  25   suffer from a paraphilia, he does not suffer from any major

J. Plaud - Cross-Examination

14:01  1  personality disorder.  He has a substance abuse problem and a
       2  diagnosis.
       3       To be able to conclude in my judgment that he's sexually
       4  dangerous you would have to do that prognosticator's two step.
14:01  5  You would have to first conclude that it would be likely that
       6  he would relapse with alcohol; and as a result of that, he
       7  would then have serious difficulty in refraining from further
       8  acts of either child molestation or sexually violent conduct.
       9       Given the absence of any paraphilia or other disorder,
14:02 10  given his institutional history, given the ongoing evidence,
      11  we're coming up on a decade and a half of both general and
      12  behavioral regulation and control, given his current age of 57
      13  years of age, I am unable, and I want to underscore that four
      14  times, to conclude that he will have serious difficulty in
14:02 15  refraining at this time.  He is not sexually dangerous.
      16            MS. SHEA:  Thank you, Your Honor.  No more questions.
      17            THE COURT:  Cross-examination?
      18            MR. JAMES:  Thank you, Your Honor.
      19                      CROSS-EXAMINATION
14:02 20  BY MR. JAMES:
      21  Q.   Good afternoon, Dr. Plaud.
      22  A.   Good afternoon.
      23  Q.   Dr. Plaud, on direct examination you stated that with
      24  regard to the 1987 sexual assault, that Mr. Charboneau didn't
14:03 25  deny that he committed it, but he told you that he didn't

J. Plaud - Cross-Examination

14:03  1    remember?

       2    A.    Right.

       3    Q.    Right.  But that's not what you wrote in your report.  If

       4    you look at page 7 of your report, the last -- the paragraph

14:03  5    that begins August 12th, 1987, the last sentence, "During the

       6    clinical interview, Mr. Charboneau denied committing any

       7    sexually offensive behavior as described above."

       8    A.    Right.

       9    Q.    That described the same sexual assault that you told --

14:03 10    you testified he stated to you he didn't remember.

      11    A.    He didn't remember, that's what he told me.

      12    Q.    But then in your report you say he denied committing it.

      13    A.    Right.  He said, I don't think I did it, I don't remember.

      14    That's what he told me.  So there was an element of denial what

14:03 15    he said to me so I had to put it in as such, but I do recall

      16    him specifically him saying he didn't remember.

      17    Q.    You didn't put that in your report, though?

      18    A.    You're right.  I amend my report.

      19    Q.    You also testified that with regard to that denial you

14:04 20    stated that -- withdrawn -- that he did not deny to you during

      21    the clinical interview that he -- that he didn't have an

      22    alcohol problem or a substance abuse problem?

      23    A.    Correct.

      24    Q.    That he acknowledged that to you?

14:04 25    A.    Right.

J. Plaud - Cross-Examination

14:04  1    Q.    Now, you interviewed him on I believe it was February 9th?

       2    A.    February 9th, 2016.

       3    Q.    Okay.  And then about nine days later he was interviewed

       4    by Dr. Zinik and denied that he had an alcohol problem; is that

14:04  5    correct?

       6    A.    I came to learn that afterwards obviously, yes.

       7    Q.    And before you interviewed him on February 9th, Dr. North

       8    had interviewed him on January 19th, right?

       9    A.    If you say so.  I don't recall the date.

14:05 10    Q.    Well, for the record, it is in Dr. North's report.

      11    A.    Okay.

      12    Q.    If you could go back to that, that's Exhibit 3, it's on

      13    the first page.

      14    A.    I take your word for it.

14:05 15    Q.    In that report, Dr. North interviewed him on January 19th.

      16    A.    Okay.

      17    Q.    And he denied to Dr. North that he had an alcohol problem.

      18    A.    I came to learn that as well after my interview; that's

      19    correct.

14:05 20    Q.    So is it concerning to you that he's saying these very

      21    inconsistent diametrically opposite, find diametrically

      22    opposite information through different experts in a short

      23    timeframe?

      24    A.    I would make two observations in answer to your question.

14:05 25    Number one, I wasn't there.  I know what he told me.  I don't

J. Plaud - Cross-Examination

14:05  1  know how the questions were asked, I don't know how his rapport

2  was with them.  I don't know how he received them.  So, you

3  know, it could have been a function of him being nervous and

4  withdrawn.  I don't know.

14:06  5      All I know is what he told me and that did not involve him

6  denying a substance abuse problem.  That's all I can tell you.

7  They can speak for themselves.

8  Q.   That's fine.  With regard to problem solving being an

9  issue that Mr. Charboneau struggles, you were asked on direct

14:06  10 examination regarding Dr. North's analysis if that was one of

11 the bigger problems that Mr. Charboneau had.

12 A.   Right.

13 Q.   And I believe you agreed that he has a -- problem solving

14 was an issue that Mr. Charboneau does have.

14:06  15 A.   Sure.

16 Q.   And then I believe you went on to criticize it as a factor

17 supported by research; is that fair?

18 A.   No, I don't think that's fair.  What I said was it is a

19 factor identified, but in and of itself it's not, if you want

14:07  20 to use the term robust, a robust predictor.  In other words, if

21 you say someone is a poor problem solver so you're 40 percent

22 of the way to being able to determine if someone is sexually

23 dangerous, that would be a robust or significant predictor.

24 It's not that.  It's not anywhere near that.

14:07  25 Q.   You would agree, however, that in combination with other

J. Plaud - Cross-Examination

14:07  1    factors it does?

       2    A.    Yeah.  That's what I testified to.  I said if you put it

       3    in context with a whole bunch of other things --

       4    Q.    Such as --

14:07  5    A.    Go ahead.

       6    Q.    One factor that is robust statistically is supervision

       7    failure; is that correct?

       8    A.    I wouldn't say it's robust.  It is a factor.

       9    Q.    In the Mann study, the 2010 study, in the 2010 Mann study,

14:07 10    they list a number of empirically supported factors, right?

      11    A.    That's right.

      12    Q.    And of the number of empirically supported factors,

      13    supervision failure is one of the more robust ones, isn't it?

      14    A.    It is, but you have to -- I don't have the article in

14:08 15    front of me.  I believe they present Cohen's statistics in

      16    these factors.  Do you have that?  If you can give that to me,

      17    I can answer your question hopefully.  I don't have it to

      18    memory right now.

      19    Q.    Do you recall that is one of the more robust factors?

14:08 20    A.    Well, relatively speaking.  In and of itself, it is not

      21    predictive.

      22    Q.    I understand.  That wasn't my question, though, whether it

      23    in and of itself it was.

      24          My question was whether it was one of the more robust

14:08 25    ones.

J. Plaud - Cross-Examination

14:08  1    A.    It's one.

       2    Q.    Now, when you combine that with other empirically

       3    supportive factors, then you have greater predictor factors,

       4    wouldn't you?

14:08  5    A.    Potentially.

       6    Q.    And you have more than one that indicates on

       7    Mr. Charboneau, wouldn't you agree?

       8    A.    You have some risk factors that you can describe, yes.  I

       9    think they were described by the experts.

14:09 10    Q.    Now, on direct examination you were asked by Ms. Shea

      11    regarding the 2014 family letter and whether it would impact

      12    your analysis, and paraphrasing you, you said it would not

      13    because they're not experts, talking about the family,

      14    obviously.

14:09 15          And would you agree, though, that a lack of support is

      16    relevant in the sense that if he were to be -- if

      17    Mr. Charboneau were to be released by the Court, he doesn't

      18    have that protective factor where the person has family

      19    supporting them through their recovery on their time while on

14:09 20    supervision to help lessen their sexually dangerousness?

      21    A.    Mr. James, you can't have it both ways.  If you had the

      22    family support you would be saying wasn't he offending when he

      23    was around this family, isn't this a risk factor?  This is what

      24    happens.  And then you say, well, he doesn't have the family

14:10 25    support, isn't that a risk factor, he doesn't have family

J. Plaud - Cross-Examination

| | | |
|---|---|---|
| 14:10 | 1 | support?  I think I'd rather have him not going back to that |
| | 2 | family.  I don't think he ever really functioned very well |
| | 3 | after age 12 within the context of that family environment. |
| | 4 | So no, I don't think that particular family, for goodness |
| 14:10 | 5 | or whatever else, would be a good place for him to ever go back |
| | 6 | to. |
| | 7 | Q.  Now, with regard to treatment, you reference that two |
| | 8 | years supervised release and outpatient treatment would be |
| | 9 | available to Mr. Charboneau? |
| 14:10 | 10 | A.  Correct. |
| | 11 | Q.  Now, you said with regard to treatment, you look for the |
| | 12 | least restrictive, is that -- am I paraphrasing your testimony |
| | 13 | correctly? |
| | 14 | A.  Yes.  To meet level of service needs in the least |
| 14:10 | 15 | restrictive environment given the risk factors involved, that's |
| | 16 | really a key ethical manner of decision-making. |
| | 17 | Q.  Now, he was in the least restrictive treatment when he was |
| | 18 | out between 2000 and 2003; is that correct? |
| | 19 | A.  He was. |
| 14:11 | 20 | Q.  And he clearly sexually re-offended? |
| | 21 | A.  He did re-offend. |
| | 22 | Q.  How long did you interview Mr. Charboneau? |
| | 23 | A.  I don't recall specifically.  It goes back -- I must have |
| | 24 | spent at least in total of four hours or so with him. |
| 14:11 | 25 | Q.  So four hours? |

J. Plaud - Cross-Examination

14:11  1    A.    Maybe longer.

       2    Q.    We won't hold you to that.

       3    A.    Please don't.

       4    Q.    Okay.  So at least four hours with him, right?

14:11  5    A.    Right.

       6    Q.    Now, you were also a treatment provider?

       7    A.    Correct.

       8    Q.    In fact, I think in your CV it says from 1994, and it

       9    still says to present, you were providing services as a

14:11  10   clinical psychologist and a supervisor -- I don't know if

       11   that's -- you tell me if that's still correct -- in North

       12   Dakota?

       13   A.    The great state of North Dakota.  I did.  I was on faculty

       14   at the University of North Dakota in the psychology department.

14:12  15   I went back into academia and it's a long story I don't want to

       16   get into.

       17   Q.    Well, okay.  I don't need the long story because the Court

       18   does have to leave at 3:00.  But you were in the STOP program,

       19   S-T-O-P program in North Dakota?

14:12  20   A.    Well, I wasn't in it.  But I designed it, if that's what

       21   you're asking.

       22   Q.    Right.  Your CV still says from 1994 to present.  Is that

       23   correct?

       24   A.    Yeah.  I still occasionally consult -- it was my program,

14:12  25   I created the program.  It stood for the Specialized Treatment

J. Plaud - Cross-Examination

14:12  1  of Offenders Program.  It was a statewide treatment program of

2  sex offenders in the State of North Dakota who also had a

3  history of developmental disabilities and autism.  In other

4  words, they were not being served in the typical prison

14:13  5  settings and they were getting lost in the system.  So as a

6  faculty member, I was consulting with the North Dakota

7  Developmental Center, which is what we called it then, ICFMR,

8  Intervening Care Facility Mental Retardation.  It was an

9  inpatient; it was a locked facility.  And I was asked by the

14:13  10  state to design a program, treatment program for sex offenders

11  who we could then get into a program to have services because

12  they couldn't benefit from treatment in the prisons, in jails

13  of North Dakota.  That's what the program is.

14  Q.   And that was a locked facility, you testified?

14:13  15  A.   It was.

16  Q.   Now, with regard to while you were treating sex offenders

17  in that program, you saw them daily, right?

18  A.   I didn't see them daily.  I had a full-time job at the

19  University.  I had students there.  I consulted once or twice a

14:13  20  week.  It was about 40 miles away.

21  Q.   Your staff saw them there?

22  A.   Oh, yes.

23  Q.   And your staff interacted with them there?

24  A.   Correct.

14:14  25  Q.   Much of the way that Dr. Holden interacts with

J. Plaud - Cross-Examination

14:14  1    Mr. Charboneau at the CTP?

2    A.    No doubt.

3    Q.    All right.  And so you would agree, would you not, that

4    the treatment provider who has daily access to the individual,

14:14  5    who can observe the individual, would have greater insights to

6    the person's treatment needs say as someone who shows up for a

7    four-hour interview?

8    A.    I would say in ordinary circumstances I would go with the

9    treatment provider, yes.

14:14 10    Q.    All right.  Now, you would agree that the therapeutic

11    alliance or relationship between a treating provider and a

12    patient is a very important thing?

13    A.    It is a foundational element, yes.

14    Q.    So when that alliance is made between the person who is in

14:15 15    treatment and the patient -- and the patient starts opening up,

16    finally revealing themselves to that person, that's a very

17    important thing?

18    A.    It can be.

19    Q.    And in the case of Mr. Charboneau, with his

14:15 20    well-documented neurocognitive disorders or his personality

21    being very closed apparently while he's sober, for him to open

22    up, that's a big thing, not a small thing?

23    A.    I think to start he's had some problems opening up to

24    people, yeah.

14:15 25    Q.    So it's true if he were to be released, that would be a

J. Plaud - Cross-Examination

14:15  1  setback in terms of his own treatment, wouldn't you agree?

2  A.   I wouldn't put it in those terms of setback.  It would

3  present some challenges probably to him; but certainly, I don't

4  think any challenge that couldn't be overcome.

14:16  5  Q.   All right.  Now, you testified that on examination Ms.

6  Shea asked you about Dr. Ross' report about the communal aspect

7  of the victims and I -- I believe you said that would lessen

8  his sexual offending.

9      Now, isn't that contrary, though, to the earlier part of

14:16  10  your testimony when you talked about the victim in 1982, that

11  he didn't really know that she was a relative of his at the

12  time?

13  A.   Well, I'm not quite sure of your question.  I said in my

14  testimony I don't consider him a classic incest offender noting

14:16  15  that two of his victims were, though, family members.

16      Where I think that enters my analysis about the family

17  members part is that, again, it -- I think it speaks to issues

18  of volitional capacity even at that time.  Again, we're all

19  basically in agreement of the fact that he was a very active

14:17  20  and consistent alcohol abuser at that period of time.  And --

21  and his offenses, especially during that time, we'll talk about

22  the last two, the ones that are closest in time, involved not

23  him going out and getting stranger victims, acting impulsive in

24  that way, which would, again, be a signal of volitional

14:17  25  difficulties, right?  No.  They were in the confines of his

J. Plaud - Cross-Examination

14:17  1    family environment where he's more familiar, where he has a

2    relationship already, et cetera.

3         I think that actually it's hard to say it's a positive

4    factor because how do you say that about a sex offender?  But I

14:18  5    think you understand what I'm saying.  It means he's not just

6    out there hanging around alleys and getting drunk in a bar and

7    then going out in the alley and waiting for women because he's

8    lost control of himself sexually.  That's what I was referring

9    to.

14:18 10    Q.   When you testified regarding Mr. Charboneau's excellent

11    behavioral control in institutions, you -- in reviewing all the

12    data, there's nothing in the reports that have been provided

13    that indicated that he was a trouble inmate back in '82 when he

14    was serving his sentence or back in 1990s, 2000 while serving a

14:18 15    sentence; is that correct?

16    A.   I indicated as much on my direct testimony.

17    Q.   So he's always had fairly good institutional control while

18    he's in that sort of a structure?

19    A.   Yes.

14:18 20         THE WITNESS:  If I may indulge the Court a bit, I'm

21    waterless.

22    BY MR. JAMES:

23    Q.   Your answer to my question was a yes?

24    A.   Right.

14:19 25    Q.   Now, the record also shows clearly that every time he's

J. Plaud - Cross-Examination

14:19  1    been unstructured, in the community, right, because he has

2    been -- let me back up for just a second.

3        He has been in institutions for numerous years?

4    A.   Yes.

14:19  5    Q.   You got numerous 10 years stretches, 13, I think the

6    current 13-year stretch, right?

7    A.   Right.

8    Q.   So he's been out of the community for a significant period

9    of his life?

14:19  10   A.   I would say, yeah, he has been.

11   Q.   When he has been out in the community, he has not been

12   sexually offense-free for significant periods of time; wouldn't

13   that be a fair statement?

14   A.   Well, the most recent it appears that was a period of

14:20  15   time, again, I don't want to make that a basis for any of my

16   opinions, but since you're asking me the question, there was a

17   period of time that he was offense-free in the community going

18   back in time most recently.

19   Q.   Okay.  My question was significant period of time.  Do you

14:20  20   think there was a significant period of time where he remained

21   offense-free?

22   A.   I'm not saying it's a significant period.  I don't think

23   three years is a significant period of time.  No, I never wrote

24   a sentence in my report about that, but I would note three

14:20  25   years -- most offenders that have lack of volition of

J. Plaud - Cross-Examination

14:20  1    recidivism, most of the offending occurs within the first year.

       2    So it is what it is.

       3    Q.   Now, with regard to Prong 2, and the Court asked you some

       4    questions and so did Ms. Shea regarding whether prong to in and

14:20  5    of itself would qualify, in your opinion, as a serious mental

       6    illness, abnormality or disorder, and what I took from your

       7    testimony, it seemed to me -- I don't want to use the word

       8    hedge -- you stated that, well, it would have to be something,

       9    with something else, a co-morbid other diagnosis; in other

14:21 10    words, whether it's paraphilia or with a personality disorder

      11    and that that would be a stronger case in which you would

      12    consider alcohol abuse disorder a serious mental illness,

      13    abnormality or disorder?

      14    A.   You're half right.  That was the second part of my answer.

14:21 15    The first part was it could in and of itself if there was more

      16    concordance, more data to suggest and point to the conclusion.

      17    If A, then B, to use basic logical notation.  And we don't have

      18    this in the case of Blake Charboneau.

      19    Q.   So let me ask you an example.  Is it your opinion that

14:22 20    Mr. Charboneau would have to consume alcohol and walk out and

      21    if he sees a woman and because now he's -- when I say "consume

      22    alcohol," I mean intoxicated and drunk -- and he sees a woman,

      23    so he slaps the woman and he rapes the woman.  And then he's --

      24    let's say he's not arrested that day, let's say he stumbles

14:22 25    home or whatever, then the next day he consumes alcohol again

J. Plaud - Cross-Examination

14:22   1   and he walks out to wherever he's at and sees a woman and then
        2   he grabs that woman and rapes that woman, is that the type of
        3   example you're saying that would cause you then to opine that
        4   that person is now sexually dangerous pursuant to the Adam
14:22   5   Walsh Act if they have an alcohol abuse disorder?
        6   A.   I think you're putting that in one end of the continuum.
        7   It doesn't even have to be that.  It just has to be
        8   significantly greater instances of sexually deregulation.
        9   Doesn't have to mean that he's raping women, but he's grabbing
14:23  10   women, he's engaging in a bunch of risk behavior every time he
       11   drinks.
       12       I mean, there is no certain instances of three or four
       13   over a long period of time with sexual assaults with
       14   Mr. Charboneau.  How many times do you think he's been
14:23  15   intoxicated during his lifetime?  How many instances and what's
       16   the correlation of him being intoxicated and him attempting to
       17   engage, not even -- just attempting to engage in sexually
       18   inappropriate behavior?  Well, we don't know the answer to that
       19   question, but we don't know enough to say that there's
14:23  20   indication that that was even back then how he was.
       21       Did he at certain points do that?  Yes.  Did he also
       22   engage in other illegal behaviors when he was intoxicated that
       23   had nothing to do with sexual behavior?  Yes.  I counted over
       24   20 instances that I think I put in my report.
14:24  25       So the weight would be in the nonsexual area when he was

J. Plaud - Cross-Examination

14:24  1  intoxicated.  And if you say, well, jeez, let's count out the
       2  time he was in the community because I think the guy was drunk
       3  a thousand times.  Well, then it's a very low correlation
       4  between that and acting out in a sexually inappropriate manner.
14:24  5  So I mean, you have to put it in terms of this whole context
       6  and not say every time he's out he's re-offending.
       7  Q.    Well, in this whole context, even in the nonsexual
       8  offenses, he's convicted and many of these offenses he's
       9  serving 30 days, 25 days, 50 days, so you have a number of
14:24 10  periods which even these numerous small periods he is in
      11  custody; isn't that correct?
      12  A.    Uhm-uhm.
      13  Q.    So then we do have the 1987 sexual -- attempted sexual
      14  assault for which he was not convicted of that, but you were
14:25 15  present when he testified that he, in fact, committed?
      16  A.    I was present.
      17  Q.    Well, do you believe that he actually committed it?
      18  A.    I took it -- did I not put it in as a sexual offense in my
      19  report?  I did.  I don't believe he remembers.
14:25 20  Q.    So you think he's untruthful when he testified under oath?
      21  A.    I just think he's nervous and said yes to just about
      22  anything.  Like I said, I think if you asked him if he was on
      23  the grassy knoll, he probably would have said yes.
      24  Q.    You were present when he testified about going to AA.  He
14:25 25  testified that Dr. Holden didn't recommend it.  He didn't go

J. Plaud - Cross-Examination

14:25  1    because of Dr. Holden, he went on his own.  Do you believe him?

       2    A.    I don't know.  I don't know what the truth of it is.

       3    Q.    Well, I mean, if he's someone who will do whatever someone

       4    says, then when he testifies that he did it on his own, are you

14:25  5    crediting his testimony that he --

       6            THE COURT:  Mr. James, next question.

       7    BY MR. JAMES:

       8    Q.    You had a chance to read Mr. Charboneau's deposition; is

       9    that correct?

14:26 10    A.    I did.

      11    Q.    And you're aware that he testified with regard to alcohol

      12    in the BOP, he talked about being at four different

      13    institutions.

      14    A.    Correct.

14:26 15    Q.    Wisconsin, Rochester, Butner.  And with regard to hooch in

      16    prison he testified that he testified that he didn't see it; is

      17    that correct?

      18    A.    That's right.

      19            MR. JAMES:  May I just have one moment, Judge?

14:27 20            THE COURT:  You may.

      21    BY MR. JAMES:

      22    Q.    You would agree that Mr. Charboneau's alcohol abuse

      23    disorder, which you have found, is a severe mental disorder; is

      24    that correct?

14:27 25    A.    Yes.

J. Plaud - Cross-Examination

14:27 1    Q.    In fact, severe in a controlled environment?

2    A.    Correct.

3    Q.    Just like the others testified?

4    A.    As I said, there's really no disparity among all the

14:27 5    experts diagnostically.  We're pretty much singing the same

6    tune.

7    Q.    So you agree with Prong 1?

8    A.    Yes.

9    Q.    And on Prong 2 you find the disorder, but in your opinion

14:27 10    it's not a serious mental illness, abnormality or disorder; is

11    that correct?

12    A.    In this case, given the facts, I have difficulty making

13    that conclusion, that's correct.

14    Q.    You agree that it's likely that if Mr. Charboneau was

14:28 15    released that he would drink?

16    A.    I didn't say "likely."  I said it would be more likely,

17    but you know, I have some hope for him given his current age,

18    institutional history and some of the things that he told me

19    during the interview as well as on the witness stand, I think

14:28 20    he's certainly aware of the situations and I think he's going

21    to try.  And I'm glad he has supervised release because I think

22    you're going to help him to try.  So you know, would it shock

23    me if he had a drink?  No.

24    Q.    Now, do you agree with me that it's more likely that if

14:28 25    released and if he does drink that he would become intoxicated?

J. Plaud - Cross-Examination

14:28  1    A.    That if he drank he would become intoxicated?

2    Q.    Yes.

3    A.    Yes.

4    Q.    Do you agree that it's more likely that if he did drink

14:28  5    and become intoxicated he would commit crimes such as being

6    arrested for public intoxication?

7    A.    He could.  It's possible.

8    Q.    Do you agree that it's more likely if he were released and

9    were drinking he would be convicted of a crime such as

14:29  10   disorderly conduct?

11   A.    It's possible.

12   Q.    And do you agree it is more likely that if he were

13   arrested he would be convicted of a crime resisting lawful

14   arrest?

14:29  15   A.    Anything is possible.

16   Q.    And do you agree that it's more likely that if he was

17   released and he did drink that he would, in fact, commit a

18   sexual crime?

19   A.    No, that's -- I'm not there.  No, I don't agree.

14:29  20             MR. JAMES:  May I have just a moment, Your Honor?

21             THE COURT:  You may.

22        (Counsel conferring.)

23   BY MR. JAMES:

24   Q.    Just a few questions, Doctor.

14:30  25             You looked at the federal regulations at 28 CFR 549.92; is

J. Plaud – Cross-Examination

14:30  1    that correct?

       2    A.    Yes.

       3    Q.    And that's at page 10 in your report?

       4    A.    Correct.

14:30  5    Q.    And you would agree that Mr. Charboneau has used or used

       6    force against his victims?

       7    A.    Yes.

       8    Q.    And you would agree that he threatened to place the victim

       9    in fear that the victim would be harmed if they did not concede

14:30 10    to his sexual wishes?

      11    A.    Yeah, I found that he's engaged in sexually violent

      12    conduct.  I'm not disputing that.

      13    Q.    In fact, you agree that Mr. Charboneau has engaged in such

      14    conduct where the victim was incapable of appraising the nature

14:31 15    of the conduct, right?

      16    A.    Yeah, I said Prong 1 is met.  He engaged in sexually

      17    violent conduct, yes.

      18    Q.    And you agree that he has engaged in acts of child

      19    molestation?

14:31 20    A.    That's his daughter, yes.

      21    Q.    You agree that he has offended while on supervision?

      22    A.    Yes.

      23    Q.    And he has engaged in offenses while likely to be caught?

      24    A.    He has.

14:31 25    Q.    And that he has not successfully completed sex offender

14:31  1    treatment?

       2    A.    He has not.

       3              MR. JAMES:  No further questions, Your Honor.

       4              THE COURT:  Thank you.

14:31  5              Any redirect?

       6              MS. SHEA:  No redirect, Your Honor.

       7              THE COURT:  Thank you, Doctor.  Please watch your

       8    step stepping down.

       9              If counsel could approach.

14:32 10         (Ms. Shea and Mr. James approached the bench.)

      11              MS. SHEA:  Your Honor, at this time the defense

      12    rests.

      13              THE COURT:  The Respondent has rested and I will now

      14    hear closing arguments from the Government.

14:33 15              MR. JAMES:  Thank you, Judge.

      16              Your Honor, in this case the United States believes

      17    that we have proved by clear and convincing evidence that

      18    Mr. Charboneau, one, suffers -- well, one, he has engaged or

      19    attempted to engage in acts of violence and child molestation,

14:33 20    and that's Prong 1 and nobody disputes that, so I won't go any

      21    further.

      22              With Prong 2, we believe we proved by clear and

      23    convincing evidence that he does suffer from severe mental

      24    illness, abnormality or disorder.

14:33 25              And in saying that, Judge, I believe the contentions

14:33  1  from the Respondent, it was in the opening argument and the
      2  questioning, is that essentially he does not suffer from a
      3  paraphilia and since he doesn't suffer from a paraphilia, that
      4  that somehow lessens his sexual dangerousness.

14:33  5          Well, this Court has, in *United States versus*
      6  *Goshay* looked at that, examined that issue and found that, in
      7  fact, that alcohol abuse disorder does qualify as a serious
      8  mental illness, abnormality or disorder.  The case number is
      9  5:082051-VR.  That's in the *Goshay* case and the order is at
14:34 10  Docket Entry 91 under that case.

      11          And has Mr. Charboneau's alcohol abuse disorder, has
      12  it been severe?  Of course it has.  Every expert says so.  Has
      13  it negatively impacted his life?  He has spent decades while
      14  incarcerated because of it.  It has caused his sexual offending
14:34 15  because it disinhibits Mr. Charboneau and that's what the bulk
      16  of the expert testimony is.  And when he does that to such an
      17  extent that he cannot control himself, he -- he while
      18  intoxicated sexually assaulted a woman in 1982, his daughter in
      19  1988.  In fact, he felt something coming over himself and from
14:35 20  the testimony and interviews he could not control himself.
      21  Now, and again in 1987, although this was not a convicted
      22  offense, for the first time he now admits before the Court
      23  that, yes, he committed it.  In 2016, he finally admitted that,
      24  well, he actually went into the woman's home.  Now, Dr. Plaud
14:35 25  may downplay that, but, one, I would submit to the Court that

14:36  1    when Mr. Charboneau is testifying wholeheartedly he remembers

       2    that, I believe that is a witness stand conversion.  He's

       3    always known he's committed the offense.  He doesn't try to

       4    deny it, but because now of civil commitment he wants to show

14:36  5    that he is better and more understanding and has greater

       6    insight, although he is only in the second stage of the

       7    treatment program that now he says to you, to the Court, that

       8    now he remembers it.

       9             Then, of course, 1988 and then 2003.  And 2003 is

14:36 10    very significant because he was out in the community after

      11    serving a very long stretch, a very long stretch of prison.  So

      12    he's in the community and when he's in a structured

      13    environment, he does somewhat well.  And when that was loosened

      14    and he was then allowed to go to his own apartment, he drank

14:36 15    again.  And then I -- during supervision he's tested, he's

      16    tested that same day.  After he passes the test, he consumes

      17    alcohol and commits a sexual offense and now he's in custody.

      18             And the argument, well, he's been straight for 13

      19    years.  Well, every expert testifies, including Dr. Plaud, his

14:37 20    records show he's always well-managed, well-behaved while he's

      21    in a structured environment in custody.

      22             The records before the Court show that we believe

      23    that Mr. Charboneau will have serious difficulty in refraining.

      24    There's nothing in his background that would show that he would

14:37 25    not if he were released.

| | | |
|---|---|---|
| 14:37 | 1 | He is also now in treatment and it would be a setback |
| | 2 | for Mr. Charboneau, A, if this Court were to release him |
| | 3 | because, one, he is sexually dangerous.  We believe we proved |
| | 4 | that by clear and convincing evidence; but two, he is in |
| 14:38 | 5 | treatment, and for the Court to remove that from him would |
| | 6 | negatively impact him.  It would impact the community for which |
| | 7 | he would be sent back to; and more importantly, the Adam Wash |
| | 8 | Act is for the safety of the community, it's not just for the |
| | 9 | treatment of the individual, and the community would not be |
| 14:38 | 10 | safe if this Court were to release Mr. Charboneau. |
| | 11 | Thank you, Your Honor. |
| | 12 | THE COURT:  Thank you, Mr. James. |
| | 13 | Ms. Shea? |
| | 14 | MS. SHEA:  Thank you, Your Honor. |
| 14:38 | 15 | Judge, in this case the Government's theory of |
| | 16 | dangerousness rests on the idea that Mr. Charboneau will have |
| | 17 | serious difficulty refraining from drinking.  Everyone agrees |
| | 18 | when he is sober he is not at risk to anyone.  He is not at |
| | 19 | risk to the community at all.  So it requires this |
| 14:39 | 20 | prognosticator's two-step that Dr. Plaud was talking about. |
| | 21 | First, the Government has to show that he would have |
| | 22 | serious difficulty refraining from drinking and then they have |
| | 23 | to show that his serious difficulty refraining from drinking |
| | 24 | would cause him serious difficulty refraining from sexually |
| 14:39 | 25 | violent conduct or child molestation. |

14:39   1          And I think everyone pretty much agrees with that;

2      that that is the Government's theory in this case, this

3      two-step theory.  And Dr. Zinik I believe admitted to that on

4      the stand as well.  He talked about how, first, Mr. Charboneau

14:39   5      has to get drunk; second, he has to become sexually aroused;

6      third, he has to be in the presence of a female, and then he's

7      dangerous.

8          But it's very conditional, Judge.  It has -- their

9      theory of dangerously is predicated on so many other things

14:39  10      happening and this does go directly to their ability to prove

11      their case by clear and convincing evidence.

12          The statute, in explaining what the Government has to

13      prove, it says the Government has to prove a serious mental

14      disorder and then as a result of which causes serious

14:40  15      difficulty refraining.  That "as a result of which" I think is

16      really the thrust of this case.  Can they prove a causal link

17      between his alcoholism and his serious difficulty refraining

18      from sexually re-offending.

19          And Judge, I think that this is something that the

14:40  20      other District Court Judges in this district have wrestled

21      with.  The Fourth Circuit, as far as my colleague and I can

22      find over this week, has not addressed this issue as to whether

23      alcoholism alone is enough.

24          There is one case that the Court has undoubtedly

14:40  25      read, which is United States versus *Antone* and it's very

14:40 1    instructive, we believe, in this case and we think it controls

2    and necessarily leads to a finding against the Government in

3    this case.

4        I do want to point out in *Antone* that the Respondent

14:41 5    in that case did not appeal whether or not Prong 2 was met.  So

6    the Fourth Circuit did not have occasion to decide whether or

7    not alcoholism would be enough to commit someone under the Adam

8    Walsh Act.  They specifically say that we are not addressing

9    that question.

14:41 10        But I want to point out some of this struggle that

11    I'm talking about, struggle with whether or not alcoholism is

12    enough.  So in *Antone*, I'm sure the Court's familiar with the

13    history that that was the case that Magistrate Judge Gates

14    actually had the first hearing and then Judge Flanagan came to

14:41 15    a different conclusion.

16        But in Judge Gates' order, and this is in *United*

17    *States vs. Antone*, 732 F.3d 151 (4th Cir. 2014) at page 163,

18    Judge Gates is citing Dr. Gutierrez, who is the BOP doctor in

19    that case, that substance abuse diagnosis alone could not

14:42 20    essentially stand by itself for civil commitment.  In this

21    case, the Government put forth a personality disorder as well,

22    which the Court declined to adopt.  But they were talking about

23    this.  And this is something that I think courts are wrestling

24    with, is that enough to commit someone based on alcoholism?

14:42 25        Other judges have wrestled with it as well.  Judge

14:42   1   Howard had two cases where this came up, this topic comes up,

        2   which was *United States versus Julius*, and *United States versus*

        3   *Sneezer*.  In both of those cases, Judge, Judge Howard found

        4   against the Government and in favor of the Respondent.  Both of

14:42   5   those were instances where the Respondents committed sex

        6   offenses under the influence of alcohol, and I think that Judge

        7   Howard says that he struggled with it.  In both of these

        8   orders, they use very similar language in *Julius* and *Sneezer*.

        9   But he says, the Court need not decide in this case whether an

14:43  10   antisocial personality disorder or substance abuse in

       11   combination or in isolation constitutes a serious mental

       12   disorder sufficient to civilly commit an individual under

       13   Section 4248 because even assuming that they have, the third

       14   prong isn't met.

14:43  15           Similarly, Judge Boyle in the case of *United States*

       16   *versus Clifford Begay*, B-E-G-A-Y, he found -- that was another

       17   case where the Respondent was someone who was a drinker and had

       18   committed sexual assaults while drinking -- under his

       19   discussion of alcoholism he says, Each of the testifying

14:43  20   experts opine to Mr. Begay either currently suffers from

       21   alcohol, cannabis dependence or he suffers from those, but is

       22   in remission.  None of the experts, however, opines that either

       23   alcohol dependence or cannabis dependence constitutes a serious

       24   mental disorder for purposes of the Adam Wash Act.

14:44  25   Accordingly, the Court finds the Government has not shown by

14:44  1    clear and convincing evidence his alcohol, cannabis dependence

2    constitutes serious mental disorders.  And in his -- he

3    footnotes that and says, To find to the contrary may well test

4    the limits of what Congress contemplated when requiring that

14:44  5    Section 4248 Respondent suffer from a serious mental disorder.

6         I think that the judges really are wrestling with

7    this.  I'd be remiss if I didn't point out *Goshay*, which

8    opposing counsel has already pointed out.  That is the only

9    case that we have found in our district where any of our judges

14:44 10    have found that alcohol use alone constitutes enough to meet

11    Prong 2.  But Judge, I have to point out a couple things about

12    that opinion.  First, I'm not conceding that it was deciding

13    correctly and of course it offers you no preferential value;

14    but second, Mr. Goshay had no one even testify on his behalf.

14:45 15    He had no doctor testify on his behalf.  It was only the

16    Government that called witnesses in that case.

17              THE COURT:  Did he get committed and did not appeal?

18              MS. SHEA:  He did not appeal, Judge.  There is no

19    opinion that affirms this decision or affirms the analysis in

14:45 20    it.

21         But I also think it's noteworthy to distinguish

22    Mr. Goshay from Mr. Charboneau.  Mr. Goshay was drinking in

23    prison, Judge.  He was drinking in the BOP.  So I think even if

24    the Court wants to credit this opinion and does believe that it

14:45 25    came to the right conclusion, I think it is a very different

14:45 1  scenario than the scenario that is before this Court.

2       I think that the reason why not having a paraphilia

3  makes the causal link more attenuating, it's because with a

4  paraphilia, paraphilia is directly related to sexual offending,

14:46 5  it's what the disorder is, it's an arousal to something that's

6  deviant.  So, of course, it's in the causal chain.

7       With alcoholism that causal chain necessarily becomes

8  attenuated because the disorder does not necessarily have

9  anything to do with sex offending.

14:46 10      But I think for Mr. Charboneau in this case we're not

11  saying that the Court has to say that alcoholism is never

12  enough to meet Prong 2.  We're saying that in this case, they

13  simply have not shown that.  So already the causal link is

14  attenuated.  But then, here, in light of the evidence that's in

14:46 15  the record before this Court, they simply have not shown it.

16  So other things that make it attenuated, one is that he has so

17  many other kinds of convictions other than sex offenses.

18      I don't think this can be understated, Judge.  That

19  means he's either drunk all the time and that that manifests

14:47 20  itself in many different ways.  That weakens the causal chain.

21  It shows that alcoholism does not necessarily have an effect on

22  his volitional control with respect to sex offending.  And I

23  think the record before this Court as to what happened in 2000

24  to 2003, either he's not really drinking at all, except for a

14:47 25  couple of times, which shows that he does have an ability to

14:47  1    control his drinking, he does have the ability to refrain from

2    alcohol or he is drinking all the time and not offending.  I

3    think either way, it's making the causal chain even more

4    attenuated.

14:47  5              But I also can't understate the importance of age in

6    this case, the importance of how long ago it's been he's had a

7    sex offense and his perfect behavior in prison.

8              Judge, he's been sober for 13 years, he's been

9    completely compliant.  This is someone who has caused no

14:48 10    disruptions whatsoever in the last 13 years.  He's willing to

11    do treatment.  I don't think that should be held against him.

12    I think the fact he's open to it is a positive thing.

13              And I would also point out that in *Antone*, the reason

14    that the Fourth Circuit reversed Judge Flanagan is because the

14:48 15    Government experts that she relied upon did exactly what the

16    Government experts in this case have done, which is ignore the

17    past 13 years.  It's actually about the same amount of time

18    that the Government experts there are ignoring as the

19    Government experts here are.  This is in *United States versus*

14:48 20    *Antone* on page 165, it's talking about how they are reluctant

21    to reverse courts in these cases.  And it says:  This is

22    precisely what's at stake here.  Our review of the lower court

23    opinion leads us to conclude that the District Court's

24    inadequate consideration of certain substantial evidence,

14:49 25    namely Antone's behavior in the past 14 years or so,

14:49  1   constitutes reversible error.  Our subsequent analysis of the

       2   evidentiary record leaves us with a definite and firm

       3   conviction that Antone's commitment should be reversed.

       4          That's what we are doing here, Judge.  He's a perfect

14:49  5   inmate.  He's doing perfectly, he's sober, he's thinking

       6   clearly.  There is no evidence currently that his alcoholism

       7   has such a grip on him that it would lead him to serious

       8   difficulty refraining from sexual re-offending.

       9          I think there have been several red herrings that

14:49 10   have been thrown out during this hearing that I think the Court

      11   should discredit and not give a lot of weight to, certainly not

      12   hinge on a decision committing upon.

      13          I think the letter from 2014, the family members'

      14   letter, I think Dr. Plaud said it perfectly.  They are not

14:50 15   doctors.  That is completely within their rights for not

      16   wanting Mr. Charboneau to come back and be with them, but that

      17   should not lead to a finding of dangerousness.

      18          I think there's been a lot of testimony about

      19   impeding his progress in treatment.  Judge, the question before

14:50 20   this Court is not whether he is going to be better off in

      21   treatment for the next four, five, however long a commitment

      22   would last at Butner.  That's not the question is would it be

      23   better.  The question is whether or not they can show by clear

      24   and convincing evidence that they met the prongs.  It's beside

14:50 25   the point if he would benefit from treatment, and moreover, he

14:50  1    could get that on the outside.

2              I think the comments of Dr. Holden I think actually

3    came across more watered down than their testimony, than they

4    appeared in the actual exhibits, but I don't think, Judge,

14:50  5    those should be considered admissions of true dangerousness.  I

6    certainly don't think they would be enough to support a finding

7    in favor of the Government.

8              I think how Dr. Plaud explained it makes complete

9    sense.  This is someone who is compliant, he's a pleaser, he's

14:51 10   trying to say what he thinks his treatment provider wants to

11   hear.  It's unclear whether he understood what sexually

12   dangerous meant when she explained it to him, so we would ask

13   you not to hinge your finding on that.

14             Lastly, Judge, I just would like to point out this

14:51 15   emphasis that I heard through the experts of going through the

16   BOP regulation, checking the box, does he meet this regulation,

17   does he meet this regulation.  Judge, this isn't a check-box

18   approach.  If he gets checks in everything, it doesn't make him

19   sexually dangerous.  It's whether or not they can prove by

14:51 20   clear and convincing evidence he has a serious mental disorder

21   that causes serious difficulty refraining.  And in light of the

22   entire record of this case and the precedential effect of

23   *United States versus Antone*, they simply have not and cannot do

24   that with Mr. Charboneau.

14:52 25             THE COURT:  Thank you.

14:52   1            Anything else today?

        2            MR. JAMES:  No, Your Honor.

        3            THE COURT:  Okay.  I do thank counsel for their work

        4    here today and I thank all of the experts that are still here.

14:52   5    I thank them for their testimony and Mr. Charboneau for his

        6    testimony.

        7            As in past cases, I'm going to take it under

        8    advisement and reread everything once I have a benefit of

        9    proposed findings that you all submit and at some point we will

14:52  10    all reconvene and I'll give you my decision.

       11            We will be in recess until 9:00 a.m. Monday.

       12            (The proceedings concluded at 2:54 p.m.)

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

14:52   1                    UNITED STATE DISTRICT COURT

        2                EASTERN DISTRICT OF NORTH CAROLINA

        3

        4

14:52   5                 CERTIFICATE OF OFFICIAL REPORTER

        6

        7    I, Amy M. Condon, CRR, CSR, RPR, Federal Official Court

        8    Reporter, in and for the United States District Court for the

        9    Eastern District of North Carolina, do hereby certify that

14:52  10    pursuant to Section 753, Title 28, United States Code, that the

       11    foregoing is a true and correct transcript of the

       12    stenographically reported proceedings held in the

       13    above-entitled matter and that the transcript page format is in

       14    conformance with the regulations of the Judicial Conference of

14:52  15    the United States.

       16

       17

       18    Dated this 12th day of December, 2017.

       19

14:52  20                                    /s/ Amy M. Condon
       21                                    Amy M. Condon, CRR, CSR, RPR
                                             U.S. Official Court Reporter
       22

       23

       24

       25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA       *   Case No. 5:15-HC-02287
                               *
vs.                            *   Raleigh, North Carolina
                               *   September 28, 2017
BLAKE CHARBONEAU,              *   4 p.m.
                               *
           Respondent.         *
*******************************


**TRANSCRIPT OF HEARING TO ANNOUNCE DECISION**
BEFORE THE HONORABLE JAMES C. DEVER, III
UNITED STATES CHIEF DISTRICT JUDGE


APPEARANCES:

For the Government:        CHRISTOPHER M. ANDERSON, ESQUIRE
                           United States Attorney's Office
                           310 New Bern Avenue, Suite 800
                           Raleigh, North Carolina 27601


For the Defendant:         HALERIE F. MAHAN, ESQUIRE
                           Federal Public Defender's Office
                           150 Fayetteville Street, Suite 450
                           Raleigh, North Carolina 27601


Court Reporter:            Lori Russell, RMR, CRR
                           P.O. Box 20593
                           Winston-Salem, North Carolina 27120


Proceedings recorded by stenotype reporter.
Transcript produced by Computer-Aided Transcription.

**P R O C E E D I N G S**

1
2      (Respondent present.)

3      **THE COURT:**  Good afternoon.  Welcome to United States

4  District Court for the Eastern District of North Carolina.  The

5  Court is going to announce its findings and conclusions in the

6  matter of United States versus Blake Charboneau,

7  5:15-HC-2287-D.  After I do that, I'll sign a short order

8  incorporating by reference my findings and conclusions.

9      The United States seeks to civilly commit Blake Charboneau

10  as a sexually dangerous person under the Adam Walsh Child

11  Protection and Safety Act of 2006, which is codified at 18,

12  U.S.C., Sections 4247 and 4248.  To civilly commit Charboneau

13  under the Adam Walsh Act, the Government must prove by clear

14  and convincing evidence that he is sexually dangerous.  A

15  person is sexually dangerous if he, quote, has engaged or

16  attempted to engage in sexually violent conduct or child

17  molestation and is sexually dangerous to others, end quote, 18,

18  U.S.C., Section 4247(a)(5).  To determine that a person is

19  sexually dangerous to others, a court must find that he, quote,

20  suffers from a serious mental illness, abnormality or disorder

21  as a result of which he would have serious difficulty in

22  refraining from sexually violent conduct or child molestation

23  if released, end quote, 18, U.S.C., Section 4247(a)(6).

24      The Court has considered and reviewed all admissible

25  evidence, including the testimony and exhibits.  The Court now

1  makes the following findings of fact and conclusions of law:

2      On July 24th, 2015, Bureau of Prisons doctor, Heather Ross,

3  a forensic psychologist, prepared a precertification report for

4  the Sex Offender Certification Review Branch.

5      On December 3rd, 2015, pursuant to 18, U.S.C., Section

6  4248, the Government filed a certification alleging Charboneau

7  is a sexually dangerous person.

8      On December 8th, 2015, the Court appointed Dr. Christopher

9  North as a court-selected mental health examiner.

10      On January 4th, 2016, the Court appointed Dr. Joseph Plaud

11  as an additional mental health examiner selected by Charboneau.

12  The Government also retained forensic psychologist Dr. Gary

13  Zinik, an expert forensic psychologist.  Dr. Zinik conducted a

14  forensic examination of Charboneau.

15      Charboneau is a 57-year-old Native American member of the

16  Turtle Mountain Band of the Chippewa Tribe.  He was born in

17  Devils Lake, North Dakota, and resided there until he was 15

18  years old.  He then moved to Fort Totten, North Dakota.  He is

19  the fifth of twelve children.

20      As a child, Charboneau began drinking beer with his

21  parents.  He would sometimes drink as many as 12 cans of beer.

22  If his parents stopped drinking for the night and went to

23  sleep, he would too.  If they stayed up drinking beer, he would

24  stay up drinking beer with them.  He continued to drink alcohol

25  extensively throughout his teenage years.  At approximately age

1  12, Charboneau also began using inhalants extensively to get

2  high.  He inhaled gasoline, spray paint, lighter fluid, and

3  glue.

4      Charboneau's school performance and behavior deteriorated

5  rapidly at age 12.  He was arrested for fighting and running

6  away at age 13.  His first of many commitments to the North

7  Dakota State Hospital at Jamestown occurred at age 16 when he

8  was placed in the adolescent unit for substance abuse and being

9  incorrigible.

10     At age 20 Charboneau's IQ was tested and he was placed in

11 the, quote, low normal to borderline range of intelligence and

12 found to be characterologically disturbed with minimal organic

13 involvement, in general cortical problems consistent with his

14 extensive history of inhalant abuse.  See Dr. North report

15 page 3.

16     Between ages 18 to 22, he was arrested six times for

17 disorderly conduct, public intoxication, failure to appear.

18 Before age 22, he had been admitted 12 times to Jamestown for

19 treatment of chemical dependency and mental problems.

20     Charboneau's parents are no longer married and his mother

21 reported that Charboneau's father may have sexually abused him

22 and his siblings.  Charboneau has no contact with his family.

23 Charboneau is single and has fathered two children with a woman

24 named Emma Bull Bear, who is deceased.  The children are now

25 adults.

1    Charboneau withdrew from school while in the ninth grade.
2    In 1977 at age 17.  Charboneau attended Kicking Horse Job Corps
3    in Montana briefly, but was discharged after staff observed him
4    sniffing gas and committing a superficial suicide gesture.
5    Charboneau has worked sporadically at unspecified temporary
6    jobs.  Before his most recent federal incarceration, he worked
7    as a dishwasher.

8    Charboneau has had frequent alcohol-fueled contact with the
9    criminal justice system.  According to records from the North
10   Dakota State Hospital at Jamestown, tribal law enforcement
11   officers first arrested Charboneau when he was 13 years old for
12   repeatedly running away and being prone to fighting.  Since
13   1978, law enforcement officers have arrested or taken
14   Charboneau into custody approximately 36 times for various
15   crimes, ranging from disorderly conduct, public intoxication,
16   assault, arson, and liquor violations to sexual crimes.  Over
17   20 of Charboneau's offenses are related to his abuse of
18   alcohol.  All four of his sexually violent offenses are related
19   to his abuse of alcohol.

20   On June 30th, 1982, Charboneau, then 22 years old, pleaded
21   guilty to his first violent sexual crime.  On April 2nd, 1982,
22   Charboneau attended a party where the victim, his 23-year-old
23   female cousin, was also present.  The victim left the party at
24   approximately 1 a.m. on April 3rd and returned to an apartment
25   of a friend.  Charboneau, then intoxicated, followed the

1   victim.  After the victim went to sleep, Charboneau pushed his

2   way inside the apartment and demanded cigarettes from his

3   cousin.  He then grabbed his cousin, tore off her nightgown and

4   underwear, slapped her across the face, and with a closed fist

5   hit her legs and threatened to kill her if she did not submit

6   to sex or if she told anyone.  Charboneau then raped her until

7   two friends heard her screams and entered the apartment and

8   found the victim and Charboneau in the bedroom.  When the

9   others arrived, Charboneau stopped raping the victim.  The

10  rescuer asked Charboneau what happened.  He laughed, commented

11  incoherently, and left the apartment.

12      Fort Totten police officers arrested Charboneau the next

13  day for fighting.  When officers questioned him about the

14  sexual assault, Charboneau told officers that he could not

15  remember what occurred because he had suffered an alcoholic

16  blackout.  Fort Totten police charged Charboneau with rape and

17  assault.  As part of a negotiated plea agreement, Charboneau

18  pleaded guilty to the assault charge and the Court sentenced

19  him to 18 months imprisonment.

20      On August 11th, 1987, Charboneau, then age 27, committed

21  his second alcohol-fueled, violent sexual offense.  Charboneau

22  entered a women's home and forcibly removed her clothing and

23  attempted to rape her on the kitchen floor.  The victim's

24  husband then came home and stopped the rape.  When questioned

25  about the incident, Charboneau provided varying accounts.  He

1  told Dr. North on January 19th, 2016, that he does not remember

2  anything about the 1987 arrest for sexually assaulting a woman

3  who lived near his brother other than after being stopped

4  someone, quote, kicked the shit out of me and she never pressed

5  charges, end quote.

6      On February 9th, 2016, Charboneau denied committing the

7  offense during his clinical interview with Dr. Plaud.  On.

8      February 18th, 2016, Charboneau told Dr. Zinik that he had

9  no memory of the actual incident; but when Dr. Zinik reminded

10  Charboneau of the victim's name, Charboneau stated that he

11  remembered meeting the victim the night before, but on the date

12  of the sexual assault, he was drinking alcohol with his brother

13  and only recalls that he woke up bleeding in a jail cell after

14  being beaten up.

15      Similarly, when deposed, Charboneau admitted that he

16  forcibly entered a woman's home.  He testified that he could

17  not remember unbuckling his pants, forcing the woman to remove

18  her clothing, attempting to rape the woman on the kitchen floor

19  or recall the woman's husband arriving in time to stop him.

20  Charboneau also testified in his deposition that he could not

21  recall the events because he was drinking alcohol at the time.

22      Charboneau's third alcohol-fueled sexual offense occurred

23  on July 31st, 1988, after a family picnic.  After drinking

24  alcohol for most of the day, Charboneau, then age 28, took his

25  10-year-old daughter to an area where an onlooker's view would

1  be obscured by bushes and raped the child.  However,

2  Charboneau's 5-year-old nephew was present and observed the

3  rape.  Charboneau halted the rape when his sister, Roberta,

4  honked the horn of her automobile as she was looking for her

5  son and niece.  Charboneau's daughter ran to the car and told

6  Roberta that Charboneau had raped her.  She also reported that

7  Charboneau slapped and punched her in the face, bloodied her

8  nose during the sexual assault.  Roberta told law enforcement

9  officers that her niece had a bloody nose and that her clothing

10  was disheveled.  Roberta also told law enforcement officers

11  that she saw Charboneau buttoning his pants as he emerged from

12  the bushes.  A physical examination of the 10-year-old victim

13  revealed pubescent genitalia with what appeared to be sperm in

14  the region of the labia and a ruptured hymen, which was

15  bleeding slightly.

16      On October 27th, 1988, a jury found Charboneau, then 28

17  years old, guilty of aggravated sexual abuse by force.  After

18  the jury verdict, the Court committed Charboneau to the custody

19  of the Attorney General for a mental examination pursuant to

20  18, U.S.C., Section 4244, before sentencing.

21      On December 5th, 1989, the warden of the federal medical

22  facility in Rochester, Minnesota, certified that Charboneau had

23  recovered to the extent that he no longer required psychiatric

24  hospitalization and could return for sentencing.

25      On January 4th, 1990, at sentencing, Charboneau alleged

1    that he suffered from a diminished mental capacity and sought a

2    downward departure from the established guideline range.

3    Although the Court agreed that medical records reflected a

4    diminished mental capacity, the Court denied the motion based

5    on the violent nature of the crime and Charboneau's

6    voluntarily -- voluntary use of intoxicants before the rape.

7    It was at the sentencing proceeding that Charboneau first

8    admitted that he, in fact, had raped his daughter.

9         The Court sentenced Charboneau to 168 months imprisonment

10   and recommended that BOP place him at a federal medical center.

11   The Court ordered that Charboneau also serve a five-year term

12   of supervised release, barred Charboneau from using alcohol,

13   narcotic drugs or any other controlled substances without a

14   prescription by a licensed medical practitioner, and required

15   drug and alcohol testing to verify Charboneau's compliance.

16        On October 11th, 2000, Charboneau, then age 41, was

17   released from BOP custody to the District of North Dakota and

18   began his term of supervised release.  The Court modified

19   Charboneau's conditions of supervision to include sex offender

20   registry, no contact with minors, no residing with minors, no

21   attempt to communicate with or traveling near the victims of

22   his offense, no loitering near areas where children congregate,

23   no dating or socializing with anyone with children, and

24   participation in sex offender treatment, including submitting

25   to the administration of a polygraph.

1    On May 1st, 2001, Charboneau's supervision was transferred

2  to the Rapid City, South Dakota, office for his placement in

3  Community Alternatives of the Black Hills, a community

4  correction center.  The transfer was intended to provide him

5  access to mental health and sex offender treatment.

6    In 2003 Charboneau, then age 44, committed his fourth

7  alcohol-fueled, violent sexual offense.  The victim was his

8  adult niece.  On the morning of July 11th, 2003, Charboneau

9  went to his probation officer's office and gave a urine sample

10  to test for alcohol.  At the time Charboneau was on supervised

11  release in the community and receiving sex offender treatment.

12  He was subject to the other conditions of supervision that I've

13  already mentioned.

14    Notwithstanding all of that, on July 11th, 2003, at 4 p.m.

15  Charboneau went to his niece's apartment.  The victim's

16  girlfriend was also present.  Charboneau and the victim drank

17  Black Velvet whiskey and Coke from about 4 p.m. to 8 p.m.  S.V.

18  did not drink.  A second friend of the victim's arrived at some

19  point, but left at approximately 9 p.m.  The victim then told

20  Charboneau that she was going to sleep.  Charboneau sat on a

21  footstool and continued to drink alcohol as the victim and S.V.

22  lay down to sleep on a pull-out bed located in the living room.

23    The victim awoke at 11 p.m. and discovered that Charboneau

24  had removed her shorts and underwear and was performing

25  cunnilingus on her.  The victim told Charboneau to stop.  She

1  got up, grabbed her shorts, and went to the bathroom.

2  Charboneau pursued the victim into the bathroom where he pushed

3  her and asked her if she was angry.  The victim told Charboneau

4  that she was angry.  The victim tried to close the door, but

5  Charboneau placed his foot inside the door and told her that he

6  would not allow her to close the door unless she told him that

7  she was not angry with him.  The victim complied and Charboneau

8  allowed her to close the door.  The victim dressed and woke up

9  S.V. and told her what happened.  Charboneau remained in the

10 residence and continued to drink alcohol.  Charboneau left

11 after approximately 15 minutes of demands from the victim that

12 he leave.  The victim then went back to sleep.

13     Charboneau returned at 4:30 a.m. and awoke the victim.  The

14 victim and Charboneau smoked cigarettes.  She told Charboneau

15 that she was angry at him.  He asked her if she did not like

16 men.  Charboneau then threw the victim to the ground and pulled

17 down her shorts and forcibly removed her underwear.  Charboneau

18 removed his pants and attempted to rape the victim.  The victim

19 told Charboneau that she would scream.  Charboneau threatened

20 to punch her if she did.  The victim fought off Charboneau and

21 ran to the bathroom.  Charboneau followed and stopped her from

22 closing the door.  The victim eventually was able to reason

23 with Charboneau.  She asked him to give her a cigarette.

24 Charboneau then put his pants back on as the victim put on her

25 underwear.  The victim returned to the living room and put her

1    shorts on.  Charboneau and the victim went to the victim's

2    girlfriend's apartment.  Charboneau stood outside.  The victim

3    and her friend then went to the sheriff's office and reported

4    the incident.

5        Law enforcement officers interviewed Charboneau.  He told

6    them that he was the victim's uncle by blood and that he had

7    known her for about six months.  On July 14th, 2003, a Deputy

8    State's Attorney filed an information in the Seventh Judicial

9    Circuit in Pennington, South Dakota, that charged Charboneau

10   with second-degree rape and attempted second-degree rape.  The

11   State later amended the information to charge Charboneau with

12   engaging in sexual contact with a person incapable of

13   consenting, a felony.

14       On December 9th, 2003, Charboneau pleaded guilty but

15   incapable of consenting.  On December 23rd, 2003, the state

16   court sentenced Charboneau, then age 44, to 10 years

17   imprisonment.  On January 9th, 2004, the state court filed an

18   amended judgment that stated Charboneau had pleaded guilty but

19   mentally ill.

20       The United States Probation Office filed a notice of

21   revocation based on Charboneau's criminal conduct involving the

22   sexual offense.  On November 23rd, 2004, the federal court

23   found that Charboneau violated the terms of his supervised

24   release by engaging in new criminal conduct and sentenced

25   Charboneau to 36 months of imprisonment consecutive to a state

USCA4 Appeal: 17-7306   Doc: 16   Filed: 01/22/2018   Pg: 259 of 313

9/28/17 - 5:15-HC-2287 - HEARING TO ANNOUNCE DECISION

13

1  court sentence and a 24-month term of supervised release to

2  commence upon Charboneau's release from federal imprisonment.

3      On July 8th, 2014, three family members of Charboneau wrote

4  the U.S. Probation officer concerning his possible release.

5  See Government Exhibit 8.  The letter stated:

6      "This letter is an attempt to prohibit Blake Charboneau

7  from being released into society.  As his family members, we

8  know the type of violent acts Blake has committed and is

9  capable of.  This in turn puts us in fear for our safety, the

10  safety of our children and grandchildren and society.

11      "Prior to Blake ever being incarcerated in prison, he

12  engaged in habitual drug use and alcohol consumption.  At a

13  very young age, about 14, Blake began to habitually abuse

14  inhalants, such as sniffing gasoline, paint, and anything that

15  would create a high for him.  After Blake began his drug use,

16  we noticed how he began to act unusual.  Blake would laugh

17  uncontrollably at the TV when there wasn't anything funny about

18  the program.  He would talk to himself and wander around in a

19  trancelike state.

20      "His behavior scared our mother, Teresa Charboneau, and

21  this prompted her to try and seek help for him.  Blake was

22  admitted to the Jamestown hospital multiple times and our

23  mother attempted to seek any help she could to help Blake.  All

24  her attempts failed.  Blake continued to abuse inhalants and

25  then began to use marijuana and alcohol.  Due to his habitual

1  drug use and mental health, Blake became totally dependent on

2  our parents to care for him in all ways.  Blake has never had a

3  job, his own home, nor does he know how to cook for himself or

4  wash his own clothing.

5      "The incident that took place on the Spirit Lake

6  Reservation many years ago involving Blake and his daughter

7  left a shock and fear in our family that is almost

8  indescribable.  After the incident, Blake wandered off.  The

9  cops later found him sitting elsewhere.  Blake didn't know

10  anything, what had happened, nor did he show any remorse for

11  the crime he had just committed on his young daughter.  Blake

12  was convicted of raping his daughter and was sentenced to

13  federal penitentiary.  The victim has never recovered from the

14  trauma and to this day continues to have mental and emotional

15  issues.  The trauma that our family has endured from his act

16  has been heartbreaking and difficult to deal with.  Sometimes

17  you never fully heal from this type of trauma because it is so

18  engrained.

19      "Blake concluded his sentence and was due to be released

20  back into society.  The victim went to face him at the Devils

21  Lake Law Enforcement Center.  In her words, she described the

22  meeting as sick.  The victim described how Blake showed no

23  remorse for his actions and told her that he was still in love

24  with her.  This prompted the victim to ask he not be released

25  in the state of North Dakota.

1    "Our mother went to visit Blake after our father and uncle

2    had died.  Blake had been notified of the deaths, but insisted

3    to our mother that they were still alive.  Blake also told our

4    mother that he had been in the fire which had killed nine of

5    our family members.  Blake could not have been in the house

6    fire.  He was in prison.  Again, this conversation took place

7    after Blake had been incarcerated for some time and shows that

8    his mental health is a huge issue and concern.

9        "Blake went to South Dakota where he again raped another

10   human being.  Blake was incarcerated and sentenced to prison.

11       "We, as a family, believe Blake is a danger to us and

12   society.  We don't feel safe knowing that he will be returned

13   to society free to wander at his will.  We, the family members

14   of Blake Charboneau, are not willing to help him reenter

15   society, take care of him or want him around our family, our

16   children or our grandchildren.  We request that he be placed in

17   an institution that will protect him and protect society from

18   him.  We believe that if he is given the opportunity to be

19   released back into society, you, as the Parole Board, are

20   putting our family, the victim, and society in grave danger

21   because he will hurt someone again.  We know him best and we

22   plea with you that you will respect our wishes and place him

23   somewhere where he can't hurt anyone again.

24       "Sincerely, the Charboneau family."

25       Charboneau was scheduled for release from federal custody

1   for his supervised release violation on February 21st, 2016.

2   On December 3rd, 2015, he was certified as sexually dangerous

3   under the Adam Walsh Act.  Six witnesses testified at the 4248

4   trial.

5       The first witness was Dr. Carol Holden.  Dr. Holden is a

6   BOP clinical psychologist in the Commitment and Treatment

7   Program.  Dr. Holden is also Charboneau's treatment provider in

8   the CTP.  Dr. Holden testified regarding the philosophy and

9   structure of the CTP and the four phases a detainee must

10  complete before BOP considers the detainee's release.

11  Dr. Holden testified that Charboneau is in Phase 2 of the

12  program.  Dr. Holden testified that Charboneau volunteered for

13  treatment in the CTP on February 22nd, 2016.  See Government

14  Exhibit 26.

15      Charboneau underwent a series of psychological tests.

16  Charboneau's responses on one such test, the Multiphasic Sex

17  Inventory, demonstrated that he seriously minimized having

18  sexual thoughts prior to committing the violent sexual

19  offenses, attempted to deny knowledge of the fundamental

20  wrongness of his violent sexual assaults, viewed himself as a

21  victim of the justice system, and denied that he had an alcohol

22  abuse problem.

23      On June 13th, 2016, approximately four months after

24  voluntarily entering the CTP, Dr. Holden testified that

25  Charboneau continued to demonstrate many of the same

1  minimizations and rationalizations first detected in his

2  answers to questions on the MSI II.  See Government Exhibit 24

3  and Government Exhibit 26.

4      On November 30th, 2016, Dr. Holden assessed Charboneau's

5  treatment needs.  Dr. Holden determined that two of

6  Charboneau's treatment needs are substance abuse and sexual

7  entitlement.  See Government Exhibit 28.  Substance use

8  pertained to Charboneau's historical use and denial of his

9  alcohol overuse.  The sexual entitlement pertained to

10 Charboneau's belief that he felt that he was owed sex from

11 women that he believed came on to him or teased him.  See

12 Government Exhibit 28.

13     Dr. Holden discussed the dangerous interplay between

14 Charboneau's alcohol overuse and his feelings of sexual

15 entitlement.  Dr. Holden also testified that during his

16 treatment with her Charboneau had begun to open up to her and

17 to trust her.  Dr. Holden described Charboneau as very

18 reserved.  To foster trust and make Charboneau more comfortable

19 communicating with her and CTP staff, Dr. Holden made

20 Charboneau an orderly in the CTP.

21     Further, Dr. Holden testified that, although Charboneau had

22 communicative challenges and had been referred to a

23 neuropsychologist for assessment based on his odd speech

24 pattern, she had developed a relationship with him where she

25 carefully noted his responses to her questions and verified

1  with him that she correctly stated his responses to her

2  questions.

3      Dr. Holden testified that Charboneau complied with her

4  suggestions that he attend weekly Alcohol Anonymous meetings at

5  Butner, but Charboneau still denied that he had an alcohol

6  problem.  Regarding the availability of alcohol, Dr. Holden

7  testified that she's aware some prisoners at Butner produce

8  alcohol or hooch.  She was not, however, aware that it was

9  available in the Maryland unit other than on one instance.  She

10  was not aware that Charboneau had used alcohol on custody at

11  Butner.  Dr. Holden also testified that Charboneau seemed

12  sincere in his desire to change his life.

13      On December 9th, 2016, Charboneau spoke to Dr. Holden after

14  a community meeting and disclosed for the first time that he

15  desired to have sexual contact with his victims before

16  committing the alcohol-fueled sex offenses and that he believed

17  he was sexually dangerous.  See Government Exhibit 27.

18      Dr. Holden also explained during her testimony that

19  Charboneau misreads social cues and has a sense of sexual

20  entitlement.  When intoxicated, alcohol acts as a disinhibitor

21  and he acts out impulsively.  He remains in Phase 2 of the CTP

22  as of the time of the trial.  He continues to have cognitive

23  distortions even when sober concerning his family, his sexually

24  assaultive behavior, and his lack of an alcohol problem.

25      Dr. Christopher North also testified at the trial.  He is a

1  forensic psychologist and a court-appointed examiner in this

2  case. His report and CV are in the record. Dr. North opined

3  in his report, Government Exhibit 3, and testified at trial

4  that Charboneau meets criteria for civil commitment as a

5  sexually dangerous person.

6      In forming his opinion, Dr. North reviewed the written

7  discovery, which includes information concerning Charboneau's

8  criminal history, social history, substance abuse history, and

9  institutional reports. Dr. North also clinically interviewed

10  Charboneau on January 19th, 2016, and considered his range of

11  risk on the Static-99R, an actuarial tool, and analyzed the

12  presence of dynamic risk factors using the Hare Psychopathy

13  Checklist-Revised, PCL-R, and the Structured Risk

14  Assessment-Forensic Version, SRA-FV.

15      During the clinical interview, Charboneau said that he

16  performed oral sex on the 2003 offense victim. Charboneau also

17  claimed to Dr. North that he had had a prior sexual

18  relationship with the victim, an assertion that the victim

19  denies. Charboneau also told Dr. North that from October 11th,

20  2000, until July 12th, 2013, he consumed alcohol while in the

21  community. He did so despite the conditions of his release,

22  which prohibited such use.

23      Additionally, Charboneau told Dr. North that during the

24  period he was in sex offender therapy he did not believe that

25  he had a sexual problem or that he needed sex offender

1  treatment.  Charboneau's interview with Dr. North also revealed

2  that he struggles with feelings of inferiority and inadequacy

3  towards women.  He also told Dr. North that he does not have a

4  drinking problem and that he believed that he could remain

5  sober even if he did not attend Alcohol Anonymous meetings.

6      As for Prong 1 under the Adam Walsh Act, Dr. North opined

7  that Charboneau had committed or attempted to engage in

8  sexually violent conduct or child molestation.

9      As for Prong 2 under the Adam Walsh Act, Dr. North used the

10 *Diagnostic and Statistical Manual of Mental Disorders, Fifth*

11 *Edition,* DSM-5, and diagnosed Charboneau with alcohol use

12 disorder, severe, in a controlled environment.  According to

13 the DSM-5, an individual meets the diagnostic criteria for

14 alcohol use disorder where there is, quote, a problematic

15 pattern of alcohol use leading to clinically significant

16 impairments or distress, end quote, that occurs within a

17 12-month period if at least 2 of the 11 criteria are met.

18 Those 11 criteria are:

19     First, alcohol is often taken in larger amounts or over a

20 longer period than was intended.

21     Second, there is a persistent desire or unsuccessful effort

22 to cut down or control alcohol use.

23     Third, a great deal of time is spent in activities

24 necessary to obtain alcohol, use alcohol or recover from its

25 effects.

1        Four, craving or a strong desire or urge to use alcohol.

2        Five, recurrent alcohol use resulting in a failure to

3   fulfill major role obligations at work, school or home.

4        Six, continued alcohol use despite having persistent or

5   recurrent social or interpersonal problems caused or

6   exacerbated by the effects of alcohol.

7        Seven, important social, occupational or recreational

8   activities are given up or reduced because of alcohol use.

9        Eight, recurrent alcohol use in situations in which it is

10  physically hazardous.

11       Nine, alcohol use is continued despite knowledge of having

12  a persistent or recurrent physical or psychological problem

13  that is likely to have been caused or exacerbated by alcohol.

14       Ten, tolerance, as defined by either of the following:  (a)

15  a need for markedly increased amounts of alcohol to achieve

16  intoxication or desired effect, (b) a markedly diminished

17  effect with continued use of the same amount of alcohol.

18       And eleven, withdrawal, as manifested by either of the

19  following:  (a) the characteristic withdrawal syndrome for

20  alcohol, (b) alcohol is taken to relieve or avoid withdrawal

21  symptoms.

22       Because Charboneau's access to alcohol in custody is very

23  limited, his alcohol use disorder is designated as in a

24  controlled environment.

25       Dr. North based his diagnosis on Charboneau's

1   well-documented use of alcohol as a child, which developed into

2   a serious addiction that caused Charboneau's admittance into

3   North Dakota's State Hospital eleven times before his 26th

4   birthday.  Moreover, Charboneau's 20 alcohol-related arrests

5   and his alcohol-fueled sexual violence further support the

6   diagnosis.

7        Charboneau also lacks independence and stable community

8   ties due to his alcohol consumption.  Dr. North opined that

9   Charboneau's life has essentially revolved around drinking,

10  getting in trouble while intoxicated, and serving time in

11  custody.

12       Dr. North also diagnosed Charboneau with severe inhalant

13  use disorder by history based on Charboneau's use of inhalants,

14  such as gasoline, glue, and paint thinners, at an early age.

15  As a result of Charboneau's chronic inhalant use, Charboneau

16  suffered organic brain damage with lasting effect on his

17  cognitive functioning.  Dr. North opined that Charboneau's

18  severe inhalant use has stunted his cognitive social,

19  emotional, and sexual development to the sense he ceased

20  developing mentally and emotionally when he was approximately

21  12 or 13 years old.  Dr. North opined that Charboneau has never

22  developed a mature adult sexuality.

23       Dr. North also found that a diagnosis of mild

24  neurocognitive disorder is warranted based on Charboneau's

25  inhalant abuse, in possible combination with his alcohol abuse,

1   which has resulted in decline in his level of functioning in

2   one or more cognitive domains and is evident by Charboneau's

3   disorganized thinking and problems with language and verbal

4   expression.

5       Dr. North also opined that Charboneau's alcohol abuse

6   disorder was a serious mental illness abnormality or disorder

7   under the Adam Walsh Act; and that as a result of the disorder,

8   Charboneau would have serious difficulty refraining from

9   engaging in sexually violent conduct or child molestation if

10  released.  Dr. North conceded during his testimony that

11  Charboneau does not suffer from a paraphilia under the DSM-5.

12      Dr. North used the Static-99R, an actuarial instrument used

13  to examine static factors that impact an individual's risk of

14  reoffending.  He concurred with Dr. Ross, except on Item 2,

15  which asks whether an individual has cohabitated with an

16  intimate partner for two years or more.  Whereas Dr. Ross

17  assigned no points for that item, Dr. North found that one

18  point should be assessed, which resulted in a total score of

19  five and placed Charboneau in the above average risk category.

20      Dr. North used the SRA-FV to review additional relevant

21  risk factors.  He found that Charboneau showed evidence of

22  intimacy deficits and cited in support his belief that marriage

23  is frightening to him.  Dr. North opined that Charboneau showed

24  significant social deviants and unstable lifestyle and poor

25  problem-solving skills.  Dr. North also noted Charboneau's

1 astonishing denial that he did not have an alcohol consumption
2 problem.

3     Using the routine sample of the comparable offenders,
4 Dr. North determined that 15 percent of the offenders in the
5 routine sample with a Static 99 score of five reoffended within
6 five years of release from custody.  Dr. North noted in his
7 report, however, that he believed that this underestimates the
8 actual recidivism rates because many sex offenders commit
9 undetected and unreported offenses.

10     Dr. North opined that Charboneau's severe alcohol abuse
11 disorder, when coupled with his other cognitive limitations,
12 made him prone to sexually assaulting females when the
13 opportunity arises and he's under the influence.  Furthermore,
14 Dr. North noted Charboneau's astonishing assertion that he
15 could stay away from alcohol without any kind of program or
16 support in the community.

17     Dr. North also scored Charboneau on the PCL-R to determine
18 the presence of psychopathy.  Charboneau obtained an overall
19 score of 19, which placed him within the moderate range of
20 psychopathy.

21     Dr. North opined that the greatest dynamic factor in his
22 analysis of Charboneau's sexual dangerousness was his denial
23 that he was an alcoholic.  Dr. North opined that he had been
24 treating patients with psychological problems for 30 years and
25 that Charboneau's denial that he had a drinking problem

1    represented the most significant level of denial that he had

2    ever seen.

3        Dr. North also examined protective factors that could

4    potentially lessen Charboneau's sexual dangerousness.

5    Dr. North identified protective risk factors to include, one,

6    having been in a community for 10 years without committing a

7    sexual offense; two, having less than 15 years left to live due

8    to an illness or physical problem or condition that would

9    decrease libido, mobility or motivation to reoffend; and,

10   three, very advanced age.

11       Dr. North opined that none of these protective factors

12   applied to Charboneau.  Charboneau is 57 years old, is in good

13   health, and does not suffer from any physical or medical

14   problems that decrease his ability sexually to reoffend.

15   Moreover, his age has affected his actuarial scores.

16   Furthermore, Charboneau has not been released into the

17   community since his last violent sexual offense.

18       Dr. North also recognized that Charboneau's two-year term

19   of supervised release could be a protective factor, but that

20   Charboneau had failed on supervised release the last time, had

21   drunk alcohol, and had violently sexually assaulted his victim.

22   Thus, Dr. North did not believe Charboneau's two-year term of

23   supervised release was a protective factor.

24       Dr. North also addressed Charboneau's institutional

25   compliance.  See *United States v. Antone*, 742 F.3d 151, 165 to

1  170, Fourth Circuit 2014.  Dr. North testified that the record

2  showed that after Charboneau's conviction in 1982 he was

3  imprisoned and that correctional officials considered him a

4  model inmate, but upon his release, he consumed alcohol and

5  violently sexually reoffended.  The same pattern emerged in his

6  incarcerations for his other violent sexual offenses.

7       Dr. North testified that Charboneau's history demonstrates

8  that when he is confined in a structured environment, such as

9  at Butner, Charboneau will conform his behavior and not act

10  out, including with respect to alcohol and sexual violence.

11  Dr. North opined, however, that alcohol is an extraordinary

12  disinhibitor with Charboneau, and when he drinks, he drinks to

13  excess and will likely sexually assault a female if the

14  opportunity arises.

15       Dr. Heather Ross is a BOP forensic psychologist.  Her CV

16  and report are in the record.  Dr. Ross prepared the

17  precertification report for the Certification Review Branch

18  panel's consideration of whether to issue a certificate stating

19  that Charboneau is a sexually dangerous person.

20       Charboneau declined to submit to an interview with

21  Dr. Ross.  Dr. Ross reviewed court documents, psychological

22  records, and other documentation, as well as the other expert

23  opinions in the case.  Additionally, Dr. Ross reviewed updated

24  BOP reports, including Dr. Holden's clinical notes, and the

25  initial treatment plan and testing report from the CTP.

1    Dr. Ross opined that Charboneau meets criteria for civil

2    commitment as a sexually dangerous person.  Dr. Ross found that

3    Charboneau met criteria for Prong 1 of the Adam Walsh Act based

4    on his criminal history, including his history of violent

5    sexual conduct.

6    As for Prong 2, Dr. Ross diagnosed Charboneau with alcohol

7    use disorder in a controlled environment; inhalant use disorder

8    in sustained remission; adult sexual abuse by a nonspouse or

9    nonpartner, perpetrator; and child sexual abuse, perpetrator.

10   Dr. Ross did not diagnose a paraphilia.  Dr. Ross's diagnostic

11   impression supporting Prong 2 are contained in her report and

12   she testified about them at the trial.

13   Dr. Ross noted that alcohol abuse has adversely affected

14   every aspect of Charboneau's life.  Dr. Ross testified that the

15   diagnosis of alcohol use disorder in a controlled environment

16   constituted a serious mental illness, abnormality or disorder

17   under the Adam Walsh Act in this case.  Dr. Ross testified that

18   her findings of adult sexual abuse by nonspouse or nonpartner,

19   perpetrator, and child sexual abuse, perpetrator, did not

20   factor in her analysis regarding whether Charboneau would have

21   serious difficulty in refraining from engaging in sexually

22   violent conduct or child molestation.

23   As for Prong 3, Dr. Ross opined in her report and at trial

24   that Charboneau would have serious difficulty refraining from

25   sexually violent conduct or child molestation if released based

1  on his overuse of alcohol, which exacerbated his impulsiveness.
2  Dr. Ross's report cites Charboneau's lack of social support as
3  evidenced by the exclusionary order issued by his tribe that
4  forbade him from returning to the reservation and the letter
5  that the Charboneau family wrote to the United States Probation
6  office in 2014 stating that they feared Charboneau's release
7  from imprisonment and that they did not want him to return to
8  the community.

9      Moreover, Dr. Ross testified that Charboneau did not have a
10 viable relapse prevention plan and that his two-year term of
11 supervised release would not be a protective factor in this
12 case.

13     Dr. Ross also analyzed static and dynamic factors.
14 Dr. Ross noted that Charboneau's score of four on the
15 Static-99R placed him in the moderate-high risk category.  She
16 testified that her score was different than that of the other
17 examiners who used the Static-99R and found a score of five
18 based on risk factor two, whether Charboneau ever lived with a
19 partner for two years, because when she did her records review
20 records did not provide sufficient information and Charboneau
21 declined to be interviewed during this precertification
22 process.  Dr. Ross testified that based on her review of the
23 other experts' reports and Charboneau's deposition that she
24 would now assess an additional point, which would bring
25 Charboneau's total score to five on the Static-99R.  Dr. Ross

1  testified that the static factors did not adequately represent

2  Charboneau's risk of sexual reoffending because the dynamic

3  risk factors were so profound.

4      To more accurately determine Charboneau's risk, Dr. Ross

5  examined dynamic risk factors and found four robust dynamic

6  risk factors:  first, problem-solving skills; second, lifestyle

7  impulsivity, such as alcohol use, low self-control, and

8  irresponsible decisions; three, resistance to rules followed in

9  the community; and four, lack of emotional intimate

10 relationships with adults.  Dr. Ross found these four factors

11 to be the most relevant dynamic risk factors applicable to

12 Charboneau when analyzing his risk of reoffending sexually.  As

13 Dr. North did, Dr. Ross acknowledged that Charboneau complied

14 with the rules while in a structured environment, but fails to

15 do so when in a nonstructured environment because of alcohol

16 and his other mental limitations.

17     Dr. Ross also considered federal regulations relevant to

18 determining sexual dangerousness.  Dr. Ross testified that

19 updated information contained in Dr. Holden's clinical notes

20 revealed that Charboneau did not appreciate the wrongfulness of

21 his conduct because he minimized, justified, and blamed others.

22 This reflects Charboneau's cognitive distortions about his

23 condition and situation.

24     Dr. Ross also testified that another relevant factor in

25 Charboneau's case was his lack of successful completion in sex

1   offender treatment.  Regarding sex offender treatment, Dr. Ross

2   noted that he failed to complete such treatment in 2003 and

3   testified that she was aware that Charboneau was now in sex

4   offender treatment in CTP, but that he was still minimizing and

5   denying his offenses.

6       Dr. Ross opined that in addition to sex offender treatment

7   she believed Charboneau also needed to successfully complete

8   substance abuse treatment and that Charboneau's continued

9   denial that he had an alcohol problem constituted a cognitive

10  distortion of his condition and situation.

11      Dr. Ross opined that Charboneau's inability to control his

12  conduct while under supervision in the community was an

13  important fact because he committed three violent sexual

14  offenses -- 1982, 1988, and 2003 offenses -- while he was

15  likely to be caught.  Additionally, that based on Dr. Zinik's

16  clinical interview with Charboneau, Charboneau committed the

17  1987 offense, while likely to be caught, because the victim met

18  Charboneau the night before he attempted to rape her.  Dr. Ross

19  further testified that his Static-99R score reflected an

20  individual in the moderate-high range for sexual offense.

21      Dr. Ross also considered protective factors.  She noted in

22  her report that the protective factors included things such as

23  age, medical factors, and time in the community, but that they

24  did not apply in this case because they did not suggest that

25  Charboneau could not perform sexually at his age and that age

1  was already factored in the Static-99R score.  Additionally, no

2  evidence suggested that Charboneau suffered from any physical

3  limitations that would minimize his ability to perform sexually

4  or to reoffend.

5      Moreover, Charboneau had not spent significant time in the

6  community offense-free and being on supervision had not acted

7  as a deterrent that prevented him from committing violent,

8  alcohol-fueled sexual crimes.  Dr. Ross testified that

9  Charboneau's two-year term of supervised release would not

10 lessen his sexual dangerousness in that he had reoffended

11 sexually while on supervision, including his sexual violence in

12 2003.

13     Dr. Ross also testified that a well-developed release

14 prevention plan would be beneficial, but that based on her

15 review of Charboneau's deposition and the other evidence in the

16 record, he merely intended to do the same thing he had done

17 when he was released previously, except this time he stated

18 that he would leave alcohol alone.  Dr. Ross opined that this

19 was not an adequate release plan to be protective because it

20 relied on Charboneau's hope that he would avoid alcohol.

21     Dr. Ross also testified that, although strong community

22 support would benefit Charboneau if released, Charboneau had no

23 community support, as evidenced by the fact that his tribe

24 forbade him from returning and that his family essentially had

25 disowned him.

1        Dr. Ross also considered Charboneau's institutional

2   behavior.  She noted that while institutionalized in a

3   structured environment Charboneau behaved appropriately at

4   Butner and at other places.  This factor, however, did not

5   lessen his sexual dangerousness in Dr. Ross's opinion because

6   he repeatedly reoffended upon release from imprisonment when he

7   was no longer in a highly structured environment.

8        Dr. Gary Zinik testified.  His report and CV are in the

9   record.  Dr. Zinik opined that Charboneau meets the criteria

10  for civil commit as a sexually dangerous person.  Dr. Zinik

11  conducted a record review, interviewed Charboneau on February

12  18th, 2016, and analyzed static and dynamic risk factors

13  concerning Charboneau's risk of reoffending sexually, and also

14  analyzed protective factors that potentially lessen

15  Charboneau's risk of reoffending.  Additionally, Dr. Zinik

16  reviewed Dr. Holden's clinical notes and initial treatment plan

17  and testing report, which were also submitted in evidence as

18  Exhibits 24 and 26 and 27, and considered all the other

19  opinions of the experts in this case.

20       Charboneau told Dr. Zinik during the clinical interview

21  that he was not related to the 2003 victim.  Charboneau also

22  denied that he grabbed the 2003 victim and attempted to

23  sexually assault her.  Charboneau admitted that he performed

24  cunnilingus on the victim, but claimed that he had done so in

25  the past and it was consensual.  Charboneau also stated that he

1   was aroused sexually while drunk and felt that it was normal

2   and that there was nothing wrong with it.

3       As for Charboneau's substance abuse problem, Charboneau

4   told Dr. Zinik that he believed he did not have an alcohol

5   problem, that he could leave alcohol alone, and that he could

6   control himself.

7       As for Prong 1, Dr. Zinik determined that Charboneau had

8   committed or attempted to engage in sexually violent conduct or

9   child molestation based on his sexually violent conduct in

10  1982, 1987, 1988, and 2003.

11      As for Prong 2, Dr. Zinik diagnosed Charboneau with alcohol

12  use disorder, severe, in a controlled environment; inhalant use

13  disorder, severe, in sustained remission; and inhalant-induced

14  mild neurocognitive disorder.

15      Dr. Zinik described alcohol as Charboneau's drug of choice

16  and most persistent addiction. Dr. Zinik testified that

17  Charboneau had consistently denied that he had an alcohol

18  problem. In addition to the reasons cited in his report,

19  Dr. Zinik discussed Charboneau's alcohol dependence. Due to

20  Charboneau's multiple neurocognitive problems, the free world

21  is a very confusing place to Charboneau, Dr. Zinik explained.

22  It makes him anxious and confused. Alcohol relaxes Charboneau

23  and, unfortunately for the victims of his sexual offenses,

24  provides liquid courage to become aroused and to approach

25  women. His multiple neurocognitive limitations then combined

1  with the alcohol to create a perfect storm and a lack of

2  emotional control.

3      In addition, Dr. Zinik found that Charboneau also qualified

4  for a diagnosis of inhalant use disorder.  Dr. Zinik found that

5  Charboneau met criteria for a diagnosis of mild neurocognitive

6  disorder based on years of inhalant use that was likely

7  compounded by his alcohol use.  Additionally, Dr. Zinik opined

8  that a diagnosis of inhalant-induced mild neurocognitive

9  disorder was warranted based on Charboneau's inhalant and

10  alcohol use, which resulted in a decline from Charboneau's

11  previous level of functioning in one or more cognitive domains,

12  as evidenced by his disorganized thinking and problems with

13  verbal expression and language.  Dr. Zinik also testified that

14  he determined that the disorder was mild because Charboneau's

15  cognitive deficits do not appear to interfere with his daily

16  living activities, particularly in a structured environment.

17      Additionally, Dr. Zinik diagnosed Charboneau with other

18  specified personality disorder, with schizotypal and schizoid

19  features.  According to the *Diagnostic and Statistical Manual*

20  *of Mental Disorders, Fifth Edition,* DSM-5, personality

21  disorders are characterized by an enduring pattern of inner

22  experience and behavior that began at the onset of adolescence

23  or early adulthood and stabilized over time and deviates

24  decidedly from an individual's culture, is pervasive and

25  inflexible, and leads to distress and impairment.  If all the

1  criteria for one personality disorder are not met or combined

2  features of one or more personality disorders are prominent,

3  then a diagnosis of other personality disorder is warranted.

4      Schizotypal personality disorder is characterized by social

5  and interpersonal deficits that result in acute discomfort with

6  and reduced capacity for close relationships.  An individual

7  suffering from schizotypal personality disorder experiences

8  cognitive and perceptual distortions and exhibits exocentric

9  behavior.  They also are unable to form emotional attachments

10  with others or sustain relationships due to a belief that

11  others harbor them ill will.  Moreover, some individuals, like

12  Charboneau, demonstrate strange speech mannerisms.  Further,

13  they might react abnormally in conversations, not respond or

14  even talk to themselves.  They may also misinterpret situations

15  as having unusual meanings to them.

16      Schizoid personality disorder is a mental disorder that is

17  characterized by a pervasive pattern of detachment from social

18  relationships and restricted range of expression of emotions in

19  interpersonal situations.  Individuals suffering from schizoid

20  personality disorder tend to be loners, secretive, cold, and

21  apathetic.

22      According to Dr. Zinik, Charboneau demonstrates a mixed

23  personality disorder that includes both schizotypal and

24  schizoid features.  Dr. Zinik opined that the schizotypal

25  features Charboneau displayed include odd beliefs, unusual

1  perceptions, odd thinking, suspicion and paranoid behavior,

2  inappropriate affect, lack of close friends, and excessive

3  social anxiety.

4      Dr. Zinik also opined that the schizoid features Charboneau

5  displayed include a solitary behavior, lack of pleasure in

6  social activities, emotional coldness, detachment, and lack of

7  interest in sexual experience with others.  Dr. Zinik testified

8  that although Charboneau engaged in solitary behavior and also

9  demonstrated little interest in sexual experience with others,

10  it did not lessen his sexual dangerousness.  Dr. Zinik

11  explained and the record demonstrates that Charboneau had been

12  a loner all of his life, yet had committed four alcohol–fueled,

13  violent sexual assaults where alcohol acted as a disinhibitor,

14  relaxed him, and fueled a sexual desire.  Charboneau is afraid

15  and embarrassed about sex, Dr. Zinik opined.  However, he still

16  can become sexually aroused and is sexually attracted to women,

17  but is unable to control and manage his sexual feelings,

18  particularly when he's under the influence of alcohol.

19      Dr. Zinik opined that based on the interplay of

20  Charboneau's very serious mental illnesses, abnormalities or

21  disorders Charboneau would have serious difficulty in

22  refraining from engaging in sexually violent conduct or child

23  molestation.  This, as a result of a causation element, is due

24  to his alcohol, his having sexual arousal which, coupled with

25  his organic dysfunction and schizotypal and schizoid features,

1  prevent Charboneau from understanding and coping with his

2  sexual arousal.  Consequently, Charboneau is overwhelmed and

3  acts impulsively, resulting in his repeated violent,

4  alcohol-fueled sexual offending.

5      Dr. Zinik used the Static-99R to determine static risk

6  factors and determined that Charboneau scored a five, which

7  fell in the above average score on the instrument.  Dr. Zinik

8  testified that the static score did not adequately represent

9  Charboneau's risk of sexual recidivism based on his alcoholism

10  and failure to complete both substance abuse and sex offender

11  treatment.

12     In order to better assess Charboneau's risk of reoffending,

13  Dr. Zinik administered the Sexual Violence Risk-20, an

14  instrument that measures 20 risk factors for offenders who have

15  been convicted or are alleged to have committed a sexual

16  offense.  The SVR-20 has predictive accuracy.  Dr. Zinik found

17  that Charboneau met 15 of the 20 risk factors, which placed him

18  in the high risk category.  Dr. Zinik opined that these factors

19  include Charboneau's lack of emotional intimate relationships

20  with adults, lifestyle impulsiveness, and poor problem-solving

21  skills.

22     Dr. Zinik also considered federal regulations used to

23  determine sexual dangerousness.  Dr. Zinik found a number of

24  these factors were met, as evidenced by Charboneau's inability

25  to control his conduct while on supervised release and living

1 in a supportive, noncustodial environment, and participating in

2 sex offender treatment and substance abuse treatment.  Further,

3 Charboneau committed sexually violent offenses, while likely to

4 get caught, and that all of his victims knew him because they

5 were related to him or one had met him the night before.

6 Dr. Zinik also considered Charboneau's admission that during

7 the 1988 rape he felt the loss of control and Charboneau's

8 statement that during the 2003 attempted rape, which Charboneau

9 pleaded guilty but mentally ill to sexual conduct with a person

10 incapable of consent, that he was out of control.

11 Additionally, Dr. Zinik considered Charboneau's statement to

12 Dr. Holden that he was sexually dangerous.

13     Dr. Zinik, who also still treats sex offenders as part of

14 his practice, testified that it was significant that Charboneau

15 had never completed sex offender treatment or substance abuse

16 treatment.  He also concurred with Dr. Holden that it would be

17 detrimental to Charboneau's treatment if the Court were to

18 effectively remove Charboneau from treatment at this time.

19 Dr. Zinik further testified that he believed Charboneau needs

20 substance abuse treatment, in addition to sex offender

21 treatment, and that Charboneau's denial that he has an alcohol

22 problem constitutes a cognitive distortion and affects his

23 ability to successfully complete substance abuse treatment.

24     Dr. Zinik testified that he reviewed Charboneau's

25 institutional behavior as a possible protective factor that

1   will reduce his risk of reoffending sexually.  Dr. Zinik

2   acknowledged that Charboneau is not diagnosed with a paraphilia

3   and also acknowledged that Charboneau did not have a history of

4   acting out while institutionalized during his present

5   incarceration or any of his previous incarcerations, but that

6   such a history did not render Charboneau less sexually

7   dangerous.  Dr. Zinik noted that each time Charboneau was

8   released into the community from a structured environment

9   Charboneau -- Charboneau consumed alcohol and committed both

10  general offenses and violent sexual offenses.

11      Dr. Zinik testified that he also examined protective

12  factors that would reduce Charboneau's risk of sexual

13  reoffending.  These factors included his age and health.

14  Dr. Zinik found that these factors would not reduce

15  Charboneau's risk of reoffending because Charboneau is in

16  physically good health, has not lived in the community for a

17  significant period of time without reoffending and, although he

18  is older, he still has an active sex drive.

19      Dr. Zinik opined that, although Charboneau was beginning to

20  make progress with Dr. Holden, Charboneau essentially was the

21  same person who committed the act of sexual violence in 2003.

22      Finally, Dr. Zinik opined that although he did not find the

23  presence of a paraphilia it did not render Charboneau less

24  sexually dangerous.  Dr. Zinik opined that Charboneau's alcohol

25  abuse disorder and other specified personality disorders with

1  schizotypal and schizoid features acted synergistically and

2  caused Charboneau to have serious difficulty in refraining from

3  engaging in sexually violent conduct or child molestation if

4  released.  Alternatively, Dr. Zinik opined that Charboneau

5  would still be sexually dangerous even if he only relied on the

6  alcohol use disorder diagnosis as the sole serious mental

7  illness abnormality or disorder at Prong 2.

8     Blake Charboneau also testified during the trial.  He is 57

9  years old and grew up on a reservation.  He is Catholic and

10  attends a weekly Bible study group in the BOP.  He testified

11  that when he committed the sexual offenses in 1982, 1987, 1988,

12  and 2003 he was under the influence of alcohol.  He testified

13  that he has been sober during his past 13 years of

14  incarceration and that he feels badly about sexually assaulting

15  his victims.  Charboneau testified that he began attending AA

16  meetings at Butner in March 2016.  He also testified that he

17  would not ever consume alcohol again if released and would not

18  ever sexually assault anyone again if released.

19     Charboneau also testified that, except for one minor

20  infraction during his 13 years of incarceration, he has

21  conformed to prison rules and regulations.  Charboneau also

22  agreed that he was also considered a model prisoner after he

23  was incarcerated on his previous convictions, but upon his

24  release, he ultimately got drunk and committed other sexually

25  violent offenses.  Charboneau also conceded that he committed

1  his most recent sexually violent offense while drunk, on

2  supervision, and enrolled in sex offender treatment.

3       As for sex offender treatment, Charboneau admitted that

4  before the 2003 violent sexual offense he intended to quit sex

5  offender treatment.  He also stated that he thought the CTP

6  program was helping him.  He understands that when he drinks

7  alcohol he loses control.  He also admitted for the very first

8  time at trial in this case that he did have a problem with

9  alcohol.  He said he wanted to admit that he had a problem with

10 alcohol before the trial, but he was afraid.  He said if he was

11 released he thought he had the power to not drink alcohol.

12      Dr. Plaud, Joseph Plaud, also testified at trial.

13 Dr. Plaud's CV and report are in the record.  Dr. Plaud opined

14 that as to Prong 1 that prong had been met based on

15 Charboneau's conduct underlying the 1982, 1987, 1988, and 2003

16 violent sexual offenses.

17      As for Prong 2, Dr. Plaud opined that Charboneau met the

18 diagnostic criteria under the DSM-5 for alcohol abuse disorder,

19 severe, in a controlled environment and inhalant use disorder,

20 severe, in sustained remission.  Unlike Drs. North, Ross, and

21 Zinik, Dr. Plaud found that alcohol use disorder in

22 Charboneau's case did not qualify as a serious mental illness,

23 abnormality or disorder under the Adam Walsh Act.  Thus,

24 Dr. Plaud opined that the Government had not met its burden of

25 proof on Prong 2.  However, Dr. Plaud also testified that the

1    diagnosis of alcohol abuse disorder theoretically could qualify

2    as a serious mental illness, abnormality or disorder under the

3    Adam Walsh Act, but that it did not apply in this case.  He

4    particularly noted that he would have expected more instances

5    of alcohol-fueled, sexually violent crimes than the four

6    alcohol-fueled, sexually violent crimes Charboneau had

7    committed.

8        As for Prong 3, Dr. Plaud opined that the Government had

9    not met its burden of proof on Prong 3.  In support, Dr. Plaud

10   said in the absence of a sexually based paraphilia diagnosis,

11   and also reasoned that because Charboneau is 57 years old, he

12   closely aligns with a comparable group of offenders who are age

13   60 and above whose risk of sexual offending is reduced.

14       Dr. Plaud conducted a statistical risk analysis by scoring

15   Charboneau on the Static-99R.  Dr. Plaud found that Charboneau

16   scored a five on the instrument and used the routine sample of

17   comparable offenders and determined that individuals in that

18   group had a 15.2 percent chance of sexually reoffending within

19   five years.

20       Dr. Plaud also performed additional testing.  He used an

21   objective psychological personality screening inventory

22   assessment, the IPDE, to assess the presence of personality

23   disorders.  Although the results of the screening questionnaire

24   indicated no major cause of personality disorder, Dr. Plaud

25   found that there was evidence of schizoid and histrionic

1  personality disorders.  Dr. Plaud disagreed with the other

2  expert witnesses about the significance of dynamic factors in

3  this case, such as poor problem-solving, compliance with

4  supervision, and denial of having an alcohol problem.

5  Dr. Plaud acknowledged, however, that multiple dynamic risk

6  factors were present.

7      He found that Charboneau displayed excellent general and

8  sexual behavioral control during his incarceration.  He also

9  testified that a review of Charboneau's institutional behavior

10 demonstrated that while incarcerated in a structured

11 environment both at Butner and at other institutions Charboneau

12 complied with rules and regulations, but when released into the

13 community in a less structured environment, he consumed alcohol

14 and ultimately violently sexually offended.  Dr. Plaud also

15 acknowledged that although prison-made alcohol is available,

16 Charboneau's deposition testimony revealed that he did not have

17 ready access to prison-made alcohol.

18     Dr. Plaud acknowledged that, given Charboneau's long

19 history of alcohol abuse, there is some probability that he

20 will abuse alcohol if released.  Dr. Plaud also testified that

21 if Charboneau drank he might become drunk; and if drunk, he

22 might commit offenses.  Dr. Plaud testified, however, that he

23 could not opine that Charboneau would commit a violent sexual

24 crime.  Dr. Plaud also cited Charboneau's attendance at AA

25 meetings at Butner as a positive factor for Charboneau and

1   believed that Charboneau's remaining two-year term of

2   supervised release was a protective factor.

3       As for enrollment in sex offender treatment, Dr. Plaud

4   recognized that he had been enrolled in that treatment.

5   Dr. Plaud opined that Charboneau was not of a proper mind-set

6   in 2002 to 2003 to benefit from that treatment.

7       As for Charboneau's participation in CTP and the importance

8   of maintaining a therapeutic alliance with Dr. Holden,

9   Dr. Plaud testified that Charboneau could receive adequate

10  outpatient sex offender treatment.  As for Dr. Holden's

11  testimony that Charboneau told her that he was sexually

12  dangerous, Dr. Plaud opined that Charboneau tended to agree

13  with whatever is placed before him and, because CTP is a sex

14  offender treatment program for sexually dangerous persons,

15  Charboneau probably simply adopted the belief that he was

16  sexually dangerous.

17      As for the Court's conclusions of law, the Government seeks

18  the commitment of Charboneau pursuant to the Adam Walsh Child

19  Protection Act of 2006.  The Government may seek civil

20  commitment of certain individuals in the custody of federal

21  Bureau of Prisons who are determined to be sexually dangerous

22  persons.

23      To demonstrate an individual should be civilly committed

24  under Section 4248, the Government must prove three elements by

25  clear and convincing evidence:  First, Charboneau has

1    previously engaged or attempted to engage in sexually violent

2    conduct or child molestation; second, Charboneau currently

3    suffers from a serious mental illness, abnormality or disorder;

4    and third, as a result of such a condition, he would have

5    serious difficulty in refraining from sexually violent conduct

6    or child molestation if released.

7         See *United States v. Perez,* 752 F.3d 398, 407, Fourth

8    Circuit, 2014; *United States v. Antone,* 742 F.3d 151, 158,

9    Fourth Circuit, 2014; *United States v. Heyer,* 740 F.3d 284, 291

10   to 292, Fourth Circuit, 2014; *United States v. Wood,* 741 F.3d

11   417, 419, Fourth Circuit, 2013; *United States v. Bolander,* 722

12   F.3d 199, 206, Fourth Circuit, 2013; *United States v. Springer,*

13   715 F.3d 535, 538 Fourth Circuit, 2013; *United States v.*

14   *Caporale,* 701 F.3d 128, 130, Fourth Circuit, 2012; *United*

15   *States v. Wooden,* 693 F.3d 440, 442, Fourth Circuit, 2012;

16   *United States v. Francis,* 686 F.3d 265, 268, Fourth Circuit,

17   2012; *United States v. Hall,* 664 F.3d 456, 461, Fourth Circuit,

18   2012; *United States v. Comstock,* 627 F.3d 513, 515, 516, Fourth

19   Circuit, 2010.

20        As for Prong 1, the Court finds that the Government has

21   proven by clear and convincing evidence that Charboneau has

22   engaged or attempted to engage in sexually violent conduct or

23   child molestation.  Drs. North, Ross, Zinik, and Plaud all

24   opined that this prong is satisfied based on the conduct

25   underlying Charboneau's 1982, 1988, and 2003 convictions and

1  the conduct underlying his 1987 attempted rape.  This Court

2  agrees and finds the Government has met Prong 1 by clear and

3  convincing evidence.

4      As for Prong 2, the Court also finds that the Government

5  has established by clear and convincing evidence that

6  Charboneau suffers from serious mental illnesses, abnormalities

7  or disorders.  On Prong 2, the Court finds Dr. Zinik's analysis

8  to be the most compelling.  As discussed, Dr. Zinik reviewed

9  the records, interviewed Charboneau, and considered all the

10 expert opinions in the case.  His report and testimony were

11 compelling and complete.  His report recounts in great detail

12 both the records review and his interview and clinical

13 impressions of Charboneau.  Dr. Zinik found that Charboneau met

14 criteria for the following four diagnoses from the DSM-5:

15 first, alcohol use disorder, severe, in a controlled

16 environment; second, inhalant use disorder, severe, in a

17 sustained remission; third, inhalant-induced mild

18 neurocognitive disorder; and, fourth, other specified

19 personality disorder with schizotypal and schizoid features.

20 Dr. Zinik then persuasively explained each mental disorder

21 afflicting Charboneau.

22     As for the diagnoses of alcohol use disorder, severe, in a

23 controlled environment and inhalant use disorder, severe, in

24 sustained remission and inhalant-induced mild neurocognitive

25 disorder, Dr. Zinik explained that the essential features of a

1  substance abuse disorder is a cluster of cognitive, behavioral,

2  and physiological symptoms indicating that the individual

3  continues using a psychoactive substance, drugs or alcohol,

4  despite significant substance-related problems.

5      Dr. Zinik explains that Charboneau has a severe inhalant

6  use disorder by history beginning at age 12 and lasting until

7  his 20s -- into his late 20s.  During that time he repeatedly

8  sniffed inhalants, such as gasoline, glue, paint thinner, that

9  likely resulted in organic brain damage with lasting effects,

10  thus the additional diagnosis of inhalant-induced mild

11  neurocognitive disorder.  Charboneau has little memory of his

12  childhood and reported that he would blackout and wake up at a

13  different age.  He was told about the disastrous effects of his

14  inhalant behavior during incarceration and it appears that he

15  stopped, quote, huffing, end quote, the street term for

16  inhalant use, in his late 20s.  Therefore, his inhalant use

17  disorder is in sustained remission.

18      Dr. Zinik also explained that Charboneau continued to

19  consume alcohol and marijuana.  He used marijuana during his

20  last probation, but it is unknown whether he reached the

21  threshold of a substance abuse disorder with respect to

22  marijuana.  On the other hand, Dr. Zinik persuasively opined

23  that alcohol is Blake Charboneau's drug of choice and his most

24  persistent addiction.

25      Charboneau first drank beer with his parents as a child and

developed a serious drinking problem during his teens.  As
discussed, he was admitted to North Dakota State Hospital
eleven times before age 26 with admissions being related to
inhalant abuse and alcohol abuse.  He's been arrested over 20
times on alcohol-related matters and all four of his documented
violent sexual assaults were committed when he was drunk.  He's
been unable to live independently or exhibit any stability in
the community due to his heavy drinking.  He's diagnosed with
alcohol abuse disorder because his life essentially has
revolved around drinking, getting into trouble, and serving
time.  Since he does not have access to alcohol in custody, his
alcohol abuse disorder is currently designated as, quote, in a
controlled environment.

    Dr. Zinik also explained that Charboneau meets criteria for
mild neurocognitive disorder due to years of inhalant abuse,
possibly compounded by years of heavy drinking of alcohol.
This diagnosis is given to individuals who show evidence of
mild neurocognitive decline from a previous level of
functioning in one or more cognitive domains.

    For Charboneau, his disorder is evident by episodes of
disorganized thinking and loose associations and problems with
verbal expressions and language.  Because Charboneau generally
keeps to himself and avoids social contact, his cognitive
deficits may not appear obvious from casual observation, but
Dr. Zinik opined that his difficulty organizing and verbally

1  expressing his thoughts were readily apparent during the

2  clinical interview when Charboneau had to answer open-ended

3  questions.  At times Charboneau's thinking became rambling and

4  illogical and characterized by strange religious themes.  His

5  cognitive deficits do not appear to interfere with his

6  activities of daily living and therefore Dr. Zinik opined that

7  they were mild in nature.

8      As for Dr. Zinik's diagnosis of personality disorder with

9  schizotypal and schizoid features, Dr. Zinik was the only

10 expert to make this diagnosis, and his explanation of the

11 diagnosis was compelling and consistent with the unique record

12 in this case.  Dr. Zinik explained in his report in detail

13 that, according to the DSM-5, a personality disorder is an

14 enduring pattern of inner experience and behavior that deviates

15 markedly from expectations of the individual's culture.  It's

16 pervasive and inflexible, has an onset in adolescence or early

17 adulthood, is stable over time and leads to distress or

18 impairment.  Personality disorders or character disorders

19 consist of long-term dysfunctional ways of behaving.  When

20 symptoms do not fully meet the criteria for any one personality

21 disorder or combined features of more than one personality

22 disorder are prominent, the, quote, other specified personality

23 disorder is diagnosed, according to Dr. Zinik.

24     According to the DSM-5, schizotypal personality disorder is

25 a mental disorder characterized by social and interpersonal

1  deficits that result in acute discomfort with, and reduced

2  capacity for, close relationships.  It is also characterized by

3  cognitive or perceptual distortions and eccentricities of

4  behavior.  People with schizotypal personality disorder have

5  severe social anxiety and odd beliefs.  They're typically

6  unable to form emotional attachments with others or sustain

7  relationships because they believe others harbor negative

8  thoughts toward them.  Peculiar speech mannerisms, strange

9  beliefs, and odd modes of dress are also diagnostic signs of

10  this disorder, according to Dr. Zinik.  In some cases, people

11  with schizotypal personality disorder may react oddly in

12  conversation, not respond or talk to themselves.  They

13  frequently misinterpret situations as being odd or having

14  unusual meaning for them.

15      According to the DSM-5, schizoid personality disorder is a

16  pervasive pattern of detachment from social relationships and a

17  restricted range of expression of emotions in interpersonal

18  settings.  It is characterized by tendencies toward a solitary

19  lifestyle, secretiveness, emotional coldness, and apathy,

20  according to Dr. Zinik.  People who have this condition often

21  appear to be socially isolated and loners.  At the same time,

22  people with schizoid personality disorder may have an elaborate

23  internal fantasy world that they ever rarely expose.

24      Dr. Zinik explained persuasively why Charboneau has a mixed

25  personality disorder with the following schizotypal and

1  schizoid features including odd beliefs, superstitions or

2  magical thinking that influence behavior and are consistent

3  with cultural norms, schizotypal; unusual perceptual

4  experiences, including bodily illusions, schizotypal; odd

5  thinking and speech, schizotypal; suspiciousness or paranoid

6  ideation, schizotypal; inappropriate or constricted affect,

7  schizotypal; lack of close friends or confidants, other than

8  first-degree relatives, schizotypal; excessive social anxiety

9  that does not diminish with familiarity and tends to be

10  associated with paranoid fears, schizotypal; almost always

11  choosing solitary activities, schizoid; takes pleasure in few,

12  if any, activities, schizoid; shows emotional coldness,

13  detachment or flattened affectivity, schizoid; has little, if

14  any, interest in having sexual experience with another person,

15  schizoid.

16      Dr. Zinik's opinion appears consistent with the opinion of

17  Dr. McKee, who is discussed in Dr. Ross's report at Government

18  Exhibit 5, page 6, who diagnosed Charboneau in 1982 with

19  schizoid personality disorder.  In crediting Dr. Zinik's

20  opinion, the Court recognized that Dr. Ross ruled out the

21  diagnosis at page 15 of her report and that Dr. Plaud's report

22  and testimony revealed some evidence of schizoid and histrionic

23  personality disorder, but that he ruled out the diagnosis.

24      The Court credits the opinion of Dr. Zinik.  Dr. Zinik

25  persuasively opined that Charboneau's substance use disorders,

1  alcohol and inhalants, inhalant-induced mild neurocognitive

2  disorder, and schizotypal-schizoid personality disorder are

3  interrelated and additive.  Charboneau abused inhalants and

4  alcohol during his formative years, his early teens, mid-20s,

5  which damaged his brain, impaired his cognitive development,

6  and arrested his emotional maturation and personality

7  development.

8       Charboneau, according to Dr. Zinik, stated that he had no

9  interest in marriage and avoided sexual opportunities with

10 women.  In the past, sex with women made him feel embarrassed.

11 As Dr. Zinik noted, one feature of schizoid personality

12 disorder is having little, if any, interest in sexual

13 experience with others, which, Dr. Zinik explains,

14 characterizes Charboneau.

15      On the other hand, this might suggest that Charboneau would

16 refrain from sexually violent conduct and lower his risk to

17 commit sexual crimes.  However, Dr. Zinik persuasively

18 explained that quite the opposite was true in this unique case.

19 Charboneau is afraid of women and embarrassed about sex.  He's

20 conflicted about sexual experience, whether it's with women or

21 masturbation.  However, he's not asexual, that is, devoid of

22 sexual feelings and desires.  He is erotically attracted to

23 women and gets sexually aroused and still masturbates, albeit

24 reluctantly.

25      His sexual anxiety, Dr. Zinik explained, and the fact that

1   he has no ability to manage and control sexual feelings when

2   they do occur, especially under the influence of alcohol, makes

3   him more sexually dangerous, according to Dr. Zinik.   Thus,

4   Dr. Zinik opined, and this Court agrees, that Charboneau

5   suffers from a combination of serious mental disorders that

6   meet criteria under Prong 2 of the Adam Walsh Act.   This Court

7   finds the Government has proven Prong 2 by clear and convincing

8   evidence.

9       Alternative.   The Government presented the testimony of

10  Drs. North, Ross, and Dr. Zinik in the alternative.   Dr. Zinik

11  opined in the alternative to establish that Charboneau also

12  suffers from a single serious mental illness, abnormality or

13  disorder, to wit:   alcohol use disorder.   The Court also

14  credits the testimony of these three experts and also finds by

15  clear and convincing evidence that Charboneau suffers from

16  alcohol use disorder, severe, in a controlled environment;

17  inhalant use disorder, severe, in sustained remission; and

18  inhalant-induced mild neurocognitive disorder.

19      In this unique case and in the alternative, the Court finds

20  that alcohol use disorder, severe, in a controlled environment

21  is a serious mental illness, abnormality or disorder.   The

22  Court finds that the opinions of Drs. North, Ross, and Zinik in

23  the alternative that Charboneau's alcohol use disorder, severe,

24  in a controlled environment qualifies as a serious mental

25  illness, abnormality or disorder are more persuasive that

1 Dr. Plaud's opinion that such a diagnosis does not qualify in

2 this case.  See *Caporale,* 701 F.3d at 135 to 137.

3        As discussed, law enforcement officers repeatedly have

4 jailed Charboneau for alcohol-related offenses, including

5 public intoxication, liquor violations, and disorderly conduct.

6 The records show that Charboneau's alcohol abuse in the

7 community was pervasive and that he committed the four sexually

8 violent offenses while severely intoxicated.  The overwhelming

9 evidence in this case demonstrates that Charboneau's alcohol

10 abuse, again coupled with all these other issues that he has,

11 even putting aside Dr. Zinik's additional diagnosis, resulted

12 in interpersonal difficulties that included estrangement from

13 his family and tribe.

14        Moreover, the strength of the disorder is such that

15 Charboneau admitted eventually that when he raped his

16 10-year-old daughter he lost control and should not have raped

17 her, and that during his 2003 sexual assault of another

18 relative he lost control and should not have orally copulated

19 the victim.  Likewise, the experts explained at length why the

20 diagnosis applied to Charboneau and why it met Prong 2 in the

21 case.

22        The Court thus finds that, in this unique case, in the

23 alternative alcohol abuse disorder, severe, in a controlled

24 environment is a serious mental illness, abnormality or

25 disorder.  Notably, in *Caporale,* the Fourth Circuit held that

1  the Adam Walsh Act's reference to, quote, serious mental

2  illness, abnormality or disorder, end quote, is not limited to

3  those disorders identified in the DSM.  See *Caporale,* 701 F.3d

4  at 136.

5      As a corollary, *Caporale* also teaches that some mental

6  illnesses, abnormalities or disorders identified in the DSM,

7  such as alcohol use disorder, are not categorically excluded

8  from qualifying as a serious mental illness, abnormality or

9  disorder.  See id. at 135 through 137.  Rather, *Caporale*

10 teaches that a court must determine on a case-specific basis

11 whether the diagnosis at issue with respect to the individual

12 at issue constitutes a serious mental illness, abnormality or

13 disorder within the meaning of the Adam Walsh Act.  See id.

14 See also *Kansas v. Crane,* 534 U.S. 407, 413, 2002; *Springer,*

15 715 F.3d at 546.

16     Here the Court does find by clear and convincing evidence

17 that this diagnosis meets Prong 2.

18     As for Prong 3, the Government also has proven by clear and

19 convincing evidence that, as a result of his serious mental

20 illnesses, abnormalities or disorders, Charboneau would have

21 serious difficulty in refraining from sexually violent conduct

22 or child molestation if released.  The Court again credits the

23 testimony and opinions of Dr. Zinik on this issue.  The Court

24 also credits the testimony of Dr. Holden that Charboneau

25 admitted to her that he was sexually dangerous.  See Government

1   Exhibit 27.

2       Again, as discussed, the Court considers Dr. Zinik's expert

3   testimony in this case to be the most persuasive expert

4   testimony among all the experts.  Alternatively as to Prong 3,

5   the Court also credits the testimony of Drs. North and Ross and

6   the alternative conclusion of Dr. Zinik that even if the Court

7   were only to consider the alcohol use disorder, severe, as the

8   only serious mental illness, abnormality or disorder that Prong

9   3 is still satisfied; and that as a result of that serious

10  mental illness, abnormality or disorder, Charboneau would have

11  serious difficulty in refraining from sexually violent conduct

12  or child molestation if released.

13      In *Kansas v. Crane,* 534 U.S. 411, 2002, the Supreme Court

14  held that in order to civilly commit someone for sexual

15  dangerousness there must be proof of serious difficulty in

16  controlling behavior.  See id. at 413.  The Supreme Court noted

17  that this standard allowed courts wide discretion in relying on

18  numerous factors relevant to sexual dangerousness.  The Fourth

19  Circuit repeatedly has applied this standard in Adam Walsh Act

20  cases.  See *Perez,* 752 F.3d at 407; *Antone,* 742 F.3d at 158;

21  *Heyer,* 740 F.3d at 291 through 294; *Wood,* 741 F.3d at 422 and

22  423; *Bolander,* 722 F.3d at 214 through 216; *Wooden,* 693 F.3d at

23  459 through 463.

24      In *Wooden,* the Fourth Circuit identified certain factors to

25  consider at Prong 3, including, one, failures while on

1   supervision; two, resistance to treatment; three, continued

2   deviant thoughts; four, cognitive distortions; five, actuarial

3   risk assessments; six, impulsiveness; and seven, historical

4   offenses, both sexual and nonsexual.  See *Wooden,* 693 F.3d at

5   pages 458 through 462.

6       A court also must fully consider and account for why a

7   detainee's positive incarceration conduct is overshadowed by

8   other factors that warrant a finding that the detainee would

9   have serious difficulty from refraining from engaging in

10  sexually violent conduct or child molestation.  See *Antone,* 742

11  F.3d at pages 164 through 170.

12      The experts all agreed that when housed in a secured

13  institution Charboneau generally acts as a model prisoner.  He

14  did so after his 1982 conviction and the other convictions.

15  Yet when he was released, he abused alcohol and reoffended

16  violently and sexually.  Unlike the detainee in *Antone,*

17  Charboneau is in BOP custody on a supervised release revocation

18  for which he violated his term of supervised release while in

19  sex offender treatment.  Indeed, on the date of the 2003

20  violent sexual assault fueled by alcohol, he was being closely

21  supervised, had been attending sex offender treatment in the

22  community, and was urine tested for alcohol on the morning of

23  the violent, alcohol-fueled sexual assault.  Yet later that

24  afternoon he engaged in the alcohol-fueled sexual assault of

25  his adult niece.

1         Moreover, Dr. Zinik's report and testimony fully explain

2    why Charboneau comports himself well in a controlled

3    institutional environment but reverts to drinking alcohol,

4    lawbreaking, and sexual violence in the community.  Drs. North

5    and Ross also gave persuasive explanations on this point even

6    if one only looks at the alcohol use disorder diagnosis.

7         Charboneau's positive institutional conduct does not

8    outweigh the other factors in this unique case.  One such

9    critical factor is Charboneau's admission in December 2016 that

10   he is sexually dangerous.  See Government Exhibit 26.  At trial

11   Dr. Holden credibly testified that Charboneau admitted to her

12   in December 2016 that he was sexually dangerous.

13        The Court gives credit to her testimony and does not credit

14   the opinion of Dr. Plaud attempting to explain the admission or

15   the denial, to the extent Mr. Charboneau denied it during his

16   testimony.  Rather, the Court credits Dr. Holden's testimony

17   that she had developed a therapeutic alliance with Charboneau,

18   that he made the admission, and that she carefully and

19   accurately recorded the statement.

20        As for the *Wooden* factors, the record is replete with

21   evidence of Charboneau's failure on supervision, including most

22   recently in 2003 his resistance to both sex offender treatment

23   and substance abuse treatment -- although to his credit, he is

24   in the CTP and attending AA meetings -- and cognitive

25   distortions as reflected in Government's Exhibits 24 and 25,

1   and as reflected in his persistent denial until the trial in

2   this 4248 case that he has an alcohol abuse problem.  The Court

3   also has considered the actuarial risk assessment,

4   impulsiveness when not in a custodial setting, particularly as

5   to alcohol, and historical offense behavior, both sexual and

6   nonsexual.  They too support this Court's finding on Prong 3.

7       The Court also credits the opinion of Dr. Zinik as helping

8   to explain the absence of continued deviant thoughts.  Unlike

9   the respondent in *Wooden,* there isn't evidence of continued

10  deviant thoughts by Mr. Charboneau.

11      Finally, the Court does not credit Dr. Plaud's opinion on

12  Prong 3.  Dr. Plaud opined, as I've mentioned, that in order to

13  conclude that Charboneau is sexually dangerous the following

14  sequence must be shown to be in place in the future, quote:

15  First, we must be able to conclude that Mr. Charboneau will

16  relapse with alcohol abuse, which does have some probability

17  given his history.  However, we must also be able to conclude

18  that as a consequence of this alcohol relapse Mr. Charboneau in

19  the future will have serious difficulty in controlling

20  specifically his sexual impulses, and we must be able to show

21  that the risk of relapse is related not to general behavioral

22  regulation and control but rather to sexual volitional

23  impairment.  Given the data in this case, it is not possible to

24  do so regarding Mr. Charboneau, especially given the absence of

25  a sexually-based mental disorder in this case.

 1   Mr. Charboneau's major issue concerns a nonsexual disorder

 2   related to his historic substance abuse.  That should be the

 3   focus of future management issues related to Mr. Charboneau,

 4   not sexual risk.  He is therefore not a sexually dangerous

 5   person under federal law in my professional opinion, end quote.

 6   And that's at page 4 of Dr. Plaud's report.

 7       Dr. Plaud opined that it was too speculative to believe

 8   that Charboneau would drink alcohol, get drunk, and commit

 9   another act of sexual violence.  Dr. Plaud opined that if

10   Charboneau lacked volitional control because of his alcohol

11   abuse disorder he would have had many more instances of sexual

12   violence.

13       The Court does not agree with Dr. Plaud.  Rather, the Court

14   gives greater weight to the opinion of Dr. Zinik at Prong 3.

15   Dr. Zinik persuasively explained the unique interplay among all

16   of Charboneau's diagnoses to explain why Charboneau met Prong 3

17   under the Adam Walsh Act.  As part of that analysis, Dr. Zinik

18   persuasively discussed his risk assessment of dynamic risk

19   factors, as well as static risk factors.  He also persuasively

20   explained how the SVR-20, in absence of protective factors,

21   supported his findings at Prong 3 and persuasively explained

22   how an examination of BOP's guidelines to determine Prong 3

23   supported a positive finding on Prong 3.

24       Alternatively, even if one just considers Charboneau's

25   alcohol use disorder alone as the Prong 2 diagnosis, the Court

9/28/17 - 5:15-HC-2287 - HEARING TO ANNOUNCE DECISION

61

1  credits the opinions of Dr. Ross, Dr. North, and the

2  alternative opinion of Dr. Zinik over the opinion of Dr. Plaud

3  at Prong 3.  The opinions of Dr. Ross, Dr. North, and the

4  alternative opinion of Dr. Zinik are better reasoned, more

5  thorough, and more consistent with this unique case.

6      In sum, the Government has proven its case by clear and

7  convincing evidence.  Thus, Blake Charboneau is committed to

8  the custody of the Attorney General under the Adam Walsh Act

9  until such time as he is no longer a sexually dangerous person.

10     I do thank counsel for their work in connection with the

11 case.  I will sign an order that will incorporate by reference

12 my findings and conclusions in connection with this case, and

13 we will be in recess until 9 a.m.

14     (Proceedings concluded at 5:38 p.m.)

15

16

17                    **C E R T I F I C A T E**

18     I, LORI RUSSELL, RMR, CRR, United States District Court
   Reporter for the Middle District of North Carolina, DO HEREBY
19 CERTIFY:

20     That the foregoing is a true and correct transcript of the
   proceedings had in the within-entitled action; that I reported
21 the same in stenotype to the best of my ability and thereafter
   reduced same to typewriting through the use of Computer-Aided
22 Transcription.

23

24 *Lori Russell*

25 Lori Russell, RMR, CRR        Date:  10-18-17
   Official Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-HC-2287-D

UNITED STATES OF AMERICA          )
                                  )
              Petitioner,         )
                                  )
      v.                          )                **ORDER**
                                  )
BLAKE CHARBONEAU,                 )
                                  )
              Respondent.         )

The United States ("petitioner") seeks to civilly commit Blake Charboneau ("Charboneau" or "respondent") as a "sexually dangerous person" under the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), codified at 18 U.S.C. §§ 4247–48. Pursuant to the Adam Walsh Act, if the court finds by clear and convincing evidence, after a hearing, that a person is a "sexually dangerous person," the court must commit the person to the custody of the Attorney General. Id. § 4248(d). A "sexually dangerous person" is one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." Id. § 4247(a)(5). A person is considered "sexually dangerous to others" if "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. § 4247(a)(6).

To obtain a commitment order against Charboneau, the government must establish three facts by clear and convincing evidence: (1) that Charboneau "has engaged or attempted to engage in sexually violent conduct or child molestation," id. § 4247(a)(5); (2) that Charboneau currently "suffers from a serious mental illness, abnormality, or disorder"; and (3) as a result of the serious

mental illness, abnormality, or disorder, that Charboneau "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. § 4247(a)(6); see United States v. Perez, 752 F.3d 398, 407 (4th Cir. 2014); United States v. Antone, 742 F.3d 151, 158 (4th Cir. 2014); United States v. Heyer, 740 F.3d 284, 291–92 (4th Cir. 2014); United States v. Wood, 741 F.3d 417, 419 (4th Cir. 2013); United States v. Bolander, 722 F.3d 199, 206 (4th Cir. 2013); United States v. Springer, 715 F.3d 535, 538 (4th Cir. 2013); United States v. Caporale, 701 F.3d 128, 130 (4th Cir. 2012); United States v. Wooden, 693 F.3d 440, 442 (4th Cir. 2012); United States v. Francis, 686 F.3d 265, 268, 274 (4th Cir. 2012); United States v. Hall, 664 F.3d 456, 461 (4th Cir. 2012); United States v. Comstock, 627 F.3d 513, 515–16 (4th Cir. 2010).

On January 27, 2017, the court held a bench trial. On September 28, 2017, the court announced its findings and conclusions from the bench. The transcript is incorporated herein by reference. The United States has proven by clear and convincing evidence that Charboneau has engaged in sexually violent conduct and suffers from serious mental illnesses, abnormalities, or disorders. The United States also has proven by clear and convincing evidence that, as a result of his serious mental illnesses, abnormalities, or disorders, Charboneau "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Thus, the United States has proven that Charboneau is a sexually dangerous person as defined in the Adam Walsh Act. Accordingly, judgment shall be entered in favor of petitioner, the United States, and against respondent, Blake Charboneau. Charboneau is hereby committed to the custody and care of the Attorney General pursuant to 18 U.S.C. § 4248.

SO ORDERED. This 28 day of September 2017.

_James C. Dever_

JAMES C. DEVER III
Chief United States District Judge

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION


UNITED STATES OF AMERICA,
                    Petitioner,
          v.                                    **Judgment in a Civil Case**
BLAKE CHARBONEAU,
                    Respondent.                 Case Number: 5:15-HC-2287-D


**Decision by Court.**

This action came before the Honorable James C. Dever III, Chief United States District Judge, for consideration after the court held a bench trial.


**IT IS ORDERED AND ADJUDGED** that the respondent is committed to the custody and care of the Attorney General pursuant to 18 U.S.C. § 4248.


This Judgment Filed and Entered on September 28, 2017, with service on:
Christopher M. Anderson, Michael James and G. Norman Acker, III
 (via CM/ECF Notice of Electronic Filing)
Halerie F. Mahan and Katherine E. Shea
 (via CM/ECF Notice of Electronic Filing)


September 28, 2017                      Peter A. Moore, Jr. _____
                                       Clerk of Court



                                 By: _____

                                       Deputy Clerk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-HC-2287-D

UNITED STATES OF AMERICA,
     Petitioner,

    v.                                                     NOTICE OF APPEAL

BLAKE CHARBONEAU,
     Respondent.

       Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure, NOTICE IS HEREBY

GIVEN that respondent, Blake Charboneau, hereby appeals to the Fourth Circuit Court of

Appeals from the judgment entered in this court in the above-captioned case.  As judgment was

entered by the Honorable James C. Dever III, Chief United States District Judge, on September

28, 2017, this notice is therefore filed within the time specification established in Rule 4(a)(B).

       Respectfully requested this 2nd day of October,  2017.

                   LOUIS C. ALLEN
                   Acting Federal Public Defender

                   */s/ Katherine E. Shea*
                   KATHERINE E. SHEA
                   Assistant Federal Public Defender
                   Counsel for Michael D. McBride
                   Office of the Federal Public Defender
                   150 Fayetteville Street, Suite 450
                   Raleigh, North Carolina 27601
                   Telephone: 919-856-4236; Fax: 919-856-4477
                   E-mail: kat_shea@fd.org
                   Member of NY State Bar
                   LR 57.1 Counsel, Appointed

*CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that a copy of the foregoing *Notice of Appeal* was served upon:

**G. NORMAN ACKER, III**          **BLAKE CHARBONEAU**
**CHRISTOPHER M. ANDERSON**      Reg. No. 05318-059
**MICHAEL JAMES**                 FCI Butner Medium I
U.S. Attorney's Office            P.O. Box 1000
310 New Bern Ave.                 Butner, NC 27509
Suite 800                         via USPS
Raleigh, NC 27601-1461
Email: norma.acker@usdoj.gov
Email: michael.anderson7@usdoj.gov
Email: mike.james@usdoj.gov

by electronically filing the foregoing with the Clerk of Court on October 2, 2017 using the

CM/ECF system which will send notification of such filing to the above.

This the 2nd day of October, 2017.

/s/ Katherine E. Shea
KATHERINE E. SHEA
Assistant Federal Public Defender
Counsel for Michael D. McBride
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236; Fax: 919-856-4477
E-mail: kat_shea@fd.org
Member of NY State Bar
LR 57.1 Counsel, Appointed

## CERTIFICATE OF SERVICE

I certify that on January 22, 2018, the foregoing document was served on all

parties or their counsel of record through the CM/ECF system and by serving a

true and correct copy at the address listed below:

MICHAEL GORDON JAMES
ASSISTANT UNITED STATES ATTORNEY
EASTERN DISTRICT OF NORTH CAROLINA
Federal Building, Suite 800
310 New Bern Avenue
Raleigh, North Carolina 27601-1461
mike.james@usdoj.gov

/s/ Jaclyn L. DiLauro
Jaclyn L. DiLauro