BRIEF FOR APPELLEE

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

NO. 17-7306

_____

UNITED STATES OF AMERICA,

Appellee,

v.

BLAKE CHARBONEAU,

Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

---

BRIEF OF THE UNITED STATES

---

ROBERT J. HIGDON, JR.
United States Attorney

BY: G. NORMAN ACKER III
Civil Chief, Assistant U.S. Attorney
MICHAEL G. JAMES
Assistant United States Attorney
310 New Bern Avenue
Suite 800
Raleigh, North Carolina 27601
Telephone: (919) 856-4530

Attorneys for Appellee

---

TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................ii

STATEMENT OF JURISDICTION.......................................1

STATEMENT OF ISSUES............................................2

STATEMENT OF FACTS.............................................3

SUMMARY OF ARGUMENT...........................................41

ARGUMENT.....................................................42

    I.    THE DISTRICT COURT DID NOT ERR WHEN IT FOUND
          CHARBONEAU SUFFERED FROM A SERIOUS MENTAL ILLNESS,
          ABNORMALITY, OR DISORDER UNDER THE ADAM WALSH ACT.......42

          A.   Standard of Review ...............................42

          B.   Discussion of Issue ..............................42

               1.  The district court did not clearly err in
                   crediting Dr. Zinik's diagnosis of a
                   personality disorder..........................44

               2.  The district court did not clearly err when
                   it found in the alternative that alcohol use
                   disorder can qualify as a serious mental
                   illness, abnormality, or disorder under the
                   Adam Walsh Act................................46

    II.  THE DISTRICT COURT DID NOT ERR WHEN IT FOUND
         CHARBONEAU WOULD HAVE SERIOUS DIFFICULTY REFRAINING
         FROM SEXUALLY VIOLENT CONDUCT OR CHILD MOLESTATION
         IF RELEASED AND THUS WAS A SEXUALLY DANGEROUS PERSON
         ......................................................51

          A.   Standard of Review ...............................51

          B.   Discussion of Issue ..............................512

CONCLUSION...................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

TABLE OF AUTHORITIES

CASES

Addington v. Texas, 441 U.S. 418 (1979)..........................43

Anderson v. Bessemer City, 470 U.S. 564 (1985)..............42, 51

Easley v. Cromartie, 532 U.S. 234 (2001)...................42, 51

Kansas v. Hendricks, 521 U.S. 346 (1997)........................44

Kansas v. Crane, 534 U.S. 407 (2002)...........................43

United States v. Antone, 742 F.3d 151
   (4th Cir. 2014).........................................passim

United States v. Begay, 880 F. Supp.2d 707
   (E.D.N.C. 2012).........................................46-48

United States v. Caporale, 701 F.3d 128
   (4th Cir. 2012).........................................passim

United States v. Gloshay, Civ. No. 5:08-HC-2051-BR
   (E.D.N.C. June 4, 2012).....................................49

United States v. Hall, 664 F.3d 456
   (4th Cir. 2012)............................................42

United States v. Julius, Civ. No. 5:08-HC-2076-H
   (E.D.N.C. Mar. 18, 2013)................................47, 50

United States v. Sneezer, Civ. No. 5:08-HC-2107-BO
   (E.D.N.C. Nov. 30, 2012)................................passim

United States v. Wooden, 693 F.3d 440
   (4th Cir. 2012).........................................passim

STATUTES

18 U.S.C. § 4244...............................................9

18 U.S.C. § 4247..............................................42

18 U.S.C. § 4247(a)(6).....................................43, 46

18 U.S.C. § 4248............................................1, 42

28 U.S.C. § 1291..............................................1

28 U.S.C. § 1331..............................................1

<u>OTHER AUTHORITIES</u>

Diagnostic and Statistical Manual of Mental Disorders
   (5th ed. 2013)..........................................passim

## STATEMENT OF JURISDICTION

Appellant Blake Charboneau ("Charboneau") appeals from an order of judgment following a civil commitment bench trial pursuant to 18 U.S.C. § 4248. Jurisdiction to the district court was established by 18 U.S.C. § 4248 and 28 U.S.C. § 1331.

Jurisdiction to this Court is provided by 28 U.S.C. § 1291. The judgment was entered on September 28, 2017. (J.A. 308). Charboneau filed a timely notice of appeal on October 2, 2017. (J.A. 309).

<u>STATEMENT OF ISSUES</u>

1.    Whether the district court committed clear error when it found Charboneau suffered from a serious mental illness, abnormality, or disorder under the Adam Walsh Act.

2.    Whether the district court erred when it found Charboneau would have serious difficulty refraining from sexually violent conduct or child molestation if released.

STATEMENT OF FACTS

Procedural History

On December 3, 2015, the United States filed a certification of a sexually dangerous person against Charboneau. (J.A. 2-3, 12-16).

On January 27, 2016, the district court held the bench trial. (J.A. 8, 28-244). At trial, the United States called Dr. Kara Holden (J.A. 36-60), Dr. Christopher North (J.A. 61-85), Dr. Heather Ross (J.A. 85-124), and Dr. Gary Zinik (J.A. 124-56). Charboneau testified on his own behalf (J.A. 158-75) and called Dr. Joseph J. Plaud (J.A. 176-231). The district court also admitted into evidence numerous exhibits, including the initial treatment plan prepared by Kara Holden ("Dr. Holden"), and the evaluations prepared by Drs. Heather Ross ("Dr. Ross"), Christopher North ("Dr. Ross"), Joseph J. Plaud ("Dr. Plaud"), and Dr. Gary Zinik ("Dr. Zinik"). (J.A. 22-24, 311-416).

On September 28, 2017, the district court announced from the bench its decision and issued a written order stating that it found Charboneau was a sexually dangerous person under the Adam Walsh Act and ordered him committed to the custody of the Attorney General. (J.A. 9, 245-307).

Summary of Trial Evidence

Charboneau is an unmarried 57-year-old Native American enrolled member of the Turtle Mountain Band of the Chippewa tribe.

(J.A. 159, 311, 372, 387). Charboneau fathered two children, although in a self-report he alleged that a paternity test determined he was not their father. (J.A. 311, 324, 350).

Charboneau was born on a reservation in Devils Lake, North Dakota, where his mother and father raised him, his seven brothers, and five sisters. (J.A. 159, 311, 372, 387). When Charboneau was 14 years-old he moved to the Devils Lake Sioux Reservation in Fort Totten, North Dakota. (J.A. 372).

Charboneau described his parents as hardworking people. (J.A. 373). Records indicate that Charboneau's father abused Charboneau's mother. (J.A. 387). Charboneau's parents are no longer married and Charboneau's mother previously alleged that Charboneau's father may have sexually abused Charboneau and his siblings, which Charboneau denied. (J.A. 323-24).

Based on Charboneau's repeated criminal conduct and alcohol abuse his family has refused to have a contact with him. (J.A. 311). Charboneau has not had contact with his siblings in over 25 years. (J.A. 311). Charboneau has not had contact with his parents in over a decade. (J. A. 311, 372-73).

Charboneau's parents reportedly abused alcohol. (J.A. 311). When Charboneau turned 12 years old, he began abusing alcohol and inhalants by sniffing solvents, paint, and gasoline and developed behavioral problems. (J.A. 373). This in turn led to poor performance in school and to his parents repeatedly petitioning

4

the Tribal Court to place Charboneau in North Dakota State Hospital for substance abuse treatment.  (J.A. 169, 373).

Charboneau has had frequent contact with the criminal justice system.  According to records from the North Dakota State Hospital, tribal law enforcement officers first arrested Charboneau when he was 13 years old for repeatedly running away from home and fighting.  (J.A. 327).  Since 1978, law enforcement officers arrested or took Charboneau into custody approximately 36 times for various crimes ranging from disorderly conduct, public intoxication, assault, larceny, and liquor violations to sexual crimes.  (J.A. 327-31).  More than 20 of Charboneau's non-sexual offenses are related to Charboneau's alcohol abuse.  (J.A. 374).  Charboneau committed all of his sexual offenses while under the influence of alcohol.  (J.A. 160).

On June 30, 1982, Charboneau, then 22 years old, pleaded guilty to his first sexual offense.  (J.A. 328).  On April 2, 1982, Charboneau attended a party where the victim, his 23-year-old female cousin, was also present.  (J.A. 328, 388).  His cousin left the party at approximately 1:00 a.m. on April 3, 1982, and returned to an apartment of a friend that she was house sitting.  (J.A. 328, 388).  Charboneau, then intoxicated, followed her to the apartment and after she got in bed, pushed the door open and entered the apartment and demanded cigarettes.  (J.A. 160, 328, 340-41, 374-75).  Charboneau grabbed her, tore off her nightgown

5

and panties, slapped her across her face, and punched her on her legs with a closed fist. (J.A. 328-29, 374-75, 388). Charboneau also threatened to kill her if she did not submit to his sexual demands or if she told anyone. (J.A. 329, 375, 388). Charboneau then raped her until two of her friends heard her screams, entered the apartment and found the victim and Charboneau in the bedroom. (J.A. 329, 341, 375, 388). A rescuer asked Charboneau what happened and Charboneau laughed, commented incoherently, and then left the apartment. (J.A. 329, 341, 375, 388).

Charboneau was in Fort Totten Tribal police custody the next day on unrelated disorderly conduct charges when officers questioned him about the sexual assault. (J.A. 341, 375, 388). Charboneau told the tribal police officers that he could not remember what occurred because he had suffered an alcoholic blackout. (J.A. 375, 388-89). Fort Totten Tribal police officials charged Charboneau with rape and assault and Charboneau, as part of a negotiated plea agreement, pleaded guilty in federal court to the assault charge and the sentencing judge sentenced him to 18 months' imprisonment. (J.A. 328, 376, 389).

Prior to sentencing, a psychologist evaluated Charboneau and diagnosed him with Borderline Intellectual Functioning, Alcohol Abuse, and Schizoid Personality Disorder. (J.A. 389). The psychologist described Charboneau as "an immature, inept loner,"

whose inhalant and alcohol abuse appeared to be a "'significant part of his interpersonal style.'" (J.A. 389).

In October 1982, Charboneau was sent to the federal medical center in Springfield, Missouri, for an evaluation based on Charboneau's odd behavior. (J.A. 389). Charboneau remained at the federal hospital for six months before he was released to the Devil's Lake Sioux Reservation on November 4, 1983, with a diagnosis of Unspecified Substance Abuse and Antisocial Personality. (J.A 389).

From September 4, 1984, to April 15, 1987, Charboneau was arrested on various public intoxication, and assault and battery charges. (J.A. 327-28, 389-90). Charboneau was admitted to Jamestown State Hospital for alcohol treatment during that period. (J.A. 327, 389).

On August 11, 1987, Charboneau committed his second sexual offense. (J.A 165-66, 329, 342, 375). Charboneau entered a woman's home and forcibly removed her clothing and attempted to rape her on the kitchen floor when the victim's husband came home and stopped him from completing the sexual assault. (J.A 165-66, 329, 342, 375, 392). Tribal law enforcement officials questioned Charboneau but did not charge him. (J.A. 342).

On July 31, 1988, Charboneau committed his third sexual offense. (J.A. 329-30, 342-44, 375-76, 390-94). This offense occurred after a family picnic. (J.A 342, 390,). Charboneau was

drunk when he took his 10-year-old daughter to an area obscured by bushes and raped her. (J.A. 329-30, 342-44, 375-76, 390-91). Charboneau's 5-year-old nephew was present during the rape. (J.A. 330, 342-44, 376). Charboneau bloodied his daughter's nose when he slapped and punched her in the face during the sexual assault. (J.A. 330, 343, 375, 390-91). Charboneau told Dr. North that he felt a numbness feeling and vibration as he pulled his daughter's clothes off. (J.A. 344).

Charboneau halted the sexual assault when his sister honked the horn of her automobile as she was looking for her son and niece, which allowed Charboneau's daughter to escape. (J.A. 330, 343, 375-76, 391-92). Charboneau's daughter then ran to the car and told her aunt that Charboneau raped her. (J.A. 330, 343, 376, 391-92).

Charboneau's sister later told law enforcement officers that her niece's nose was bloodied and her niece's clothing was disheveled. (J.A. 330, 390-91). His sister also told the officers that she saw Charboneau buttoning his pants as he emerged from the bushes. (J.A. 330, 390). Bureau of Indian Affair officers arrested Charboneau, who at the time of his arrest was drunk. (J.A. 390). A Physical examination of the victim revealed "pubescent genitalia, with what appeared to be sperm in the region of the labia, and a ruptured hymen which was bleeding slightly." (J.A. 330, 390).

On October 27, 1988, a jury sitting in the United States District Court in North Dakota found Charboneau, then 28 years old, guilty of aggravated sexual abuse by force. (J.A. 329, 390, 393). The sentencing court committed Charboneau to the custody of the Attorney General for an examination pursuant to 18 U.S.C. § 4244 prior to sentencing. (J.A. 329, 393). On December 5, 1989, the Warden of the Federal Medical Facility in Rochester, Minnesota, certified that Charboneau had recovered to the extent that he no longer required psychiatric hospitalization and could return for sentencing. (J.A. 329).

On January 4, 1990, the sentencing court denied Charboneau's downward departure motion based on the violent nature of the crime and Charboneau's voluntary use of intoxicants and sentenced Charboneau to 60 months' imprisonment and recommended that BOP place Charboneau at a federal medical center. (J.A. 329, 393). The sentencing court further ordered that Charboneau serve a five-year term of supervised release; barred Charboneau from using alcohol, narcotic drugs, or any other controlled substance without a prescription by licensed medical practitioner; and required drug testing to verify Charboneau's compliance. (J.A. 329, 394). Charboneau admitted for the first time that he raped his daughter. (J.A. 330, 344, 393-94). During Charboneau's incarceration, he did not participate in sex offender treatment, mental health, or substance abuse treatment. (J.A. 394).

On October 11, 2000, Charboneau was released from BOP custody to the District of North Dakota and began his term of supervised release. (J.A. 330). The sentencing court later modified Charboneau's conditions of supervision to include sex offender registry, no contact with minors, no residing with minors, no attempt to communicate with or traveling near the victims of his offense, no loitering near areas where minors congregate, no dating or socializing with anyone who has children, and participation in sex offender treatment including submitting to the administration of a polygraph. (J.A. 330).

In March 2001, the United States Probation cited Charboneau with two violations. (J.A. 321, 395). The petition for the warrant of summons noted that staff employed by the Sex Offender program at Lake Region Human Service Center in Devils Lake did an assessment and found Charboneau not suitable for treatment due to his denial and a lack of empathy for his victim. (J.A. 327, 395). The petition also cited the fact that Charboneau was homeless. (J.A. 395).

On May 1, 2001, United States Probation transferred Charboneau's supervision to Rapid City, South Dakota, for his placement in Community Alternatives of the Black Hills, a community corrections center, and to provide him with access to mental health and sex offender treatment. (J.A. 330, 395).

10

On January 25, 2002, Charboneau tested positive for marijuana and admitted that he drank alcohol on New Year's Eve. (J.A. 395). Charbonneau was referred to Recovering Outpatient Alcohol and Drug Services ("ROADS") for substance-abuse treatment. Charbonneau also spent 12 days in a detoxification facility. (J.A. 395). On March 28, 2002, Charbonneau completed substance abuse treatment at ROADS. (J.A. 350, 377, 395). Charbonneau also continued sex offender treatment and mental health treatment and it was thought that Charbonneau had progressed so well in his treatment that Charbonneau was moved from residential housing to his own apartment near the residential facility. (J.A. 395).

On April 22, 2003, Charboneau disclosed during sex offender treatment that he consumed alcohol at his apartment on one occasion. (J.A. 395). Probation officials increased Charboneau's supervision and programming. (J.A. 395).

Charboneau, then 43 years old, committed his fourth sexual offense in 2003. (J.A. 330-31, 395-97). The victim was his adult niece. (J.A. 331, 344, 396).

On July 11, 2003, Charboneau provided his probation officer with a urine sample to test for the presence of drugs. (J.A. 331). That same day, at 4:00 p.m., Charboneau went to the victim's apartment. (J.A. 331). A friend of the victim was also present. (J.A. 331). Charboneau and the victim drank alcohol, Black Velvet, and Coke. (J.A. 376, 396). Charboneau and the victim consumed

11

alcohol from 4:00 p.m. until 5:30 p.m., during which a second friend of the victim came over. (J.A. 396). The second friend of the victim stayed until 9:00 p.m. and then left. (J.A. 396). The victim was tired and went to sleep and the victim's friend pulled out a cot and slept. (J.A. 396). Charboneau sat on a footstool and continued to drink alcohol. (J.A. 396).

At 11:00 p.m., the victim awoke to the discovery that Charboneau had removed her shorts and panties and was performing cunnilingus on her. (J.A. 331, 345, 376, 396). The victim told Charboneau to stop, got up, and grabbed her shorts. (J.A. 331, 396). Charboneau repeatedly asked the victim if she was angry. (J.A. 331, 376, 396). The victim told Charboneau she was not angry with him. (J.A. 331, 396). The victim dressed and then woke up her friend up and went outside where she told her friend what occurred. (J.A. 331, 345, 376). Charboneau remained in the residence and continued to drink. (J.A. 331). After 15 minutes of demands from the victim to leave, Charboneau left. (J.A. 331). The victim and her friend argued and the victim's friend left the apartment. (J.A. 331). The victim then went back to sleep. (J.A. 331).

Charboneau returned to the victim's apartment at 4:30 a.m. and woke her up when he stumbled as he reentered the apartment. (J.A. 331, 376, 396). The victim noted that Charboneau appeared more intoxicated than before. (J.A. 331, 396). The victim and

Charboneau smoked cigarettes. (J.A. 331, 345). The victim told Charboneau that she was angry with him and he asked her if she did not like men. (J.A. 345, 376). The victim told Charboneau that she was worried that her girlfriend would break up with her. (J.A. 331, 345, 377, 396). At that point, Charboneau threw the victim to the ground and ripped her underwear off. (J.A. 331, 377, 396). Charboneau removed his pants and attempted to rape the victim. (J.A. 331, 345, 376, 397). The victim told Charboneau that she would scream and Charboneau threatened to punch her if she did. (J.A. 345, 377). The victim fought Charboneau off and ran to the bathroom. (J.A. 331, 345, 377, 397). Charboneau followed. (J.A. 331). Charboneau prevented the victim from closing the bathroom door. (J.A. 331, 345, 377, 397). Eventually, Charboneau stopped trying to enter the bathroom and put his clothes back on. (J.A. 331). The victim put on her underwear and shorts. (J.A. 331, 377).

Charboneau and the victim went to an apartment the victim's girlfriend rented. (J.A. 331, 345, 377, 397). Charboneau stood outside. (J.A. 377). The victim, her friend, and another female then went to the Sheriff's Office and reported the incident. (J.A. 345, 377).

Law enforcement officers interviewed Charboneau. (J.A. 346, 377, 397). Charboneau told them that he was the victim's uncle by blood and that he knew her for about six months. (J.A. 346, 377).

He claimed that they had a consensual sexual relationship. (J.A. 377).

Charboneau was charged with second-degree rape and attempted second-degree rape. (J.A. 330). The State later amended the information to charge Charboneau with engaging in sexual contact with a person incapable of consenting, a felony. (J.A. 330).

On December 9, 2003, Charboneau pleaded guilty but mentally ill to the state charge of sexual contact with a person incapable of consenting. (J.A. 330).

On December 23, 2003, the state court sentenced Charboneau to 10 years' imprisonment. (J.A. 330, 397). On January 9, 2004, the state court filed an amended judgment that stated Charboneau had pleaded guilty but mentally ill. (J.A. 330).

Based on the new criminal conduct, United States Probation filed a notice of revocation against Charboneau. (J.A. 330). On November 23, 2004, the federal sentencing court found Charboneau committed the violation and resentenced Charboneau to 36 months' imprisonment consecutive to Charboneau's state conviction and 24 months' supervised release to commence upon Charboneau's release from imprisonment. (J.A. 330, 397).

On August 22, 2013, Charboneau was interviewed he reported no history of substance abuse. (J.A. 398). He also stated that he had no interest in participating in educational or treatment programs. (J.A. 398).

According to a June 15, 2015, transfer record, Charboneau
continued to deny the need for substance abuse treatment. (J.A.
398).

On July 15, 2015, prison officials advised Charboneau that he
was referred for evaluation as a sexually dangerous person under
the Adam Walsh Act. (J.A. 398). Charboneau stated that he was
attending Alcohol Anonymous meetings. (J.A. 398).

On December 3, 2015, the United States filed a certification
and petition that alleged Charboneau was a sexually dangerous
person. (J.A. 2-3, 12-18).

On February 22, 2016, Charboneau voluntarily entered the
Commitment Treatment Program ("CTP") at FCI-Butner. (J.A. 42-43,
311). The CTP is a four-phase program. (J.A. 42). The initial
phase is an orientation phase that allows participants to orient
themselves to the therapeutic community and allows the treatment
providers to observe the participants and to prepare individual
treatment plans. (J.A. 42). The second phase of the program
emphasizes "pro-social living, citizenship, decreasing criminal
behavior as well as fostering interpersonal interactions." (J.A.
42). The third phase addresses sexual self-regulation and relapse
prevention skills. (J.A. 42). The last phase prepares the
participants for a successful re-entry into the community. (J.A.
42). Participants must master each phase before moving to the

15

next phase. (J.A. 53). At the time of the bench trial, Charboneau was in Phase Two of the program. (J.A. 52-53).

Dr. Holden's Testimony

Dr. Kara Holden is Charboneau's treatment provider. (J.A. 41). Dr. Holden testified that when Charboneau entered the CTP he was extremely reserved and did not form bonds with the treatment staff or other individuals in the program. (J.A. 43-44). Slowly that changed and Charboneau began to open up to Dr. Holden, became more comfortable with Dr. Holden and other therapists, and began to engage in the CTP programing. (J.A. 44, 47-48).

Dr. Holden further testified that on December 9, 2016, while in Phase One of the program, Charboneau admitted for the first time that he had a sexual deviance problem, needed treatment, and felt that he was sexually dangerous. (J.A. 54-56). Dr. Holden carefully noted Charboneau's admission because she was aware of his expressive difficulty. (J.A. 60). Dr. Holden testified that she works closely with Charboneau and "can gauge his emotions" and she learned Charboneau's language pattern. (J.A. 59-60).

Dr. Holden and CTP staff administered a series of tests during Charboneau's incoming assessment. (J.A. 313). One test was the Multiphasic Sexual Inventory ("MSI-II"). (J.A. 44-45, 313, 315). The MSI-II test results showed that Charboneau was defensive with regard to his sexual interests and behaviors and "has a lot of denial in regard to his sexual offenses." (J.A. 45). Charboneau

16

admitted his sexual offending but minimized having thoughts prior to committing rape, although he admitted that he derived excitement as he anticipated committing sexual assaults. (J.A. 45). The test results also revealed that Charboneau justified his sexual offenses by blaming his victims or saw himself as a victim and that he was anxious in his social interactions around age-appropriate females. (J.A. 46). Although Charboneau was treated for alcohol abuse, he denied that he had an alcohol problem. (J.A. 46). Based on the tests results CTP staff identified a number of treatment goals. (J.A. 46-52).

### Charboneau's Testimony

Charboneau testified on his own behalf. (J.A. 157-74). Charboneau testified that he has difficulty expressing how he feels. (J.A. 158). Charboneau testified that the difficulty arises because he is emotional and sad and feels guilty for things he has done. (J.A. 158). Charboneau acknowledged that people have difficulty understanding what he means. (J.A. 158). Charboneau testified that he attends a weekly Bible study because he hopes to feel better inside. (J.A. 159-60).

Regarding his criminal history, Charboneau testified that he was under the influence of alcohol when he committed all of his past sexual offenses. (J.A. 160). Charboneau further stated that he never committed a sexual offense or desired to commit sexual offenses while sober. (J.A. 161). Charboneau also testified that

he was also under the influence of alcohol when he was arrested for his non-sex related criminal offenses. (J.A. 161).

Regarding the availability of alcohol in prison, Charboneau testified that although he is aware of the presence of alcohol in prison he never tried it nor has he ever asked another inmate for alcohol. (J.A. 162). Charboneau testified that he has been incarcerated for 13 years and during that period has not tried alcohol. (J.A. 161-62). He attends weekly AA meetings and testified that he began going to AA because he was powerless over alcohol. (J.A. 162).

Regarding the CTP, Charboneau testified that he was in Phase Two of the program and that he would have a long way to go to complete the program. (J.A. 168-69).

Regarding his alcohol use, Charboneau testified that he loses control when he drinks alcohol. (J.A. 169-70).

Regarding Charboneau's incarceration history, he testified that while incarcerated he does not act out. (J.A. 170-71). Charboneau stated that in 1982, after his first offense, he was a model prisoner and then once released back into the community he began drinking again. (J.A. 171).

### Expert Opinions

Drs. North, Ross, and Zinik opined that Charboneau was a sexually dangerous person. (J.A. 61, 87, 126-27). Dr. Plaud

opined that Charboneau did not meet criteria as a sexually dangerous person. (J.A. 176).

The experts agree that Charboneau met criteria for prong one of the Adam Walsh Act. (J.A. JA 62-67, 87-88, 176, 328-31, 340-46, 370, 388-98, 411). Drs. North, Ross, and Zinik opined that Charboneau met prong one based on Charboneau's prior convictions and the uncharged attempted rape of a woman in 1987. (J.A. 62-67, 87-88, 176, 328-31, 340-46, 388-98, 411). Dr. Plaud relied upon Charboneau's prior convictions. (J.A. 370). Dr. Plaud amended his report on cross-examination to state with respect to the uncharged attempted rape in 1987 that Charboneau told him that he did not remember the attempted sexual assault as opposed to a straight denial that Charboneau attempted to commit the offense. (J.A. 211-12).

Guided by the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition ("DSM-5"), Drs. North, Ross, and Zinik opined that Charboneau suffered from Alcohol Use Disorder, Severe, in a controlled environment, which they also opined is a serious mental illness, abnormality, or disorder.[1] (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 490-97 (5th ed. 2013); J.A. 68-69, 88-90, 127-31, 333, 362-65, 406-07). According to the DSM-5, the essential features of alcohol

---

[1] Dr. Ross did not included the specifier "Severe" in her diagnosis.

use disorder are "a problematic pattern of alcohol use leading to clinically significant impairment or distress," that occurs within a 12-month period if at least 2 of 11 criteria are met.[2] (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 490-97 (5th ed. 2013)).  Drs. North, Ross, and Zinik also opined that Charboneau suffered from Inhalant Use

---

[2] The 11 criteria are:

1.    Alcohol is often taken in larger amounts or over a longer period than was intended.
2.    There is a persistent desire or unsuccessful efforts to cut down or control alcohol use.
3.    A great deal of time is spent in activities necessary to obtain alcohol, use alcohol, or recover from its effects.
4.    Craving or a strong desire or urge to use alcohol.
5.    Recurrent alcohol use resulting in a failure to fulfill major role obligations at work, school, or home.
6.    Continued alcohol use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of alcohol.
7.    Important social, occupational, or recreational activities are given up or reduced because of alcohol use.
8.    Recurrent alcohol use in situations in which it is physically hazardous.
9.    Alcohol use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by alcohol.
10. Tolerance, as defined by either of the following:
       a)  A need for markedly increased amounts of alcohol to achieve intoxication or desired effect,
       b)  A markedly diminished effect with continued use of the same amount of alcohol, and

11. Withdrawal, as manifested by either of the following:
       a)  The characteristic withdrawal syndrome for alcohol,
       b)  Alcohol is taken to relieve or avoid withdrawal symptoms.

(American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 490-97 (5th ed. 2013); J.A. 362-63).

Disorder by history, Severe, in sustained remission.[3]  (J.A. 333, 362-63, 406).   Inhalant Use Disorder is characterized by a "problematic pattern of use of a hydrocarbon-based inhalant substance leading to clinically significant impairment or distress" which is manifested by at least 2 of 10 occurrences during a 12-month period.[4]  (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 533-38 (5th

---

[3] Dr. Ross did not included the specifier "Severe" in her diagnosis.

[4] The 10 criteria are:
1.   The inhalant substances is often taken in larger amounts or over a longer period than was intended.
2.   There is a persistent desire or unsuccessful efforts to cut down or control use of the inhalant substance.
3.  A great deal of time is spent in activities necessary to obtain the inhalant substance, use it, or recover from its effects.
4.   Craving, or a strong desire or urge to use the inhalant substance.
5.  Recurrent use of the inhalant substance resulting in a failure to fulfill major role obligations at work, school, or home.
6.   Continued use of the inhalant substance despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of its use.
7. Important social, occupational, or recreational activities are given up or reduced because of the inhalant substance.
8. Recurrent use of the inhalant substance in situations in which it is physically hazardous.
9. Use of the inhalant substance is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance.
10. Tolerance, as defined by either of the following:
      a)   A need for markedly increased amounts of the inhalant substance to achieve intoxication or desired effect,
      b)   A markedly diminished effect with continued use of the same amount of the inhalant substance.

(American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 533-38 (5th ed. 2013); J.A. 362-63).

ed. 2013); J.A. 362).  Drs. North, Ross, and Zinik based their respective diagnosis on Charboneau's "huffing" inhalants (gasoline, glue, and paint thinners) in his early teen years, which resulted in numerous hospitalizations, blackouts, diminished neurocognitive functioning, and difficulty in linguistic expression.  (J.A. 70, 89, 132, 333, 363, 406). Because Charboneau reports he stopped using inhalants in his teenage years the experts use the "by history" specifier.  (J.A. 70, 89, 132, 333, 363, 406).

Dr. Ross further testified that she diagnosed Charboneau with Adult Sexual Abuse by Non-spouse or Perpetrators and Child Sexual Abuse Perpetrator.  (J.A. 88).  These diagnoses, however, did not factor in Charboneau's sexual dangerousness.  (J.A. 88, 115).

Lastly, Dr. Ross utilized the Static-99R to perform an actuarial assessment of Charboneau's risk of reoffending.[5]  Dr. Ross found Charboneau scored a 4 on the Static-99R which was based on Dr. Ross' limited access to Charbneau and was a moderate high score.  (J.A. 91-93).

---

[5] Dr. Ross' Static-99R examined risk factors such as (1) a subjects age at release from index offense, (2) whether the subject ever lived with someone for two years, (3) possessed a conviction for a nonsexual violence, (4) was convicted of a prior nonsexual violent offense, (5) the number of prior sexual offenses, (6) the number of prior sentencing dates, (7) convictions for non-contact sexual offenses, (8) had unrelated victims, (9) whether the subject had stranger victims, and (10) had male victims.  (J.A. 335).

Drs. North and Zinik further opined that Charboneau suffers from Inhalant-induced Mild Neurocognitive Disorder. (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 605-11 (5th ed. 2013); J.A. 70-71, 132-33, 362-63, 406-07). Inhalant-induced Mild Neurocognitive Disorder is characterized by evidence of modest cognitive decline from a previous level of performance in one or more cognitive domains.[6] (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 605-11 (5th ed. 2013)).

Dr. North offered this diagnosis based on Charboneau's expressive language deficits due to Charboneau's years of inhalant use, which may be compounded by his years of heavy drinking. (J.A. 70-71, 363-64). Dr. North opined that the domain impacted by this disorder is Charboneau's speech as evidenced by Charboneau's demonstrated difficulty communicating his feelings, ideas, and thoughts. (J.A. 70-71, 363-64).

Similarly, Dr. Zinik also offer this diagnosis based on Charboneau's years of inhalant abuse and heavy drinking. (J.A. 132-33, 406-07). Dr. Zinik opined in his report that Charboneau's neurocognitive disorder was evidence by "episodes of disorganized thinking and loose associations and problems with verbal

---

[6] The domains include complex attention, executive function, learning and memory, language, perceptual-motor, or social cognition. (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 605 (5th ed. 2013)).

expression and language." (J.A. 132-33, 407). Dr. Zinik further
noted that Charboneau generally kept to himself and avoided social
contact and because he did so his cognitive deficits were not
apparently obvious based on casual observation but that when
Charboneau was asked open-ended questions his thinking was
rambled, illogical, and "characterized by strange religious
themes." (J.A. 132-33, 407). Drs. North and Zinik both
characterized Charboneau's neurological disorder as "mild" based
on Charboneau's ability to conduct daily living activities. (JA
364, 407).

Dr. Zinik also diagnosed Charboneau suffered from Other
Specified Personality Disorder with Schizotypal and Schizoid
Features. (J.A. 406-08). Personality disorders are characterized
by "an enduring pattern of inner experience and behavior that
deviates markedly from the expectations of the individual's
culture." (American Psychiatric Association, Diagnostic and
Statistical Manual of Mental Disorders 646 (5th ed. 2013)). The
pattern is observable in two or more areas involving cognition,
affectivity, interpersonal functioning, or impulse control. Id.
The pattern of behavior begins at the onset of adolescence or early
adulthood, stabilizes over time, is pervasive and inflexible
across a broad range of both personal and social situations, leads
to significant distress and impairment in persons social,
occupation, or other essential areas of functioning, is not better

24

explained as an indication or result of another mental disorder, and the enduring pattern is not attributable to physiological effects of a substance or another medical condition. Id. at 646-47. If not all of the criteria for one personality disorder are met or combined features of one or more personality disorder are prominent then a diagnosis of other personality disorder is warranted. (J.A. 407).

Schizotypal Personality Disorder is characterized by a "pervasive pattern of social and interpersonal deficits marked by acute discomfort with, and reduce capacity for, close relationships as well as cognitive or perceptual distortions and eccentricities of behavior, beginning by early adulthood and present in a variety of context."[7] (American Psychiatric

_____

[7] The variety of context are indicated by five or more of the following:
1.   Ideas of reference (excluding delusions of reference).
2.   Odd beliefs or magical thinking that influences behavior and is inconsistent with some cultural norms, i.e. superstitions, a belief in clairvoyance, telepathy, or "sixth sense", in children and adolescents, bizarre fantasies or preoccupations).
3.   Unusual perceptual experiences, including body bodily illusions.
4.   Odd thinking and speech (vague, circumstantial, metaphorical, overelaborate, or stereotyped).
5.   Suspiciousness or paranoid ideation.
6.   Inappropriate or constricted affect.
7.   Behavior or appearance that is odd, eccentric, or peculiar.
8.   Lack of close friends or confidant other than first-degree relatives.
9.   Excessive social anxiety that does not diminish with familiarity and tends to be associated with paranoid fears rather than the negative judgments about self.

Association, Diagnostic and Statistical Manual of Mental Disorders 655 (5th ed. 2013)). Additionally, the pattern of social or interpersonal deficits does not exclusively during bouts of schizophrenia, a bipolar disorder or depressive disorder with psychotic features, another psychotic disorder, or autism spectrum disorder. Id. at 656.

Schizoid Personality Disorder is characterized by a "pervasive pattern of detachment from social relationships and a range of expression of emotions in interpersonal settings, beginning by early adulthood and present in a variety of contexts." (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 652 (5th ed. 2013)). Dr. Zinik opined that persons with schizoid personality disorders tend to live solitary lifestyles and are secretive loners. (J.A. 407).

Dr. Zinik found that Charboneau suffered from mixed personality disorder based on multiple schizotypal and schizoid features Charboneau exhibited. (J.A. 408). Dr. Zinik pointed out during his testimony that previous mental health providers diagnosed Charboneau with schizoid personality disorder in the 1980s and that Charboneau was diagnosed with schizotypal personality disorder in 1988. (J.A. 133). Dr. Zinik further

---

(American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 655-54 (5th ed. 2013))

testified that Charboneau exhibited bizarre thinking and magical thinking. (J.A. 133).

Moreover, Dr. Zinik testified that although Charboneau is a loner, Charboneau has a "significant libido" which makes Charboneau uncomfortable and when disinhibited by alcohol Charboneau's sexual feelings rise to the surface. (J.A. 134-35), If Charboneau is in the presence of a woman during those times Charboneau is ill-equipped to manage his urges and that coupled with Charboneau's poor judgment leads to Charboneau's sexual violence. (J.A. 134-35).

Dr. Zinik also performed a detailed risk assessment wherein he examined dynamic and static risk factors, examined federal regulations adopted after the Adam Walsh Act, and protective factors. (J.A. 409-11).

Dr. Zinik identified lack of emotionally intimate relationships with adults, lifestyle impulsivity, poor problem solving and poor cooperation with rules and supervision as dynamic risk factors in Charboneau's case. (J.A. 409). An examination of 20 factors utilizing the Sexual Violence Risk-20 ("SVR-20") demonstrated the presence of 15 out of 20 risk factors. (J.A. 410, 416).[8] Dr. Zinik noted that major mental illness, substance

---

[8] Dr. Zinik categorized the 20 factors as factors impacting psychological adjustments which include: (1) sexual deviance, (2) victim of child abuse, (3) psychopathy, (4) major mental

use problems, relationship problems, employment problems, past nonsexual violent offenses, past nonviolent offenses, and past supervision failure were psychosocial adjustment risk factors in Charboneau's case. (J.A. 416). Dr. Zinik also found that high density sex offense, multiple type of sex offenses, physical harm to victims, use of threats and weapons, extreme minimization or denial of sex offenses, and attitudes that support or condone sex offenses were present. (J.A. 416). Dr. Zinik also found the presence of lack of realistic plans and negative attitudes towards intervention were present. (J.A. 416). Based on Dr. Zinik's review of the SVR-20 factors he opined Charboneau was high or very elevated risk for sexual violence. (J.A. 416).

Dr. Zink also reviewed static risk factors using the Static-99R and found a score of 5. (J.A. 415). Dr. Zinik translated the score in risk categories and determined that a score of 5 equated to High-Moderate risk of reoffending. (J.A. 415).

---

illness, (5) substance abuse use problems, (6) suicidal or homicidal ideation, (6) a history of substance abuse, (7) relationship problems, (8) employment problems, (9) past nonsexual violence, (10) past nonviolent offenses, and (11) past supervision failure. (J.A. 416). Factors impacting sexual offenses include: (12) a high density of sexual offenses, (13) multiple types of offenses, (14) causing victims physical harm, (15) the use of weapons or threats of death, (16) the presence of escalating sexual offenses or severity of sexual offenses, (17) extreme minimization or denial of responsibility, and (18) attitudes that support or condone sexual offenses. (J.A. 416). Factors impacting future plans include: (19) lacking realistic plans, and (20) negative attitudes towards intervention. (J.A. 416).

Dr. Zinik also examined protective factors such as extended time in the community without reoffending, 5-10 year, illness or disability, advanced age, and successful completion of sex offender treatment. (J.A. 410). Dr. Zinik found none of the factors were present. (J.A. 411). Lastly, Dr. Zinik examined federal regulations used to determine sexual dangerousness. (J.A. 411).

Dr. Plaud testified that Charboneau met criteria for prong one. (J.A. 176, 228).

Dr. Plaud testified that he was "in sync" with the other experts who found Charboneau suffered from Alcohol Use Disorder, Sever, in a controlled environment and Inhalant Use Disorder, Sever, in sustained remission. (J.A. 177, 227-28, 382). Dr. Plaud testified that absent antisocial personality disorder or another personality disorder and a primary paraphilia, i.e. sexual sadism, pedophilia, or pedophilic disorder he did not believe that Charboneau's substance abuse disorder met prong two is a serious mental illness, abnormality, or disorder. (J.A. 177, 185).

Dr. Plaud acknowledged that Charboneau has a significant history of drinking in the community and that when Charboneau consumed alcohol it has historically disinhibited Charboneau sexually and it has negatively affected Charboneau's life and those around him. (J.A. 178-79). Dr. Plaud further testified that he believes that Charboneau may relapse if released back into the

community and commit alcohol-related crimes, except sexual offenses. (J.A. 190-93, 228-29). Dr. Plaud testified that he believed it would be a "jump" to assume that Charboneau would relapse and then commit a sexually violent act. (J.A. 178).

Dr. Plaud opined that to meet prong two based on alcohol abuse disorder he would have expected more victims than those Charboneau assaulted. (J.A 180, 183). Dr. Plaud testified that he believed that nonsexual disorders could qualify under prong two but that the link to a person's condition would involve repeated sequential sexual inappropriate behavior. (J.A. 194). Dr. Plaud testified that under different circumstances he believed alcohol use disorder, by itself, could qualify as a serious mental illness, abnormality, or disorder. (J.A. 224-25).

Dr. Plaud also testified that it was reasonable to assume Charboneau had neurocognitive "issues" even though he did not offer that diagnosis. (J.A. 183, 188). Dr. Plaud further testified that although he did not offer a personality disorder diagnosis his testing revealed Charboneau still demonstrated some schizoid disorder personality features. (J.A. 187).

Regarding dynamic risk factors, Dr. Plaud testified that Charboneau has historically displayed poor problem solving and there are multiple dynamic risk factors in Charboneau's case. (J.A. 207, 215-16).

Dr. Plaud also considered the federal regulations adopted pursuant to the Adam Walsh Act and found that Charboneau used violence against his victims, molested a child, engaged in sexually violent conduct the victim was incapable of appraising the nature of, offended while under supervision, engaged in conduct while likely to get caught and did not successfully complete sex offender treatment. (J.A. 230-31).

Dr. Plaud also reviewed static risk factors using the Static-99R and found a score of 5. (J.A. 383-84). Individuals in the routine correction group with a score of 5 had a 15.2% chance of reoffending after 5 years. (J.A. 384).

### The District Court's Bench Opinion

On September 28, 2017, the district court announced its finding of facts and conclusions of law from the bench. (J.A. 245-305). The district court noted at the outset that it had considered all admissible evidence in the case, including all the testimony and exhibits. (J.A. 246-47).

The district court found the fact that Charboneau was a 57-year-old Native American member of the turtle Mountain band the Chippewa tribe. (J.A. 247).

The district court found that Charboneau began drinking with his parents and would drink as many as 12 cans of beer at a time. (J.A. 247). The district court found when Charboneau was 12 years old he began using inhalants, gasoline, spray paint, lighter fluid

and glue to get high. (J.A. 248). Charboneau's inhalant and alcohol abuse rapidly resulted in poor school performance and behavior. (J.A. 248). The district court found that when Charboneau was 13 years old he was arrested for running away from home. (J.A. 248).

Charboneau was committed for the first of many times to the North Dakota State Hospital at Jamestown when he was 16. (J.A. 248). Charboneau was placed in the adolescent unit for substance-abuse treatment and for being incorrigible. (J.A. 248). Charboneau was admitted to the Jamestown for treatment of chemical dependency and mental problems 12 times before he reached the age of 22. (J.A. 248).

When Charboneau was 20 years old his IQ was tested and found to be in the low normal to borderline range of intelligence. (J.A. 248). The district court relied on Dr. North's report that stated test also disclosed that due to Charboneau's extensive history of inhalant abuse he was "characterologically" disturbed with minimal organic involvement. (J.A. 248).

Between the ages of 18 to 22, Charboneau was arrested six times for disorderly conduct, public intoxication, and failing to appear. (J.A. 248).

The district court found that Charboneau continued to drink alcohol extensively throughout his teenage years. (J.A. 247).

The district court found that Charboneau withdrew from school while in the ninth grade. (J.A. 249). Charboneau attended Kicking Horse Job Corps in Montana but was discharged after a brief stay there when staff observed them stiffing gas and committing a superficial suicide gesture. (J.A. 249). Charboneau was also previously employed as a dishwasher before his or current federal incarceration. (J.A. 249).

The district court noted that Charboneau's frequent contact with the criminal justice system was powered by his alcohol use. (J.A. 249). This district court cited records from the North Dakota State Hospital at Jamestown that stated tribal law enforcement officers first arrested Charboneau when he was 13 years old for running away and engaging in fighting. (J.A. 249). Since 1978 law-enforcement officers arrested or took Charboneau into custody possibly 36 times for numerous crimes, including disorderly conduct, public intoxication, assault, arson, and liquor violations, and sexual offenses. (J.A. 249). The district court also noted that over 20 of Charboneau's offenses related to his abuse of alcohol and that all of his sexual offenses were powered by his abuse of alcohol. (J.A. 249).

The district court recalled the facts of Charboneau's June 30, 1982; August 11, 1987; July 31, 1988; and 2003 alcohol-fueled violent sexual offenses and convictions. (J.A. 249-56). The district court further noted that Charboneau's 2003 conviction

33

resulted in a notice of revocation filed against him and that on November 23, 2004, the federal sentencing court found Charboneau violated the terms of his supervised release because he engaged in criminal conduct and sentenced him to 36 months' imprisonment, consecutive to the state court sentence and a 24-month term of supervised release to commence upon Charboneau's release from federal imprisonment. (J.A. 256-57). The district court further noted that on July 8, 2014, three of Charboneau's family members wrote to the United States probation officer concerning Charboneau's possible release. (J.A. 257-59). The family detailed the harm Charboneau's substance abuse caused the family. Particularly, Charboneau's sexual assault of his daughter. (J.A. 258). The district court also summarized the testimony of the witnesses. (J.A. 260-88).

Regarding prong one, whether Charboneau previously engaged or attempted to engage in sexually violent conduct or child molestation, the district court found that the United States had proved by clear and convincing evidence prong one of the Adam Walsh Act. (J.A. 289). Specifically, the district court found that Drs. North, Zinik, and Plaud opined that this prong was satisfied based on Charboneau's underlying conduct in 1982, 1988, and 2003, and Charboneau's 1987, attempted rape of a woman. (J.A. 289-90).

Regarding prong two, whether Charboneau suffered from a serious mental illness, abnormality, or disorder, the district

court found the United States approved by clear and convincing evidence that Charboneau suffered from serious mental illnesses, abnormalities, or disorders. (J.A. 290-99). The district court found Dr. Zinik's analysis the most helpful and compelling. (J.A. 290). The district court noted the Dr. Zinik reviewed the records, interviewed Charboneau, considered the other expert opinions, and his report synthesized the evidence in a persuasive manner. (J.A. 290). The district court found this the most "compelling and complete." (J.A. 290).

The district court agreed with Dr. Zinik's analysis that Charboneau met criteria for alcohol use disorder, severe, a controlled environment; inhalant use disorder, severe, in sustained remission; inhalant-induced mild neurocognitive disorder; and other specified personality disorder with schizotypal and schizoid features. (J.A. 290-97). The district court found the Dr. Zinik "persuasively explained" the features of each diagnosis and how each disorder afflicted Charboneau." (J.A. 290-91).

The district court found that substance abuse disorders characterized by a cluster of cognitive, behavioral, and physiological symptoms and that the abuser continues to use psychoactive substance, drugs, or alcohol despite significant substance abuse related problems. (J.A. 290-91). The district court cited Dr. Zinik's opinion that alcohol was Charboneau's "drug

of choice and his most persistent addiction." (J.A. 291). The district court further stated that Charboneau's drinking problem was so severe that he was hospitalized numerous time before he was 26 years old, arrested over 20 times for alcohol-related crimes, including all four sexual assaults, and that because Charboneau's life revolved around consuming alcohol Charboneau could not function in the community. (J.A. 292).

The district court also relied on Dr. Zinik's explanation that Charboneau suffered from severe inhalant use disorder by history, which began at age 12 and lasted until Charboneau's late 20s. (J.A. 291). The district court noted that Charboneau repeatedly sniffed inhalants that included gasoline, glue, and paint thinner and this abuse had a lasting effect. (J.A. 291).

The district court also explained why it accepted Dr. Zinik's opinion that Charboneau met criteria for a diagnosis of mild neurocognitive disorder. (J.A. 292-93).

The district court also explained in detail why it credited Dr. Zinik's diagnostic finding that Charboneau met criteria for other specified personality disorder with schizotypal and schizoid features. (J.A. 293-97). The district court acknowledged that Dr. Zinik was the only expert to offer that diagnosis. (J.A. 293). The district court found Dr. Zinik's explanation compelling and consistent with the record in Charboneau's "unique" case. (J.A. 293). The district court cited Dr. Zinik's detailed explanation of

36

the diagnosis in Dr. Zinik's report. (J.A. 293-95). The district court acknowledged that Dr. Ross also considered the diagnosis but ruled it out and that Dr. Plaud's testimony and report demonstrated that he found some evidence of schizoid and histrionic personality disorder but that he too ruled out the diagnosis. (J.A. 295). The district court, however, credited Dr. Zinik's opinion. (J.A. 296-97).

The district court also made an alternative finding that Charboneau's alcohol use disorder constituted a serious mental illness, abnormality, or disorder. (J.A. 297). The district court also found that Charboneau met criteria for inhalant use disorder, severe, in sustained remission; and inhalant-induced mild neurocognitive disorder. (J.A. 297-99). In making this alternate finding, the district court relied on the testimony of Drs. North, Ross, and Zinik that alcohol use disorder met criteria under prong two. (J.A. 297-99). The district court explicitly rejected Dr. Plaud's opinion that alcohol use disorder did not qualify as a serious mental illness, abnormality, or disorder. (J.A. 297-98). In so doing, the district court analyzed alcohol use disorder in light of the Court's holding in United States v. Caporale, 701 F.3d 128 (4th Cir. 2012), and found that this Court's focus in Caporale was that some diagnosis identified in the DSM are not "categorically excluded from qualifying as a serious mental illness, abnormality, or disorder." (J.A. 298-99).

37

Regarding prong three, the district court found that the United States had proved by clear and convincing evidence that as a result of serious mental illnesses, abnormalities, and disorders, Charboneau would have serious difficulty in refraining from engaging in sexually violent conduct or child molestation if released. (J.A. 299-305). The district court once again found Dr. Zinik's testimony and opinion on this issue most helpful. (J.A. 299-300). The district court also credited the testimony of Dr. Holden that Charboneau admitted to her that he was sexually dangerous. (J.A. 299-300, 302). The district court specifically rejected Dr. Plaud's attempt to explain Charboneau's admission that he was sexually dangerous. (J.A. 302).

The district court also made an alternative finding that based on the testimony and reports of Drs. North, Ross, and Zinik, that alcohol use disorder in Charboneau's unique case would cause Charboneau to have serious difficulty in refraining from sexually violent conduct or child molestation. (J.A. 300-05). In accordance with the Court's opinions in Wooden[9] and Antone[10] the district court examined various factors in reaching its conclusion. (J.A. 300-05).

---

[9] United States v. Wooden, 693 F.3d 440, 458-62 (4th Cir. 2012).

[10] United States v. Antone, 742 F.3d 151, 164-70 (4th Cir. 2014)

The district court noted that all the experts agreed that Charboneau acts like a model prisoner when housed in a secured facility and when released he abuses alcohol and commits violent sexual offenses. (J.A. 301). The district court also cited Dr. Zinik's report and analysis on why Charboneau was a model prisoner when institutionalized. (J.A. 302). The district court found that in this unique case Charboneau's institutional conduct did not outweigh other factors. (J.A. 302). Similarly, the district court noted that to Charboneau's credit Charboneau was now in sex offender treatment and attending AA meetings. (J.A. 302). The district court noted that Charboneau had exhibited cognitive distortions based on Charboneau's denials that Charboneau had a drinking problem. (J.A. 302-03).

The district court distinguished the respondent in Antone and Charboneau by stating that unlike Antone, Charboneau was on supervised release when he committed the alcohol-powered 2003 sexual offense. (J.A. 301). The district court further noted that Charboneau was in sex offender treatment and U.S Probation supervised him closely when he committed the sexual offense. (J.A. 301).

The district court also cited its consideration of the actuarial risk assessments, Charboneau's impulsiveness when not in a custodial setting and his historical behavior, nonsexual and sexual as support for its prong three findings. (J.A. 303).

39

The district court further credited Dr. Zinik's explanation for the absence of Charboneau's continued deviant thoughts. (J.A. 304). The district court noted that it did not credit Dr. Plaud's opinion that to find alcohol use disorder, a non-paraphilic disorder, a qualifying serious mental illness, abnormality, or disorder under the Adam Walsh Act in Charboneau's case there would have been more instances of sexual violence. (J.A. 303-04). The district court cited Dr. Zinik's persuasive explanation of how the SVR-20 and the absence of protective factors supported Dr. Zinik's prong three analysis. (J.A. 304).

Alternatively, the district court stated that with regard to alcohol use disorder, the district court credited Drs. North, Ross, and Zinik's alternative opinion over that of Dr. Plaud because their opinions were better reasoned, consistent, and thorough in light of the features of Charboneau's unique case. (J.A. 304-05).

## SUMMARY OF ARGUMENT

1.    The district court did not commit clear error when if found Charboneau met criteria for multiple diagnosis of serious mental illnesses, abnormalities, or disorders under the Adam Walsh Act, including other personality disorder based on the well-reasoned and compelling testimony of Dr. Zinik.    Moreover, the district court did not err when it credited the testimony of Dr. Zinik, that alcohol use disorder, in Charboneau's unique case, can constitute a serious mental illness, abnormality, or disorder and in the alternative that Drs. North, Ross, and findings by Dr. Zinik that Charboneau suffered from alcohol use disorder.    Nor did the district court commit clear error when it found Charboneau's alcohol use disorder was linked to his sexual offending.

2.    The district court did not commit clear error when it found that based on multiple serious mental illnesses, abnormalities, or disorders (or in the alternative on alcohol use disorder, singularly) Charboneau would have serious difficulty refraining from sexually violent conduct or child molestation.

41

ARGUMENT

I.   THE DISTRICT COURT DID NOT ERR WHEN IT FOUND CHARBONEAU
     SUFFERED FROM A SERIOUS MENTAL ILLNESS, ABNORMALITY, OR
     DISORDER UNDER THE ADAM WALSH ACT.

     A.   Standard of Review.

     The Court reviews a district court's factual findings for

clear error and its legal conclusions de novo.  United States v.

Antone, 742 F.3d 151, 159 (4th Cir. 2014); United States v. Hall,

664 F.3d 456, 462 (4th Cir. 2012).  A court reviewing for clear

error may not reverse a lower court's factual finding simply

because it would have decided the case differently.  United States

v. Wooden, 693 F.3d 440, 451 (4th Cir. 2012).  The reviewing court

must instead ask whether, based on the entire evidence, the

reviewing court is "left with the definite and firm conviction

that a mistake has been committed."  Easley v. Cromartie, 532 U.S.

234, 242, (2001).  "If the district court's account of the evidence

is plausible in light of the record viewed in its entirety, the

court of appeals may not reverse it even though convinced that had

it been sitting as the trier of fact, it would have weighed the

evidence differently."  Anderson v. Bessemer City, 470 U.S. 564,

573-74 (1985).

     B.   Discussion of Issue.

     The district court's commitment order correctly identified

that under the Adam Walsh Act, 18 U.S.C. §§ 4247-48, to civilly

commit Charbonneau as sexually dangerous the United States was

42

required to prove by clear and convincing evidence (1) that
Charbonneau had engaged or attempted to engage in sexually violent
conduct or child molestation, (2) that Charbonneau suffers from a
serious mental illness, abnormality, or disorder, and (3) as a
result of that serious mental illness, abnormality, or disorder
that Charbonneau would have serious difficulty refraining from
sexually violent conduct if the District Court released him from
custody. (J.A. 246, 288-89).

The determination of whether an individual's mental illness
rises to the level of a sexually dangerous person is fact-specific
as viewed by expert psychiatrist and psychologists. Addington v.
Texas, 441 U.S. 418, 429 (1979). A district court in making its
determination of whether an individual's mental illness rises to
the level of a sexually dangerous person is not limited to the
precise definition of a disorder in the DSM-5 or an expert's report
since the science in these matters may inform the district court
but does not control the district court's ultimate legal
conclusions. Kansas v. Crane, 534 U.S. 407, 413 (2002). Congress
did not include in the definition of "sexually dangerous to others"
(18 U.S.C. § 4247(a)(6)) language restricting mental impairment to
the "universe of qualifying mental impairments within clinical or
pedagogical parameters." United States v. Caporale, 701 F.3d 128,
136 (4th Cir. 2012). Therefore, the meaning of the term serious
mental illness, abnormality, or disorder, is a legal term of art

43

for which the legal definitions may not mirror precisely definitions advanced by medical professionals. Id.; Kansas v. Hendricks, 521 U.S. 346, 359 (1997).

Charboneau first challenges the district court's finding that he suffered from a serious mental illness, abnormality, or disorder. (Brief at 26-39). Charboneau argues on appeal that the district court erred when it found that the United States proved by clear and convincing evidence the serious mental illness prong under the Adam Walsh Act when it (1) credited Dr. Zinik's testimony and report that Charboneau suffered from a mixed personality disorder, (2) that in the absence of a paraphilic disorder, alcohol use disorder can qualified as a serious mental illness, abnormality, or disorder, and (3) that the United States failed to prove by clear and convincing evidence that there was a causal link between Charboneau's alcohol use disorder and the mix personality disorder findings adopted by Dr. Zinik and credited by the district court. (Brief at 26-39).

1.  The district court did not clearly err in crediting Dr. Zinik's diagnosis of a personality disorder.

Charboneau asserts the district court erred when it credited Dr. Zinik's other personality disorder with schizotypal and schizoid features diagnosis and in support of Charboneau cites Drs. North, Ross, and Plaud's disagreement with Dr. Zinik's opinion. (Brief at 28-31).

44

In Wooden, this Court held that the district court relied upon an expert's opinion that was "internally inconsistent and was otherwise deficient or problematic" that it provided the district court "no safe harbor for the district court's factual findings." United States v. Wooden, 693 F.3d 440, 454-55 (4th Cir. 2012).

Here, unlike Wooden, Charboneau fails to demonstrate how Dr. Zinik's opinion was internally inconsistent, deficient, or problematic. Instead, Charboneau cites Drs. North, Ross, and Plaud's mere disagreement with Dr. Zinik's opinion. (Brief at 28-31). Importantly, the district court in this instance explained in a methodical and detailed fashion the essential features of the other personality disorders and how Dr. Zinik's analysis was persuasive in that area. (J.A. 293-95). Further, the district court cited evidence at trial that showed a psychologist in 1982 found that Charboneau suffered from schizoid personality disorder. (J.A. 384). The district court also cited testing conducted by Dr. Plaud, Charboneau's selected expert, that revealed Charboneau still had some evidence of schizoid personality disorder, although Dr. Plaud ruled out the diagnosis. (J.A. 384). Because the trial evidence demonstrated that Charboneau still possessed some features of schizoid personality disorder it cannot be said that the district court ignored or failed to account for "substantial" contrary evidence and consequently Charboneau cannot demonstrate the district court clearly erred in finding Charboneau suffered

45

from other specified personality disorder with schizotypal and
schizoid features when it credited Dr. Zinik's testimony and report
over that of Dr. Plaud's.

2.  The district court did not clearly err when
    it found in the alternative that alcohol
    use disorder can qualify as a serious mental
    illness, abnormality, or disorder under the
    Adam Walsh Act.

Next, Charboneau challenges the district court's alternative
finding that alcohol use disorder qualifies under the Adam Walsh
Act as a serious mental illness, abnormality, or disorder because
none of the experts diagnosed Charboneau as suffering from a
paraphilic disorder under the DSM-5 and therefore "it is hard to
see how an individual could meet the requirements of the Adam Walsh
Act while four experts agree that a paraphilic disorder diagnosis
is not warranted." (Brief at 32-33). Notwithstanding Charboneau's
perceptual difficulties, nothing in the definition of "sexually
dangerous to others" in § 4247(a)(6) limited the district court to
paraphilic disorders listed in the DSM-5. Caporale, 701 F.3d at
136.

Charboneau relies on United States v. Begay, 880 F. Supp.2d
707, 711 (E.D.N.C. 2012), for the proposition that personality
disorders and/or alcohol and cannabis dependence cannot constitute
a serious mental illness under the Adam Walsh Act. (Brief at 33).
Charboneau also relies on two unpublished cases, United States v.
Sneezer, Civ. No. 5:08-HC-2107-BO, ECF 65 (E.D.N.C. Nov. 30, 2012),

and United States v. Julius, Civ. No. 5:08-HC-2076-H, ECF 59 (E.D.N.C. Mar. 18, 2013) for the proposition that the district court erred in finding that he suffered from a serious mental illness, abnormality, or disorder.    Charboneau's reliance on Begay, Sneezer, and Julius fails.

The district court in Begay found the United States failed to prove by clear and convincing evidence that Begay suffered from antisocial personality disorder based on conflicting expert testimony regarding whether Begay's maladaptive behavior was attributable to his early substance abuse or before his uncharged conduct. Begay, 880 F.Supp.2d at 710. The district court in Begay also opined that even if it found Begay suffered from antisocial personality disorder "in this instance (emphasis added)" it was reluctant to find that a personality disorder, alone, qualified as a serious mental disorder. Id. at 711. Importantly, the district court in Begay did not categorically find that a personality disorder could not constitute a serious mental disorder.

The district court in Begay found the United States failed to prove by clear and convincing evidence Begay alcohol and cannabis dependence was a serious mental disorder based on the unanimous opinions of the psychologists that alcohol and cannabis dependence cannot constitute a serious mental disorder. Id. This Court should give no weight to the district court's opinion in Begay.

47

The district court issued its findings in Begay on July 25, 2012, months before this Court issued its holding in Caporale.

On December 6, 2012, the Court decided United States v. Caporale, 701 F.3d 128 (4th Cir. 2012). In Caporale, the Court held that the district court erred in its prong two analysis when the district court found that hebephilia could not constitute a serious mental disorder under the Adam Walsh Act because hebephilia is not listed in the DSM-IV-TR. Caporale, 701 F.3d at 137. This Court noted in reversing the district court's prong two finding that the respondent's "ability to function normally in society has been preempted" as a result of his mental disorder, whether or not that disorder was listed in the DSM. Id. In so doing, the Court in Caporale focused on the impact the disorder had on the respondent and not on its label. Likewise, the district court here focused on the destructive power Charboneau's alcohol use disorder significantly affected his interpersonal relationships, mental health, and societal separations due to incarceration.

Like the Court in Caporale, the district court's alternative finding in the instant case focused on the impact of Charboneau's alcohol use disorder. (J.A. 297-99). The district court found that in this unique case, alcohol use disorder, severe, in a controlled environment, is a serious mental illness, abnormality, or disorder. (J.A. 297). The district court credited the opinions

48

of Drs. North, Ross, and Zinik over that of Dr. Plaud.[11]   The
district court noted that law enforcement officials repeatedly
arrested Charbonneau for alcohol-based offenses, i.e. public
intoxication, liquor violations, and disorderly conduct to four
sexually violent offenses.

The district court further found that Charboneau's alcohol
abuse was so severe that even setting aside Dr. Zinik's additional
diagnosis, Charboneau's alcohol abuse has indisputably led to his
estrangement from his family and tribe. (J.A. 298). Additionally,
the district court found that the strength of his disorder caused
Charboneau to lose control and to rape his own daughter in 1988
and sexually assault another relative in 2003. (J.A. 298).

Like the district court in the instant matter, the district
court in United States v. Gloshay, Civ. No. 5:08-HC-2051-BR, ECF
91 (E.D.N.C. June 4, 2012), focused on the impact of that the
mental disorder, alcohol dependence, in a controlled environment,
on the respondent's life. Id. at 7-9. The respondent in Gloshay
suffered alcohol-related withdrawal, black outs, memory loss, and
similar to Charbonneau believed his alcohol abuse resulted in
aggressive behavior. Id. at 7-8. Unlike the district court in
United States v. Sneezer, Civ. No. 5:08-HC-2107-BO, ECF 65 at 9-

---

[11] Even Dr. Plaud testified that under different circumstances
alcohol use disorder, by itself, could qualify as a serious
mental illness, abnormality, or disorder. (J.A. 224-25).

49

10 (E.D.N.C. Nov. 30, 2012) and <u>United States v. Julius</u>, Civ. No. 5:08-HC-2076-H, ECF 59 at 12 (E.D.N.C. Mar. 18, 2013), the district court in Charboneau reached the merits consistent with this Court's analysis in <u>Corporale</u>.

>    3.    <u>The district court did not err when it found that the United States proved by clear and convincing evidence that there was a causal link between Charboneau's alcohol use disorder and/or Dr. Zinik's other diagnosis and Charboneau's serious difficulty in refraining from sexually violent conduct.</u>

Charboneau asserts the district court erred when it found a causal connection between the various mental disorders identified by Dr. Zinik and alcohol use disorder. (Brief at 35-39). The entire premise of this argument is that the district court should have credited Dr. Plaud's testimony over that of Dr. Zinik.

Here, the district court provided a detailed explanation in its in-court announcement of its decision the basis upon which it credited Dr. Zinik's analysis as the most compelling in the case. (J.A. 290-99). On appeal, Charboneau, other than citing Dr. Plaud's disagreement with Dr. Zinik, can point to no substantial evidence at trial that the district court failed to consider or error in Dr. Zinik's report relied upon by the district court. As such, Charboneau's argument amounts to nothing more than an assertion that the district court should have found Dr. Plaud more

credible and as such cannot serve as basis for a reviewing Court to overturn the district court's credibility finding.

II.  THE DISTRICT COURT DID NOT ERR WHEN IT FOUND CHARBONEAU WOULD HAVE SERIOUS DIFFICULTY REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR CHILD MOLESTATION IF RELEASED AND THUS WAS A SEXUALLY DANGEROUS PERSON.

   A.   Standard of Review.

The Court reviews a district court's factual findings for clear error and its legal conclusions de novo. United States v. Antone, 742 F.3d 151, 159 (4th Cir. 2014); United States v. Hall, 664 F.3d 456, 462 (4th Cir. 2012).  A court reviewing for clear error may not reverse a lower court's factual finding simply because it would have decided the case differently. United States v. Wooden, 693 F.3d 440, 451 (4th Cir. 2012).  The reviewing court must instead ask whether, based on the entire evidence, the reviewing court is "left with the definite and firm conviction that a mistake has been committed." Easley v. Cromartie, 532 U.S. 234, 242, (2001). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985).

B.   Discussion of Issue.

Charboneau also asserts the district court erred when it found the United States had proved by clear and convincing evidence that Charboneau would have serious difficulty in refraining from engaging in sexually violent conduct or child molestation. (Brief 39-46). Charboneau claims the district court did not "heed this Court's guidance" in Antone and that the district court failed to "fully credit" Charboneau's 13-year period of incarceration. (Brief at 39).

In Antone, this Court reversed the district court's commitment order after holding the district court failed to take into account substantial favorable evidence of Antone's conduct. Antone, 742 F.3d at 165.

Contrary to Charboneau's claims, the district court, consistent with Antone, took into consideration the entire record, including evidence in the record favorable to Charboneau.

The district court noted that in accordance with Antone it must consider and account for why Charboneau's positive incarceration conduct is overcome by other factors. (J.A. 301). The district court accounted for Charboneau's positive incarceration conduct when it noted that all experts agree that when Charboneau is in a secured prison setting he is a model prisoner but when released from imprisonment he abused alcohol and engaged in violent sexual conduct. (J.A. 301-02). Thus, the

district court explained why the positive conduct Charboneau displayed when incarcerated did not outweigh the other factors. Notably, Charboneau, unlike Antone had been released from federal custody and was supervised closely, but still reoffended violently and sexually because of the strength grip of his alcohol use disorder.

Moreover, contrary to Charboneau's assertion that the district court did not account for Charboneau's expressive difficulty when it found Charboneau admitted to Dr. Holden that he was sexually dangerous, the district court credited Dr. Holden's testimony that Charboneau told her that he remained sexually dangerous and did not credit Dr. Plaud's attempt to explain away Charboneau's admission. (J.A. 302). Dr. Holden testified to the strengthened therapeutic alliance she developed with Charboneau and that she often defined words for him and made sure she understood what Charboneau told her. (J.A. 59-60). As such, the district court fully accounted for Dr. Plaud's contrary evidence and its rejection of that evidence was not against the substantial weight of the evidence. Superficial similarities to <u>Antone</u> aside, this case is more like <u>Caporale</u> where there is debatable evidence for the fact-finder to sift through.

Lastly, regarding Charboneau's age as a factor, the district court noted that it had considered all admissible evidence. (J.A. 246). That evidence necessarily includes the expert reports of

Drs. Ross, North, and Zinik that explained why Charboneau's age was not a protective factor.

Here, the district court thoroughly explained the basis for its opinion, accounted for Charboneau's strongest favorable evidence and came down ultimately that Charboneau was a sexually dangerous person. The Court should affirm the judgment of the district court.

<u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully submits that the judgment of the district court should be affirmed.

Respectfully submitted, this 14th day of March, 2018.

ROBERT J. HIDGDON, JR.
United States Attorney


BY: <u>/s/ Michael G. James</u>
MICHAEL G. JAMES
Assistant United States Attorney
310 New Bern Avenue
Suite 800, Federal Building
Raleigh, North Carolina 27601-1461
Telephone: 919-856-4530

G. NORMAN ACKER, III
Assistant United States Attorney

Of Counsel

54

CERTIFICATE OF COMPLIANCE

1.  Pursuant to Rule 32(g) of the Federal Rules of Appellate
    Procedure, I hereby certify that this brief meets the page
    or type-volume limits of Rule 32(a) because, exclusive of
    the portions of the document exempted by Rule 32(f), this
    brief contains:

    ☐  ‗‗‗‗  Pages (may not exceed 30 pages for a principal
             brief or 15 pages for reply brief, pursuant
             to Rule 32(a)(7)(A)); OR

    ☒  11,351 Words (may not exceed 13,000 words for a
             principal brief or 6,500 words for reply
             brief, pursuant to Rule 32(a)(7)(B)).

2.  Further, this document complies with the typeface
    requirements of Rule 32(a)(5) and the type-style
    requirements of Rule 32(a)(6) because it has been prepared
    in Microsoft Word 2016 using twelve-point Courier New, a
    monospaced typeface.

                            /s/ Michael G. James
                            MICHAEL G. JAMES
                            Assistant United States Attorney


CERTIFICATE OF SERVICE

    I hereby certify that on March 14, 2018, I electronically

filed the foregoing with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following

registered CM/ECF user(s):

        Jaclyn L. DiLauro
        Assistant Federal Public Defender
        Office of the Federal Public Defender


                            /s/ Michael G. James
                            MICHAEL G. JAMES
                            Assistant United States Attorney